UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| LIFE CARE ST. JOHNS, INC.,<br>a Florida not-for-profit corporation,<br>doing business as GLENMOOR,[1] | ) | Case No.: 3:16-bk-1347 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |

## MOTION FOR INTERIM AND FINAL ORDERS
## AUTHORIZING USE OF CASH COLLATERAL

Life Care St. Johns, Inc. (the "Debtor" or "Glenmoor") hereby moves the Court, pursuant to §§ 105(a), 361, 362, 363(c), 503(b) and 507 of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of interim and final orders authorizing the Debtor to use cash collateral and granting adequate protection with respect thereto. The Debtor also requests that the Court schedule a hearing to approve the relief requested herein on a final basis (the "Final Hearing") and grant certain related relief and respectfully states as follows:

### Background

1.     Glenmoor is a not-for-profit organization that owns and operates a continuing care retirement community ("CCRC") in St. Johns County, Florida.    The

---

[1] The Federal Employer Identification Number of the Debtor is 59-3474627. The principal address of the Debtor is 235 Towerview Drive, St. Augustine, Florida 32092.

company received its certificate of occupancy in 1999 and began operations in October of 2001.

2.      As a CCRC, Glenmoore provides "lifecare services" to its residents, each of whom reside in a residential unit.    The "lifecare" concept recognizes that the healthcare and residency needs of elderly residents vary along a continuum beginning with independent living and in many cases ending with a need for full-time nursing care. The Glenmoor community thus includes independent residential units, an assisted living center, and a healthcare center for residents requiring round the clock nursing care.

3.      Residency at Glenmoor is provided pursuant to "Residence and Care Contracts" which require prospective residents to pay an "Entrance Fee" and a "Monthly Service Fee."   The Entrance Fee is a lump sum, one-time payment based on the type of Residential Unit occupied by the resident, and obligates Glenmoor to provide care to the resident so long as he or she remains a resident.   Depending upon the type of contract selected, the Entrance Fee may or may not be refundable.   For residents with refundable Entrance Fee contracts, the refund is to be paid from the proceeds of the next Entrance Fee received by Glenmoor.

4.      Unfortunately, the economic recession which began in late 2007 had a dramatic impact on Glenmoor, with fewer residents being able to afford the required Entrance Fees as their home equity and investments portfolios shrank in value.   With fewer new residents entering the community than were moving out, significant Entrance Fee refund liabilities began to accumulate, rising to almost $8 million at their peak (the "Refund Queue").   The decreasing revenues eventually led to payment and other defaults under the $55,555,000 Series 2006A Fixed Rate Health Care Revenue Bonds and $4,000,000 Series 2006B Adjustable Rate Health Care Revenue Bonds (collectively, the

2

(the "2006 Bonds"), which were issued to support Glenmoor and refinance an earlier bond issue.

5.     The defaults under the 2006 Bonds and the accumulation of the Refund Queue were of obvious concern to Florida's Office of Insurance Regulation (the "OIR"), the government entity that governs the licensing and operations of CCRCs in Florida, which threatened enforcement action in 2013 if the payment defaults and refund liabilities were not addressed in a timely fashion.

6.     With pressure mounting from each of these angles, Glenmoor sought relief under Chapter 11 of the Bankruptcy Code on July 3, 2013, which Chapter 11 case was styled as *In re Life Care St. Johns, Inc.*, debtor; United States Bankruptcy Court, Middle District of Florida, Jacksonville Division; Case No. 3:13-bk-4158-JAF (the "Initial Chapter 11 Case").

7.     During the course of the Initial Chapter 11 Case, Glenmoor worked closely with its creditor constituency and together they developed a consensual reorganization embodied in a Plan of Reorganization filed November 27, 2013 (the "Plan").   Among other things, the Plan contemplated a restructuring of Glenmoor's indebtedness through (i) the exchange of the 2006 Bonds for new Health Care Refunding Revenue Bonds (Glenmoor Project), Series 2014A (the "Series 2014A Bonds")  and Subordinate Health Care Refunding Revenue Bonds (Glenmoor Project), Series 2014B (the "Series 2014B Bonds"); (ii) formation of Refund Queue Claim Holders' Distribution Trust for the benefit of prepetition Entrance Fee refund claimants and issuance of promissory notes in favor of the Refund Queue Claim Holders' Distribution Trust; and (iii) establishment of a "Distribution Waterfall" governing the use and expenditure of operating and other post-confirmation income.

3

8.   Glenmoor's Plan was confirmed by this Court on February 28, 2014, and the Final Decree was entered on April 6, 2016.

9.   In accordance with Plan, the St. Johns County Industrial Development Authority (the "Issuer") issued the (a) Series 2014A Bonds in the amount of $41,711,250 and (b) the Series 2014B Bonds in the amount of $15,434,643.75 (collectively, the "Bonds") upon the terms and for the purposes set forth in that certain Bond Trust Indenture, dated as of April 1, 2014 (the "Bond Trust Indenture") by and between the Issuer and UMB Bank, National Association (the "Bond Trustee"), in its capacity as indenture trustee.

10.   In addition, in connection with the Plan, a certain Loan Agreement, dated as of April 1, 2014 (the "Loan Agreement"), was executed by and between the Debtor and the Issuer.

11.   In connection with the Bonds, the Debtor granted to the Bond Trustee (i) a mortgage on certain real and personal property pursuant to the Series 2014A Mortgage, Security Agreement and Fixture Filing Statement dated as of April 16, 2014 (the "Mortgage"), and (ii) a security interest in the accounts and Gross Revenues[2] of the Debtor (pursuant to, and as more fully described in, the Master Trust Indenture dated as of April 1, 2014 by and between the Bond Trustee (as Master Trustee) and the Debtor (the "Master Trust Indenture") (and together with the Bond Trust Indenture, the Loan Agreement, the Mortgage and all other documents related thereto and to the Bonds, the "Bond Documents").

---

[2] Unless otherwise indicated, any capitalized terms not defined herein shall have the same meaning ascribed to them in the Bond Documents.

4

12.    Pursuant to these grants, as security for the Series 2014A Bonds, the Bond Trustee holds first priority liens on and security interests in substantially all assets of the Debtor (as more particularly described in the Bond Documents, the "Pre-Petition Bond Collateral"), except for (a) certain funds held by TD Bank, National Association, as escrow agent in an "Operating Reserve Fund" (the "ORF") and a "Renewal and Replacement Reserve" (the "R&R Fund") as required by Florida Statute § 651.025, and (b) certain miscellaneous real estate (the "Miscellaneous Real Estate" and together with the Pre-Petition Bond Collateral, the "Pre-Petition Collateral"). To further secure the Series 2014A Bonds, the Debtor granted to the Bond Trustee a second priority lien on the Miscellaneous Real Estate until such time as the Refund Queue Holder A Note (as defined in the Plan) is paid in full, at which time the Series 2014A Bonds shall have a first priority lien on the Miscellaneous Real Estate. To secure the Series 2014B Bonds, the Debtor granted to the Bond Trustee a third priority lien on all assets of the Debtor (except the ORF and R&R Fund) on parity with the Refund Queue Holder B Note (as defined in the Plan).

13.    In addition to the foregoing, the Bond Trust Indenture established various funds to be held by the Bond Trustee (the "Bond Trustee Funds"), including a Debt Service Reserve Fund. As of the Petition Date, the balance of the Bond Trustee Funds held by the Bond Trustee was approximately $1,404,232.17. The Debtor acknowledges and agrees, based upon the terms of the Bond Documents, that the Bond Trustee Funds are held in trust for the holders of the Bonds and are neither property of the Debtor's bankruptcy estate nor cash collateral of the Bond Trustee under section 363 of the Bankruptcy Code.

14.    As of the Petition Date, the amounts due and owing by the Debtor with respect to the Bonds are as follows (collectively, the "Bond Claim"):

a.    With respect to the Series 2014A Bonds (the "Series 2014A Bond Claim"): (1) unpaid principal in the amount of $41,711,250.00; and (2) accrued but unpaid interest in the amount of $622,772.14 as of April 11, 2016, which interest continues to accrue at a per diem rate of $6,227.72;

b.    With respect to the Series 2014B Bonds (the "Series 2014B Bond Claim"): (1) unpaid principal in the amount of $16,104,149.21; and (2) accrued but unpaid interest in the amount of $111,834.37 as of April 11, 2016, which interest continues to accrue at a per diem rate of $1,118.34; and

c.    Unliquidated, accrued and unpaid fees and expenses of the Bond Trustee and its professionals incurred through the petition date in connection with the Bonds.

15.    In accordance with the Plan, the Debtor executed and delivered to U.S. Bank National Association, in its capacity as trustee (the "Refund Queue Trustee") under that certain Refund Queue Claim Holders' Distribution Trust agreement dated as of April 1, 2014 by and among the Refund Queue Trustee, the Committee of Beneficial Interest Holders appointed pursuant to the Plan and the Debtor, the following documents: (a) the Refund Queue Holder A Note in the original principal amount of $4,700,378.40 (the "Refund Queue Holder A Note"); (b) the Refund Queue Holder B Note in the original principal amount of $3,133,588.00 (the "Refund Queue Holder B Note" and together with the Refund Queue Holder A Note, the "Refund Queue Notes"); and (c) certain mortgages and security interests (together with the Refund Queue Notes, the "Refund Queue Documents").    As security for the Refund Queue Holder A Note, the Refund Queue Trustee holds a first priority mortgage and security interest in the Miscellaneous Real Estate and a second priority lien on certain other assets of the Debtor (together with the Miscellaneous Real Estate, and as more particularly described in the Refund Queue

Documents, the "Pre-Petition Refund Queue Collateral").[3]   As security for the Refund Queue Holder B Note, the Refund Queue Trustee holds a third priority lien on the Pre-Petition Refund Queue Collateral.

16.     As of the Petition Date, the amounts due and owing by the Debtor with respect to the Refund Queue Notes are as follows (collectively, the "Refund Queue Claim"):

  a. With respect to the Refund Queue Holder A Note (the "Refund Queue Holder A Claim"): (1) unpaid principal in the amount of $3,911,086.13; and (2) accrued but unpaid interest in the amount of $718,424.28 as of April 11, 2016, which interest continues to accrue at a per diem rate of $1,282.32;

  b. With respect to the Refund Queue Holder B Note (the "Refund Queue Holder B Claim"): (1) unpaid principal in the amount of $3,133,585.60; and (2) accrued but unpaid interest in the amount of $159,030.64 as of April 11, 2016, which interest continues to accrue at a per diem rate of $224.91; and

  c. unliquidated, accrued and unpaid fees and expenses of the Refund Queue Trustee and its professionals incurred through the Petition Date in connection with the Refund Queue Notes.

17.     Following the Effective Date of the Plan, although Glenmoor's post-confirmation operational performance was consistent with the Plan, Glenmoor's post-confirmation refund obligations exceeded the actuarial projections supporting the Plan due to unexpected move-outs.   While Entrance Fees from residents moving into Glenmoor have been sufficient to offset the refund liabilities, there were no surplus revenues from the new entries sufficient to fully fund the Distribution Waterfall. Glenmoor was thus unable to fulfill its financial commitments under the Plan and defaulted on payments due under the Loan Agreement and Refund Queue Holder A Note.

---

[3] The Pre-Petition Refund Queue Collateral does not include the ORF and R&R Fund.

18.     Following the defaults, Glenmoor met with the Bond Trustee and the Refund Queue Oversight Committee to discuss potential solutions.    Through such negotiations, it was decided that an affiliation with a national operator of CCRCs or an outright sale of Glenmoor's assets was preferable to the constant renegotiation and restructuring of Glenmoor's debt.    To that end, Glenmoor entered into a Forbearance Agreement with the Bond Trustee and a Restructuring Agreement with the Refund Queue Trustee which established a timetable and structure for the agreed upon affiliation or sales process.    The Forbearance Agreement and the Restructuring Agreement were approved by the Court in the Initial Chapter 11 Case on July 20, 2015.

19.     In accordance with the Forbearance and Restructuring Agreements, Glenmoor retained the advisory services of DTZ Senior Housing Group ("DTZ") as an investment banker to administer the affiliation and sale process.[4]    DTZ in turn solicited offers from over 100 industry prospects, with a number of prospective purchasers ultimately submitting letters of intent to acquire Glenmoor's assets.    After vetting the various offers with the Bond Trustee, LCS Glenmoor, LLC ("LCS") was selected as the Stalking Horse purchaser of Glenmoor's assets.

20.     Thereafter, an Asset Purchase Agreement governing the terms under which Glenmoor would sell the Facility and substantially all assets relating to the operation of the Facility (the "Purchased Assets"), and LCS would purchase such assets, was entered into on March 21 2016, and a separate asset purchase agreement ("the Real Estate Purchase Agreement") governing the terms under which Glenmoor would sell the Miscellaneous Real Estate, and LCS would purchase the Miscellaneous Real Estate, was entered into on that same day.    Among other things, the Asset Purchase Agreement

contemplates the assumption of all active Residence and Care Contracts and refund liabilities arising after February 28, 2014, and payment of all trade debt owed by Glenmoor on the date of sale – including prepetition trade debt, up to a cap of $150,000. Due to jurisdictional concerns regarding the Court's authority to conduct a post-confirmation sale, however, it was necessary for Glenmoor to commence a second Chapter 11 case to obtain approval of the proposed transactions. This Chapter 11 case was therefore filed to facilitate that process.

