# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re                            )

LIFE CARE ST. JOHNS, INC.,     )     Case No.:  3:16-bk-1347-JAF
a Florida not-for-profit corporation
doing business as GLENMOOR,[1]    )     Chapter 11

              Debtor.       )

_____ )

## MOTION FOR ENTRY OF ORDERS (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS; (B) APPROVING BIDDING PROCEDURES AND OVERBID PROTECTIONS IN CONNECTION THEREWITH; (C) APPROVING THE FORM AND MANNER OF NOTICE; AND (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Life Care St. Johns, Inc., a Florida not-for-profit corporation doing business as Glenmoor ("Glenmoor" or  "Debtor"), moves the Court, pursuant to §§ 363, 1129(b)(2) and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006,  and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of orders (a) authorizing the Debtor to sell substantially all of its assets to LCS Glenmoor, LLC ("LCS" or the "Stalking Horse Bidder") or such other party (the "Successful Bidder") who submits a higher and better bid at the Auction (as defined below) free and clear of liens, claims and interests; (b) approving bidding procedures and overbid protections in connection therewith; (c) approving the form and manner of notice;

---

[1] The Federal Employer Identification Number for the Debtor is 59-3474627.  The address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

and (d) approving assumption and assignment procedures with respect to executory contracts and unexpired leases, and in support of the motion states:

## Preliminary Statement

By this motion, Glenmoor seeks entry of orders authorizing the sale of Debtor's continuing care retirement community ("CCRC") in St. Augustine, Florida, to LCS for $24,450,000, or to such other prospective purchaser who may submit a higher and better offer for Glenmoor's assets at a court supervised auction. To ensure that the sale process is open, fair and efficient, Glenmoor also seeks the entry of an order scheduling an auction of the Debtor's assets, approving bid procedures to be utilized in connection therewith (the "Bid Procedures"), and providing certain bid protections to the Stalking Horse Bidder, including a break-up fee of $700,000 (the "Break-Up Fee") and an expense reimbursement of up to $150,000 (the "Expense Reimbursement").

## Jurisdiction And Venue

1.      This Court has jurisdiction over the matters raised in this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to one or more subsections of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

3.      On April 11, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtor is authorized to continue to operate its business and manage its property as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

5.      Glenmoor is a not-for-profit organization that owns and operates a continuing care retirement community ("CCRC") in St. Johns County, Florida.  The company received its certificate of occupancy in 1999 and began operations in October of 2001.

6.      As a CCRC, Glenmoor provides "lifecare services" to its residents, each of whom reside in a residential unit.  The "lifecare" concept recognizes that the healthcare and residency needs of elderly residents vary along a continuum beginning with independent living and in many cases ending with a need for full-time nursing care.  The Glenmoor community thus includes independent residential units, an assisted living center, and a healthcare center for residents requiring round the clock nursing care.

7.      Residency at Glenmoor is provided pursuant to "Residence and Care Contracts" which require prospective residents to pay an "Entrance Fee" and a "Monthly Service Fee."  The Entrance Fee is a lump sum, one-time payment based on the type of Residential Unit occupied by the resident, and obligates Glenmoor to provide care to the resident so long as he or she remains a resident and pays the Monthly Service Fee. Depending upon the type of contract selected, the Entrance Fee may or may not be refundable.  For residents with refundable Entrance Fee contracts, the refund is to be paid from the proceeds of the next Entrance Fee received by Glenmoor.

8.      Unfortunately, the economic recession which began in late 2007 had a dramatic impact on Glenmoor, with fewer residents being able to afford the required Entrance Fees as their home equity and investments portfolios shrank in value.  With fewer

new residents entering the community than were moving out, significant Entrance Fee refund liabilities began to accumulate, rising to almost $8 million at their peak (the "Refund Queue"). The decreasing revenues eventually led to payment and other defaults under the $59 million in Revenue Bonds issued in 2006 to support Glenmoor and refinance an earlier bond issue (the "2006 Bonds").

9.    The defaults under the 2006 Bonds and the accumulation of the Refund Queue were of obvious concern to Florida's Office of Insurance Regulation (the "OIR"), the government entity that governs the licensing and operations of CCRCs in Florida, which threatened enforcement action if the payment defaults and refund liabilities were not addressed in a timely fashion.

10.    With pressure mounting from each of these angles, Glenmoor had little choice but to seek relief under chapter 11 of the Bankruptcy Code. Its petition was filed on July 3, 2013, and was styled as *In re Life Care St. Johns, Inc.*, debtor; United States Bankruptcy Court, Middle District of Florida, Jacksonville Division; Case No. 3:13-bk-4158-JAF (the "Initial Chapter 11 Case").

11.    During the course of the Initial Chapter 11 Case, Glenmoor worked closely with its creditor constituency and together they developed a consensual Plan of Reorganization filed November 27, 2013. Among other things, the Plan contemplated a restructuring of Glenmoor's indebtedness through (i) the exchange of the 2006 Bonds for new Series 2014A and Series 2014B Bonds; (ii) formation of Refund Queue Claim Holders' Distribution Trust (as defined in the Confirmed Plan) for the benefit of prepetition Entrance Fee refund claimants and issuance of promissory notes in favor of the Refund Queue Claim Holders' Distribution Trust; and (iii) establishment of a distribution waterfall governing the use and expenditure of operating and other post-confirmation income.

4

12.     Glenmoor's Plan of Reorganization was confirmed by this Court on February 28, 2014 (the "Confirmed Plan").  The Final Decree was entered on April 6, 2016.

13.     Though Glenmoor's post-confirmation operational performance was consistent with the Confirmed Plan projections, Glenmoor's post-confirmation refund obligations exceeded the actuarial projections upon which the Confirmed Plan was based due to unexpected move-outs.  While Entrance Fees from residents moving into Glenmoor have been sufficient to offset the unexpected refund liabilities, the surplus of revenues ordinarily expected from the new entries was consumed in such effort, leaving Glenmoor with insufficient revenues to fully fund the distribution waterfall established by the Confirmed Plan.  Glenmoor was thus unable to fulfill the financial commitments owing to its Bondholders (as defined in the Confirmed Plan) and the Refund Queue Claim Holders' Distribution Trust  required under the Confirmed Plan.

14.     Following the defaults, Glenmoor met with the Bond Trustee and representatives of the Refund Queue Oversight Committee (each as defined in the Confirmed Plan) to discuss potential solutions.  Through such negotiations, it was decided that an affiliation with a national operator of CCRCs or an outright sale of Glenmoor's assets was preferable to the constant renegotiation and restructuring of Glenmoor's debt. To that end, Glenmoor entered into a Forbearance Agreement with the Bond Trustee and a Restructuring Agreement with the Refund Queue Claim Holders' Distribution Trustee which established a timetable and structure for the agreed upon affiliation or sales process. The Forbearance Agreement and the Restructuring Agreement were approved by the Court in the Initial Chapter 11 Case on July 20, 2015.

15.    In accordance with the Forbearance and Restructuring Agreements, Glenmoor retained the advisory services of DTZ, now known as Cushman & Wakefield, as an investment banker to administer the affiliation process.  DTZ in turn solicited offers from over 100 industry prospects, with a number of prospective purchasers ultimately submitting letters of intent to acquire Glenmoor's assets.  After vetting the various offers with the Bond Trustee, LCS was selected as the Stalking Horse purchaser of Glenmoor's assets and a Letter of Intent was signed on October 23, 2015 and amended on January 29, 2016.  Though their names are similar, there is no affiliation between Life Care St. Johns, Inc. and LCS.