21.     During the sale process, the Debtor requires the use of cash collateral to preserve the value of its business. As set forth above, the Bonds and the Refund Queue Notes are secured by substantially all of the Debtor's real and personal property, including the Debtor's deposit accounts, cash and cash proceeds. Without the use of this cash collateral, the Debtor would suffer irreparable and immediate harm and would likely disrupt Debtor's business as a going concern, and would significantly decrease the likelihood of the sale of the Debtor's assets. The Debtor acknowledges the requirement under the Bankruptcy Code for it to provide adequate protection to the Bond Trustee and the Refund Queue Trustee in respect of the Debtor's use of cash collateral. The Bond Trustee has informed the Debtor, however, that it does not consent to the use of cash collateral unless certain provisions are provided for in the interim and the final orders authorizing the use of cash collateral.

## Use of Cash Collateral

22.     Attached hereto as **Exhibit A** is a cash budget (the "Cash Collateral Budget") reflecting the Debtor's anticipated revenues and expenses for the first two

---

[4] DTZ is now known as Cushman & Wakefield.

weeks of the administration of this Chapter 11 case. The expenses reflected in the Cash Collateral Budget primarily represent amounts necessary to continue Glenmoor's high quality of care, protect residents and preserve existing standards of health and human services.

**<u>Relief Requested</u>**

23.    Debtor seeks authority to use the cash collateral in accordance with the Cash Collateral Budget to pay postpetition expenses of maintaining and preserving Glenmoor, providing care and services to residents pursuant to the Resident Care Contracts and to administer the Chapter 11 case. As noted above, Debtor's requested use of cash collateral is necessary to continue Glenmoor's high quality of care and should be authorized for the reasons set forth below. Specifically, and pending the entry of a final order authorizing the Debtor to use the Cash Collateral (as defined below), the Debtor requests that the Court enter an interim cash collateral order: (a) authorizing the Debtor to use the cash collateral on the terms contained therein; (b) granting the Bond Trustee and the Refund Queue Trustee adequate protection with respect thereto; (c) approving the proposed form and method of notice of the Final Hearing; (d) scheduling the Final Hearing; and (e) granting related relief.

24.    The Bond Trustee and the Refund Queue Trustee are entitled to adequate protection against any diminution in value of the Cash Collateral pursuant to Bankruptcy Code §§ 361 and 363(e). The Debtor thus proposes, and the Bond Trustee and Refund Queue Trustee agree, that the Court enter an order approving the use of cash collateral in

substantially the form attached hereto as **Exhibit B**. The relief provided in the proposed order can be summarized as follows:[5]

    a.    <u>Term</u>. Pursuant to the terms and conditions of the cash collateral order, the Debtor is authorized to use as cash collateral any Gross Revenues derived by the Debtor in the ordinary course of its business (the "Cash Collateral"), for the period from the date of entry of the interim order through the termination date (the "Interim Period").

    b.    <u>Cash Collateral Budget</u>. The Debtor shall not, without the prior written consent of the Bond Trustee, use cash collateral with respect to the payment of any expenses that would cause the aggregate expenditures to exceed either of (x) one hundred ten percent (110%) of the total budgeted expenses for that same period or (y) one hundred twenty percent (120%) of the amount budgeted for that same line item for that same period, exclusive of professional fees which shall not be entitled to any variance (each comparison period, a "Measuring Period"). This variance shall be measured, on a rolling four (4) week basis; provided however, that, for purposes of calculating such variances, (i) the first Measuring Period shall be the two weeks after the Petition Date and the first week of the Cash Collateral Budget, and (ii) the second Measuring Period shall be the second week after the Petition Date and the first two weeks of the Cash Collateral Budget, a copy of which is attached hereto as **Exhibit A**. Such cash collateral shall be used solely to pay expenses and other amounts listed in the Cash Collateral Budget. Expenditures, other than legal or other professional fees, may be paid in an earlier period in the reasonable discretion of the Debtor, in which event, the Cash Collateral Budget shall be deemed amended to move the expenditure into the week of the actual expenditure for the purpose of calculating rolling four week variances set forth above. The Debtor will provide a written explanation in reasonable detail explaining the amount of and the reason for the prepayment or delay in payment. In accordance with the Master Trust Indenture, the Debtor's Gross Revenues shall continue to be deposited on a daily basis into the Gross Revenue Fund maintained by the Bond Trustee under the terms of the Master Trust Indenture, and on the first business day of each calendar month, pursuant to the terms of the Master Trust Indenture, the Bond Trustee shall advance funds from the Gross Revenue Fund to the Debtor based on 110% of the projected amount of Operating Expenses for the upcoming month as set forth in the Cash Collateral Budget, less any funds previously advanced by the Bond Trustee and remaining in the Debtor's operating account at the time of the advance.

---

[5] This summary of the cash collateral orders is qualified in its entirety by the orders themselves. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the proposed orders.

c.    Prohibited Use of Cash Collateral.  Debtor shall not use Cash Collateral or the proceeds thereof for the purpose of (a) objecting to, or contesting in any manner, or raising any defense to, the validity, amount, extent, perfection, priority, or enforceability of the Bonds, the Pre-Petition Collateral, the Bond Claim or any liens or security interests with respect thereto, or any other rights or interests of the Bond Trustee; (b) objecting to, or contesting in any manner, or raising any defense to, the validity, amount, extent, perfection, priority, or enforceability of the Refund Queue Notes, the Pre-Petition Refund Queue Collateral, the Refund Queue Claim or any liens or security interests with respect thereto, or any other rights or interests of the Refund Queue Trustee; (c) asserting any claims, defenses or causes of action against the Bond Trustee or any holder of the Bonds or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, including with respect to payments made pursuant to the Bond Documents; (d) asserting any claims or defenses or causes of action against the Refund Queue Trustee or any Beneficial Interest Holder or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, including with respect to payments made pursuant to the Refund Queue Documents; (e) seeking to modify any of the rights granted to the Bond Trustee or the Refund Queue Trustee under the terms of the cash collateral orders; (f) seeking to bifurcate any claims of the Bond Trustee or the Refund Queue Trustee; (g) paying any amounts not included in the Cash Collateral Budget; or (h) paying any amounts on account of claims arising before the Petition Date, except to the extent provided for in the Cash Collateral Budget and approved by the Court.

d.    Amendment of Extension of Use of Cash Collateral.  The Debtor may, at any time, propose to the Bond Trustee in writing (including by email) an amended budget, either for the period covered by the Cash Collateral Budget or for any period thereafter.  The amended budget shall become the Cash Collateral Budget upon the Bond Trustee's written consent (which may be supplied to the Debtor by email).  At such time as the amended budget becomes the Cash Collateral Budget, the Debtor shall file a copy thereof with the Court and serve it upon all parties entitled to notice in accordance with Bankruptcy Rule 4001(b).  The Debtor shall also be permitted to seek other or further use of cash collateral by filing a motion with the Court, which motion shall include a budget for the period proposed for use of such cash collateral, and the Bond Trustee and the Refund Queue Trustee reserve all rights to object to such motion.

e.    Adequate Protection.  As adequate protection against any diminution in value of the Cash Collateral and other Pre-Petition Collateral and Pre-Petition Refund Queue Collateral as a result of the use of Cash Collateral, the Bond Trustee, for the ratable benefit of the bondholders, and the

Refund Queue Trustee, for the benefit of the Beneficial Interest Holders, will receive the following:

i.    <u>Rollover Lien</u>.  As adequate protection for any diminution in the value of Cash Collateral and other Pre-Petition Collateral and Pre-Petition Refund Queue Collateral resulting from the Debtor's use thereof after the Petition Date ("Diminution"), the Bond Trustee and the Refund Queue Trustee shall continue to have a valid, perfected and enforceable continuing replacement lien and security interest (the "Rollover Lien") in all assets of the Debtor existing on or after the Petition Date of the same type as the Pre-Petition Collateral and Pre-Petition Refund Queue Collateral, together with the proceeds, rents, products and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability and priority of the respective liens and security interests of the Bond Trustee and Refund Queue Trustee as of the Petition Date (the "Post-Petition Collateral"). Neither the Bond Trustee nor the Refund Queue Trustee shall have a Rollover Lien on the ORF or the R&R Fund.  The Rollover Lien shall be subject to only prior valid and perfected liens, if any, existing as of the Petition Date with priority over the liens of the Bond Trustee and Refund Queue Trustee, as applicable, and to the Carve-Out.  The Rollover Lien shall be limited to the amount of any Diminution;

ii.    <u>Supplemental Lien</u>.  As additional adequate protection for any Diminution, the Bond Trustee and the Refund Queue Trustee shall have a valid, perfected and enforceable continuing supplemental lien and security interest (the "<u>Supplemental Lien</u>") in all of the assets of the Debtor of any kind or nature whatsoever within the meaning of § 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof (the "Supplemental Collateral" and, collectively with the "Post-Petition Collateral," the "Collateral"), to the same extent, validity, perfection, enforceability and priority of the respective liens and security interests of the Bond Trustee and the Refund Queue Trustee as of the Petition Date.  Neither the Bond Trustee nor the Refund Queue Trustee shall have a Supplemental Lien on the ORF or the R&R Fund.   The Supplemental Lien shall be subject to only prior valid and perfected liens, if any, existing as of the Petition Date;

iii.    <u>Superpriority Claim</u>.  As additional adequate protection for any Diminution, the Bond Trustee and the Refund Queue Trustee shall have superpriority administrative expense claims pursuant to § 507(b) of the Bankruptcy Code, with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of the Debtor, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual which for any

reason cannot not be made the subject of the Rollover Lien or Supplemental Lien (the "Secured Party Superpriority Claims"). The Secured Party Superpriority Claims shall be subject to only prior valid and perfected liens existing on the Petition Date and shall have priority over any and all administrative expenses, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in §§ 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any successor trustee or any creditor in this Chapter 11 Case or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject to the Carve-Out; and

iv.   Bankruptcy Transaction Milestones.   As further adequate protection against Diminution, Debtor shall comply with the following Bankruptcy Transaction milestones (the "Milestones"), unless excused by the Bond Trustee or by an order of this Court, on notice to and with the opportunity to be heard by the Bond Trustee and the Refund Queue Trustee:

i.   on the Petition Date, the Debtor shall file (1) a motion that seeks entry of an order approving, among other things, (A) the Debtor's request to sell, transfer and assign, as applicable, the Facility and substantially all assets relating to the operation of the Facility (the "Assets"), pursuant to an asset purchase agreement with a stalking horse purchaser (the "Proposed Sale"); and (B) approval of bidding procedures related to the Proposed Sale (the "Bidding Procedures"), which shall be acceptable to the Bond Trustee and the majority of the holders of the Bonds; and (2) a motion that seeks entry of an order approving, among other things, (A) the Debtor's request to sell the Miscellaneous Real Estate, pursuant to an asset purchase agreement with a stalking horse purchaser (the "Proposed Real Estate Sale"); and (B) approval of bidding procedures related to the Proposed Real Estate Sale (the "Real Estate Bidding Procedures").

ii.   on or before the date that is three (3) days after the Petition Date, the Debtor shall file a Chapter 11 plan (the "Consensual Plan") and accompanying disclosure

statement (the "Disclosure Statement"), which shall be acceptable to the Bond Trustee and the majority of the holders of the Bonds;

ii. on or before the date that is four (4) days after the Petition Date, the Court shall have entered an order approving the Bidding Procedures;

iii. on or before the date that is forty-five (45) days after the Petition Date, the Court shall have entered an order approving the Disclosure Statement as providing adequate information (the "Disclosure Statement Order");

iv. on or before June 1, 2016, any counter bids for the Assets and the Miscellaneous Real Estate shall be due;

v. on or before June 3, 2016, auctions of the Assets and the Miscellaneous Real Estate shall be held;

vi. on or before the date that is sixty (60) days after the Petition Date, the Court shall have entered orders approving the Proposed Sale (the "Sale Order") and the Proposed Real Estate Sale (the "Real Estate Sale Order");

vii. on or before the date that is forty-five (45) days after the date the Court enters the Disclosure Statement Order, the Court shall have entered an order confirming the Consensual Plan; and

viii. on or before the date that is sixty (60) days after the date the Court enters the Sale Order and the Real Estate Sale Order, the Proposed Sale and the Proposed Real Estate Sale shall have been consummated.

f. <u>No Offsets or Recoupment</u>. No Cash Collateral or prepetition obligations shall be subject to any right of offset or recoupment by arising prior to the Petition Date.

g. <u>Status of Adequate Protection Liens</u>. The adequate protection liens set forth in the Interim Order shall be in addition to all other rights of the Bond Trustee and/or the Refund Queue Trustee, including the Bond Trustee's or the Refund Queue Trustee's respective liens and security interests in the Pre-Petition Collateral and the Pre-Petition Refund Queue Collateral. The Rollover Liens and the Supplemental Liens shall not be subject or subordinate to (i) any liens arising after the Petition Date except for any liens or security interests in favor of any federal, state, municipal or other government unit, commission, board or court for any tax liability of the Debtor, whether secured or unsecured, including property taxes for which liability is *in rem*, *in personam*, or both and a tax of a kind specified

15

in § 507(a)(8) of the Bankruptcy Code, or (ii) any intercompany or affiliate liens of the Debtor, or subordinated to or made *pari passu* with any other lien or security interest under §§ 363 or 364 of the Bankruptcy Code or otherwise.