16.    Following execution of the Letter of Intent, the parties negotiated an asset purchase agreement spelling out in detail the terms under which Glenmoor would sell its assets and LCS would acquire such assets.[2]  The Stalking Horse APA was executed on March 21, 2016, a copy of which is attached as **Exhibit A**.  Importantly, the Stalking Horse APA contemplates the assumption of all active Residence and Care Contracts and all Entrance Fee refund liabilities arising after February 28, 2014, and payment of all trade debt owed by Glenmoor on the date of sale – including prepetition trade debt, up to a cap of $150,000.  Due to jurisdictional concerns regarding the Court's authority to conduct a post-confirmation sale, however, it was necessary for Glenmoor to commence a second chapter 11 case to obtain approval of the proposed transaction under §§ 363 and 1129(b)(2) of the Bankruptcy Code.  This chapter 11 case was therefore filed to facilitate that process.

---

[2]  Glenmoor and LCS have entered into a separate agreement regarding the purchase and sale of the 11 acre parcel of unimproved real property adjacent to its primary campus (the "11 Acre Parcel").  Glenmoor anticipates running a separate but simultaneous sales process with respect to the 11 Acre Parcel.  LCS' obligation to purchase the 11 Acre Parcel is conditioned upon its purchase of Glenmoor.  The purchase of the 11 Acre Parcel is not, however, a condition to its purchase of Glenmoor.

17.     Notwithstanding the second chapter 11 filing, Glenmoor continues to pay its operating expenses in a timely fashion.  There has not been nor is there now any threat to current operations.


**The Marketing of Glenmoor and Selection of the Stalking Horse Bidder**

18.     As required by the Forbearance Agreement, Glenmoor employed DTZ as its investment banker and sales broker in July 2015.

19.     Following its retention, DTZ (i) prepared marketing materials for potential acquirers, investors and lenders, (ii) established an electronic data room through which potential applicants could access material information concerning Glenmoor, (iii) prepared an agreed form of offering memorandum; (iv) contacted 116 buyers and industry consultants and referral services about the acquisition opportunity, and (v) marketed Glenmoor and solicited transaction proposals from various interested parties.  As a result, DTZ secured confidentiality agreements from and distributed the offering memorandum to 44 potential buyers.

20.     On March 21, 2016, Glenmoor entered into the Stalking Horse APA with LCS.

21.     The material terms and conditions of the Stalking Horse APA are summarized as follows:[3]

---

[3]   This summary is qualified in its entirety by the Stalking Horse APA. To the extent this summary conflicts with the Stalking Horse APA, the Stalking Horse APA governs. Capitalized terms used in this summary but not defined herein shall have the meanings provided in the Stalking Horse APA.

| | |
|---|---|
| Purchase Price | $24,450,000 |
| | The purchase price is subject to customary adjustments upward and downward as set forth in the Stalking Horse APA. |
| Deposit | As an inducement for the Seller to enter into the Stalking Horse APA, Buyer has deposited $1,375,000 (the "Deposit") with TD Bank, N.A. pursuant to an escrow agreement entered into between Buyer and Seller. The Deposit will be nonrefundable (with customary exceptions). |
| Stalking Horse Bid | Pursuant to sections 105, 363, 365 and/or 1129 of the Bankruptcy Code, and subject to the terms, conditions and other provisions of the Stalking Horse APA, Buyer will serve as the stalking horse bidder for substantially all of the assets of the Seller, subject to a competitive auction process proposed in bidding procedures to be negotiated between Seller and Buyer. |
| Assets Acquired | Acquisition of 100% fee simple interest in the Community together with Seller's rights, title and interest, free and clear of all liens, claims, interests, encumbrances and liabilities, in and to, all associated land (except the 11 acre undeveloped parcel adjacent to the operational facilities), improvements, intellectual property (including but not limited to trademarks, copyrights, or other licensing agreements), tangible and intangible personal property (including inventory), permits and licenses (to the extent transferable), accounts receivable, including any notes due from the residents, books and records relating to the business, Transferred Contracts (subject to further diligence), residency agreements except as otherwise provided herein, and other assets identified in the Stalking Horse APA owned by Seller regarding the ownership or operation of the Community. |
| | Buyer will also acquire the Medicare provider number of the Community. |
| Liabilities Assumed | Buyer will assume all obligations arising under the residency agreements entered into by Seller and all current residents of the Community, including any entrance fee refund obligations contained therein. |
| | Buyer will assume entrance fee refund obligations arising after February 28, 2014 through the date of Closing. For avoidance of doubt, Buyer is not assuming any obligations |

8

owing to the Refund Queue Claim Holders' Distribution Trust or to any beneficial interest holder therein.

Buyer will assume prepetition accounts payable to ordinary course trade creditors, but only up to $150,000 in the aggregate and paid time off and related employee obligations as set forth in the Stalking Horse APA.

Except as specifically identified in the Purchase Agreement, Buyer will assume no other liabilities of Seller, and the Community will be delivered to Buyer unencumbered of any other debt.

| | |
|---|---|
| Excluded Liabilities | Buyer will not assume any liabilities owing to the Beneficial Interest Holders of the Refund Queue Claim Holders' Distribution Trust established pursuant to the Amended Plan of Reorganization confirmed in Seller's prior Chapter 11 case on February 28, 2014 or residency care claims. |
| MLR | Buyer will fund any required Minimum Liquidity Reserve ("MLR") Funds as required by Florida Statute 651.091. Funds currently held in any MLR fund would be released to Seller and distributed in accordance with the Debtor's plan of reorganization. |
| Closing | Closing would occur within sixty (60) days after entry of the Sale Order.<br><br>Receipt of all Bankruptcy Court approvals and requisite licensing and regulatory approvals are closing conditions. |
| Financing | It is contemplated that closing will be on an all-cash basis. Any financing placed on the Community by Buyer will be post-closing. Accordingly, the Stalking Horse APA does not contain any financing contingencies. |
| Bid Protections | A break-up fee in the amount of $700,000 and expense reimbursement up to $150,000 are required to induce Buyer to conduct the costly diligence necessary to negotiate the Stalking Horse APA and provide a competitive floor bid for the assets, as is customary in this type of transaction. |

## The Proposed Bid Procedures

22.      In order to ensure that the Stalking Horse APA is in fact the highest and best offer, Glenmoor has determined that the sale to LCS should be subjected to competitive bidding on terms and procedures established by the Court.

23.      This section sets forth key provisions of the "Bid Procedures" procedures proposed by Glenmoor with respect to the proposed sales process.[4]

24.      ***Obtaining Due Diligence Access.***   Any entity (other than LCS) interested in the Purchased Assets (a "Potential Bidder") must deliver an executed confidentiality agreement (each, a "Confidentiality Agreement") reasonably acceptable to Glenmoor and containing terms in the aggregate no less favorable to Glenmoor in any material respect (other than with respect to the effective periods and the non-disclosure and non-solicitation provisions contained therein, all of which terms shall be commercially reasonable) than those contained in the confidentiality agreement by and between LCS and Glenmoor. After Glenmoor's receipt of an executed Confidentiality Agreement, Glenmoor shall provide each Potential Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request. The due diligence period will end on **May 30, 2016** (the "Bid Deadline").