h.  <u>Termination of Use of Cash Collateral Without Prior Notice</u>.  The Debtor's authority to use Cash Collateral hereunder shall terminate without any further action by this Court and a Termination Event shall occur without prior notice upon the occurrence of any of the following (a "Termination Event"):

   i.  the Debtor's Chapter 11 case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

   ii.  the earlier of (y) the date of the entry of an order of this Court appointing a Chapter 11 trustee or an examiner with enlarged powers (beyond those set forth in §§ 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code) for the Debtor; or (z) the date the Debtor files a motion, application or other pleading consenting to or acquiescing in any such appointment;

   iii.  this Court suspends the Debtor's Chapter 11 Case under § 305 of the Bankruptcy Code;

   iv.  the interim order authorizing use of Cash Collateral becomes stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the Bond Trustee and the Refund Queue Trustee;

   v.  an order is entered in the Chapter 11 Case over the objection of the Bond Trustee and/or the Refund Queue Trustee approving financing pursuant to § 364 that would grant an additional security interest or a lien on any Collateral or granting a superpriority administrative claim that is equal or superior to the superpriority administrative claims granted to the Bond Trustee and the Refund Queue Trustee under an interim order authorizing use of cash collateral;

   vi.  an adversary proceeding or contested matter is commenced by the Debtor challenging the amount, validity, enforceability, priority or extent of the liens, security interests or claims of the Bond Trustee and/or the Refund Queue Trustee; or

   vii.  the Court fails to enter a final order on the Motion, on terms acceptable to the Bond Trustee or substantially

16

modifies the protections granted to the Refund Queue Trustee in the interim order, on or before April 30, 2016.

i.    Section 363(m) Protection.  The Bond Trustee and the Refund Queue Trustee shall be entitled to the full protections of § 363(m) of the Bankruptcy Code with respect to the adequate protection liens and all other adequate protection created or authorized by the cash collateral order in the event that the order or any authorization contained therein is stayed, vacated, reversed or modified on appeal. Any stay, modification, reversal, or vacation of the cash collateral order shall not affect the validity of any obligation of the Debtor to the Bond Trustee and the Refund Queue Trustee, incurred pursuant to the cash collateral order.

25.    Section 363(e) of the Bankruptcy Code provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest . . . " Section 363(c)(2) contemplates that the Court may authorize the Debtor to use the Cash Collateral with or without the consent of the secured parties with an interest therein. *See* 11 U.S.C. § 363(c)(2)(B).  In considering whether to authorize use of cash collateral, however, a court must find that the interests of the holders of the secured claims are adequately protected.  11 U.S.C. § 363(e).  The principal purpose of adequate protection is to safeguard the interests of the secured creditor in the particular collateral against diminution in the value of such collateral.  *See, e.g.*, *In re Continental Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993) (noting that all forms of adequate protection are designed to protect secured creditors from diminution in the value of their collateral).  As noted above, courts may require adequate protection in circumstances where the secured creditor does not consent.  *See, e.g.*, *In re Westport-Sandpiper Assocs. Ltd. P'ship*, 116 B.R. 355, 357 (Bankr. D. Conn. 1990).

26.     Courts have held that adequate protection may be demonstrated by a showing that use of cash collateral maintains the value of a secured lender's collateral. *See, e.g.*, *Principal Mut. Life Ins. Co. v. Atrium Dev. Co. (In re Atrium Dev. Co.)*, 159 B.R. 464, 470 (Bankr. E.D. Va. 1993) ("Adequate protection is typically established by the fact that cash is being used to maintain and enhance the value of the underlying income producing real property in which the creditor also usually holds a security interest"); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral).

27.     As the Debtor will establish at the hearing on this motion, the Debtor's proposed use of the Cash Collateral will preserve, to the extent possible, the value of the Collateral by providing funds, among other things, to maintain, insure and secure the property, as well as provide funds for daily operations. The Bond Trustee and the Refund Queue Trustee will be further adequately protected because the Cash Collateral Budget will ensure that the Debtor will use cash only for these purposes as well as for the administration of the Chapter 11 case.

28.     Under Bankruptcy Code § 361, adequate protection may be provided by, among other things, periodic cash payments, granting a lienholder an additional or replacement lien and granting other relief to the extent that the usage of the cash collateral results in a decrease in the value of such entity's interest in such property. As discussed above, the proposed interim and final cash collateral orders provide the adequate protection liens to ensure that the Bond Trustee and Refund Queue Trustee continue to have liens on the collateral with the same priority as their respective pre-petition liens. In addition, in accordance with Bankruptcy Code §§ 503(b) and 507(b),

the proposed cash collateral orders provide for the Superpriority Claims with priority over all other administrative claims.

29.    For all the foregoing reasons, the Debtor submits that the terms of the interim and final cash collateral orders are reasonable and beneficial to the Debtor's estate, creditors and parties in interest.  The cash collateral orders will permit the Debtor to protect and preserve the continuing operation of Glenmoor and the care of residents. Moreover, the cash collateral orders' provisions for adequate protection of the respective interests of the Bond Trustee and the Refund Queue Trustee in the Cash Collateral are fair and reasonable under the circumstances of this case.

### Request for Authority to Use Cash Collateral Immediately

30.    Bankruptcy Rule 4001(b) provides that a final hearing on a motion for authorization to use cash collateral pursuant to Bankruptcy Code § 363 may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.  Pursuant to Bankruptcy Rule 4001(b), the Debtor requests that the Court conduct an interim hearing and authorize the Debtor to use, on an interim basis, the Cash Collateral in accordance with the Cash Collateral Budget and the terms and provisions of the cash collateral orders.

31.    As noted above, the Cash Collateral is the primary source of funds available to the Debtor, and the Debtor will be unable to maintain and operate Glenmoor and administer the Chapter 11 case unless the Court authorizes interim use of the Cash Collateral.  Therefore, the Debtor requests that the Court enter a cash collateral order

authorizing the Debtor's use of the Cash Collateral in accordance with the Cash Collateral Budget until a final determination is made on this motion.

## Request for a Final Hearing and Waiver of Stay

32.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor respectfully requests that the Court set a date for the Final Hearing that is no later than 20 days from the Petition Date and approve the provisions for notice and the objection procedures set forth in the proposed interim cash collateral order.

33.     The Debtor further requests a waiver of any stay of the effectiveness of the interim cash collateral order.  As set forth above, immediate use of Cash Collateral is essential to prevent potentially irreparable damage to the Debtor's estate.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

**THAMES MARKEY & HEEKIN, P.A.**

*/s/ Richard R. Thames*
By _____
          Richard R. Thames
          Bradley R. Markey

Florida Bar Number 0718459
Florida Bar Number 0984213
50 North Laura Street, Suite 1600
Jacksonville, Florida  32202
(904) 358-4000
(904) 358-4001 (Facsimile)
rrt@tmhlaw.net
brm@tmhlaw.net

Proposed Attorneys for Life Care St. Johns, Inc., a Florida not-for-profit corporation, doing business as Glenmoor

6.4

## Exhibit "A"

### Budget

DRAFT FOR DISCUSSION

Life Care St. John's, Inc. d/b/a Glenmoor
Forecasted Weekly Cash Budget
As of April 07, 2016

| | Projected WE 4/8 | Projected WE 4/16 | Projected WE 4/23 | Projected WE 4/30 | Projected WE 5/7 | Projected WE 5/14 | Projected WE 5/21 | Projected WE 5/28 | Projected WE 6/4 | Projected WE 6/11 | Projected WE 6/18 | Projected WE 6/25 | Projected WE 7/2 | Projected WE 7/9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | |
| Medicare A | $ - | $ 654,613 | $ 26,500 | $ 78,660 | $ 105,360 | $ 614,600 | $ 26,500 | $ 79,020 | $ 79,020 | $ 35,040 | $ 613,200 | $ 26,500 | $ 35,280 | $ 26,500 |
| Private Pay | 56,907 | | 78,660 | | | | 79,020 | | | | | 157,680 | | 70,560 |
| Co-Insurance | 1,709 | | 2,791 | | | 1,000 | 4,500 | | | | | 4,500 | | |
| Other | 314 | 686 | | | | | | | | | 1,000 | | | |
| **Total Cash Receipts** | 60,090 | 659,299 | 107,951 | 78,660 | 105,360 | 815,650 | 110,020 | 79,020 | 35,040 | 70,080 | 614,200 | 188,680 | 35,280 | 70,560 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| General & Administrative | 21,750 | 20,000 | 5,000 | 5,000 | 20,200 | 20,000 | 5,000 | 5,000 | 15,000 | 5,000 | 20,000 | 5,000 | 17,750 | 5,000 |
| Marketing | 5,000 | 5,000 | 5,000 | 5,000 | 2,750 | 2,750 | 5,000 | 6,500 | 6,500 | 8,250 | 6,500 | 2,750 | 2,750 | 2,750 |
| Plant Operations | 32,550 | 20,000 | 20,000 | 20,000 | 16,150 | 20,000 | 20,000 | 20,000 | 15,800 | 20,000 | 20,000 | 20,000 | 26,675 | 20,000 |
| Apartment Refurbishments - Non Capital | 4,200 | | | | 4,200 | | | | 4,200 | | | | 4,200 | |
| Capital Improvements - Routine | 5,000 | 5,000 | | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | 5,000 | 5,000 | 5,000 | |
| Dining Services | 18,500 | 18,500 | 18,500 | 18,500 | 17,500 | 17,500 | 17,500 | 17,500 | 18,500 | 18,500 | 18,500 | 18,500 | 17,500 | 17,500 |
| Health Services | | | | | | | | | | | | | | |
| Health Center | 15,000 | 2,500 | 2,500 | 2,500 | 15,000 | 2,500 | 2,500 | 2,500 | 15,000 | 2,500 | 2,500 | 2,500 | 15,000 | 2,500 |
| Home Health | 1,000 | 27,000 | 27,000 | 27,000 | 1,000 | 27,000 | 1,000 | 27,000 | 1,000 | 27,000 | 27,000 | 27,000 | 1,000 | 27,000 |
| Payroll, Payroll Taxes & 403b | 1,600 | 161,500 | 161,500 | 161,500 | | 161,500 | 161,500 | 161,500 | | 161,500 | 161,500 | 161,500 | | 161,500 |
| Benefits | 52,000 | 650 | 650 | 5,600 | 5,600 | 52,000 | 650 | 5,600 | 5,600 | 52,000 | 650 | 5,600 | 5,600 | 52,000 |
| Management Fee | 8,333 | | 8,333 | 8,333 | 8,333 | | 650 | 8,333 | 8,333 | | | 8,333 | 8,333 | |
| Reimbursement to Vicars for LCSJ Operating Costs | | | | | | | | | | | | | | |
| Insurance - WC, Auto, GL/PL | 19,950 | | 20,000 | 20,000 | 19,950 | | 20,000 | 20,000 | 19,950 | | 20,000 | 20,000 | 19,950 | |
| Health Services - Shared Labor | 5,000 | | 5,000 | 5,000 | 5,000 | | 5,000 | 5,000 | 5,000 | | 5,000 | 5,000 | 5,000 | 5,000 |
| IT Services | 300 | | 300 | 300 | 300 | | 300 | 300 | 300 | | 300 | 300 | 300 | 300 |
| Employee Benefits | | | | | | | | | | | | | | |
| Other - auto fuel, Verizon, administrative | 3,625 | | 3,625 | 3,625 | | | 3,625 | | | | 3,625 | | | |
| Insurance | | | | | | | | | | | | | | |
| Flood | | | | | | | | | | | | | | |
| Crime | | | | | | | | | | | | | | |
| Utilities | 48,905 | | 48,905 | 48,905 | | | 49,405 | 49,405 | | 10,000 | | 49,405 | 49,405 | |
| Chapter 11 Professional Expenses | | | | | | | | | | | | | | |
| Quarterly US Trustee Fees | | | | | | | | | | | | | | |
| Legal Counsel to Debtor - TMAH | | | 80,000 | | | | 50,000 | | | | | 50,000 | | |
| Regulatory Counsel to Debtor - Holland & Knight | | | | | | | | | | | | | | |
| Operations Consultant to Debtor - Greystone | 11,000 | | 7,500 | 11,000 | | | 5,000 | | 11,000 | | | | | |
| Noticing Agent - American Legal Claims Services | | | 14,000 | | 11,000 | | | 10,500 | | 11,000 | | 10,500 | | |
| Voting Agent - Globic Advisors, Inc | | | | | | | 10,000 | | | | | | | |
| Capital Improvements | | | | | | | | | | | | | | |
| Apartment Refurbishments | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| HOA & Commercial Property Dues | 48,000 | | | | | | | | | | | | 48,000 | |
| **Total Cash Disbursements** | 258,183 | 286,150 | 74,500 | 439,080 | 140,983 | 334,250 | 281,350 | 38,120 | 416,330 | 140,183 | 335,750 | 91,650 | 349,175 | 253,183 |
| **Net Cash Flow from Operations** | (198,093) | 373,149 | 33,451 | (360,420) | (35,623) | 281,350 | (38,120) | 38,120 | (337,310) | (105,143) | (265,670) | 522,550 | (160,495) | (237,690) |
| **Cash Rollforward** | | | | | | | | | | | | | | |
| Beginning Cash | 1,863,625 | 1,665,532 | 2,038,681 | 2,072,132 | 1,711,712 | 1,676,089 | 1,957,439 | 1,995,559 | 1,658,249 | 1,553,106 | 1,287,436 | 1,809,986 | 1,649,491 | 1,431,608 |
| Cash Increase (Decrease) | (198,093) | 373,149 | 33,451 | (360,420) | (35,623) | 281,350 | 38,120 | (337,310) | (105,143) | (265,670) | 522,550 | (160,495) | (217,883) | (237,690) |
| Sweep | | | | | | | | | | | | | | |
| **Ending Cash Balance** | $ 1,665,532 | $ 2,038,681 | $ 2,072,132 | $ 1,711,712 | $ 1,676,089 | $ 1,957,439 | $ 1,995,559 | $ 1,658,249 | $ 1,553,106 | $ 1,287,436 | $ 1,809,986 | $ 1,649,491 | $ 1,431,608 | $ 1,193,918 |

Notes
A.  Plant Operations includes costs for building maintenance, housekeeping, security and transportation.
B.  The annual General & Professional Liability (GL/PL) insurance premium of approximately $55,000 will be due during the week ending September 24.