25.      In connection with the provision of due diligence information to Potential Bidders, Glenmoor shall not furnish any confidential information relating to Glenmoor, the Purchased Assets, or the Sale to any person except a Potential Bidder or such bidder's duly-authorized representatives to the extent provided in the Confidentiality Agreement.

---

[4]  All dates proposed in this Motion by the Debtor are subject to the Court's approval and, assuming the relief requested in this Motion is granted, will be finalized at the hearing on the Bid Procedures. To the extent this summary conflicts with the Bid Procedures, the Bid Procedures as attached to the Bidding Procedures Order (as entered by the Court) shall govern.

26.     Glenmoor shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.  No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

27.     ***Bid Requirements.***  To participate in the Auction, prior to the Bid Deadline, a Potential Bidder (other than LCS) must deliver to Glenmoor a written irrevocable offer that must:

(a)     be in writing;

(b)     authorize Glenmoor to provide the bid to LCS and the Bond Trustee;

(c)     equal or exceed $25,400,000, which is the sum of the following: (i) the Sales Proceeds of $24,450,000; (ii) the Break-up Fee of $700,000; (iii) the Expense Reimbursement of $150,000; and (iv) the minimum bid increment of $100,000 (such aggregate sum, the "Minimum Bid Amount") (all of which must be in cash, and/or the assumption of administrative expense liabilities, except in the event of a credit bid by the Bond Trustee);

(d)     constitute a good faith, bona fide offer to purchase all of the Purchased Assets, and to assume the Assumed Liabilities, including the Residence and Care Contracts of current residents and all Entrance Fee refund obligations arising after February 28, 2014, and the consummation of the transactions contemplated in the Stalking Horse APA;

(e)     be accompanied by a clean and duly executed copy of an Asset Purchase Agreement and the documents set forth as exhibits thereto, along with copies that are marked to reflect the amendments and modifications from the Stalking Horse APA executed with LCS, which may not be on terms less favorable in the aggregate to Glenmoor or inconsistent with these Bidding Procedures;

(f)     identify with particularity each and every condition to closing, including the executory contracts and unexpired leases for which assumption and assignment is required;

(g)     not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval (other than court approval and issuance of licenses necessary to operate Glenmoor), or (iii) the outcome or completion of a due diligence review by the Potential Bidder; and

(h)     must remain irrevocable until 48 hours after the Auction.

11

28.     In addition to the above, each Potential Bidder must:

    (a)     provide Glenmoor and the Bond Trustee, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of Glenmoor (in consultation with the Bond Trustee), that such Potential Bidder has the financial wherewithal and ability to consummate the acquisition of the Purchased Assets, and the assumption of the Assumed Contracts, including current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring Glenmoor, current audited financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtor, demonstrating such Potential Bidder's ability to timely close the proposed transaction and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed and assigned;

    (b)     fully disclose the identity of each entity that will be bidding for or purchasing the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;

    (c)     on or before the Bid Deadline, submit a cash deposit equal to $1,375,000 by wire transfer of immediately available funds to an account or accounts established pursuant to an escrow agreement (the "Good Faith Deposit"); and

    (d)     not be entitled to any break-up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

29.     Bids fulfilling all of the preceding requirements shall be deemed to be "Qualified Bids," and those parties submitting Qualified Bids shall be deemed to be "Qualified Bidders."  Within twelve hours after receipt of a Qualified Bid, Glenmoor shall provide such Qualified Bid to the Bond Trustee and LCS.  Within one (1) Business Day

after the Bid Deadline, Glenmoor, shall determine, in consultation with the Bond Trustee, which Potential Bidders are Qualified Bidders and will notify the Potential Bidders and LCS whether their bids constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction.  The Stalking Horse APA submitted by LCS shall be deemed a Qualified Bid.

30.  ***Bid Deadline.***  Binding bids must be actually received by Glenmoor no later than 5:00 p.m. (prevailing Eastern Time) on May 30, 2016 (the "Bid Deadline").

31.  ***Evaluation of Qualified Bids.***  Prior to the Auction, Glenmoor shall evaluate Qualified Bids and, in consultation with the Bond Trustee, identify the Qualified Bid that is, in Glenmoor's judgment, the highest or otherwise best bid (the "Starting Bid"). Within 24 hours of such determination, Glenmoor shall notify LCS as to which Qualified Bid is the Starting Bid.  Glenmoor shall distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

32.  ***Reservation of Rights.***  Bidding Procedures provide that the Debtor, in consultation with the Bond Trustee, may modify the Bid Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the proposed Sale of its assets if in its reasonable judgment, such modifications would be in the best interests of the Debtor's estate and promote an open and fair sale process, and so long as such modifications and/or additional terms are consistent with the provisions of the Stalking Horse APA.

33.  ***Acceptance of the Successful Bid.***  Upon the conclusion of the Auction (if the Auction is conducted), Glenmoor, in the exercise of its reasonable, good-faith business judgment and after consulting with the Bond Trustee, shall identify the highest and best bid (the "Successful Bid").  In determining which Qualified Bid is the Successful Bid, the

Debtor may consider, after consultation with the Bond Trustee (other than any one of the foregoing choosing to bid at the Auction), among other things: (1) the amount of the purchase price; (2) the form of consideration being offered; (3) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (4) the net benefit to the Debtor's estate and all of its constituents, and the effect of the Sale Transaction on the residents of the Debtor; (5) the extent of such Qualified Bidder's background and experience operating a CCRC; (6) licensure qualification issues; and (7) any other facts, including but not limited to, all other non-economic factors. Before the conclusion of the Auction, the Debtor shall inform each of the Bidders of the decision regarding designation of the Successful Bid, and the Qualified Bidder who submitted such Successful Bid shall be required to execute a definitive asset purchase agreement at such time. The Debtor shall present the Successful Bid to the Bankruptcy Court for approval at the Sale Hearing.

34.     ***Assumption and Assignment of Unexpired Leases.***

In connection with the proposed sale, it is also necessary that uniform procedures be established for the assumption and assignment of executory contracts and unexpired leases. The Stalking Horse APA provides for the assumption of all active Residence and Care Contracts and all Entrance Fee refund liabilities arising after February 28, 2014. Each Qualified Bid must contain similar provisions. With respect to all other executory contracts and unexpired leases, Debtor proposes that the following Assumption and Assignment Procedures govern the assumption and assignment of Assumed Contracts in connection with the Sale of the Purchased Assets to LCS or the Successful Bidder:

(a)     Initial Contract Designations. On or before **[TBD]**, Glenmoor shall file with this Court and serve on each non-debtor counterparty to an executory contract or unexpired lease with Glenmoor (each, a "Non-Debtor Counterparty") that Glenmoor may assume and assign to LCS or the Successful Bidder, a notice of assumption and assignment of executory

14

contracts and unexpired leases in substantially the form of the Contract Assumption Notice attached hereto as **Exhibit C**. Glenmoor shall attach to the Contract Assumption Notice a list identifying the Non-Debtor Counterparties to the Assumed Contracts and the corresponding Cure Amounts under the Assumed Contracts. In addition, Glenmoor shall serve a copy of the Contract Assumption Notice on a Non-Debtor Counterparty's counsel of record, if any, as of the date of the Contract Assumption Notice ("Counsel of Record").