Privileged and Confidential
Tentative and Preliminary
Subject to Material Change

DRAFT FOR DISCUSSION

Life Care St. John's, Inc. d/b/a Glenmoor
Forecasted Weekly Cash Budget
As of April 07, 2016

| | Projected WWE 7/16 | Projected WWE 7/23 | Projected WWE 7/30 | Projected WWE 8/6 | Projected WWE 8/13 | Projected WWE 8/20 | Projected WWE 8/27 | Projected WWE 9/3 | Projected WWE 9/10 | Projected WWE 9/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | |
| Medicare A | 617,400 | 79,380 | 79,380 | 106,800 | 623,000 | 80,100 | 80,100 | 106,800 | 623,000 | - |
| Private Pay | 26,500 | 26,500 | - | - | - | 80,100 | - | 26,500 | - | 80,100 |
| Co-Insurance | - | 4,500 | - | - | - | 4,500 | - | 4,500 | - | 5,000 |
| Other | 1,000 | - | - | - | 1,000 | - | - | - | - | 1,000 |
| **Total Cash Receipts** | 618,400 | 110,380 | 79,380 | 106,800 | 624,000 | 111,100 | 80,100 | 133,300 | 623,000 | 81,100 |
| **Cash Disbursements** | | | | | | | | | | |
| General & Administrative | 20,000 | 5,000 | 5,000 | 15,000 | 20,000 | 5,000 | 5,000 | 15,000 | 20,000 | 5,000 |
| Marketing | 2,750 | 4,000 | 4,000 | 4,000 | 4,000 | 7,500 | 7,500 | 7,500 | 7,500 | 5,000 |
| Plant Operations | 20,000 | 20,000 | 20,000 | 18,700 | 20,000 | 20,000 | 20,000 | 15,800 | 20,000 | 20,000 |
| Apartment Refurbishments - Non Capital | | | | 4,200 | | | | 4,200 | | |
| Capital Improvements - Routine | 5,000 | - | - | 5,000 | 5,000 | 5,000 | 5,000 | - | 5,000 | - |
| Dining Services | 17,500 | 17,500 | 17,500 | 18,500 | 18,500 | 18,500 | 18,500 | 17,500 | 17,500 | 17,500 |
| Health Services | | | | | | | | | | |
| Health Center | - | 2,500 | - | 15,000 | 2,500 | 2,500 | 2,500 | 15,000 | 2,500 | 2,500 |
| Home Health | 1,000 | 27,000 | 1,000 | 27,000 | 1,000 | 1,000 | 1,000 | 27,000 | 1,000 | 27,000 |
| Payroll, Payroll Taxes & 403b | 161,500 | 161,500 | 161,500 | 161,500 | 161,500 | 161,500 | 161,500 | 161,500 | 52,000 | 161,500 |
| Benefits | 650 | 2,500 | 5,600 | 52,000 | 650 | 2,500 | | 8,333 | 52,000 | 650 |
| Management Fee | | | 8,333 | 8,333 | | | | | | |
| Reimbursement to VCare for LCSJ Operating Costs | | | | | | | | | | |
| Insurance - W/C, Auto, GL/PL | - | 20,000 | 20,000 | 19,950 | - | 20,000 | - | 19,950 | - | 27,000 |
| Health Services - Shared Labor | | | 5,000 | 5,000 | | | 5,000 | 5,000 | | |
| IT Services | - | - | 300 | 300 | - | - | 300 | 300 | - | - |
| Employee Benefits | - | - | 3,625 | | - | - | 3,625 | | - | - |
| Other - auto fuel, Verizon, admin/other | | | | | | | | | | |
| Insurance | | | | | | | | | | |
| Flood | - | 43,000 | - | - | - | - | - | - | - | - |
| Crime | - | 1,000 | - | - | - | - | - | - | - | - |
| Utilities | - | 49,405 | - | - | - | 49,405 | - | - | - | - |
| Chapter 11 Professional Expenses | | | | | | | | | | |
| Quarterly US Trustee Fees | | | | | | | | | | |
| Legal Counsel to Debtor - TMH | 10,400 | | 50,000 | | | 50,000 | | | | |
| Regulatory Counsel to Debtor - Holland & Knight | | | | | | | | | | |
| Operations Consultant to Debtor - Greystone | | | | | | | | | | |
| Noticing Agent - American Legal Claims Services | 11,000 | 10,500 | 10,500 | 11,000 | | | 10,500 | | | 11,000 |
| Voting Agent - Globic Advisors, Inc. | | | | | | | | | | |
| Capital Improvements | | | | | | | | | | |
| Apartment Refurbishments | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| HOA & Commercial Property Dues | | | | | | | | | | |
| **Total Cash Disbursements** | 97,900 | 270,400 | 260,930 | 369,483 | 102,650 | 259,500 | 220,830 | 322,683 | 145,500 | 267,650 |
| **Net Cash Flow from Operations** | 520,500 | (160,020) | (181,550) | (262,683) | 521,350 | (148,400) | (140,730) | (189,383) | 477,500 | (186,550) |
| **Cash Rollforward** | | | | | | | | | | |
| Beginning Cash | 1,193,918 | 1,714,418 | 1,554,398 | 1,372,848 | 1,110,165 | 1,631,515 | 1,483,115 | 1,342,385 | 1,153,002 | 1,630,502 |
| Cash Increase (Decrease) | 520,500 | (160,020) | (181,550) | (262,683) | 521,350 | (148,400) | (140,730) | (189,383) | 477,500 | (186,550) |
| Sweep | | | | | | | | | | |
| **Ending Cash Balance** | $ 1,714,418 | $ 1,554,398 | $ 1,372,848 | $ 1,110,165 | $ 1,631,515 | $ 1,483,115 | $ 1,342,385 | $ 1,153,002 | $ 1,630,502 | $ 1,443,952 |

Notes
A. Plant Operations includes costs for building maintenance, housekeeping, t
B. The annual General & Professional Liability (GL/PL) insurance premium of

Privileged and Confidential
Tentative and Preliminary
Subject to Material Change

**Exhibit "B"**

**Interim Cash Collateral Order**

6.4

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
<u>**JACKSONVILLE DIVISION**</u>

| | | |
|---|---|---|
| In re | ) | |
| LIFE CARE ST. JOHNS, INC., | ) | Case No. |
| a Florida not-for-profit corporation, | | |
| doing business as GLENMOOR,[1] | ) | Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |

<u>**INTERIM ORDER AUTHORIZING USE OF CASH**</u>
<u>**COLLATERAL AND PROVIDING ADEQUATE PROTECTION**</u>

This Interim Order Regarding Use of Cash Collateral and Adequate Protection (this "<u>Interim Order</u>") is entered upon the Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral [Docket No. _____] (the "<u>Cash Collateral Motion</u>"), and upon terms agreed to by and among Life Care St. Johns, Inc., doing business as Glenmoor (the "<u>Debtor</u>"), UMB Bank, N.A. in its capacity as master trustee and bond trustee for the bonds described more fully below (the "<u>Bond Trustee</u>") and U.S. Bank, National Association in its capacity as trustee (the "<u>Refund Queue Trustee</u>") under that

_____

[1] The Federal Employer Identification Number of the Debtor is 59-3474627. The principal address of the Debtor is 235 Towerview Drive, St. Augustine, Florida 32092.

certain Refund Queue Claim Holders' Distribution Trust Agreement dated as of April 1, 2014 by and among the Refund Queue Trustee, the Committee of Beneficial Interest Holders appointed pursuant to the 2013 Plan (as defined below) and the Debtor. Capitalized terms used in this order but not specifically defined have the meanings set forth in the Cash Collateral Motion.

Upon the terms of the Cash Collateral Motion, the stipulations, acknowledgements and agreements of the Debtor and the Bond Trustee and the Refund Queue Trustee, the statements of the parties and their respective counsel at the hearing on the interim use of Cash Collateral (as defined below), and the record of these proceedings, the Court makes the following findings of fact and rulings of law:

**The Debtor's Chapter 11 Case; Procedural Background; Jurisdiction; Notice**

A.    On April 11, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief (the "Chapter 11 Case") with this Court under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") for the purpose of pursuing two sale transactions (the "Bankruptcy Transaction"). Since the Petition Date, the Debtor has operated its business and managed its property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. No request has been made for the appointment of a trustee or examiner in the Chapter 11 Case and no committee has been appointed in this case under section 1102 of the Bankruptcy Code as of the date hereof.

B.    The Debtor is the owner and operator of a continuing care retirement community known as Glenmoor consisting of one hundred fifty-seven (157) independent living units including seventy (70) apartment homes, thirty (30) patio homes, thirty-one (31) estate homes, twenty-six (26) cottages, thirty-six (36) licensed assisted living units,

and thirty (30) licensed nursing beds, and common areas located on a 40-acre site in St. Johns County, Florida (the "Facility").

C.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, and this matter constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

D.    The Debtor has properly served notice of the Cash Collateral Motion and the interim hearing thereon pursuant to Sections 102, 361, 362 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002 and 4001, and the local rules for this Court, which notice was sent to, among others: the Bond Trustee; the Refund Queue Trustee; the Debtor's 20 largest unsecured creditors as set forth in the list filed by the Debtor in the Chapter 11 Case pursuant to Bankruptcy Rule 1007(d); all known holders of liens on the Debtor's assets; the Office of the United States Trustee for the Middle District of Florida (the "U.S. Trustee"); the Office of Insurance Regulation (the "OIR") and all applicable government agencies to the extent required by the Bankruptcy Rules or local rules of this Court.  This notice is appropriate in the particular circumstances and is sufficient for all purposes under the Bankruptcy Code and the applicable Bankruptcy Rules in light of the relief requested.

**The Debtor's Secured Bond Obligations**

E.    The Debtor is obligated to the Bond Trustee for the benefit of the beneficial holders of the tax-exempt Bonds (as defined below) authorized and issued by the St. Johns County Industrial Development Authority (the "Issuer").

F.    In accordance with the Debtor's Chapter 11 Plan of Reorganization (the "2013 Plan") filed on November 27, 2013 in *In re Life Care St. Johns, Inc.*, case no. 3:13-bk-04158-JAF (the "2013 Case"), the Issuer issued the (a) $41,711,250 Health Care

3

Refunding Revenue Bonds (Glenmoor Project), Series 2014A (the "Series 2014A Bonds"), and (b) $15,434,643.75 Subordinate Health Care Refunding Revenue Bonds (Glenmoor Project), Series 2014B (the "Series 2014B Bonds" and together with the Series 2014A Bonds, the "Bonds") upon the terms and for the purposes set forth in that certain Bond Trust Indenture, dated as of April 1, 2014 (the "Bond Trust Indenture") by and between the Issuer and the Bond Trustee (as indenture trustee).

G.    In addition, and in connection with the 2013 Plan, a certain Loan Agreement, dated as of April 1, 2014 (the "Loan Agreement") was executed by and between the Debtor and the Issuer.

H.    The Bond Trust Indenture established various funds to be held by the Bond Trustee, including a "Debt Service Reserve Fund" (as defined in the Bond Trust Indenture) (the "Bond Trustee Funds").  As of the Petition Date, the balance of the Bond Trustee Funds held by the Bond Trustee was approximately $1,404,232.17.  The Debtor has acknowledged and agreed, and the Court finds, that the Bond Trustee Funds are held in trust for the holders of the Bonds and otherwise not property of the Debtor's bankruptcy estate, or, as an alternative, given the lack of adequate protection, the Debtor consents to a lift of the automatic stay imposed under Section 362 of the Bankruptcy Code so as to permit the Bond Trustee to exercise all of its rights in and with respect to the Bond Trustee Funds, pursuant to the Bond Documents and the Bankruptcy Code.

I.    TD Bank, National Association, as escrow agent, holds certain funds in an "Operating Reserve Fund" the ("ORF") and a "Renewal and Replacement Reserve" (the "R&R Fund") as required by Florida Statute § 651.025.

J.    As of the Petition Date, the amounts due and owing by the Debtor with respect to the Bonds are as follows (collectively, the "Bond Claim"):

a. With respect to the Series 2014A Bonds (the "Series 2014A Bond Claim"): (1) unpaid principal in the amount of $41,711,250.00; and (2) accrued but unpaid interest in the amount of $622,772.14 as of April 11, 2016, which interest continues to accrue at a per diem rate of $6,227.72;

b. With respect to the Series 2014B Bonds (the "Series 2014B Bond Claim"): (1) unpaid principal in the amount of $16,104,149.21; and (2) accrued but unpaid interest in the amount of $111,834.37 as of April 11, 2016, which interest continues to accrue at a per diem rate of $1,118.34;[2] and

c. unliquidated, accrued and unpaid fees and expenses of the Bond Trustee and its professionals incurred through the Petition Date in connection with the Bonds.