(b)　　Information in Assumption Notice. For each Assumed Contract, on the Contract Assumption Notice, Glenmoor shall either (i) indicate the proposed Cure Amounts relating to such Assumed Contract or (ii) provide an amount representing the proposed Cure Amounts for multiple Assumed Contracts with the same Non-Debtor Counterparty, subject, upon request, to providing greater detail to a Non-Debtor Counterparty to identify on a contract-by-contract basis the proposed applicable Cure Amounts to the extent reasonably available. On a Contract Assumption Notice, Assumed Contracts may be listed individually or in groups of agreements with the Non-Debtor Counterparty, as long as the Non-Debtor Counterparty is provided with sufficient information to identify the contracts to be assumed and assigned. The Contract Assumption Notice also may identify any additional proposed terms or conditions of assumption and assignment.

(c)　　If a party other than LCS is the Successful Bidder, or if a transaction other than the Sale to LCS is consummated for the Purchased Assets in accordance with the Bidding Procedures, then these Assumption and Assignment Procedures may be modified if necessary by further order of this Court.

(d)　　Additional Contract Assumption Designations. LCS or the Successful Bidder, as the case may be, may designate, up to **[TBD]**, (the "Assumption Designation Deadline"), additional executory contracts and unexpired leases as agreements to be assumed by Glenmoor and assigned to LCS or the Successful Bidder pursuant to the Stalking Horse APA or the APA executed by the Successful Bidder. Glenmoor shall serve a Contract Assumption Notice on each of the Non-Debtor Counterparties to such Assumed Contracts and their counsel of record, if any, indicating (i) that the notice recipient is a Non-Debtor Counterparty to one or more executory contracts or unexpired leases with Glenmoor that Glenmoor intends to assume and assign to LCS or the Successful Bidder and (ii) the corresponding Cure Amount under the Assumed Contracts as of the date of such Contract Assumption Notice.

(e)　　Contract Removal Designations. In accordance with the Stalking Horse APA or the APA executed by the Successful Bidder, LCS or the Successful Bidder may remove executory contracts and unexpired leases as agreements to be assumed by Glenmoor and assigned to LCS or the Successful Bidder pursuant to the Stalking Horse APA or the APA executed by the Successful Bidder (the "Removed Contracts") until three (3)

Business Days following entry of a final order determining all Cure Amounts and adequate assurance (if any) required for such contract. Upon notice by LCS or the Successful Bidder to Glenmoor of a removal of a specific Removed Contract, or a group thereof, Glenmoor shall serve a notice (a "Removal Notice") on each of the Non-Debtor Counterparties to such Removed Contracts and their Counsel of Record, indicating that the notice recipient is a Non-Debtor Counterparty to one or more executory contracts or unexpired leases with Glenmoor that Glenmoor no longer intends to assume and assign to LCS or the Successful Bidder in connection with the Sale.

(f)     Section 365 Objections. Objections, if any ("§ 365 Objections"), to the proposed Cure Amounts, or to the proposed assumption and assignment of the Assumed Contracts, including objections related to adequate assurance of future performance or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, LCS or the Successful Bidder for purposes of § 365(c)(l) of the Bankruptcy Code, must (a) be in writing; (b) state with specificity the nature of such objection and the alleged Cure Amounts (with appropriate documentation in support thereof); (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of this Court, and (d) be filed with the Court so as to be received no later than the deadline to file objections to the Sale.

(g)     Section 365 Hearing. If any of Glenmoor, the Non-Debtor Counterparty or LCS or the Successful Bidder determines that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Assumed Contract and/or the Cure Amounts will be determined by the Court at the Sale Hearing, unless Glenmoor, LCS or the Successful Bidder and the Non-Debtor Counterparty to the Assumed Contract in dispute agree otherwise. If the Court determines at a § 365 Hearing that the Assumed Contract cannot be assumed and assigned, or establishes Cure Amounts that LCS or the Successful Bidder is not willing to pay, then such executory contract or unexpired lease shall no longer be considered an Assumed Contract.

(h)     Consent to Assumption and Assignment. Any Non-Debtor Counterparty to an Assumed Contract who fails to file a timely § 365 Objection to the proposed Cure Amounts or the proposed assumption and assignment of an Assumed Contract by the § 365 Objection Deadline is deemed to have consented to (i) such Cure Amounts, (ii) the assumption and assignment of such Assumed Contract, (iii) the related relief requested in the Sale Motion and (iv) the Sale. Such party shall be forever barred and estopped from objecting to the Cure Amounts, the assumption and assignment of the Assumed Contract, adequate assurance of future performance, the relief requested in the Sale Motion, whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, LCS or the Successful Bidder for purposes of § 365(c)(1)

16

of the Bankruptcy Code and from asserting any additional cure or other amounts against Glenmoor, its estate and LCS or the Successful Bidder with respect to such party's executory contract(s) or unexpired lease(s).

(i)     Resolution of Assumption/Assignment Issues.    If the Non-Debtor Counterparty to an Assumed Contract fails to timely assert a § 365 Objection as described in subparagraph (f) above, or upon the resolution of any timely § 365 Objection by agreement of the parties or order of the Court approving an assumption and assignment, such Assumed Contract shall be deemed to be assumed, without the need for provision of adequate assurance, by Glenmoor and assigned to LCS or the Successful Bidder and the proposed Cure Amount related to such Assumed Contract shall be established and approved in all respects.

(j)     Conditions on Assumption and Assignment.    Glenmoor's decision to assume and assign the Assumed Contracts is subject to Court approval and consummation of the Sale.    Accordingly, subject to the satisfaction of conditions above to address any cure or assignment disputes, Glenmoor shall be deemed to have assumed and assigned to LCS or the Successful Bidder each of the Assumed Contracts as of the date of and effective only upon the Closing, and absent such Closing, each of the Assumed Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by Glenmoor under the Bankruptcy Code. Assumption and assignment of the Assumed Contracts also is subject to the rights of LCS or the Successful Bidder set forth in subparagraphs (c) and (d) above. LCS or the Successful Bidder shall have no rights in and to a particular Assumed Contract until such time as the particular Assumed Contract has been identified by LCS or the Successful Bidder as an Assumed Contract and is assumed and assigned in accordance with the procedures set forth herein

## Relief Requested

35.    By this Motion, the Debtor seeks authorization to sell substantially all of its assets (except the 11 acre undeveloped parcel adjacent to the operational facilities) (the "Sale") to LCS on the terms stated in the Stalking Horse APA or to the Successful Bidder on the terms stated in the APA between such Successful Bidder and the Debtor.  To affect the Sale, the Debtor respectfully requests entry of two orders.  First, at a hearing to be held on April 14, 2016 (the "Bid Procedures Hearing"), the Debtor will seek entry of the Bidding Procedures Order, attached hereto as **Exhibit B**, to approve the proposed bid

procedures and notice procedures relating to the Sale and the Bid Protections to be provided to LCS.  Second, subject to the terms of the Bidding Procedures Order, at a proposed hearing (the "Sale Hearing"), the Debtor will seek entry of a Sale Order approving (i) the sale of the Purchased Assets to LCS, or such other higher and better bidder pursuant to the terms of a Stalking Horse APA or the APA of the Successful Bidder, free and clear of all claims, interests, liens, or encumbrances not expressly assumed, and (ii) the assumption and assignment of Assumed Contracts (defined herein) to LCS, or such other higher and better bidder.