**Security for the Debtor's Bond Obligations**

K. The Debtor has granted to the Bond Trustee (i) a mortgage on certain real and personal property pursuant to the Series 2014A Mortgage, Security Agreement and Fixture Filing Statement dated as of April 16, 2014 (the "Mortgage"), and (ii) a security interest in the accounts and Gross Revenues (as defined in the Master Trust Indenture) of the Debtor (pursuant to, and as more fully described in, the Master Trust Indenture dated as of April 1, 2014 by and between the Bond Trustee (as master trustee) and the Debtor (the "Master Trust Indenture"; together with the Bond Trust Indenture, the Loan Agreement, the Mortgage and all other documents related thereto and to the Bonds, the "Bond Documents")). Pursuant to these grants, as security for the Series 2014A Bonds, the Bond Trustee holds first priority liens on and security interests in substantially all assets of the Debtor (as more particularly described in the Bond Documents, the "Pre-Petition Bond Collateral"), except for the ORF and R&R Fund and certain miscellaneous real estate (the "Miscellaneous Real Estate" and together with the Pre-Petition Bond

---

[2] If the Bond Trustee asserts that the amounts of principal and interest included in the Series 2014A Bond Claim or the Series 2014B Bond Claim exceed the amounts set forth above as of the Petition Date, the Debtor or any other estate representative may object to such increased amounts.

Collateral, the "Pre-Petition Collateral"). To further secure the Series 2014A Bonds, the Debtor granted to the Bond Trustee a second priority lien on the Miscellaneous Real Estate until such time as the Refund Queue Holder A Note (as defined in the 2013 Plan) is paid in full, at which time the Series 2014A Bonds shall have a first priority lien on the Miscellaneous Real Estate. To secure the Series 2014B Bonds, the Debtor granted to the Bond Trustee a third priority lien on all assets of the Debtor (except the ORF and R&R Fund) on parity with the Refund Queue Holder B Note (as defined in the 2013 Plan).

L.      In accordance with the Bond Documents, the Debtor's Gross Revenues (as defined in the Master Trust Indenture) are deposited on a daily basis into a Gross Revenue Fund maintained by the Bond Trustee under the terms of the Master Trust Indenture. Pursuant to the Master Trust Indenture, on the first business day of each calendar month, the Bond Trustee advances funds from the Gross Revenue Fund to the Debtor based on the projected amount of Operating Expenses (as defined in the Master Trust Indenture) for the upcoming month as set forth in the Operating Budget (as defined in the Master Trust Indenture).

**The Debtor's Refund Queue Obligations**

M.      The Debtor is obligated to the Refund Queue Trustee for the benefit of the holders of claims for entrance fee refunds that arose prior to the commencement of the 2013 Case (the "Beneficial Interest Holders").

N.      In accordance with the 2013 Plan, the Debtor executed and delivered to the Refund Queue Trustee (1) the Refund Queue Holder A Note in the original principal amount of $4,700,378.40 (the "Refund Queue Holder A Note"); (2) the Refund Queue Holder B Note in the original principal amount of $3,133,588.00 (the "Refund Queue Holder B Note" and together with the Refund Queue Holder A Note, the "Refund Queue

6

Notes"); and (3) certain mortgages and security interests (together with the Refund Queue Notes, the "Refund Queue Documents").

O.     As of the Petition Date, the amounts due and owing by the Debtor with respect to the Refund Queue Notes are as follows (collectively, the "Refund Queue Claim"):

a.     With respect to the Refund Queue Holder A Note (the "Refund Queue Holder A Claim"): (1) unpaid principal in the amount of $3,911,086.13; and (2) accrued but unpaid interest in the amount of $718,424.28 as of April 11, 2016, which interest continues to accrue at a per diem rate of $1,282.32;

b.     With respect to the Refund Queue Holder B Note (the "Refund Queue Holder B Claim"): (1) unpaid principal in the amount of $3,133,585.60; and (2) accrued but unpaid interest in the amount of $159,030.64 as of April 11, 2016, which interest continues to accrue at a per diem rate of $224.91; and

c.     unliquidated, accrued and unpaid fees and expenses of the Refund Queue Trustee and its professionals incurred through the Petition Date in connection with the Refund Queue Notes.

**Security for the Debtor's Refund Queue Obligations**

P.     As security for the Refund Queue Holder A Note, the Refund Queue Trustee holds a first priority mortgage and security interest in the Miscellaneous Real Estate and a second priority lien on certain other assets of the Debtor (together with the Miscellaneous Real Estate, and as more particularly described in the Refund Queue Documents, the "Pre-Petition Refund Queue Collateral").[3]  As security for the Refund Queue Holder B Note, the Refund Queue Trustee holds a third priority lien on the Pre-Petition Refund Queue Collateral.

---

[3] The Pre-Petition Refund Queue Collateral does not include the ORF and R&R Fund.

### Use of Cash Collateral and Need for Adequate Protection

Q.      The Debtor has requested the use of cash collateral in connection with the Chapter 11 Case to preserve the value of its business.  Pursuant to the Bankruptcy Code, the Debtor is required to provide adequate protection to the Bond Trustee and the Refund Queue Trustee in respect of the Debtor's use of cash collateral.  The Bond Trustee has informed the Debtor and this Court that the Bond Trustee does not consent to the use of cash collateral except upon the terms and conditions of this Interim Order.

R.      Without the use of cash collateral on an interim basis, the Debtor would suffer immediate and irreparable harm pending a final hearing on the Motion and would likely be required to cease operations immediately or, at a minimum, the Debtor's inability to use cash collateral would disrupt the Debtor as a going concern, would eliminate or significantly decrease the likelihood of the sale of the Project as a going concern, confirmation of a plan, and would otherwise not be in the best interests of the Debtor, its estate or creditors, including the holders of the Bonds and residents of the Facility. In lieu of giving the Bond Trustee and the Refund Trustee relief from stay or attempting to obtain this Court's approval for use of Cash Collateral (as defined below) on a non-consensual basis, the Debtor wishes to provide adequate protection of the liens and security interests of the Bond Trustee and Refund Queue Trustee in Cash Collateral and other Pre-Petition Collateral and Pre-Petition Refund Queue Collateral on the terms set forth in this Interim Order, reflecting the agreement of the Debtor, the Bond Trustee and the Refund Queue Trustee.

S.      Subject to the rights of third parties pursuant to paragraph 27 herein, the Debtor acknowledges that:  (i) the Bond Claim is a valid, binding and allowed claim against the estate; (ii) the Series 2014A Bond Claim is secured by valid, enforceable, duly

8

perfected first priority liens on and security interests in the Pre-Petition Bond Collateral and a valid, enforceable, duly perfected second priority lien and security interest on the Miscellaneous Real Estate pursuant to the Bond Documents; (iii) the Series 2014B Bond Claim is secured by valid, enforceable, duly perfected third priority liens on and security interests in the Pre-Petition Collateral; and (iv) neither the Bond Claim, nor the liens or security interests securing the Bond Claim, are subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

   T.  Subject to the rights of third parties pursuant to paragraph 27 herein, the Debtor acknowledges that: (i) the Refund Queue Claim is a valid, binding and allowed claim against the estate; (ii) the Refund Queue Holder A Note is secured by valid, enforceable, duly perfected (a) first priority security interests and liens on the Miscellaneous Real Estate and (b) second priority security interests and liens on the other Pre-Petition Refund Queue Collateral; (iii) the Refund Queue Holder B Note is secured by valid, enforceable, duly perfected third priority liens on and security interests in the Pre-Petition Refund Queue Collateral; and (iv) neither the Refund Queue Claim, nor the liens or security interests securing the Refund Queue Claim, are subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

   U.  The terms of this Interim Order are fair and commercially reasonable, reflect the Debtor's prudent exercise of business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration. Good cause has been shown for the entry of this Interim Order.

   V.  To the extent any portion of the foregoing constitutes rulings of law, it shall constitute this Court's rulings with respect to the matters so stated.

**NOW, THEREFORE, THE COURT HEREBY ORDERS AS FOLLOWS:**

1.     <u>Disposition</u>.  The Cash Collateral Motion is granted on an interim basis on the terms set forth in this Interim Order.   The requirements of Bankruptcy Rule 4001(b)(2) are satisfied with respect to the use of Cash Collateral on an interim and preliminary basis pending a final hearing on the Cash Collateral Motion.  Any objections to the relief sought in the Cash Collateral Motion that have not been previously resolved or withdrawn, and all reservations of rights contained therein, are overruled on the merits, without prejudice, however, to any such objection or reservation of rights being reasserted in connection with the hearing on entry of the Final Order.

2.     <u>Authorization to Use Cash Collateral</u>.  The Debtor is authorized to use, as cash collateral (as defined in Section 363 of the Bankruptcy Code), any Gross Revenues derived by the Debtor in the ordinary course of its business (the "Cash Collateral") until the earlier of (i) the occurrence of a Termination Event (as defined below) or (ii) the last day included in the budget attached hereto as **Schedule A** (the "Cash Collateral Budget"), but only on the terms of this Interim Order.   Subject to the preceding sentence, in accordance with the Master Trust Indenture, the Debtor's Gross Revenues shall continue to be deposited on a daily basis into the Gross Revenue fund maintained by the Bond Trustee under the terms of the Master Trust Indenture, and on the first business day of each calendar month, pursuant to the terms of the Master Trust Indenture, the Bond Trustee shall advance funds from the Gross Revenue Fund to the Debtor based on 110% of the projected amount of Operating Expenses for the upcoming month as set forth in the Cash Collateral Budget, less any funds previously advanced by the Bond Trustee and remaining in the Debtor's operating account at the time of the advance which are not committed to pay expenses included within the prior month's budget.  Debtor shall also

be permitted to retain a $50,000 working capital reserve. Further, such Cash Collateral shall be used solely to pay expenses in the amounts and at the times listed in the Cash Collateral Budget; *provided however,* the Debtor shall be permitted to exceed the amounts set forth in the Cash Collateral Budget to pay categories of expenses listed in the Cash Collateral Budget to the extent such a variance does not constitute a Termination Event described in paragraphs 17(i) or 17(ii) of this Interim Order.

3.     <u>Exclusion from Cash Collateral</u>.  The Debtor is not authorized to use and shall not use any Gross Revenues or proceeds thereof not derived in the ordinary course of the Debtor's operations, including but not limited to proceeds from amounts received in connection with promissory notes executed by existing or former residents. Nothing in this Interim Order shall entitle the Debtor to use any Bond Trustee Funds, other than the funds in the Gross Revenue Fund, and no lien or other interest may be granted in any Bond Trustee Funds to any third party.

4.     <u>Prohibited Use of Cash Collateral</u>.  Except as expressly provided in this paragraph 4, no Cash Collateral or proceeds thereof shall be used for the purpose of:  (a) objecting to, or contesting in any manner, or raising any defense to, the validity, amount, extent, perfection, priority, or enforceability of the Bonds, the Pre-Petition Collateral, the Bond Claim or any liens or security interests with respect thereto, or any other rights or interests of the Bond Trustee therein; (b) objecting to, or contesting in any manner, or raising any defense to, the validity, amount, extent, perfection, priority, or enforceability of the Refund Queue Notes, the Pre-Petition Refund Queue Collateral, the Refund Queue Claim or any liens or security interests with respect thereto, or any other rights or interests of the Refund Queue Trustee therein; (c) asserting any claims or defenses or causes of action against the Bond Trustee or any holder of the Bonds or their respective

11

agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, including with respect to payments made pursuant to the Bond Documents; (d) asserting any claims or defenses or causes of action against the Refund Queue Trustee or any Beneficial Interest Holder or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, including with respect to payments made pursuant to the Refund Queue Documents; (e) seeking to modify any of the rights granted to the Bond Trustee or Refund Queue Trustee hereunder; (f) paying any amounts not included in the Cash Collateral Budget; or (g) paying any amounts on account of claims arising before the Petition Date, except to the extent provided for in the Cash Collateral Budget and approved by the Court.

5.     Amendment or Extension of Order.   This Interim Order shall not be amended without the express written consent of the Bond Trustee, which shall be at its sole discretion; provided, however, that such amendments cannot impair the rights of the Refund Queue Trustee without its express written consent.   Notice of any such amendment to this Interim Order shall be filed with the Court and served on all parties entitled to notice in accordance with Bankruptcy Rule 4001(b) and the Local Rules of this Court.   Any party may object to such amendment and request a hearing before the Court. If no such objection is made within five (5) days of such notice, such amendment shall become final.

6.     Amendment or Extension of Use of Cash Collateral.   The Debtor may, at any time, propose to the Bond Trustee in writing (including by email) an amended budget, either for the period covered by the Cash Collateral Budget or for any period

thereafter. The Bond Trustee may withhold its consent to such amended budget for any reason or purpose. The amended budget shall become the Cash Collateral Budget for purposes of this Interim Order upon the Bond Trustee's written consent (which may be supplied to the Debtor by email). At such time as the amended budget becomes the Cash Collateral Budget, the Debtor shall file a copy thereof with this Court and serve it upon all parties entitled to notice in accordance with Bankruptcy Rule 4001(b). The Debtor shall also be permitted to seek other or further use of Cash Collateral by filing a motion with the Court, which motion shall include a budget for the period proposed for use of such Cash Collateral, and the Bond Trustee and the Refund Queue Trustee reserve all rights to object to such motion.