## Basis For Relief Requested

36.    Cause exists to approve the proposed Bid Procedures and to authorize the Sale.  The proposed Bid Procedures are reasonable and necessary to effectuate the sale process and provide sufficient notice and opportunity to permit other bidders to participate in the Auction process.  Upon conclusion of the Auction, the Debtor believes that sufficient cause will exist to enter an order approving the proposed sale to LCS as the Stalking Horse Bidder or such higher and better bidder that results from the Auction.

## A.    The Proposed Bid Procedures Should be Approved

37.    The Debtor, through DTZ, and in conjunction with agreed upon milestones contained in the Forbearance Agreement, has been actively soliciting potential purchasers or affiliates for Glenmoor since the launch of the solicitation process in July, 2015.  During that time, DTZ has contacted at least 116 non-profit and for-profit service providers.  Forty-four interested parties signed confidentiality agreements and were then given access to a data room containing pertinent information and were provided access to the Glenmoor facility and its management.  Ultimately, LCS submitted its final LOI in mid-October

(which LOI was amended on January 29, 2016) and was chosen as the Stalking Horse Bidder.  The Debtor seeks approval of the Bid Procedures in an effort to maximize the likelihood of higher and better bids from those parties that have expressed interest and appear to be qualified potential purchasers of Glenmoor.  As described above, the Debtor's investment banker, DTZ, has extensively marketed Glenmoor prepetition and has advised the Debtor that the Bid Procedures will permit interested parties reasonable opportunities to evaluate whether to propose a bid for Glenmoor that is higher and better than the Stalking Horse Bid.

38.     Under Bankruptcy Rule 6004(f)(1), the Debtor may sell property outside the ordinary course of business by private sale or by public auction.  In this case, the Debtor believes that an auction will expose Glenmoor to a broad and diverse market and ensure a sale to the bidder that makes the highest and best offer.

39.     The Debtor desires to receive the greatest value for Glenmoor.  Although the Debtor believes the Stalking Horse APA represents a fair and reasonable offer and reflects the highest and best value for the assets under these terms as of the date of this Motion, and although Glenmoor was marketed extensively as described above, the Debtor nevertheless desires to place the Stalking Horse APA to the test of the broader public marketplace in the hope that higher and better offers are generated for Glenmoor.

40.     If the Bid Procedures are approved, the Debtor will further solicit competing bids for Glenmoor.  The Bid Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders and the Debtor, the receipt, negotiation and qualification of bids received, the conduct of any auction, and the selection and approval of any ultimately successful bidder.

### (i)      The Proposed Bid Procedures Are Reasonable and Necessary

41.     The Bid Procedures were developed after consultation with DTZ and are consistent with the Debtor's need to promote participation and active bidding. Moreover, the Bid Procedures reflect the Debtor's objective of conducting the Auction in a controlled, fair, and open fashion.

42.     The Debtor believes that the Auction and proposed Bid Procedures will promote active bidding from seriously interested parties and will identify the highest and best offer(s) for Glenmoor.  The proposed Bid Procedures will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  The Debtor believes that the Bid Procedures are: (a) sufficient to encourage bidding for Glenmoor; (b) consistent with procedures previously approved by the Court in similar cases; and (c) appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Further, the Bid Procedures are designed to maximize the value received by the Debtor's bankruptcy estate for Glenmoor while ensuring an orderly sale process.

43.     Once the Debtor articulates a valid business justification for a sale of substantially all of the Debtor's assets, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co*., 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (citing *Smith v. Van Gorkam*, 488 A.2d 858 (Del. 1985); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *Comm. of Asbestos-Related Litigants v. Johns-Manville (In re Johns-Manville Corp.)*, 60

B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a Debtor's management decisions").

44.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate. *See*, *e.g., In re Integrated Res.*, 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

45.     The paramount goal in any proposed auction of property of the estate is to maximize the proceeds received by the estate. *See, e.g.*, *Four B Corp. v. Food Barn Stores (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

46.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets . . .

[should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

47.     The Debtor has a sound business justification for seeking approval of the Bid Procedures at this juncture.  Given the Debtor's current circumstances, the Debtor believes it is in the best interest of its estate, creditors, and parties-in-interest, including the Debtor's residents and employees, to commence bidding procedures immediately to maximize value.  Additionally, the sale of Glenmoor provides a realistic means for the continuation of resident care services for the Debtor's residents with minimal interruption and inconvenience.  For these reasons, the Debtor has determined that, based upon its business judgment, the best option for maximizing value is through the sale pursuant to the Bid Procedures.

48.     The Debtor believes that the Bid Procedures will establish the parameters under which the proposed Sale to LCS as the Stalking Horse Bidder may be tested at the Auction.  The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value of Glenmoor for the benefit of the Debtor's bankruptcy estate and creditors.  The proposed Bid Procedures contain terms typical for a process through which a sale of this nature is consummated and will increase the likelihood that the Debtor will receive the greatest possible consideration by ensuring a competitive and fair bidding process.

### (ii)    The Break-Up Fee and Expense Reimbursement Are in the Best Interest of the Debtor's Estate

49.     To induce LCS to expend the time, energy, and resources necessary to submit a stalking horse bid, the Debtor has agreed to provide, and to seek at this time this Court's approval of, the Break-Up Fee and Expense Reimbursement pursuant to the terms

of the Stalking Horse APA.  The Break-Up Fee and Expense Reimbursement provisions of

the Stalking Horse APA are as follows:

> <u>Bid Protections</u>:    A break-up fee in the amount of $700,000 and expense reimbursement up to $150,000 are required to induce Buyer to conduct the costly diligence necessary to negotiate the Stalking Horse APA and provide a competitive floor bid for the assets, as is customary in this type of transaction.

50.    The Break-Up Fee and the Expense Reimbursement shall be paid at closing

from the closing of any alternate sale.

51.    The Debtor believes that the Break-Up Fee and Expense Reimbursement

protections are fair and reasonable in view of (a) the intensive analysis, due diligence

investigation, and negotiation undertaken by LCS in connection with the transaction, and

(b) the fact that, if an event triggering entitlement to the Break-Up Fee and Expense

Reimbursement occurs, the Debtor will have closed on a higher and better offer for

Glenmoor, to the benefit of the Debtor's estate, creditors, and parties-in-interest. Such

protections are a material inducement for, and a condition of, LCS's entry into the Stalking

Horse APA.

52.    The Debtor believes that having the ability to offer the Bid Protections to

the Buyer and thereby facilitating an Auction will maximize the realizable value of

Glenmoor for the benefit of the Debtor's estate and creditors.