7.      Rollover Lien. As adequate protection for any diminution in the value of Cash Collateral and other Pre-Petition Collateral and Pre-Petition Refund Queue Collateral resulting from the Debtor's use thereof after the Petition Date ("Diminution"), the Bond Trustee and the Refund Queue Trustee shall continue to have a valid, perfected and enforceable continuing replacement lien and security interest (the "Rollover Lien") in all assets of the Debtor existing on or after the Petition Date of the same type as the Pre-Petition Collateral and the Pre-Petition Refund Queue Collateral, together with the proceeds, rents, products and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability and priority of the respective liens and security interests of the Bond Trustee and the Refund Queue Trustee as of the Petition Date (the "Post-Petition Collateral").[4] The Rollover Lien shall be subject to only prior valid and perfected liens, if any, existing as of the Petition Date

---

[4] For the avoidance of doubt, neither the Bond Trustee nor the Refund Queue Trustee shall have a Rollover Lien in the ORF or the R&R Fund.

with priority over the liens of the Bond Trustee and/or the Refund Queue Trustee, as applicable, and to the Carve-Out (as defined below). The Rollover Lien shall be limited to the amount of any Diminution.

8.   Supplemental Lien. As additional adequate protection for any Diminution, the Bond Trustee and the Refund Queue Trustee shall have a valid, perfected and enforceable continuing supplemental lien and security interest (the "Supplemental Lien") in all of the assets of the Debtor of any kind or nature whatsoever within the meaning of Section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof (the "Supplemental Collateral" and, collectively with the Post-Petition Collateral, the "Collateral"), to the same extent, validity, perfection, enforceability and priority of the respective liens and security interests of the Bond Trustee and the Refund Queue Trustee as of the Petition Date.[5] Subject to and upon entry of the Final Order (defined below), Collateral shall include any causes of action or proceeds thereof under Sections 544 through 550 and 724(e) of the Bankruptcy Code. The Supplemental Lien shall be subject to only prior valid and perfected liens, if any, existing as of the Petition Date.

9.   Status of Adequate Protection Liens. The adequate protection liens set forth in this Interim Order shall be in addition to all other rights of the Bond Trustee and/or the Refund Queue Trustee, including the Bond Trustee's or the Refund Queue Trustee's respective liens and security interests in the Pre-Petition Collateral and the Pre-Petition Refund Queue Collateral. The Rollover Liens and the Supplemental Liens shall not be subject or subordinate to (a) any liens arising after the Petition Date except for any liens or security interests in favor of any federal, state, municipal or other government

---

[5] For the avoidance of doubt, neither the Bond Trustee nor the Refund Queue Trustee shall have a Supplemental Lien in the ORF or the R&R Fund.

unit, commission, board or court for any tax liability of the Debtor, whether secured or unsecured, including property taxes for which liability is *in rem*, *in personam*, or both and a tax of a kind specified in Section 507(a)(8) of the Bankruptcy Code, or (b) any intercompany or affiliate liens of the Debtor, and shall not be subordinated to or made *pari passu* with any other lien or security interest under Sections 363 or 364 of the Bankruptcy Code or otherwise.

10.    No Further Action Required.  The approval of this Interim Order by the Court shall be sufficient and conclusive evidence of the validity, extent, enforceability and perfection of the Rollover Lien and Supplemental Lien granted to the Bond Trustee and the Refund Queue Trustee, whether or not the Bond Trustee and/or the Refund Queue Trustee elect to file or record financing statements, any other documents which may otherwise be required under federal or state law in any jurisdiction, or to take such other steps as may otherwise be required to obtain, evidence or perfect such liens under applicable law; *provided*, *however*, that upon the request of the Bond Trustee or the Refund Queue Trustee, the Debtor shall execute such other documents as may be reasonably requested to evidence and perfect such liens, and the Bond Trustee and/or the Refund Queue Trustee may, in their sole discretion, but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any jurisdiction in which the Debtor has real or personal property, and the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements or other documents upon the reasonable request of the Bond Trustee or the Refund Queue Trustee, and such filing or recording shall be accepted and shall constitute further evidence of perfection of the respective liens and security interests of the Bond Trustee and the Refund Queue Trustee.  No obligation, payment, transfer or grant of security under this Interim Order

shall be stayed (other than by court order in an appeal from this Interim Order), restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any otherwise applicable state law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

11.   <u>Superpriority Claim</u>.   As additional adequate protection for any Diminution, the Bond Trustee and the Refund Queue Trustee shall have a super-priority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code, with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of the Debtor, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual which for any reason cannot be made the subject of the Rollover Lien or Supplemental Lien (the "<u>Secured Party Superpriority Claims</u>").   The Secured Party Superpriority Claims shall be subject to only prior valid and perfected liens existing on the Petition Date and shall have priority over any and all administrative expenses, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any successor trustee or any creditor in this Chapter 11 Case or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment which allowed claims shall be payable from and have recourse to all pre- and post-

petition property of the Debtor and all proceeds thereof, subject to the Carve-Out (as defined below).

12.     Adequate Protection Payments. – [INTENTIONALLY OMITTED].

13.     Allowance of Claim and Bankruptcy Code Section 506(c) Waiver.  Except as set forth in paragraph 27 below, the entry of this Interim Order by the Court shall be a conclusive and binding determination on all parties (x) as to the amounts of the Bond Claim and Refund Queue Claim; (y) as to the scope, extent, perfection, validity and enforceability, in all respects, of the Bond Trustee's and Refund Queue Trustee's respective security interests and liens in the Pre-Petition Collateral and the Pre-Petition Refund Queue Collateral, including, without limitation, the Cash Collateral; and (z) that such liens and security interests shall not be subject to any claim under Bankruptcy Code Section 552(b).  The entry of an order by the Court approving the Cash Collateral Motion on a final basis (the "Final Order") shall be a conclusive and binding determination on all parties that the Bond Trustee's and Refund Queue Trustee's respective security interests in the Pre-Petition Collateral and the Pre-Petition Refund Queue Collateral, including, without limitation, the Cash Collateral, are not subject to any claim under Bankruptcy Code Section 506(c).

14.     Financial Information.  As additional adequate protection of the Bond Trustee's and Refund Queue Trustee's respective security interests in the Cash Collateral, the Debtor shall allow the Bond Trustee, the Refund Queue Trustee and their respective professionals and designees reasonable access, during normal business hours, to the premises of the Debtor in order to conduct appraisals, analyses and/or audits of the Pre-Petition Collateral, the Pre-Petition Refund Queue Collateral and the Collateral, and shall otherwise reasonably cooperate in providing any other financial information requested by

the Bond Trustee and/or the Refund Queue Trustee for this purpose. From and after the entry of this Interim Order, the Debtor shall provide to the Bond Trustee and the Refund Queue Trustee on Wednesday of every other week (commencing with the second week after the Petition Date), a bi-weekly report certified by the Debtor's chief financial officer and in the same form as the Cash Collateral Budget indicating all receipts received and disbursements made by the Debtor in the two weeks ending the prior Friday compared to the Cash Collateral Budget and detailing any variances of more than 5% and at least $10,000 from the expenditures and receipts in the Cash Collateral Budget. The Debtor, its professionals and consultants shall be available upon request (subject to reasonable scheduling conflicts) for telephonic conference calls with the Bond Trustee, the Refund Queue Trustee and/or their respective professionals to discuss the status of the Chapter 11 Case, the results of operations and other matters pertaining to the Facility and the Chapter 11 Case. The Bond Trustee shall have independent access to the Debtor's investment banker for the Facility to discuss matters relating to the Bankruptcy Transaction (as defined below) and the Refund Queue Trustee shall have independent access to the broker for the Miscellaneous Real Estate to discuss matters relating to the Proposed Real Estate Sale. The Debtor shall provide to the Bond Trustee and the Refund Queue Trustee such other reports and information as the Bond Trustee and/or the Refund Queue Trustee may reasonably request from time to time.

15. <u>Compliance with Bond Documents</u>. As further adequate protection against Diminution, the Debtor shall comply with those terms and provisions of the Bond Documents set forth on **Schedule B** attached hereto and incorporated herein. The requirements of this Order shall be in addition to, and not in substitution for, the terms and provisions of the Bond Documents set forth on **Schedule B**, provided, however, in

the event of any inconsistency between the Bond Documents and this Interim Order, the terms of this Interim Order shall control.

16.     <u>Bankruptcy Transaction Milestones</u>.  As further adequate protection against Diminution, the Debtor shall comply with the following Bankruptcy Transaction milestones (the "<u>Milestones</u>"):

a.      On the Petition Date, the Debtor shall file (i) a motion that seeks entry of an order approving, among other things, (A) the Debtor's request to sell, transfer and assign, as applicable, the Facility and substantially all assets relating to the operation of the Facility (the "<u>Assets</u>"), pursuant to an asset purchase agreement with a stalking horse purchaser (the "<u>Proposed Sale</u>"); and (B) approval of bidding procedures related to the Proposed Sale (the "<u>Bidding Procedures</u>"), which shall be acceptable to the Bond Trustee and the majority of the holders of the Bonds; and (ii) a motion that seeks entry of an order approving, among other things, (A) the Debtor's request to sell the Miscellaneous Real Estate, pursuant to an asset purchase agreement with a stalking horse purchaser (the "<u>Proposed Real Estate Sale</u>"); and (B) approval of bidding procedures related to the Proposed Real Estate Sale (the "<u>Real Estate Bidding Procedures</u>").

b.      On or before the date that is three (3) days after the Petition Date, the Debtor shall file a Chapter 11 plan (the "<u>Consensual Plan</u>") and accompanying disclosure statement (the "<u>Disclosure Statement</u>"), which shall be acceptable to the Bond Trustee and the majority of the holders of the Bonds;

c.      On or before the date that is four (4) days after the Petition Date, the Court shall have entered orders approving the Bidding Procedures and the Real Estate Bidding Procedures;

d.      On or before the date that is forty-five (45) days after the Petition Date, the Court shall have entered an order approving the Disclosure Statement as providing adequate information (the "<u>Disclosure Statement Order</u>");

e.      On or before June 1, 2016, any counter bids for the Assets and the Miscellaneous Real Estate shall be due;

f.      On or before June 3, 2016, auctions of the Assets and the Miscellaneous Real Estate shall be held;

g.      On or before the date that is sixty (60) days after the Petition Date, the Court shall have entered orders approving the Proposed Sale (the "<u>Sale Order</u>") and the Proposed Real Estate Sale (the "<u>Real Estate Sale Order</u>");

h.    On or before the date that is forty-five (45) days after the date the Court enters the Disclosure Statement Order, the Court shall have entered an order confirming the Consensual Plan; and

i.    On or before the date that is sixty (60) days after the date the Court enters the Sale Order and the Real Estate Sale Order, the Proposed Sale and the Proposed Real Estate Sale shall have been consummated.

17.    <u>Termination of Use of Cash Collateral With Notice</u>.  A Termination Event shall be deemed to have occurred three (3) business days after written notice is sent by the Bond Trustee to the Debtor, its counsel, the Refund Queue Trustee's counsel, and the U.S. Trustee of the occurrence of any of the following:

a.    the payment or incurrence by the Debtor of any material expense of a type not set forth in the Cash Collateral Budget;

b.    the payment of any expenses that would cause the aggregate expenditures to exceed either of (x) one hundred ten percent (110%) of the total budgeted expenses for that same period or (y) one hundred twenty percent (120%) of the amount budgeted for that same line item for that same period (each comparison period, a "<u>Measuring Period</u>"). This variance shall be measured on a rolling four week basis; provided however, that, for purposes of calculating such variances, (i) the first Measuring Period shall be the two weeks after the Petition Date and the first week of the Cash Collateral Budget, and (ii) the second Measuring Period shall be the four weeks after the Petition Date and the first four weeks of the Cash Collateral Budget. Any budgeted expenditures not paid in a particular budget period may be paid during a subsequent period.  Expenditures, other than legal or other professional fees, may be paid in an earlier period in the reasonable discretion of the Debtor, in which event, the Cash Collateral Budget shall be deemed amended to move the expenditure into the week of the actual expenditure for the purpose of calculating rolling four week variances set forth above. The Debtor will provide a written explanation in reasonable detail explaining the amount of and the reason for the prepayment or delay in payment.

c.    the failure of the Debtor to pay, within ten (10) days of the applicable due date, all undisputed administrative expenses in full in accordance with their terms as provided for in the Cash Collateral Budget;

d.    the failure of the Debtor to timely pay all fees due under 28 U.S.C. §1930; and

e.     the failure of the Debtor to comply with, keep, observe or perform any of its agreements or undertakings under this Interim Order, including the Milestones.

Unless the Debtor has cured the Termination Event(s) specified in the Bond Trustee's notice prior to the expiration of the three business day period described in this paragraph 17, or obtained an order of this Court, on notice to and with the opportunity to be heard by the Bond Trustee and the Refund Queue Trustee, that no such Termination Event has occurred, the Debtor's authority to use Cash Collateral hereunder shall terminate upon expiration of the three business day period described herein.