53.    The Third Circuit, for example, identified at least two instances in which

bidding incentives may benefit the estate.  First, a bidding incentive benefits the estate if

the incentive promoted a more competitive bidding process, "such as by inducing a bid that

otherwise would not have been made and without which bidding would have been

limited." *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999). Second, where bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as the floor bid on which other bidders can rely, the bidding incentive benefits the estate. *Id.*

54.     The amount of the Break-Up Fee and Expense Reimbursement in the Stalking Horse APA are reasonable and appropriate in light of the size and nature of the transaction. The Break-Up Fee of $700,000 is less than 3% of the Buyer's cash purchase price. Thus, it is fair and reasonably calculated to produce the highest and best offers for the Property. *See, e.g.*, *In re CWT Liquidation Co. formerly doing business as The Clare at Water Tower*, Case No. 11-46151 (Bankr. N.D. Ill. Mar. 21, 2012) [No. 264] (SPS) (approving break-up fee equal to 4.57% of cash purchase price); *In re Fairview Ministries*, Case No. 11-04386 (Bankr. N.D. Ill. May 24, 2011) [No. 277] (SPS) (approving break-up fee of 3% of purchase price); *In re SK Hand Tool Corp.*, Case No. 10-28882 (Bankr. N.D. Ill. July 9, 2010) [No. 53] (ERW) (approving break-up fee of 4.4% of purchase price); *In re Select Snacks, Inc.*, Case No. 07-18769 (Bankr. N.D. Ill. Oct. 23, 2007) [No. 93] (PSH) (approving break-up fee equal to 3% of purchase price); *In re Hartmarx Corp.*, Case No. 09-02046 (Bankr. N.D. Ill. June 2, 2009) [No. 482] (BWB) (approving break-up fee equal to 3.1% of purchase price).

55.     Moreover, the Break-Up Fee and Expense Reimbursement are consistent with the *O'Brien* test above. The Break-Up Fee and Expense Reimbursement were a material consideration without which LCS would not have entered into the Stalking Horse APA. Additionally, LCS required the Break-Up Fee and Expense Reimbursement as an inducement to conduct the costly diligence necessary to negotiate the Stalking Horse Bid and thereby provide a competitive floor bid.

56.     The Debtor submits that break-up fees are typical and often times necessary components of sales outside the ordinary course of business under § 363 of the Bankruptcy Code.  This is true in cases including CCRCs and other types of businesses.  *See e.g.*, *In re CWT Liquidation Co. formerly doing business as The Clare at Water Tower*, Case No. 11-46151 (Bankr. N.D. Ill. Mar. 21, 2012) [No. 264] (SPS); *In re Fairview Ministries*, Case No. 11-04386 (Bankr. N.D. Ill. May 24, 2011) [No. 277] (SPS); *In re SK Hand Tool Corp.*, Case No. 10-28882 (Bankr. N.D. Ill. July 9, 2010) [No. 53] (ERW); *In re Select Snacks, Inc.*, Case No. 07-18769 (Bankr. N.D. Ill. Oct. 23, 2007) [No. 93] (PSH); *In re Hartmarx Corp.*, Case No. 09-02046 (Bankr. N.D. Ill. June 2, 2009) [No. 482] (BWB); *In re Kmart Corp.,* Case No. 02- 02474 (Bankr. N.D. Ill. May 10, 2002) [No. 3003] (SPS); *In re Comdisco, Inc.,* Case No. 01-24795 (Bankr. N.D. Ill. Aug. 9, 2001) [No. 289] (BWB).

57.     In sum, the Debtor's ability to offer the Break-Up Fee and Expense Reimbursement provisions to LCS enables the Debtor to ensure the sale of Glenmoor to LCS at a price it believes to be fair while, at the same time, providing the Debtor with potentially even greater benefit to its estate.  Thus, the Break-Up Fee and Expense Reimbursement provisions of the Stalking Horse APA should be approved.

58.     Moreover, payment of the Break-Up Fee and Expense Reimbursement provisions will not diminish the value of assets available for distribution to creditors, because, as stated above, the Debtor will only be required to make payments in accordance with the Stalking Horse APA if the Debtor consummates a sale with an alternative bidder that exceeds the consideration offered by Buyer by an amount sufficient to pay the Break-Up Fee and Expense Reimbursement.

### (iii)    Assumption of the Residency Agreements are Necessary

59.    The requirement that a Qualified Bid must contain an agreement to assume the Residency Agreements is necessary in order to ensure that the going concern value of Glenmoor is preserved and to ensure the equitable treatment and well-being of the Debtor's residents.  *See e.g.*, *In re Fairview Ministries*, Case No. 11-04386 (Bankr. N. D. Ill. May 24,2011) [No. 277] (requiring bids to take assignment of and honor all terms of residency agreements, including honoring the refund of entrance fee deposits); *In re Lincolnshire Campus, LLC*, Case No. 10-34176 (Bankr. N.D. Tex. July 21, 2010 through July 23, 2010) [Nos. 193-194, 204] (SGJ) (requiring bids to accept assignment of and agree to honor all terms of Residence and Care Agreements for each of the residents at debtors' facilities) and Sept. 24, 2010 [No. 316] (sale order approving assumption and assignment of Residence and Care Agreements and delivery of Initial Entrance Fee Deposits to asset Buyer).

### B.    The Sale Order Should Be Approved

### (i)    The Proposed Sale is an Exercise of Sound Business Judgment and Should Be Approved

60.    The Debtor submits that ample authority exists for the approval of the proposed sale of Glenmoor to LCS pursuant to the Stalking Horse APA.  Section 363 of the Bankruptcy Code, which authorizes a debtor to sell assets of the estate other than in the ordinary course of business, provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).

61.    Although Bankruptcy Code § 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a

debtor's assets, courts have held that approval of a proposed sale of property pursuant to §

363(b) is appropriate if the transaction represents the reasonable business judgment of the

debtor. *See In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *Grochocinski v. Zeigler (In*

*re Zeigler)*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005); *see also Comm. of Equity Sec.*

*Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063 (2d Cir. 1983); *see also In re*

*Delaware & Hudson River Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that a court

must be satisfied that there is a "sound business reason" justifying the pre-confirmation

sale of assets); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987)

(stating that the elements necessary for approval of a § 363 sale in a Chapter 11 case are

"that the proposed sale is fair and equitable, that there is a good business reason for

completing the sale and the transaction is in good faith"); *Stephens Indus., Inc. v. McClung*,

789 F.2d 386, 391 (6th Cir. 1986).

62.    If a valid business justification exists for the sale, as it does in this case, the

Debtor's decision to sell property out of the ordinary course of business enjoys a strong

presumption "that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in an honest belief that the action taken was in the best

interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D. N.Y. 1992)

(quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Therefore, parties

objecting to the Debtor's proposed sale must make a showing of "bad faith, self-interest or

gross negligence." *Id.*; *see also Comm. of Asbestos-Related Litigants v. Johns-Manville*

*Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D. N.Y. 1986) ("Where

the debtor articulates a reasonable basis for its business decisions (as distinct from a

decision made arbitrarily or capriciously), courts will generally not entertain objections to

the debtor's conduct").

63.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See, e.g.*, *In re Schipper*, 933 F.3d 513, 515 (7th Cir. 1991); *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005); *In re Delaware & Hudson River Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).  The proposed Sale satisfies all these factors.

64.     The Debtor has proposed the Sale after thorough consideration of all viable alternatives and an extensive marketing process conducted by DTZ.  As a result of the foregoing, the Debtor has concluded that the Sale is supported by a number of sound business reasons described in this Motion.  Primarily, the Sale is critical to maintaining the going concern value of the Debtor's business operations at Glenmoor in an efficient manner.  The maximization of value for the benefit of the Debtor's bankruptcy estate and creditors and the protection of the residents reflect sound business purposes that warrant authorization of the proposed Sale.