18.     <u>Termination of Use of Cash Collateral Without Prior Notice</u>.  The Debtor's authority to use Cash Collateral hereunder shall terminate without any further action by this Court and a Termination Event shall occur without prior notice upon the occurrence of any of the following (also a "<u>Termination Event</u>"):

a.     the Debtor's Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

b.     the earlier of (y) the date of the entry of an order of this Court appointing a Chapter 11 trustee or an examiner with enlarged powers (beyond those set forth in Sections 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code) for the Debtor; or (z) the date the Debtor files a motion, application or other pleading consenting to or acquiescing in any such appointment;

c.     this Court suspends the Debtor's Chapter 11 Case under Section 305 of the Bankruptcy Code;

d.     this Interim Order becomes stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the Bond Trustee and the Refund Queue Trustee;

e.     an order is entered in the Chapter 11 Case over the objection of the Bond Trustee and/or the Refund Queue Trustee approving financing pursuant to Section 364 that would grant an additional security interest or a lien on any Collateral or granting a superpriority administrative claim that is equal or superior to the superpriority administrative claims granted to the Bond Trustee and the Refund Queue Trustee under this Interim Order;

f.     an adversary proceeding or contested matter is commenced by the Debtor challenging the amount, validity, enforceability, priority or extent of the

21

liens, security interests or claims of the Bond Trustee and/or the Refund Queue Trustee; or

g.   the Court fails to enter a final order granting the Cash Collateral Motion, on terms acceptable to the Bond Trustee or substantially modifies the protections granted to the Refund Queue Trustee as contained herein, on or before April 30, 2016.

Upon the occurrence of a Termination Event described in this paragraph 18, the Debtor's authority to use Cash Collateral hereunder shall automatically terminate.

19.   <u>Post-Termination Rights</u>.  Notwithstanding cessation of the Debtor's right to use Cash Collateral hereunder as of a particular date (a "<u>Termination Date</u>"), the Debtor or a trustee appointed for the Debtor's estate may use Cash Collateral to pay payroll and payroll-related expenses such as taxes accrued through and including the Termination Date, up to the amounts set forth in the Cash Collateral Budget.

20.   <u>Releases</u>.

a.   Subject to paragraph 27, the Debtor hereby waives, releases and discharges the Bond Trustee, all holders of the Bonds and their respective affiliates, agents, attorneys, professionals, officers, directors and employees from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Bonds and the Bond Documents, any aspect of the prepetition relationship between the Bond Trustee and/or all holders of the Bonds and the Debtor, and any other acts or omissions by the Bond Trustee and/or all holders of the Bonds in connection with either the Bond Documents or the Bond Trustee's and/or bondholders' prepetition relationship with the Debtor.  Further, the Debtor waives any and all rights to object to or contest the amount of the Bond Claim or the Bond Trustee's security interests in the Pre-Petition Collateral and agrees that all such claims and security interests have been duly perfected. The Debtor further agrees that (a) as security for the Series 2014A Bonds, the Bond

Trustee has valid and enforceable first priority security interests and liens on the Pre-Petition Bond Collateral and a duly perfected and in all respects valid and enforceable second priority security interest and lien on the Miscellaneous Real Estate and (b) as security for the Series 2014B Bonds, the Bond Trustee has valid and enforceable third priority security interests and liens on the Pre-Petition Collateral.

      b.      Subject to paragraph 27, the Debtor hereby waives, releases and discharges the Refund Queue Trustee, all the Beneficial Interest Holders and their respective affiliates, agents, attorneys, professionals, officers, directors and employees from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Refund Queue Documents, any aspect of the prepetition relationship between the Refund Queue Trustee and/or all Beneficial Interest Holders and the Debtor, and any other acts or omissions by the Refund Queue Trustee and/or all Beneficial Interest Holders in connection with either the Refund Queue Documents or the Refund Queue Trustee's and/or Beneficial Interest Holders' prepetition relationship with the Debtor.  Further, the Debtor waives any and all rights to object to or contest the amount of the Refund Queue Claim or the Refund Queue Trustee's security interests in the Pre-Petition Refund Queue Collateral and agrees that all such claims and security interests have been duly perfected.  The Debtor further agrees that (a) as security for the Refund Queue Holder A Note, the Refund Queue Trustee has valid and enforceable (i) first priority security interests and liens on the Miscellaneous Real Estate and (ii) second priority security interests and liens on the other Pre-Petition Refund Queue Collateral and (b) as security for the Refund Queue Holder B Note, the Refund Queue Trustee has valid and enforceable third priority security interests and liens on the Pre-Petition Refund Queue Collateral.

21. <u>Failure of Adequate Protection</u>.  Nothing herein shall constitute a waiver, release or modification of the rights of the Bond Trustee to assert a claim under Bankruptcy Code Sections 364(c) and 507(b).

22. <u>Deemed Request for Stay Relief</u>.  This Interim Order shall be deemed to constitute a request by the Bond Trustee and the Refund Queue Trustee for relief from the automatic stay with respect to the Pre-Petition Collateral and Pre-Petition Refund Queue Collateral, respectively, and for adequate protection for the use of Cash Collateral as of the Petition Date, and shall suffice for all purposes of Section 507(b) of the Bankruptcy Code.

23. <u>No Charge on Collateral; Carve Out</u>.  In partial consideration of the Debtor's acknowledgement of the debt due and owing and the Debtor's waiver of any claims under Section 506(c) of the Bankruptcy Code, the Bond Trustee and the Refund Queue Trustee consent to certain expenses and professional fees incurred by the Debtor during the pendency of this Chapter 11 Case which shall be superior in all instances to the liens and claims of the Bond Trustee, the Refund Queue Trustee and all other parties (the "<u>Carve Out</u>").  For purposes hereof, the "Carve Out" means (a) the fees and expenses of professionals retained by the Debtor, in an aggregate amount not to exceed the sum of: (i) the dollar amount of such fees and expenses (A) incurred or accrued prior to a Termination Event, (B) provided for under the Cash Collateral Budget, and (C) previously or subsequently allowed by Court order, plus (ii) $50,000, plus (iii) the statutory fees of the United States Trustee pursuant to 28 U.S.C. § 1930 and the fees of the Clerk of this Court.  For avoidance of doubt, professional fees in this context do not include broker's commissions or fees and costs of Debtor's noticing agents.  Nothing herein shall constitute a waiver of any right of the Bond Trustee and/or the Refund Queue

Trustee to object to fees and expenses of any professionals or to challenge any assertion that any amount of the fees and expenses remain unpaid. The entry of a the Final Order shall be a conclusive and binding determination on all parties that except for the Carve Out, no costs or expenses of administration shall be imposed against the Bond Trustee, the Refund Queue Trustee, the Pre-Petition Collateral, the Pre-Petition Refund Queue Collateral or the Collateral under Sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

24.    Payment of Professional Fees from Collateral. Prior to (and after, subject to paragraph 23 above) a Termination Event, the Debtor shall be permitted to pay compensation and reimbursement of expenses to the Debtor's attorneys, consultant, investment banker and accountants employed under section 327 or 1103 of the Bankruptcy Code ("Professional Persons") as the same may be due and payable, and only to the extent set forth in the Cash Collateral Budget (the "Budgeted Professional Expenses"). Modification of Stay. The automatic stay imposed by Section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the Bond Trustee and/or the Refund Queue Trustee to: (a) receive payments to be made by the Debtor to the Bond Trustee or the Refund Queue Trustee and the payment of amounts due to the holders of the Bonds or the Beneficial Interest Holders; (b) apply, allocate or pay from any of the funds or accounts maintained by the Bond Trustee (including, without limitation, the Bond Trustee Funds) in accordance with the terms of the Bond Documents; and (c) take any action specifically authorized or contemplated by this Interim Order. Any of the aforementioned actions may be taken without further order of this Court.

25.     <u>Preservation of Rights</u>.  If any or all of the provisions of this Interim Order are, at any time, modified, vacated or stayed, such stay, modification or vacation shall not affect the validity, extent, priority and enforceability of any lien, priority, or other benefit conferred under this Interim Order prior to such stay, modification or vacation.

26.     <u>Binding Effect</u>.  This Interim Order shall be binding on all creditors and parties in interest in this case, including, but not limited to, the Debtor and any successors thereto, any Chapter 11 or Chapter 7 trustee that is appointed or elected in this case, and any estate representative; provided, however, that (a) this Interim Order is without prejudice to the rights of any third party to, on behalf of the Debtor's estate, challenge the validity, amount, perfection, priority, extent or enforceability of the Bond Claim, the Refund Queue Claim or the respective pre-petition security interests of the Bond Trustee and the Refund Queue Trustee, so long as any such challenge is made on or before April 30, 2016, after which time all such challenges shall be deemed finally and conclusively barred; provided further that if one or more claims are timely made under paragraph 27 and properly filed, then except for such claims, all potential claims and causes of action are hereby deemed forever waived and relinquished; and (b) the Bond Trustee and Refund Queue Trustee reserve their respective rights concerning the allocation of any proceeds received from the sale of the Debtor's Assets, and this Interim Order is without prejudice to and shall not waive or otherwise limit such rights or any claims related to such rights.

27.     <u>No Competing Liens</u>.  Except as set forth herein, the Debtor shall not grant liens on, or security interests in the Pre-Petition Collateral, the Pre-Petition Refund Queue Collateral or the Collateral to any other party pursuant to Section 364 of the Bankruptcy Code or otherwise.

28.     Reservation of Rights.  Except as provided in this Interim Order, neither the Debtor, the Bond Trustee nor the Refund Queue Trustee waives any of their rights under the Bankruptcy Code, any applicable law, or the Bond Documents or Refund Queue Documents, as applicable, including, without limitation, the right of the Debtor, the Bond Trustee or the Refund Queue Trustee at any time to seek any relief (or to oppose any such relief) under the Bankruptcy Code, or the right of the Debtor, the Bond Trustee or the Refund Queue Trustee to exercise any of their rights and remedies under the Bankruptcy Code at any time.

29.     Further Relief.  Nothing herein shall (a) preclude the Bond Trustee and/or the Refund Queue Trustee from seeking any other relief that they may deem appropriate, including relief from the automatic stay, or (b) prevent the Bond Trustee and/or the Refund Queue Trustee from asserting at some later time that their respective liens and security interests in the Pre-Petition Collateral and the Pre-Petition Refund Queue Collateral are not being adequately protected.

30.     No Control.  Neither the Bond Trustee nor the Refund Queue Trustee shall be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute) with respect to the operation or management of the Debtor, notwithstanding their consent to this Interim Order and extending financial accommodations of any type, kind or nature under this Interim Order.

31.     No Third Party Beneficiaries.  No rights are created hereunder for the benefit of any third party, any creditor, or any direct, indirect or incidental beneficiary.

27

32.     Effectiveness.  The rights and obligations of the parties under this Interim Order shall be effective and enforceable as of the Petition Date.  This Interim Order shall be deemed effective immediately and, for the avoidance of doubt, Bankruptcy Rule 6004(h) shall not apply hereto.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect (i) the validity, extent, priority or enforceability of any obligations incurred prior to the actual receipt of written notice by the Bond Trustee and the Refund Queue Trustee of the effective date of such reversal, modification, vacatur or stay or (ii) the validity, extent or enforceability of the liens and claims granted hereunder.

33.     Notices.     All notices, requests, demands, waivers and other communications required or permitted to be given under this Interim Order shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) sent by email with a copy sent by next-day or overnight mail or delivery or (c) sent by facsimile, with a confirming phone message or call to the addressee:

    (a)     If to the Debtor to:

                    Life Care St. Johns, Inc.
                    Attn:  Bruce Jones
                    1000 Vicar's Landing Way
                    Ponte Vedra Beach, Florida 32082
                    Fax:
                    Email:  bjones@vicarslanding.com

            with a copy sent contemporaneously by email to:

                    Thames Markey & Heekin, P.A.
                    Attn:   Richard R. Thames, Esq.
                            Bradley R. Markey, Esq.
                    50 N. Laura Street, Suite 1600
                    Jacksonville, Florida 32202
                    Fax:  (904) 358-4001
                    Email:  rrt@tmhlaw.net; brm@tmhlaw.net

    (b)     If to the Bond Trustee to:

28

UMB Bank, N.A.
Attn:  Michael G. Slade, SVP
120 South Sixth Street
Suite 1400
Minneapolis, MN 55402
Fax:
Email:  michael.slade@umb.com

with a copy sent contemporaneously by email to:

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Attn: Daniel S. Bleck, Esq.
One Financial Center
Boston, MA 02111
Fax:  617-542-2241
E-mail:  dsbleck@mintz.com

(c)     If to the Refund Queue Trustee to:

U.S. Bank National Association
c/o U.S. Bank Global Corporate Trust Services
225 Water Street, Suite 700
Jacksonville, Florida 32202
Attention:  Vicki B. Bellamy

with a copy sent contemporaneously by email to:

Akerman LLP
50 North Laura Street, Suite 3100
Jacksonville, FL 32202
Fax:
Email:  david.otero@akerman.com

34.     Notice of Final Hearing.  The Debtor shall, within two (2) business days
after entry of this Interim Order, mail a notice of the entry of this Interim Order, together
with a copy of the Cash Collateral Motion and notice of the Final Hearing, to: counsel to
the Bond Trustee; counsel to the Refund Queue Trustee, the Debtor's 20 largest
unsecured creditors as set forth in the list filed by the Debtor in the Chapter 11 Case
pursuant to Bankruptcy Rule 1007(d); all known holders of liens on, or equipment leasing
interests in, the Debtor's assets; all applicable government agencies to the extent required

by the Bankruptcy Rules or local rules of this Court; all parties that have filed an appearance in the Chapter 11 Case; and the U.S. Trustee (the "Notice Parties").