65.     The Debtor will provide notice of the Bid Procedures as provided in the Bidding Procedures Order, including notice to creditors, potential bidders, and other parties in interest.  The Debtor submits that such notice constitutes adequate and reasonable notice to interested parties.   In addition to the extensive notice contemplated by this Motion, the Debtor also participated in a comprehensive pre-petition marketing process and DTZ continues to market the Property as contemplated in the Bid Procedures.

66.     The value the Debtor will receive for Glenmoor as a going concern by entering into the Stalking Horse APA, or through such other purchase agreement(s) between the Debtor and the Successful Bidder, (a) maintains services for residents at Glenmoor, and (b) exceeds any value the Debtor could get for Glenmoor if the Debtor was required to liquidate its assets piecemeal.

67.     Finally, as described in more detail below, the Sale and Stalking Horse APA were negotiated in the utmost good faith and at arm's length.

68.     For the foregoing reasons, the Debtor submits that approval of the Sale and the Stalking Horse APA and all related transactions are appropriate and warranted under Bankruptcy Code § 363.

### (ii)     The Assets May Be Sold Free and Clear of all Encumbrances

69.     The Debtor further submits that it is appropriate to sell the assets free and clear of all encumbrances, pursuant to Bankruptcy Code § 363(f), with any such encumbrances attaching to the net sale proceeds of the assets, as and to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a the sale of a debtor entity's assets free and clear of liens, claims, interests and encumbrances if:

(1)     applicable non-bankruptcy law permits sale of such property free and clear of such interests;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or
equitable proceeding, to accept a money satisfaction
of such interest.

11 U.S.C. § 363(f).

70.     Because Bankruptcy Code § 363(f) is drafted in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Debtor's assets "free and clear" of liens and interests.  *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005); *see also Michigan Emp't Sec. Comm'n v. Wolverine Radio Co*. (*In re Wolverine Radio Co*.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code § 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code § 363(f) is met); *In re Dundee Equity Corp*., No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D. N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met"); *In re Bygaph, Inc*., 56 B.R. 596, 606 n.8 (Bankr. S.D. N.Y. 1986).

71.     The standard for a sale under § 363(f) is satisfied because, among other things, applicable non-bankruptcy law permits the sale of such property free and clear of such interests; namely because such lienholders will be adequately protected by having their liens attach to the sale proceeds received by the Debtor for the sale of the assets to the Buyer in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto. In addition, creditors could be compelled to accept a

money satisfaction for their claims.  Accordingly, § 363(f) authorizes the sale and transfer of the assets free and clear of any such encumbrances.[5]

**(iii)     The Stalking Horse APA Was Negotiated in Good Faith, at Arm's Length**

72.     The terms of the Stalking Horse APA were negotiated at arm's length, without collusion, and in good faith.  Accordingly, the Debtor requests that the Court determine LCS to have negotiated and acted at all times in good faith and, as a result, be entitled to the protections of a good faith purchaser under § 363(m) of the Bankruptcy Code.

73.     Furthermore, the Debtor submits that the Stalking Horse APA represents substantial value to the Debtor's estate inasmuch as it provides favorable terms for the disposition of Glenmoor for fair and reasonable consideration.  *See Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646-47 (3d Cir. 1991) (reasonably equivalent value under the Bankruptcy Code); *see Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors of R.M.I., Inc, (In re R.M.I., Inc.)*, 92 F.3d 139 (3d Cir. 1996); *Salisbury v. Texas Commerce Bank-Houston (In re WCC Holding Corp.)*, 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994) (reasonably equivalent value under Texas law); *Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (Bankr. N.D. Tex. 1992); *In re China Resource*

---

[5]  LCS (or the Successful Bidder) shall have no successor liability for any claims against the Debtor. Courts have consistently held that the purchaser of a debtor's assets under Bankruptcy Code § 363 takes such assets free and clear of successor liability resulting or arising from pre-existing claims. Such successor liability-type claims would frustrate the purpose of an order authorizing the sale of estate assets free and clear of all "interests." Accordingly, the purchasing parties should not be subject to further claims related to the Debtor's pre-Sale conduct. *See e.g.*, *Ninth Ave. Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 722 (N.D. Ind. 1996).

*Prod. (U.S.A.) Ltd. v. Favda Int'l, Inc.*, 856 F. Supp. 856, 866 (D. Del. 1994) (fair consideration under Delaware law).

74.     Based upon the foregoing, the Debtor submits that, to preserve and maximize the value of Glenmoor, the sale of the assets pursuant to the Stalking Horse APA (or a higher and better offer) is an exercise of sound business judgment, is in the best interests of the Debtor and its estate, and should be approved in all respects.

### (iv)     Debtor's execution of the Stalking Horse APA should be approved

75.     Courts routinely approve entry into asset purchase agreements. *See, e.g.*, *In re CWT Liquidation Co. formerly doing business as The Clare at Water Tower*, Case No. 11-46151 (Bankr. N.D. Ill. Mar. 21, 2012) [No. 264] (SPS); *In re Fairview Ministries*, Case No. 11-04386 (Bankr. N.D. Ill. May 24, 2011) [No. 277] (SPS); *In re SK Hand Tool Corp.*, Case No. 10-28882 (Bankr. N.D. Ill. July 9, 2010) [No. 53] (ERW); *In re Hartmarx Corp.*, Case No. 09-02046 (Bankr. N.D. Ill. June 2, 2009) [No. 482] (BWB); *In re Select Snacks, Inc.*, Case No. 07-18769 (Bankr. N.D. Ill. Oct. 23, 2007) [No. 93] (PSH). *See also In re Enron Corp.*, No. 01-16034 (AJG), 2002 WL 32154269, at *4 (Bankr. S.D. N.Y. Apr. 24, 2002). Such agreements are approved if they are an exercise of the debtor's sound business judgment. *See, e.g.*, *In re Decora Indus., Inc.*, Nos. 00-4459 and 00-4460 (JJF), 2002 WL 32332377, at *5 (Bankr. D. Del. May 17, 2002); *Galey & Lord, Inc. v. Arley Corp. (In re Arlco, Inc.)*, 239 B.R. 261, 265 (Bankr. S.D. N.Y. 1999). In this case, the Stalking Horse APA was the subject of extensive arm's length negotiations between the Debtor and LCS, and the Debtor submits that the terms and conditions of the Stalking Horse APA are the best that could be obtained under the circumstances and that entry into the Stalking Horse APA is a sound exercise of the Debtor's business judgment. Likewise,

if LCS is not the Successful Bidder, Glenmoor submits that the APA with the Successful

Bidder should be approved.

### (v)    Assumption and Assignment of the Assumed Contracts is Authorized by § 365 of the Bankruptcy Code

76.    Bankruptcy Code §§ 365(a) and (b) authorize a debtor-in-possession to

assume, subject to the court's approval, executory contracts or unexpired leases of the

debtor.  11 U.S.C. §§ 365(a) and (b).  *See Metro. Airports Comm'n v. Nw. Airlines (Matter*

*of Midway Airlines, Inc.)*, 6 F.3d 492, 494 (7th Cir. 1993); *In re Del Grosso*, 115 B.R. 136

(Bankr. N.D. Ill. 1990).  *See also In re Jamesway Corp.*, 201 B.R. 73, 76 (Bankr. S.D. N.Y.