35.     <u>Final Hearing; Objections</u>.  A final hearing to further consider the Motion will be held on April ____, 2016 at _____ __.m. before the Hon. Jerry A. Funk, Bankruptcy Judge, Courtroom 4D, United States Bankruptcy Court, 300 N. Hogan Street, Jacksonville, Florida 32202.  Any party desiring to object to the relief sought in the Cash Collateral Motion on a final basis shall file a written objection with the Court on or before **April ____, 2016 at _____ __.m.** and shall contemporaneously serve that objection on the Notice Parties so as to be received by such parties on or before such date.

American Legal Claim Services is directed to serve a copy of this order on interested parties and file a proof of service within 3 business days of entry of this order.

**SCHEDULE A**

**CASH COLLATERAL BUDGET**

DRAFT FOR DISCUSSION

**Life Care St. John's, Inc. d/b/a Glenmoor**
**Forecasted Weekly Cash Budget**
As of April 07, 2016

| | Projected WE 4/9 | Projected WE 4/16 | Projected WE 4/23 | Projected WE 4/30 | Projected WE 5/7 | Projected WE 5/14 | Projected WE 5/21 | Projected WE 5/28 | Projected WE 6/4 | Projected WE 6/11 | Projected WE 6/18 | Projected WE 6/25 | Projected WE 7/2 | Projected WE 7/9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | |
| Medicare A | | | | | | | | | | | | 26,500 | | |
| Private Pay | 58,067 | 658,613 | 107,951 | 78,660 | 105,360 | 614,600 | 110,020 | 79,020 | 35,040 | 70,080 | 613,200 | 157,680 | 35,280 | 70,560 |
| Co-Insurance | 1,709 | | | | | | | | | | | 4,500 | | |
| Other | 314 | 686 | | | | 1,000 | | | | | 1,000 | | | |
| **Total Cash Receipts** | 60,090 | 659,299 | 107,951 | 78,660 | 105,360 | 615,600 | 110,020 | 79,020 | 35,040 | 70,080 | 614,200 | 188,680 | 35,280 | 70,560 |
| | | | | | | | | | | | | | | |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| General & Administrative | 21,750 | 20,000 | 5,000 | 5,000 | 20,000 | 20,000 | 5,000 | 5,000 | 15,000 | 5,000 | 20,000 | 5,000 | 17,750 | 5,000 |
| Marketing | 5,000 | 5,000 | 5,000 | 5,000 | 2,750 | 2,750 | 2,750 | 6,500 | 6,500 | 8,250 | 6,500 | 2,750 | 2,750 | 2,750 |
| Plant Operations | 32,550 | 20,000 | 20,000 | 20,000 | 16,150 | 20,000 | 20,000 | 20,000 | 15,800 | 20,000 | 20,000 | 20,000 | 26,875 | 20,000 |
| Apartment Refurbishments - Non Capital | 4,200 | | | | 4,200 | | | | 4,200 | | | | 4,200 | |
| Capital Improvements - Routine | | | | | | | | | | | | | | |
| Dining Services | 18,500 | 18,500 | 18,500 | 18,500 | 17,500 | 17,500 | 17,500 | 17,500 | 18,500 | 18,500 | 18,500 | 18,500 | 17,500 | 17,500 |
| Health Services | | | | | | | | | | | | | | |
|   Health Center | 15,000 | | 2,500 | | 2,500 | 2,500 | | 2,500 | 15,000 | 2,500 | 2,500 | 2,500 | 15,000 | 2,500 |
|   Home Health | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | |
| Benefits | | | | | | | | | | | | | | |
| Payroll, Payroll Taxes & 403b | 161,500 | | 161,500 | | 161,500 | | 161,500 | | 161,500 | | 161,500 | | 161,500 | |
| Management Fee | 8,333 | | | 8,333 | | 8,333 | | | 8,333 | | | | 8,333 | |
| Reimbursements to Vicars for LCSJ Operating Costs | | | | | | | | | | | | | | |
|   Insurance - WC, Auto, GL/PL | 19,950 | | | 19,950 | | | | 19,950 | | | | 19,950 | | |
|   Health Services - Shared Labor | | | | | | | | | | | | | | |
|   IT Services | 5,000 | | | 5,000 | | | 5,000 | | | | 5,000 | | | |
|   Employee Benefits | 300 | | | 300 | | | 300 | | | | 300 | | | |
|   Other - auto fuel, Verizon, Administer | | | | 3,625 | | | 3,625 | | | | 3,625 | | | |
| Insurance | | | | | | | | | | | | | | |
|   Flood | | | | | | | | | | | | | | |
|   Crime | | | | | | | | | | | | | | |
| Utilities | | | | | | | | | | | | | | |
| Chapter 11 Professional Expenses | | | | | | | | | | | | | | |
|   Quarterly UST Trustee Fees | | | | | | | | | | 10,000 | | | | |
|   Legal Counsel to Debtor - TMKH | | | | 60,000 | | | | 50,000 | | | | 50,000 | | |
|   Regulatory Counsel to Debtor - Holland & Knight | | | | 7,500 | | | | 5,000 | | | | | | |
|   Operations Consultant to Debtor - Greystone | | 11,000 | | | | 11,000 | | | | 11,000 | | | | |
|   Noticing Agent - American Legal Claims Services | | | | 14,000 | | | | 10,000 | | | | 10,500 | | |
|   Voting Agent - Global Advisors, Inc | | | | 3,625 | | | | | | | | | | |
| Capital Improvements | | | | | | | | | | | | | | |
|   Apartment Refurbishments | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
|   HOA & Commercial Property Dues | 48,000 | | | | | | | | | | | | 48,000 | |
| | | | | | | | | | | | | | | |
| **Total Cash Disbursements** | 256,183 | 286,150 | 74,500 | 439,080 | 140,983 | 334,250 | 71,900 | 416,330 | 140,183 | 335,750 | 91,650 | 349,175 | 253,163 | 308,250 |
| | | | | | | | | | | | | | | |
| **Net Cash Flow from Operations** | (196,093) | 373,149 | 33,451 | (360,420) | (35,623) | 281,350 | 38,120 | (337,310) | (105,143) | (265,670) | 522,550 | (160,495) | (217,883) | (237,690) |
| | | | | | | | | | | | | | | |
| **Cash Rollforward** | | | | | | | | | | | | | | |
| Beginning Cash | 1,861,625 | 1,665,532 | 2,038,681 | 2,072,132 | 1,711,712 | 1,676,089 | 1,957,439 | 1,995,559 | 1,658,249 | 1,553,106 | 1,287,436 | 1,809,986 | 1,649,491 | 1,431,608 |
| Cash Increase (Decrease) | (196,093) | 373,149 | 33,451 | (360,420) | (35,623) | 281,350 | 38,120 | (337,310) | (105,143) | (265,670) | 522,550 | (160,495) | (217,883) | (237,690) |
| Sweep | | | | | | | | | | | | | | |
| **Ending Cash Balance** | 1,665,532 | 2,038,681 | 2,072,132 | 1,711,712 | 1,676,089 | 1,957,439 | 1,995,559 | 1,658,249 | 1,553,106 | 1,287,436 | 1,809,986 | 1,649,491 | 1,431,608 | 1,193,918 |

Notes:
A. Plant Operations includes costs for building maintenance, housekeeping, security and transportation.
B. The annual General & Professional Liability (GL/PL) insurance premium of approximately $35,000 will be due during the week ending September 24.

Privileged and Confidential
Tentative and Preliminary
Subject to Material Change

DRAFT FOR DISCUSSION

**Life Care St. John's, Inc. dBa Glenmoor**
**Forecasted Weekly Cash Budget**
As of April 07, 2016

| | Projected WE 7/16 | Projected WE 7/23 | Projected WE 7/30 | Projected WE 8/6 | Projected WE 8/13 | Projected WE 8/20 | Projected WE 8/27 | Projected WE 9/3 | Projected WE 9/10 | Projected WE 9/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | |
| Medicare A | | 26,500 | | | | 26,500 | 80,100 | 26,500 | | 80,100 |
| Private Pay | 617,400 | 79,380 | 79,380 | 106,800 | 623,000 | 80,100 | | 106,800 | 623,000 | |
| Co-Insurance | | 4,500 | | | | 4,500 | | | | 0 |
| Other | 1,000 | | | | 1,000 | | | | | 1,000 |
| **Total Cash Receipts** | 618,400 | 110,380 | 79,380 | 106,800 | 624,000 | 111,100 | 80,100 | 133,300 | 623,000 | 81,100 |
| **Cash Disbursements** | | | | | | | | | | |
| General & Administrative | 20,000 | 5,000 | 5,000 | 15,000 | 20,000 | 5,000 | 5,000 | 15,000 | 20,000 | 5,000 |
| Marketing | 2,750 | 4,000 | | 4,000 | 4,000 | 7,500 | 7,500 | 7,500 | 7,500 | 5,000 |
| Plant Operations | 20,000 | 20,000 | 20,000 | 18,700 | 20,000 | 20,000 | 20,000 | 15,800 | 20,000 | 20,000 |
| Apartment Refurbishments - Non Capital | | | | | | | | 4,200 | | |
| Capital Improvements - Routine | 5,000 | | 5,000 | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Dietary Services | 17,500 | 17,500 | 17,500 | 18,500 | 18,500 | 18,500 | 18,500 | 17,500 | 17,500 | 17,500 |
| Health Services | | | | | | | | | | |
| Health Center | | 2,500 | | 15,000 | 2,500 | 2,500 | 2,500 | 15,000 | 2,500 | 2,500 |
| Home Health | 1,000 | 1,000 | 1,000 | 27,000 | 1,000 | 1,000 | 1,000 | 27,000 | 1,000 | 1,000 |
| Payroll, Payroll Taxes & 403b | 161,500 | 27,000 | 161,500 | 161,500 | 161,500 | 161,500 | 161,500 | 161,500 | 161,500 | 161,500 |
| Benefits | 650 | 2,500 | 5,600 | 52,000 | 650 | 2,500 | 2,500 | 5,600 | 52,000 | 650 |
| Management Fee | | | | 8,333 | | | | 8,333 | | |
| Reimbursement to Vitas for LCSJ Operating Costs | | | | | | | | | | |
| Insurance - WC, Auto, GL/PL | | 20,000 | 20,000 | | | 20,000 | 20,000 | | | |
| Health Services - Shared Labor | | | 5,000 | 5,000 | | 5,000 | 5,000 | 5,000 | 5,000 | |
| IT Services | | | 300 | 300 | | 300 | 300 | 300 | | |
| Employee Benefits | | | 3,625 | | | 3,625 | | | | |
| Other - auto fuel, Verizon, admin/other | | | | | | | | | | |
| Insurance | | | | | | | | | | |
| Flood | | | 43,000 | | | | | | | |
| Crime | | | 1,000 | | | | | | | |
| Utilities | | | 49,405 | | | 49,405 | | | | |
| Chapter 11 Professional Expenses | | | | | | | | | | |
| Quarterly US Trustee Fees | | 10,400 | | | | | | | | |
| Legal Counsel to Debtor - TMBH | | | 50,000 | | | 50,000 | | | | |
| Legal Counsel to Debtor - Holland & Knight | | | | | | | | | | |
| Regulatory Counsel to Debtor - Greystone | | | | | | | | | | |
| Operations Consultant to Debtor - Greystone | 11,000 | | 10,500 | 11,000 | | 10,500 | | | 11,000 | |
| Noticing Agent - American Legal Claims Services | | | | | | | | | | |
| Voting Agent - Globic Advisors, Inc | | | | | | | | | | |
| Capital Improvements | | | | | | | | | | |
| Apartment Refurbishments | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| HOA & Commercial Property Dues | | | | | | | | | | |
| **Total Cash Disbursements** | 520,500 | 270,400 | 260,930 | 369,483 | 521,350 | 259,500 | 220,830 | 322,683 | 477,500 | 267,650 |
| **Net Cash Flow from Operations** | 97,900 | (160,020) | (181,550) | (262,683) | 102,650 | (148,400) | (140,730) | (189,383) | 145,500 | (186,550) |
| **Cash Rollforward** | | | | | | | | | | |
| Beginning Cash | 1,193,918 | 1,714,418 | 1,554,398 | 1,372,848 | 1,110,165 | 1,631,515 | 1,483,115 | 1,342,385 | 1,153,002 | 1,630,502 |
| Cash Increase (Decrease) | 520,500 | (160,020) | (181,550) | (262,683) | 521,350 | (148,400) | (140,730) | (189,383) | 477,500 | (186,550) |
| Sweep | | | | | | | | | | |
| **Ending Cash Balance** | 1,714,418 | 1,554,398 | 1,372,848 | 1,110,166 | 1,631,515 | 1,483,115 | 1,342,385 | 1,153,002 | 1,630,502 | 1,443,952 |

Privileged and Confidential
Tentative and Preliminary
Subject to Material Change

Notes

A. Plant Operations includes costs for building maintenance, housekeeping, ...

B. The annual General & Professional Liability (GL/PL) insurance premium of ...

## SCHEDULE B
## PROVISIONS OF BOND DOCUMENTS

**[TO BE PROVIDED]**

80.4