1996).  Under Bankruptcy Code § 365(a), a debtor, "subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. §

365(a).  Bankruptcy Code § 365(b)(l), in turn, codifies the requirements for assuming an

unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A)    cures or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)    provides adequate assurance of future performance under such contract or lease.
>
> 11 U.S.C. § 365(b)(1).

33

77.     Section 365 of the Bankruptcy Code allows a debtor-in-possession to maximize the value of its estate by assuming executory contracts or unexpired leases that benefit the estate and by rejecting those that are burdensome to the estate.  *See COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 382 (2d Cir. 2008); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) ("[T]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property'") (citations omitted).

78.     The "business judgment" standard is not a strict standard; it requires only a showing that assumption of the executory contract or unexpired lease will benefit the Debtor's estate.  *See In re Penn Traffic Co.,* 524 F.3d at 383 ("[The business judgment] standard rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage . . .").

79.     The standard applied by a court in determining whether the assumption or rejection of an executory contract or unexpired lease pursuant to § 365(a) should be approved is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate.  *See, e.g.*, *In re Group of Institutional Investors, Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co*., 318 U.S. 523, 550 (1943) ("the question . . . [of assumption] is one of business judgment"); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) (business judgment standard); *Software Customizer Inc. v. Bullet Jet Charter, Inc. (In re Bullet Jet Charter, Inc.)*, 177 B.R. 593, 601 (Bankr. N.D. Ill. 1995) (business judgment rule); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp*.), 4 F.3d 1095, 1098-99 (2d Cir. 1993) (to decide

a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

80.     Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Bullet Jet Charter*, 177 B.R. at 601 (debtor's discretion to assume or reject an executory contract should only be disturbed where the Court's finds the debtor in possession "acted in bad faith or grossly abused [its] retained managerial discretion . . . ."); *In re Paolo Gucci*, 193 B.R. 411, 414 (S.D. N.Y. 1996); *see also Sharon Steel Corp. v. Nat'l Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *In re III Enter., Inc.*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet").

81.     In the present case, the Debtor's assumption and assignment of the Assumed Contracts (as that term is defined in the Stalking Horse APA) to LCS (or the Successful Bidder) meets the business judgment standard and satisfies the requirements of § 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Stalking Horse APA (or an APA between the Debtor and the Successful Bidder) will provide significant benefits to the Debtor's estate. Because the Debtor cannot obtain the benefits of the Stalking Horse APA (or an APA between the Debtor and the Successful Bidder) without the assumption of the Assumed Contracts, the assumption of these Assumed Contracts is undoubtedly a sound exercise of the Debtor's business judgment.

82.     Further, a debtor-in-possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section

365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.  *See* 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D. N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

83.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D. N.Y. 1992) (citations omitted).

84.     Here, LCS has agreed to assume all active Residence and Care Contracts, all Entrance Fee refund liabilities arising after February 28, 2014, and all cure amounts associated with the Assumed Contracts.  LCS has sufficient assets to continue performance thereunder and will provide adequate assurance of future performance under such obligations as requested by any Counterparty and required by the Court.  Likewise, any Successful Bidder will be required to assume all cure amounts in connection with the Assumed Contracts and perform its obligations thereunder.  Accordingly, the Debtor submits that the assumption and assignment of the Assumed Contracts as set forth herein should be approved.

85.     Pursuant to the Bid Procedures and this Motion, not later than five (5) days after the entry of the Bidding Procedures Order, the Debtor shall serve each Counterparty

to a potential Assumed Contract (each a "Counterparty", and together, the "Counterparties"), by express mail or facsimile transmission, with a notice of the cure amount that the Debtor believes is owed under each such potential assumed contract at the time of such notice, according to Debtor's books and records. No such notice need, however, be provided with respect to any Residence and Care Contract.

86.     Counterparties shall have until **[TBD]** (prevailing Eastern Time) (the "Cure Objection Deadline") to file an objection to the proposed cure amounts set forth in such notice. To the extent no objection is filed with regard to a particular cure amount, such cure amount shall be binding on the applicable Counterparty. The payment of the cure amounts specified in the notice to Counterparties (or a different amount either agreed to by the Debtor or resolved by the Court as a result of a timely filed objection filed by a Counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the Counterparties for any pecuniary losses under such contracts or leases pursuant to § 365(b)(1) of the Bankruptcy Code.

87.     To assist in the assumption and assignment of the Assumed Contracts, the Debtor also requests that the Bankruptcy Court enter an order providing that any anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

88.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or
> unexpired lease of the debtor, or in applicable law, that
> prohibits, restricts, or conditions the assignment of such
> contract or lease, the trustee may assign such contract or
> lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1).

89.     Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease.  *See, e.g.*, *Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.)*, 127 F.3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtor here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365").  Section 365(f)(3) goes beyond the scope of § 365(f)(l) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  *See, e.g.*, *In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (§ 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

90.     Other courts have recognized that provisions that have the effect of restricting assignments also cannot be enforced.  *See In re Rickel Home Centers, Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions").

91.     Therefore, the Debtor requests that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of § 365(f) of the Bankruptcy Code.

## Notice

1.     In accordance with the Motion for an Order Establishing Notice Procedures [Docket No. 5], the Debtor has provided copies of this Motion to (a) the Office of the United States Trustee; (b) Daniel S. Bleck, Esq., counsel to UMB, n.a., in its capacity as Bond Trustee under the Bond Indenture; (c) the Florida State Office of Insurance Regulation; (d) the Internal Revenue Service; (e) counsel for LCS; (f) David Otero, Esq., counsel to the Refund Queue Trustee; (g) all known holders of liens on the Purchased Assets; (h) the Debtor's twenty largest unsecured creditors; and (i) those persons who have formally appeared and requested service in these proceedings pursuant to Bankruptcy Rule 2002 (collectively, the "Master Service List")

2.     Additionally, the Debtor's noticing and claims agent, American Legal Claims Services ("ALCS"), has served by first class mail on all creditors and parties-in-interest not on the Master Service List a detailed notice of hearing on this Motion and provides instructions on how to request – free of charge – a hard copy of this Motion from the Debtor's counsel and/or accessing an electronic copy.

3.     The Debtor therefore respectfully submits that notice of this Motion is sufficient under the circumstances and that no further notice is required.

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form attached hereto as **Exhibit B**: (i) approving the Bid Procedures;

(ii) approving the Break-Up Fee and Expense Reimbursement; (iii) scheduling an Auction and a Sale Hearing to approve the proposed Sale; (iv) approving the form and manner of notice of the Bid Procedures Hearing, Auction and Sale Notice, Notice to Counterparties, and Sale Hearing; and (v) granting such other relief as may be just and proper. Additionally, the Debtor requests that, at the Sale Hearing, the Court enter the Sale Order substantially in the form to be filed prior to the Sale Hearing subject to the result of the Auction and to the Bid Procedures (i) approving and authorizing the Sale; (ii) authorizing the assumption and assignment of the Assumed Contracts; and (iii) granting such other and further relief as may be just and proper.

**THAMES MARKEY & HEEKIN, P.A.**

*/s/ Richard R. Thames*
By _____
            Richard R. Thames
            Bradley R. Markey

Florida Bar No. 0718459
Florida Bar No. 0984213
50 N. Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 Facsimile
rrt@tmhlaw.net
brm@tmhlaw.net

Attorneys for Life Care St. Johns, Inc., a Florida not-for-profit corporation doing business as Glenmoor

61.8