## STALKING HORSE ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Stalking Horse Asset Purchase Agreement") is made and entered into as of March 21, 2016 (the "Execution Date"), by and between **LIFE CARE ST. JOHNS, INC.**, a Florida not-for-profit corporation, d/b/a Glenmoor ("Glenmoor" or the "Seller"), and **LCS GLENMOOR, LLC**, an Iowa limited liability company ("Buyer"). Each of the foregoing parties is referred to as a "Party," and collectively as the "Parties".

## RECITALS

A.    Glenmoor owns and operates a continuing care retirement community ("CCRC") consisting of (i) 157 independent living units comprised of 70 one- to three-bedroom apartment homes, 30 patio homes, 31 estate homes and 26 cottages (collectively, the "Independent Living Facilities"), (ii) an assisted living center with 36 assisted living suites (the "Assisted Living Facility"), and (iii) a health center containing 30 sheltered nursing beds, all in private rooms (the "Skilled Nursing Facility," and, together with the Independent Living Facilities and the Assisted Living Facility, the "Facilities"), located on a 40 acre site in World Golf Village, St. Johns County, St. Augustine, Florida.

B.    The Facilities are owned by Glenmoor in fee, and are located on a parcel of land legally described on Exhibit B attached hereto (the "Land Premises"). Glenmoor also owns an 11 acre undeveloped parcel adjacent to the Facilities legally described on Exhibit C attached hereto (the "Adjacent Parcel"); for the sake of clarity, the Adjacent Parcel will not be included as part of the Land Premises.

C.    Glenmoor was formed by Life Care Pastoral Services, Inc. ("LCPS"), which is Glenmoor's sole member. Glenmoor is regulated by the State of Florida Department of Financial Services, Office of Insurance Regulation (the "OIR"), under the provisions of Chapter 651, Florida Statutes, as amended ("Chapter 651"). Chapter 651 prescribes certain requirements for continuing care agreements (the "Residency Agreements," defined below), pursuant to which Residents pay an Entrance Fee and Monthly Service Fees (such terms being defined below).

D.    On July 3, 2013, Glenmoor (also referred to herein as the "Debtor"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), styled *In re: Life Care St. Johns, Inc.*, Case No. 3:13-bk-4158-JAF (the "Seller's 2013 Bankruptcy Case").

E.    Glenmoor's Disclosure Statement [Dkt. 271] and Plan of Reorganization [Dkt. 270] were filed in Seller's 2013 Bankruptcy Case on November 27, 2013, and on February 28, 2014, the Bankruptcy Court entered an order confirming Glenmoor's Plan

of Reorganization [Dkt. 377]. The final decree in Seller's 2013 Bankruptcy Case has not yet been entered.

F.    Seller now believes, after consultation with its financial advisors and consideration of the available alternatives, that a sale of substantially all of the assets of the Business (as defined below) is necessary to maximize value and is in the best interests of Seller, its estates, creditors and other parties-in-interest, including the Residents and Prospective Residents of Glenmoor.

G.    Buyer desires to purchase from Seller substantially all of the assets of Seller relating to the operation of the Facilities, other than the Excluded Assets (as defined below), in exchange for the payment by Buyer of the consideration set forth herein and the assumption by Buyer of the Assumed Liabilities (as defined below), all upon the terms and conditions set forth herein.

H.    Buyer agrees to provide the stalking horse bid for the Facilities in accordance with the terms of this Stalking Horse Asset Purchase Agreement.

I.    The transactions contemplated by this Stalking Horse Asset Purchase Agreement (the "Transactions") will be subject to the approval of the Bankruptcy Court and certain other conditions, as expressly set forth hereunder.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the premises and the agreements, covenants, representations and warranties hereinafter set forth and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS; INTERPRETATION

1.1    Definitions.  These terms shall have, for all purposes of this Stalking Horse Asset Purchase Agreement, the following meanings:

"Accounts Payable" means accounts payable and trade debt incurred in the Ordinary Course of Seller's business, which are either (a) reflected on Seller's balance sheet immediately prior to the Closing Date or (b) listed on Schedule F of Seller's bankruptcy schedules filed in the Bankruptcy Case.

"Accounts Receivable" means all accounts, accounts receivable, rents, receivables, promissory notes executed by any Resident for the payment of Entrance Fees, notes receivable and other rights to receive payment for goods or services provided by Seller in connection with the Business prior to the Closing, whether owed as private pay, governmental patient receivables, health insurance or similar contracts, and whether such Accounts Receivable have been charged off as bad debt, together with all financial and billing records related to the Accounts Receivable.

"Action" means any action, claim, proceeding, litigation, arbitration, mediation, suit, investigation or regulatory inquiry (whether civil, criminal, administrative or judicial), or any appeal therefrom or any material demand letter threatening the initiation of any of the foregoing.

"Affiliate" shall mean, as to the entity in question, any person or entity that directly or indirectly controls, is controlled by or is under common control with, the entity in question and the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity whether through ownership of voting securities, by contract or otherwise.

"Alternative Transaction" shall mean a transaction consummated in accordance with the Bidding Procedures Order.

"Assisted Living Facility" has the meaning set forth in paragraph A of the Recitals hereto.

"Assumed Liabilities" has the meaning set forth in Section 2.3 hereto.

"Bankruptcy Case" shall mean the bankruptcy case to be filed by Seller in the Bankruptcy Court under chapter 11 of title 11 of the United States Code.

"Bankruptcy Code" has the meaning set forth in paragraph D of the Recitals hereto.

"Bankruptcy Court" has the meaning set forth in paragraph D of the Recitals hereto.

"Bidding Procedures Order" means the order, in substantially the form attached hereto as Exhibit A-1, which is to be entered by the Bankruptcy Court in the Bankruptcy Case.

"Bond Trustee" shall mean UMB Bank, N.A., in its capacity as (i) the trustee under that certain Bond Trust Indenture dated as of April 1, 2014 by and between UMB Bank, N.A. and the St. Johns County Industrial Development Authority, and (ii) as the master trustee under that certain Master Trust Indenture dated as of April 1, 2014 between UMB Bank, N.A. and Seller.

"Bonds" shall mean the $41,711,250 Health Care Refunding Revenue Bonds (Glenmoor Project), Series 2014A and $15,434,643.75 Subordinate Health Care Refunding Revenue Bonds (Glenmoor Project), Series 2014B issued by the St. Johns County Industrial Development Authority.

"Break-Up Fee" has the meaning set forth in Section 9.2(b) hereto.

"Business" means, collectively, the businesses conducted by Seller as of the Execution Date in connection with the ownership and operation of the Facilities.

"Business Day" means any day except Saturday, Sunday or any day on which commercial banks are authorized or required by Law to close in St. Augustine, Florida.

"Buyer" has the meaning set forth in the Preamble hereto.

"CCRC" has the meaning set forth in paragraph A of the Recitals hereto.

"Chapter 651" has the meaning set forth in paragraph C of the Recitals hereto.

"Closing" has the meaning set forth in Section 4.1 hereto.

"Closing Date" has the meaning set forth in Section 4.1 hereto.

"Closing Cash Payment" means the Purchase Price, as adjusted pursuant to Section 3.2 hereto.

"Closing Date Entrance Fee Refunds" has the meaning set forth in Section 3.5(a) hereto.

"Closing Date Promissory Notes" has the meaning set forth in Section 3.5(b) hereto.

"Closing Date PTO" has the meaning set forth in Section 3.5(g) hereto.

"Closing Notice" has the meaning set forth in Section 7.9 hereto.

"Code" means the Internal Revenue Code of 1986, as amended.

"Community Specific IP" means the website www.glenmoor.com and any other domain names reserved by Seller; the name "Glenmoor"; United States Patent and Trademark Registration Nos. 3255936 and 3298115 (dead service mark); and related logos and marketing materials.

"Confidential Information" has the meaning set forth in Section 7.8 hereto.

"Confirmation Order" means the order entered by the Bankruptcy Court in the Bankruptcy Case confirming the Liquidating Plan; provided, however that Buyer may require that a separate Sale Order be entered by the Bankruptcy Court in the Bankruptcy Case in connection with consummating the Transactions pursuant to sections 363(b) and (f) and 365 of the Bankruptcy Code and Bankruptcy Rule 6004.

"Contract" means any written or oral agreement, arrangement, lease, mortgage, contract, note, power of attorney, insurance policy, covenant, understanding, commitment or instrument.

"Contract Schedules" has the meaning set forth in Section 7.9 hereto.

"Court Approval" means the entry of the Sale Order by the Bankruptcy Court, together with all other orders of the Bankruptcy Court necessary to effect the Transactions.

"Cure Amounts" has the meaning set forth in Section 2.3(b) hereto.

"Damages" means any loss, Liability, fine, penalty, judgment, award, cost or expense (including, without limitation, reasonable attorneys' fees or any other reasonable out-of-pocket expenses incurred in connection with any Action).

"Debtor" has the meaning set forth in paragraph D of the Recitals hereto.

"Debtor's Reserve Accounts" shall mean the following reserve accounts maintained by Seller in accordance with Chapter 651: (i) a debt service reserve escrow in an amount equal to the principal and interest payments becoming due during the current fiscal year (12 months' interest on the financing if no principal payments are currently due on any mortgage loan or other long term financing, including lease payments, Taxes, and insurance) held by the Bond Trustee, (ii) an operating reserve escrow in an amount equal to 15% of the total operating expenses as set forth in the Debtor's annual report filed pursuant to Chapter 651, and (iii) a renewal and replacement reserve escrow in an amount equal to 15% of the total accumulated depreciation based on the Debtor's audited financial statement filed pursuant to Chapter 651, not to exceed 15% of the Debtor's average operating expenses for the prior three fiscal years based on the audited Financial Statements for each of such years.

"Deed" has the meaning set forth in Section 4.2(a)(ii) hereto.

"Deposit" shall mean the amount of One Million, Three Hundred Seventy Five Thousand Dollars ($1,375,000) deposited by Buyer with the Escrow Agent in connection with this Stalking Horse Asset Purchase Agreement, and any interest that may accrue thereon prior to the Closing.

"Due Diligence Period" means the period ending at 5:00 P.M. PT on February 9, 2016.

"Employees" shall mean Seller's employees performing job functions at the Facilities.

"Entrance Fee" means (i) all entrance fees and entrance fee deposits, including reservation deposits, pursuant to the Residency Agreements, (ii) deferred entrance fee

5

arrangements and promissory notes issued by any Prospective Resident or Resident for the payment of entrance fees, reservation deposits, subject to Residency Agreements, all of which are described on Schedule 1.1 hereto. Schedule 1.1 shall be modified from time to time to include any additional Entrance Fees that are modified from the Execution Date through the Closing Date, whether arising as a new Entrance Fee or the payoff of an existing Entrance Fee.

"Entrance Fee Refunds" has the meaning set forth in Section 2.3(c) hereto.

"Escrow Agent" has the meaning set forth in Section 3.1 hereto.

"Excluded Assets" has the meaning set forth in Section 2.2 hereto.

"Excluded Liabilities" has the meaning set forth in Section 2.4 hereto.

"Execution Date" has the meaning set forth in the Preamble hereto.

"Expense Reimbursement" has the meaning set forth in Section 9.2(b) hereto.

"Facilities" has the meaning set forth in paragraph A of the Recitals hereto.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, the operation or effect of which has not been reversed, stayed, modified, amended, vacated or supplemented and as to which order or judgment the time to appeal or seek review, rehearing, reargument or certiorari has expired and as to which no appeal or petition for review, rehearing, reargument or certiorari has been filed and remains pending.

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governance Documents" means, with respect to any entity, all documents (i) pursuant to which the legal existence of the entity is established; (ii) that were adopted or approved by the owners, board of directors, managers or other similar management authority of the entity and set forth provisions for the regulation and management of the entity's internal affairs; and (iii) that are binding upon any owners of the entity and establish the governance, economic and/or other rights of such owners in their capacity as such.

"Government Entity" means any federal, state, local or foreign government, court, agency, commission, department or other authority or instrumentality.

"HIPAA" has the meaning set forth in Section 2.1 hereto.

"Indenture" means either that certain (i) Master Trust Indenture dated as of April 1, 2014 between UMB Bank, N.A., as master trustee, and Seller; or (ii) Bond Trust

6

Indenture dated as of April 1, 2014 by and between UMB Bank, N.A. and the St. Johns County Industrial Development Authority.

"Independent Living Facilities" has the meaning set forth in paragraph A of the Recitals hereto.

"Initial Deposit" shall mean the fully earned and non-refundable extension fee of One Hundred Thousand Dollar ($100,000) that was paid by Buyer to Seller in connection with the First Modification to Summary of Terms between Buyer and Seller.

"IP" means, interchangeably and collectively as the context requires: (i) patents and invention disclosures, including continuations, divisionals, continuations-in-part, renewals and reissues; (ii) trademarks, service marks, trade names, trade dress, designs, logos, emblems, signs or insignia, slogans, domain names and other similar designations of source or origin, together with all goodwill symbolized by the foregoing; (iii) copyrights and copyrightable material; (iv) trade secrets and other Confidential Information, know-how, customer lists, prospect lists, business plans, inventions, proprietary processes, formulae, algorithms, models and methodologies; (v) rights of publicity and privacy relating to the use of the names, likenesses, voices, signatures and biographical information of natural persons; (vi) all rights with respect to hardware, software, computer programs, computer program code (including source code and executable code), the algorithms underlying any computer program, documentation associated with any software, data and databases, to the extent not otherwise embodied in the foregoing clauses (i)-(vi); (vii) all moral rights and/or rights of attribution and/or integrity in any of the foregoing; (viii) registrations and applications for any of the foregoing; (ix) the right to sue for past infringement or unauthorized use of any of the foregoing; and (x) all other intellectual property.

"Knowledge of Buyer" or "Buyer's Knowledge" means the actual knowledge of the following individuals: Tom Mathisen and Kendall Young.

"Knowledge of Seller" or "Seller's Knowledge" means the actual knowledge of the following individuals: D. Bruce Jones (CEO), Dale F.  Pirkle (COO), Debra Neitzel (Director of Human Resources), Kimberly Brown (Comptroller) and Candace Bowling (Director of Financial Services).

"Land Premises" means the land legally described in Exhibit B hereto, as defined in paragraph B of the Recitals.

"Laws" means all applicable federal, state, local and foreign laws (including common law), codes, statutes, rules, regulations, ordinances and policies, and all applicable orders, judgments, arbitration awards, decrees, administrative or judicial promulgations, injunctions, determinations, Permits of, agreements with, and rulings of or by any Government Entity.

"Liability" means any debt, liability, commitment or obligation of any kind, character or nature whatsoever, whether known or unknown, asserted or unasserted, liquidated or unliquidated, secured or unsecured, accrued, fixed, absolute, contingent or otherwise, and whether due or to become due.

"Liens" means all mortgages, claims (including all claims as defined in § 101(5) of the Bankruptcy Code), leases, options, hypothecations or similar restrictions, liens, pledges, security interests, and charging orders and any other encumbrance, right or interest of any kind or character, whether vested or contingent, that evidences or secures a debt or payment obligation or adverse ownership interest in the property or rights in question, whether imposed by agreement, understanding, law, equity or otherwise, or liens, interests or encumbrances both now existing or hereafter arising which would encumber the Purchased Assets arising under any agreement binding on Seller or its property or arising from any act of Seller or arising pursuant to any right, title or interest, lien or encumbrance which could hereafter be asserted as a result of the transfer of the Purchased Assets by Seller with any such lien to attach solely to the proceeds of sale contemplated herein.

"Liquidating Plan" has the meaning set forth in Section 7.1(b) hereto.

"Medicare" means Title XVIII of the Social Security Act.

"Medicare Provider Agreements" means the Medicare provider agreement(s) identified as Provider Number 10-6040.

"Monthly Service Fees" means those monthly service fees paid by Residents pursuant to their respective Residency Agreements.

"New Petition Date" has the meaning set forth in Section 7.1(a) hereto.

"OIR" has the meaning set forth in paragraph C of the Recitals hereto.

"Ordinary Course" means, with respect to any Person, the ordinary course of such Person's business, consistent with past practice in nature, scope and magnitude, including the collection of Entrance Fees and the full or partial payment of Entrance Fee Refunds, taking into account all limitations imposed by bankruptcy law on the conduct and activities of the Seller.

"Outside Closing Date" has the meaning set forth in Section 9.l(b) hereto.

"Party" and "Parties" have the meanings set forth in the Preamble to this Stalking Horse Asset Purchase Agreement.

"Permits" means all applicable approvals, permits (including environmental, construction and operation permits), licenses, certificates, exemptions, classifications and

other similar documents, rights and authorizations issued by any Government Entity, including, but not limited to those items set forth on <u>Schedule 2.1</u> attached hereto.

"<u>Permitted Exceptions</u>" has the meaning set forth in Section 7.18(c) hereto.

"<u>Person</u>" means an individual, a sole proprietorship, a partnership, a corporation, an association, an institution, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization, or a Government Entity or any other legal organization or entity.

"<u>Plan of Reorganization</u>" means the Chapter 11 plan confirmed by the Bankruptcy Court in Seller's 2013 Bankruptcy Case.

"<u>Potential Alternative Sale</u>" has the meaning set forth in Section 7.23(b) hereto.

"<u>Prepaid Utility Deposits</u>" has the meaning set forth in Section 3.5(e) hereto.

"<u>Prospective Resident</u>" means any natural person who has entered into a reservation agreement, waitlist agreement, Residency Agreement (but has not moved in), or similar agreement for anticipated future entrance to the Facility, which is in effect as of the Effective Date between such natural person and Seller.

"<u>Purchased Assets</u>" has the meaning set forth in Section 2.1 hereto.

"<u>Purchase Price</u>" means Twenty Four Million, Four Hundred Fifty Thousand Dollars ($24,450,000).

"<u>Rejected Contracts</u>" has the meaning set forth in Section 7.9 hereto.

"<u>Reporting Person</u>" has the meaning set forth in Section 10.22(a) hereto.

"<u>Representatives</u>" means, with respect to any Person, the directors, officers, employees, financial advisors, attorneys, accountants, consultants, agents and other authorized representatives of such Person.

"<u>Residency Agreements</u>" means (i) the Residence and Care Contracts executed between Seller and each Resident of the Independent Living Facilities detailing the residential and other rights and obligations of the Resident and the rights and obligations of Seller; (ii) the Residence and Care Contracts executed between Seller and certain Prospective Residents of the Independent Living Facilities pursuant to which a Prospective Resident has paid a deposit toward an Entrance Fee on a specific independent living unit; (iii) the Residence and Care Contracts executed between Seller and certain Prospective Residents of the Independent Living Facilities pursuant to which a Prospective Resident has paid a deposit toward an Entrance Fees but not in respect of a specific independent living unit; and (iv) the occupancy contract executed between each Resident of the Assisted Living Facility and the Skilled Nursing Facility and Seller

detailing the rights and obligations of the Resident and the rights and obligations of Seller thereunder.

"<u>Resident Care Claims</u>" means any Action by any Resident against Seller or any Liability to any Resident arising out of or related to care provided to, or statutory violation related to, such Resident at the Facilities on or prior to the Closing Date, whether such Action is known or unknown, asserted or not yet asserted.  For the avoidance of doubt, the term "Resident Care Claims" shall not include any claims in respect to Entrance Fee Refunds.

"<u>Resident</u>" means a present or former occupant of the Facilities who is or was a party to a Residency Agreement, excluding those former occupants whose claims are addressed under the Refund Queue Claim Holders Distribution Trust established pursuant to the Plan of Reorganization in Seller's 2013 Bankruptcy Case.

"<u>Retained Employees</u>" has the meaning set forth in Section 2.2(e) hereto.

"<u>Sale Order</u>" means the order, in substantially the form attached hereto as <u>Exhibit A-2</u>, which is to be entered by the Bankruptcy Court in the Bankruptcy Case approving the consummation of the Transactions.

"<u>Seller</u>" has the meaning set forth in the Preamble hereto.

"<u>Seller's 2013 Bankruptcy Case</u>" has the meaning set forth in paragraph D of the Recitals hereto.

"<u>Seller's Cost Reports</u>" has the meaning set forth in Section 7.16 hereto.

"<u>Skilled Nursing Facility</u>" has the meaning set forth in paragraph A of the Recitals hereto.

"<u>Stalking Horse Asset Purchase Agreement</u>" shall mean this asset purchase agreement.

"<u>Survey</u>" has the meaning set forth in Section 7.18(b) hereto.

"<u>Taxes</u>" means all taxes, assessments, charges, duties, fees, levies or other governmental charges (including interest, penalties or additions associated therewith), including, without limitation, income, franchise, capital stock, real property, personal property, tangible, estimated withholding, employment, payroll, social security, unemployment compensation, disability, transfer, sales, use, franchise, excise, gross receipts, value-added and all other taxes of any kind imposed by any Government Entity, whether disputed or not, whether inchoate, accrued, invoiced, levied, or otherwise, and any charges, interest or penalties imposed or that may be imposed thereon by any Government Entity.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes of any kind or nature filed or required to be filed, including any schedule or attachment thereto, and including any amendment thereof.

"Title Commitment" has the meaning set forth in Section 7.18(a) hereto.

"Title Company" has the meaning set forth in Section 7.18(a) hereto.

"Transactions" has the meaning set forth in paragraph I of the Recitals hereto.

"Transferred Contracts" has the meaning set forth in Section 7.9(a) hereto.

"Transferred Employees" has the meaning set forth in Section 7.3(a) hereto.

"WARN Acts" has the meaning set forth in Section 7.3(b) hereto.

## ARTICLE II
## THE PURCHASE AND SALE

2.1     Purchased Assets.  Subject to the terms, conditions and other provisions of this Stalking Horse Asset Purchase Agreement, and subject to Court Approval and higher and better bids in accordance with the Bidding Procedures Order, at the Closing, Seller shall grant, sell, assign, transfer and deliver to Buyer, and Buyer shall purchase from Seller, all right, title and interest of Seller in, to, and under the Purchased Assets, free and clear of any and all Liens and encumbrances, other than Permitted Exceptions.

As used herein, "Purchased Assets" means any and all tangible and intangible real and personal property and assets of and owned by Seller which are used in connection with the operation of the Business, including, without limitation, the following property: (i) the Land Premises, together with the Facilities and all buildings, improvements and fixtures erected on the Land Premises and all easements and other rights appurtenant thereto; (ii) all rights under the Transferred Contracts, specifically including, without limitation, (x) Seller's Medicare Provider Agreements and accompanying provider numbers, and (y) the Residency Agreements; (iii) all Community Specific IP and other trade names or IP of Seller, software licenses, and other general intangibles for or associated with the Facilities or the Business, to the extent that such intangibles are transferable; (iv) all vehicles, furniture, fixtures, consumables, machinery, tools, appliances, and equipment used in connection with the Business or the Facilities; (v) all inventories of supplies, drugs, disposable goods, labels, containers, bags and other packaging supplies, and other materials used in the operation of the Business or the Facilities; (vi) all books, records, files and papers, whether in tangible, intangible or electronic form utilized by the Business or in connection with the Facilities, excluding those books, records, files and papers as set forth in Sections 2.2(c)-(e) below, and subject to the terms and conditions of this Stalking Horse Asset Purchase Agreement; (vii) all Residents' and Prospective Residents' records, if any, that Seller is permitted by applicable Law (e.g., the Health Insurance Portability and Accountability Act

("HIPAA")) to transfer to Buyer or its Affiliates; (viii) all goodwill associated with the Business or the Facilities; (ix) all phone numbers; (x) all Accounts Receivable; (xi) all Entrance Fees; and (xii) to the extent transferable, all licenses, Permits, authorizations, approvals or similar documents granted or issued by any Government Entity and uniquely utilized by the Business, including those listed on Schedule 2.1 hereto.

2.2   Excluded Assets. Notwithstanding anything herein to the contrary, the Purchased Assets will not include the following assets of Seller (collectively, the "Excluded Assets"):

(a)   cash and cash equivalents, including all restricted cash held by or for the benefit of Seller, the Residents, the OIR, or the Bond Trustee, and including all bank accounts and all electronic fund transfer accounts;

(b)   the Debtor's Reserve Accounts;

(c)   Seller's minute books, corporate record books and Governance Documents;

(d)   Permits, and Residents' and Prospective Residents' records, if any, that Seller is prohibited by applicable Law (e.g., HIPAA) from transferring to Buyer or its Affiliates;

(e)   personnel records for Employees who are not Transferred Employees ("Retained Employees") and, to the extent the transfer of such records (whether directly or by means of the sale of a Seller) to Buyer or its Affiliates is prohibited by applicable Law, for Transferred Employees;

(f)   any reserves or prepaid expenses (including, without limitation, prepaid legal expenses or insurance premiums);

(g)   any cause or causes of action or claim or claims arising in connection with or relating to events that occurred prior to the Closing Date, and rights to recovery pursuant to all causes of action of Seller, including under Chapter 5 of the Bankruptcy Code, existing as of the Execution Date, but excluding (i) any claim expressly released by Seller, and (ii) any claim, cause of action, defense, setoff, or recoupment related to Transferred Contracts;

(h)   any insurance policies and all insurance proceeds arising in connection with the operation of the Facilities prior to the Closing Date;

(i)   all claims, rights, interests and proceeds with respect to refunds of Taxes for periods ending prior to the Closing Date and all rights to pursue appeals of the same;

(j)   any retirement or benefit plans, or employee-related programs, policies, or arrangements, maintained by Seller, and any assets associated with or held for

the benefit of Seller's qualified employee benefits plans or qualified employee benefit plans in which Seller's Employees participate;

        (k)     donor files and contact information owned by Seller related to donors;

        (l)     all work product, attorney-client and accountant-client privileges held by Seller;

        (m)     the consideration delivered to Seller pursuant to this Stalking Horse Asset Purchase Agreement;

        (n)     any other assets specifically set forth on <u>Schedule 2.2(n)</u> hereto which are identified as Excluded Assets; and

        (o)     the Adjacent Parcel.

For the avoidance of doubt, the following are not assets of Seller and are not Purchased Assets: (i) unit furnishings and other personal property to the extent owned by the Residents; and (ii) the debt service reserve fund and other accounts held by the Bond Trustee pursuant to the Indenture.

2.3    <u>Assumed Liabilities</u>.   Subject to the terms, conditions, and other provisions of this Stalking Horse Asset Purchase Agreement, at and effective as of the Closing, Buyer shall assume only the following Liabilities of Seller (collectively, the "<u>Assumed Liabilities</u>"):

        (a)     Accounts Payable, up to an aggregate amount of $150,000;

        (b)     All Liabilities arising from or related to the Transferred Contracts with respect to (i) matters occurring thereunder on or after the Closing Date, and (ii) the amounts, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller under any of the Transferred Contracts as required by 11 U.S.C. § 365(b)(l)(B) (the "<u>Cure Amounts</u>");

        (c)     Liabilities to Residents and Prospective Residents, or their respective estates, executors, heirs, permitted assignees, personal representatives and successors, under current or former Residency Agreements, including refund or reimbursement of Entrance Fees ("<u>Entrance Fee Refunds</u>") that were made by Residents and Prospective Residents to Seller prior to the Closing Date, but excluding those Liabilities (i) owed to the Beneficial Interest Holders of the Refund Queue Claim Holders Distribution Trust (as defined in Seller's Plan of Reorganization) established pursuant to Seller's Plan of Reorganization, and (ii) for Resident Care Claims arising or relating to periods prior to the Closing Date;

(d)       Liabilities of Seller assumed by Buyer pursuant to Sections 7.3 and 7.4 hereto;

(e)       Liabilities of Seller assumed by Buyer pursuant to Section 3.5, including, without limitation, *ad valorem* real and personal property Taxes owed by Seller; and

(f)       All Liabilities relating to or arising out of the operation of the Purchased Assets or the conduct of the Business after the Closing Date.

2.4    <u>Excluded Liabilities</u>.  Notwithstanding anything else herein, except for the Assumed Liabilities, Buyer shall not assume, agree to pay, discharge or satisfy, or otherwise have any responsibility, Liability or obligation or for any Liability of Seller or any Affiliate of Seller (collectively, the "<u>Excluded Liabilities</u>"), including for avoidance of doubt any Liabilities:

(a)       arising out of or related to any Excluded Asset;

(b)       for Resident Care Claims arising or relating to periods prior to the Closing Date;

(c)       owed to the Beneficial Interest Holders of the Refund Queue Claim Holders Distribution Trust established pursuant to Seller's Plan of Reorganization;

(d)       related to Retained Employees, or related to Transferred Employees to the extent such Liability is attributable to events or circumstances occurring or existing at or prior to the Closing, including without limitation all Liabilities with respect to discrimination or similar claims, severance benefits, or the like, except to the extent assumed pursuant to Sections 7.3 and 7.4 hereto;

(e)       under or related to any employee compensation or benefit plan, program, policy or arrangement presently or formerly maintained or contributed to by any Seller, any of its Affiliates, or any other Person;

(f)       under the Transferred Contracts arising prior to the Closing Date, other than Liabilities related to Entrance Fee Refunds, which are being assumed by Buyer pursuant to Section 2.3(c) and the Cure Amounts, which will be paid by Buyer pursuant to Section 2.3(b); or

(g)       Liabilities related to the promissory note in favor of Life Care Ponte Vedra, Inc.

For the avoidance of doubt, the Excluded Liabilities are retained by Seller.

**ARTICLE III**
**DEPOSIT; CONSIDERATION**

3.1    Deposit.  As an inducement for Seller to enter into this Stalking Horse Asset Purchase Agreement, Buyer will deposit within three (3) Business Days of the Execution Date the Deposit with T.D. Bank, N.A., as escrow agent (the "Escrow Agent"), pursuant to an escrow agreement in substantially the same form as attached hereto as Exhibit D (the "Escrow Agreement").  The Deposit shall be non-refundable, except in the circumstances described in Section 9.2 hereto.

3.2    Consideration.  In consideration for the sale, assignment, and conveyance of Seller's right, title, and interest in, to and under the Purchased Assets:

(a)    Buyer shall at the Closing pay the Closing Cash Payment, minus the Deposit and Initial Deposit and subject to the adjustments set forth in Section 3.4 and Section 3.5 hereto, for the account of the Debtor, by wire transfer of immediately available funds to the Escrow Agent to be disbursed in accordance with the terms and conditions of this Agreement and the Sale Order; and

(b)    Buyer shall assume the Assumed Liabilities to the extent provided herein.

3.3    [Intentionally omitted]

3.4    Costs.

(a)    Seller's Title.  Seller shall pay on the Closing Date the cost of: (i) the title search, basic title premium for the Title Commitment and Owner's Policy of Title Insurance to be issued pursuant to Section 7.18(a) hereto; and (ii) recording fees or title insurance endorsements with respect to clearing public records of items that are not Permitted Exceptions per Section 7.18(c).

(b)    Buyer's Title Charges.  Buyer shall be responsible for the cost of: (i) recording fees of the Deed; (ii) the cost of any endorsements to the Title Commitment and Owner's Policy of Title Insurance to be issued pursuant to Section 7.18(a) hereto (other than extended coverage) and of any simultaneously issued lender's title policy; and (iii) the cost of recording fees for any Buyer financing documents.

(c)    Transfer Taxes.  Seller shall pay for all transfer or conveyance Taxes imposed in connection with the purchase and sale of the Land Premises, Purchased Assets and Assumed Liabilities, if any.

(d)    Survey.  On the Closing Date, in addition to the Closing Cash Payment, the Buyer shall reimburse Seller for the cost of the Survey.

3.5    Prorations and Adjustments to Closing Cash Payment.  The following shall be prorated as of the Closing Date and shall be settled by an adjustment to the Closing Cash Payment:

(a)    Entrance Fee Refunds.  If on the Closing Date the amount of the Entrance Fee Refund liabilities then accrued, due and owing ("Closing Date Entrance Fee Refunds") is greater than $2,500,000, then the Closing Cash Payment shall be reduced by the amount that the Closing Date Entrance Fee Refunds exceed $2,500,000. If on the Closing Date the amount of the Closing Date Entrance Fee Refunds are less than $1,605,067, then the Closing Cash Payment shall be increased by the amount that the Closing Date Entrance Fee Refunds are less than $1,605,067.

(b)    Promissory Notes.  If on the Closing Date the amount of the Accounts Receivable relating to Resident promissory notes then due and owing ("Closing Date Promissory Notes") is greater than $1,976,375, then the Closing Cash Payment shall be increased by the amount that the Closing Date Promissory Notes exceed $1,976,375. If on the Closing Date the amount of the Closing Date Promissory Notes are less than $1,770,250, then the Closing Cash Payment shall be decreased by the amount that the Closing Date Promissory Notes are less than $1,770,250.

(c)    Real Estate Taxes.  *Ad valorem* real and personal property Taxes, and any general or special assessments levied, which are due and payable for the year of Closing, shall be prorated as of the date of Closing based upon (i) 110% of the 2015 *Ad valorem* real property taxable value and total millage rate, using the payment amount due by November 30, 2015, and (ii) 100% of the 2015 *Ad valorem* personal property taxable value and total millage rate, using the payment amount due by November 30, 2015, in each case, as set forth in the 2015 St. Johns County Tax Collector Ad Valorem Taxes and Non-Ad Valorem Assessments attached hereto as Schedule 3.5(c), which proration shall be a final settlement between Buyer and Seller. Any such prorated amount that is allocated to Seller hereunder shall reduce the Closing Cash Payment and Buyer shall be responsible for, and shall pay, all such charges, assessments and Taxes for all periods prior to Closing.

(d)    Utilities and Prepaid Expenses.  Charges for water, fuel, gas, oil, heat, electricity and other utility and operating charges and prepaid service Contracts shall be prorated based upon the last available invoice. The Parties will either coordinate the transfer of such utility accounts to Buyer as of the Closing Date or attempt to obtain final utility meter readings as close as possible to the Closing Date. Any such prorated amount that is allocated to Seller shall reduce the Closing Cash Payment and Buyer shall be responsible for, and shall pay, all such charges for all periods prior to Closing.

(e)    Prepaid Utility Deposits.  If on the Closing Date any prepaid utility deposits set forth on Schedule 3.5(e) (the "Prepaid Utility Deposits") are transferred to Buyer as part of the transfer of utility accounts, then the Closing Cash Payment shall be increased by the amount of such transferred Prepaid Utility Deposits.

(f)    Rents/Monthly Service Fees.  Rents and Monthly Service Fees under the Residency Agreements for the month in which Closing occurs shall be prorated as of the Closing Date and apportioned between the Parties as follows: Seller shall be entitled to the portion of such rents/ Monthly Service Fees attributable to the period from the 1st day of such month to and including the day immediately prior to the Closing Date and Buyer shall be entitled to the portion of such rents/ Monthly Service Fees attributable

to the period from and including the Closing Date to and including the last day of the month in which Closing occurs.

With respect to any such rents/Monthly Service Fees collected by Seller prior to the Closing Date, Seller shall provide Buyer with a credit at Closing for Buyer's share of such collected rents/Monthly Service Fees and the Closing Cash Payment shall be decreased by the amount of Buyer's share of such collected rents/Monthly Service Fees. With respect to any such rents/Monthly Service Fees collected by Buyer on and after the Closing Date, Buyer shall remit the amount of Seller's share of such collected rents/Monthly Service Fees to Seller within five (5) Business Days after such receipt of same. Any such amounts received by Seller from and after the Closing Date shall be held by Seller in trust and transferred to Buyer within five (5) Business Days after receipt of same.

(g)    Employee Benefits.  If on the Closing Date the value of all unused or unpaid time accrued by any Transferred Employee under any existing vacation, sick pay or other paid-time-off programs that Buyer is assuming under Section 7.4 (collectively, the "Closing Date PTO") is greater than $157,200, then the Closing Cash Payment shall be decreased by the amount that the Closing Date PTO exceeds $157,200. If on the Closing Date the amount of the Closing Date PTO is less than $157,200, then the Closing Cash Payment shall be increased by the amount that the Closing Date PTO is less than $157,200.

(h)    Advance Payments and Services.  On the Closing Date, Seller will deliver or credit to Buyer private pay payments received by Seller for services to be rendered subsequent to the Closing Date, if any. To the extent that private pay services are rendered by Seller prior to the Closing Date and payment for such services is collected by Buyer on and after the Closing Date, Buyer shall remit the amount of such payment to Seller within five (5) Business Days after such receipt of same.

## ARTICLE IV
## CLOSING

4.1    Closing.  The closing of the Transactions (the "Closing") shall occur as soon as reasonably practicable, but in any event no later than the fifth (5th) Business Day, following the day upon which all of the conditions to Closing have been satisfied or waived (other than those conditions which by their terms cannot be satisfied until the Closing), at the offices of Thames Markey & Heekin, P.A. in Jacksonville, Florida or pursuant to a customary escrow arrangement acceptable to Seller and Buyer.  The date on which the Closing actually occurs, or the date on which Buyer and Seller agree the Closing is deemed to occur, is referred to herein as the "Closing Date".

4.2    Closing Deliveries.

(a)    At Closing, Seller shall execute and deliver to Buyer:

(i)    a certificate executed by its principal executive officer as to the satisfaction of the conditions in Sections 8.1(a), 8.1(b) and 8.1(e) hereto or

identifying any material respect in which any representation of Seller is no longer true and correct;

(ii)      a special warranty deed, in such form as shall be agreed upon by Buyer, acting reasonably, executed by Seller conveying Seller's title to the Land Premises to Buyer, subject to the Permitted Exceptions (the "Deed");

(iii)      a bill of sale with respect to all Purchased Assets, in substantially the form attached hereto as Exhibit E;

(iv)      assignment and assumption agreements with respect to all (x) Assumed Liabilities and (y) Transferred Contracts, in substantially the forms attached hereto as Exhibit F;

(v)      a certificate that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code, in such form as shall be agreed upon by Buyer, acting reasonably;

(vi)      customary title affidavits and indemnities, and such other reasonable documents as may be required to permit issuance of a policy of title insurance insuring title in the manner set forth in Section 7.18;

(vii)      possession of and all keys to the Land Premises;

(viii)      a closing settlement statement reflecting the Closing Cash Payment, minus the Deposit and subject to the adjustments set forth in Section 3.5 hereof, in such form as shall be agreed upon by Buyer, acting reasonably; and

(ix)      a certificate executed by the Secretary or other authorized officer of Seller (x) as to the incumbency of the individual(s) signing this Stalking Horse Asset Purchase Agreement and all other agreements to which it is a party on behalf of Seller, and (y) certifying that the resolutions of the board of directors (or other similar governing body) approving this Stalking Horse Asset Purchase Agreement and the Transactions (a copy of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented.

(b)      At Closing, Buyer shall execute and deliver to Seller:

(i)      the Closing Cash Payment and (via direction of Buyer to the Escrow Agent) the Deposit;

(ii)      a certificate executed by its principal executive officer as to the satisfaction of the conditions in Sections 8.2(a) and 8.2(b) hereto;

(iii)    written approval of licensure assignments from the OIR, or assurances reasonably satisfactory to Buyer as provided in Section 8.1(h) hereof;

(iv)    a certificate executed by the Secretary or other authorized officer of Buyer (x) as to the incumbency of the individual(s) signing this Stalking Horse Asset Purchase Agreement and the other agreements to which it is a party on behalf of Buyer, and (y) certifying that the resolutions of the board of directors or other similar governing body of Buyer approving this Stalking Horse Asset Purchase Agreement and the Transactions (copies of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented;

(v)    assignment and assumption agreements with respect to all (x) Assumed Liabilities and (y) Transferred Contracts, in substantially the forms attached hereto as Exhibit F;

(vi)    a closing settlement statement reflecting the Closing Cash Payment, minus the Deposit and subject to the adjustments set forth in Section 3.5 hereof, in such form as shall be agreed upon by Seller, acting reasonably.

(c)    Seller and Buyer shall execute and deliver instruments, assigning all of the Residency Agreements of the Residents and Prospective Residents to Buyer, in form and substance reasonably satisfactory to Buyer, and evidencing the agreement of Buyer to assume all obligations of Seller under the assigned Residency Agreements.

(d)    At the Closing, each Party shall execute and deliver such other instruments of transfer and/or assignment, certificates, deeds, bills of sale, evidence of filing and/or recording, and other documents as are required pursuant to the terms of this Stalking Horse Asset Purchase Agreement or applicable law or are reasonably necessary to effectuate the Transactions, including customary documents required in order for title policies to be issued by the Title Company to Buyer at Closing.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to the required approval of the Bankruptcy Court, and except as expressly set forth in the disclosure schedules attached hereto and incorporated by reference herein, as of the Execution Date and as of the Closing Date, Seller represents and warrants to Buyer the following:

5.1    Existence and Capacity.    Seller is a not-for-profit corporation, duly organized and validly existing in good standing under the Laws of the State of Florida. Seller has the requisite power and authority to enter into this Stalking Horse Asset Purchase Agreement and to perform all of its obligations contemplated hereunder.

5.2    Powers; Consents; Absence of Conflicts with Other Agreements, etc.    The execution, delivery, and performance of this Stalking Horse Asset Purchase Agreement

by Seller, and the consummation of the Transactions contemplated herein and therein by Seller:

        (a)     have been duly authorized by all necessary and appropriate board action, none of which actions have been modified or rescinded and all of which remain in full force and effect;

        (b)     except as set forth on <u>Schedule 5.2(b)</u> hereto and subject to the requirements of the Bankruptcy Case, do not require any approval or consent of, or filing with, any Government Entity or authority bearing on the validity of this Stalking Horse Asset Purchase Agreement which is required by Law or the regulations of any such agency or authority or the approval of any other third party, except to the extent any failure to so comply would not reasonably be expected to have a material adverse effect;

        (c)     except as set forth on <u>Schedule 5.2(c)</u> hereto and subject to the requirements of the Bankruptcy Case, will neither conflict with, nor result in any breach or contravention of, or the creation of any Lien under, any indenture, agreement, Contract, lease, instrument or understanding, written or oral, to which it is a party or by which it is bound;

        (d)     will not violate any Laws of any Government Entity to which it or the Purchased Assets may be subject; and

        (e)     will not violate any judgment, decree, writ or injunction of any court or Government Entity to which it or the Purchased Assets may be subject.

        5.3    <u>Binding Agreement</u>.  This Stalking Horse Asset Purchase Agreement constitutes a valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, subject only to all required approvals of the Bankruptcy Court, general equitable principles and the discretion of courts in granting equitable remedies.

        5.4    <u>Real Property</u>.

        (a)     The Land Premises constitute all of the real property used in connection with the operation of the Facilities located thereon.  Except as set forth on <u>Schedule 5.4(a)</u>, Seller has not collaterally assigned or granted any Liens encumbering the Land Premises; and Seller is not obligated under or a party to, any option, right of first refusal or other contractual right to purchase any Land Premises or any portion thereof or interest therein.

        (b)     With respect to the Land Premises, other than Residents and Salon Operations, Inc., there are no tenants or other Persons or entities occupying any space in the Land Premises.

        (c)     There is no pending or, to Seller's Knowledge, threatened action, suit, or proceeding, including without limitation, condemnation proceeding, affecting Seller or the Land Premises or any portion thereof by or before any court, municipal

department, commissioner, board, bureau or agency; nor are there any pending, or to Seller's Knowledge, presently contemplated public improvements in, about or outside the Land Premises which will in any manner affect access to the Land Premises; nor is there any such Action affecting the Land Premises or, to Seller's Knowledge, presently contemplated, which will in any manner affect Buyer upon or after the consummation of the Transactions.

     5.5    <u>Title to Purchased Assets</u>.  At the Closing, Seller will assign and convey to Buyer title to the Purchased Assets free and clear of all Liens except the Permitted Exceptions and the Assumed Liabilities.

     5.6    <u>Financial Statements</u>.    Seller has delivered to Buyer copies of the following financial statements (the "<u>Financial Statements</u>"): audited financial statements of or pertaining to Seller's operations for the fiscal year ended December 31, 2013, audited financial statements for the fiscal year ended December 31, 2014, and, to Seller's knowledge, true, correct and complete unaudited financial statements for the eleven (11) months ended November 30, 2015.  Except as set forth on <u>Schedule 5.6</u>, the Financial Statements are accurate in all material respects and fairly and accurately represent the Seller's financial position and results of the Seller's operations as of the dates referenced therein, all in accordance with GAAP; provided, however, that the unaudited Financial Statements lack footnotes and are subject to normal year-end audit adjustments.

     5.7    <u>Compliance With Laws</u>.  Except as set forth on <u>Schedule 5.7</u>, Seller is not in violation of any applicable statutes, rules, regulations, and requirements of the Government Entities having jurisdiction over Seller and the operations of the Facilities and the Purchased Assets, except to the extent any failure to so comply would not reasonably be expected to have a material adverse effect. Seller has timely filed with Government Entities all forms, applications, reports, statements, data and other information required to be filed with Government Entities relating to the Facilities, except to the extent any failure to so file would not reasonably be expected to have a material adverse effect. The sheltered nursing beds in the Skilled Nursing Facility are being used in material compliance with all applicable statutes, rules regulations and requirements of the Government Entities having jurisdiction over the operations of the Skilled Nursing Facility.

     5.8    <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 5.8</u> hereto, to Seller's Knowledge: (a) no hazardous material has been stored or exists in, on, under or around the Land Premises other than asbestos, PCBs, and lead emanating from lead-based paint; (b) Seller has not caused or suffered any hazardous materials to be used, released, discharged, placed or disposed of at, on or under the Land Premises or any real property adjacent thereto except in compliance with applicable environmental laws, rules and regulations; and (c) no underground storage tanks are located on the Land Premises, and no portion of the Land Premises has ever been used as a dump for waste material. Seller has not received any written notice from any Government Entity or any written complaint from any third party with respect to its alleged noncompliance with, or potential Liability under, any applicable environmental laws, rules or regulations

involving the Land Premises or the Facilities, nor does it have a reasonable basis to expect the issuance of such a notice or complaint.

5.9    Litigation and Proceedings.  Schedule 5.9 is an accurate list of all pending litigation or adversarial proceedings with respect to the Facilities and the Purchased Assets. Except as set forth on Schedule 5.9, and except for Actions that would not have a material adverse effect on the operations of the Business, (a) Seller is not in default under any order of any court or federal, state, municipal, or other governmental department and (b) there are no Actions pending, or to the Knowledge of Seller, threatened against or related to Seller, the Facilities or the Purchased Assets, at law or in equity, or before or by any federal, state, municipal, or other governmental department, including, without limitation, claims for successor liability under any theory of law or equity or otherwise or claims that Buyer is not a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

5.10    Taxes.  Seller has filed in a timely manner all federal, state and local Tax Returns required to be filed by it, except to the extent any failure to so file would not reasonably be expected to have a material adverse effect, and to Seller's Knowledge, each such return is true and correct in all material respects and was prepared in substantial compliance with applicable Laws. A true, correct and complete list of all taxes or tax valuations currently being appealed by or on behalf of Seller is set forth on Schedule 5.10. No deficiencies for any Taxes have been asserted against Seller or, to Seller's Knowledge, threatened, and no audit of any Tax Returns is currently pending or, to Seller's Knowledge, threatened. Seller has not waived any statute of limitations or has not agreed to any extensions of time with respect to a Tax assessment or deficiency. There are no Liens on any of Seller's assets for unpaid Taxes (other than statutory Liens for real estate Taxes not yet due and payable). Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code.  To Seller's Knowledge, any retailers occupation (e.g., sales) Taxes, use Taxes, and other similar Taxes imposed under applicable Law upon the purchase, ownership or use of then tangible personal property that is presently in Seller's possession was, to the extent required by applicable Law, paid to the person from which Seller acquired such property at the time such property was purchased.

5.11    Intellectual Property.  There is no IP that is material to the operation of the Business, other than the Community Specific IP and Seller owns all of the Community Specific IP.  All trademarks, service marks, trade names, patents, copyrights, inventions, processes and applications therefor (whether registered or common law) currently owned or used by Seller are listed on Schedule 5.11 hereto.  No proceedings have been instituted or are pending or, to Seller's Knowledge, threatened which challenge the validity of the ownership by Seller of the Community Specific IP.  Seller has no Knowledge of the use or the infringement of any of the Community Specific IP by any other Person.  Seller owns, or possesses adequate enforceable licenses or other rights to use, all computer software programs and similar systems used in the conduct of the Business.

5.12    Employee Relations.

(a)    Except as set forth on Schedule 5.12 hereto, all Employees of the Facility are Employees of Seller. To Seller's Knowledge, Seller is not in material violation of any Laws or in material violation of any Contracts respecting employment or employment practices, labor relations, terms and conditions of employment, or wages or hours. Except as set forth on Schedule 5.12, there are no pending or to Seller's Knowledge, threatened, complaints or charges before any Government Entity regarding employment discrimination, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like.

(b)    There has not been within the last three (3) years any strike, slowdown, picketing or work stoppage, or any proceeding against or affecting Seller or the Business relating to an alleged violation of any legal requirements pertaining to labor relations, including any charge, complaint, or unfair labor practices claim filed by an employee, union, or other person with the National Labor Relations Board, organizational activity, or other labor dispute against or affecting Seller or the Facility. Except as set forth on Schedule 5.12, with respect to the Transferred Employees, no collective bargaining agreement exists or is currently being negotiated by Seller; no application for certification of a collective bargaining agent is pending; no union organizing activities are taking place; and none of the Transferred Employees is represented by any labor union or organization.

5.13    Material Contracts.

(a)    Schedule 5.13(a) sets forth, as of the Effective Date, a complete and accurate list of all Contracts of the following types to which Seller is a party, or by which its properties or assets are bound (the "Material Contracts"):

(i)    Contracts to manage the Facilities or any real property, Business or charitable activity in connection with the Facilities;

(ii)    Contracts under which Seller is a lessor, lessee, sublessor, sublessee, licensor or licensee of any real property;

(iii)    Contracts relating to the development of, or the construction of any improvements on, any real property;

(iv)    Contracts under which Seller has the right or option to purchase any real property;

(v)    Contracts imposing non-competition or any other restriction on Seller with respect to the geographical area, scope or type of operations of Seller;

(vi)    Contracts involving an investment by Seller in any Person, including any partnership, limited liability company or joint venture;

(vii)    Contracts under which any revenue, profit or income of the Business is required to be, or may be, shared with any third Person; and

(viii)    Contracts that involve aggregate payments in excess of Fifty Thousand and No/100 Dollars ($50,000) per annum.

(b)    Seller has previously delivered or made available to Buyer a true and complete copy of each written Material Contract.

(c)    To Seller's Knowledge, each Material Contract is in full force and effect and is legal, valid, binding and enforceable against Seller. Except as set forth on Schedule 5.13(c), and except for any defaults resulting from the filing of the Bankruptcy Case, to Seller's Knowledge, there does not exist under any Material Contract any default or condition or event that, after notice or lapse of time or both, would constitute a default on the part of Seller, or, to Seller's Knowledge, any other party that is a party thereto which would reasonably be expected to have a material adverse effect or, to Knowledge of Seller on the part of any other party thereto.

(d)    Seller has provided Buyer with true and correct copies of all the Residency Agreements. To the Knowledge of Seller, each such form complies with applicable Laws and has been approved, to the extent necessary, by all applicable Government Entities.

5.14    Relationships with Payors.  Seller is duly certified to participate in, and has Medicare Provider Agreements for participation in, the Medicare program. To Seller's Knowledge, Seller is in material compliance with all of the terms, conditions and provisions of such programs, as well as state and federal Laws related thereto.

5.15    CONDITION OF PURCHASED ASSETS.  THE PURCHASED ASSETS ARE BEING SOLD BY SELLER "AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED". EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER MAKES NO ADDITIONAL REPRESENTATIONS OR WARRANTIES OF ANY KIND TO BUYER, INCLUDING, WITHOUT LIMITATION, AS TO (A) THE VALUE, NATURE, QUALITY, OR CONDITION OF THE LAND PREMISES, INCLUDING THE WATER, SOIL, AND GEOLOGY; (B) THE INCOME TO BE DERIVED FROM THE BUSINESS OR THE LAND PREMISES; (C) THE COMPLIANCE OF OR BY THE LAND PREMISES OR BUSINESS OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES, OR REGULATIONS OF ANY APPLICABLE GOVERNMENT ENTITY; (D) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE LAND PREMISES OR FACILITIES; (E) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE FACILITIES; (F) THE PHYSICAL CONDITION OF THE FACILITIES OR THE MANNER, QUALITY, STATE OF REPAIR, OR LACK OF REPAIR OF THE FACILITIES; OR (G) ANY OTHER MATTER WITH RESPECT TO THE LAND PREMISES OR FACILITIES. BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS EXPERIENCED IN

THE OWNERSHIP AND OPERATION OF BUSINESSES SIMILAR TO THE BUSINESS AND THAT BUYER PRIOR TO THE CLOSING WILL HAVE INSPECTED THE LAND PREMISES AND FACILITIES AND FULLY REVIEWED AND EVALUATED THE PROPERTY INFORMATION TO ITS SATISFACTION AND IS QUALIFIED TO MAKE SUCH INSPECTIONS AND EVALUATIONS. BUYER ACKNOWLEDGES THAT, EXCEPT AS SET FORTH HEREIN IT IS FULLY RELYING ON BUYER'S (OR BUYER'S REPRESENTATIVES') INSPECTIONS OF THE LAND PREMISES AND FACILITIES AND NOT UPON ANY STATEMENT (ORAL OR WRITTEN) WHICH MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY SELLER OR ANY OF ITS REPRESENTATIVES. BUYER ACKNOWLEDGES THAT BUYER HAS (OR BUYER'S REPRESENTATIVES HAVE), OR PRIOR TO THE EXPIRATION OF THE INSPECTION PERIOD WILL HAVE, THOROUGHLY INSPECTED AND EXAMINED THE LAND PREMISES AND FACILITIES TO THE EXTENT DEEMED NECESSARY BY BUYER IN ORDER TO ENABLE BUYER TO EVALUATE THE CONDITION OF THE LAND PREMISES AND FACILITIES, THE MATTERS DISCLOSED BY THE PROPERTY INFORMATION AND ALL OTHER ASPECTS OF THE LAND PREMISES AND FACILITIES, AND BUYER ACKNOWLEDGES THAT, EXCEPT AS SET FORTH HEREIN, BUYER IS RELYING SOLELY UPON ITS OWN (OR ITS REPRESENTATIVES') INSPECTION, EXAMINATION AND EVALUATION OF THE LAND PREMISES AND FACILITIES AND ITS CONDITION. BOTH PARTIES HEREBY AGREE THAT FROM AND AFTER THE CLOSING NEITHER PARTY NOR THEIR RESPECTIVE EMPLOYEES, PARTNERS, OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, ATTORNEYS, AFFILIATES, PARENT COMPANIES, SUBSIDIARIES, SUCCESSORS OR ASSIGNS SHALL BE LIABLE TO THE OTHER PARTY OR THEIR RESPECTIVE EMPLOYEES, PARTNERS, OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, ATTORNEYS, AFFILIATES, PARENT COMPANIES, SUBSIDIARIES, SUCCESSORS OR ASSIGNS, FOR ANY SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL, OR OTHER DAMAGES RESULTING OR ARISING FROM OR RELATED TO THE OWNERSHIP, USE, CONDITION, LOCATION, MAINTENANCE, REPAIR OR OPERATION OF THE BUSINESS, AND THE PARTIES RELEASE AND WAIVE ANY CLAIMS OR CAUSES OF ACTION THEY MAY HAVE RELATING TO THE SAME. BUYER ACKNOWLEDGES THAT ANY CONDITION OF THE LAND PREMISES OR FACILITIES THAT BUYER DISCOVERS OR DESIRES TO CORRECT OR IMPROVE PRIOR TO OR AFTER THE CLOSING SHALL BE AT BUYER'S SOLE EXPENSE. EXCEPT AS PROVIDED HEREIN, BUYER EXPRESSLY WAIVES (TO THE EXTENT ALLOWED BY APPLICABLE LAW) ANY CLAIMS UNDER FEDERAL, STATE OR OTHER LAW THAT BUYER MIGHT OTHERWISE HAVE AGAINST SELLER AND ITS EMPLOYEES, PARTNERS, OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, ATTORNEYS, AFFILIATES, PARENT COMPANIES, SUBSIDIARIES, SUCCESSORS OR ASSIGNS RELATING TO THE USE, CHARACTERISTICS OR CONDITION OF THE LAND PREMISES AND FACILITIES, EXCEPT TO THE EXTENT SUCH CLAIMS ARISE OUT OF SELLER'S FRAUD OR WILLFUL MISCONDUCT. ANY REPAIRS PAID FOR BY SELLER PURSUANT TO THIS

AGREEMENT, IF ANY, SHALL BE DONE WITHOUT ANY WARRANTY OR REPRESENTATION BY SELLER, AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER IN CONNECTION WITH SUCH REPAIRS.

5.16    No Brokers.  Except for DTZ and its Affiliates, who will be paid by Seller pursuant to a separate agreement between Seller and DTZ, there is no investment banker, broker, finder or financial intermediary that has been retained by or is authorized to act on behalf of Seller or any Affiliate, or who is or might be entitled to any fee or commission in connection with the Transactions.

5.17    Plan Assets.  Seller is not (and, throughout the period Transactions are occurring pursuant to this Stalking Horse Asset Purchase Agreement, will not be) and is not acting on behalf of (and, throughout the period Transactions are occurring pursuant to this Stalking Horse Asset Purchase Agreement, will not be acting on behalf of) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to Title I of ERISA, a "plan" as defined in and subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or an entity deemed to hold the plan assets of any of the foregoing pursuant to 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA.  None of the Transactions contemplated by this Stalking Horse Asset Purchase Agreement are in violation of any state statutes applicable to Seller regulating investments of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code.

5.18    OFAC.  Neither Seller nor any of Seller's Affiliates, nor any of their respective brokers or other agents acting in any capacity in connection with the Transactions contemplated by this Stalking Horse Asset Purchase Agreement, is or will be (a) conducting any business or engaging in any transaction or dealing with any person appearing on the U.S. Treasury Department's OFAC list of prohibited countries, territories, "specifically designated nationals" or "blocked persons" (each a "Prohibited Person") (which lists can be accessed at the following web address: http://www.ustreas.gov/offices/enforcement/ofac/), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (b) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (c) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (d) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (e) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (i) any U.S. anti-money laundering law, (ii) the Foreign Corrupt Practices Act, (iii) the U.S. mail and wire fraud statutes, (iv) the Travel Act, (v) any similar or successor statutes or (vi) any regulations promulgated under the foregoing statutes.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as expressly set forth in the disclosure schedules attached hereto and incorporated by reference herein, as of the Execution Date and as of the Closing Date, Buyer represents and warrants to Seller the following:

6.1     Existence and Capacity.   Buyer is a limited liability company, duly organized and validly existing in good standing under the Laws of the State of Iowa. Buyer has the requisite power and authority to enter into this Stalking Horse Asset Purchase Agreement, to perform its obligations hereunder, and to conduct its business as now being conducted.  Buyer is properly registered to do business as a foreign entity in the State of Florida and all other states in which it does business.

6.2     Powers; Consents; Absence of Conflicts With Other Agreements, etc.  The execution, delivery, and performance of this Stalking Horse Asset Purchase Agreement by Buyer and all other agreements referenced herein, or ancillary hereto, to which Buyer is a party, and the consummation of the Transactions contemplated herein by Buyer:

(a)     are within its corporate powers, are not in contravention of Law or of the terms of its Governance Documents, and have been duly authorized by all necessary and appropriate corporate actions, none of which action have been modified or rescinded and all of which remain in full force and effect;

(b)     except as set forth on Schedule 6.2(b) hereto, do not require any approval or consent of, or filing with, any Government Entity or authority bearing on the validity of this Stalking Horse Asset Purchase Agreement which is required by Law or the regulations of any such Government Entity;

(c)     will neither conflict with, nor result in any breach or contravention of, or the creation of any lien, charge or encumbrance under, any indenture, agreement, lease, instrument or understanding to which it is a party or by which it is bound;

(d)     will not violate any Law of any Government Entity to which it may be subject; will not violate any judgment, decree, writ, or injunction of any court or Government Entity to which it may be subject; and

(e)     are not in contravention or violation of the terms of the Governance Documents of Buyer.

6.3     Binding Agreement.  This Stalking Horse Asset Purchase Agreement and all agreements to which Buyer will become a party pursuant hereto are and will constitute the valid and legally binding obligations of Buyer and are and will be enforceable against Buyer in accordance with the respective terms hereof and thereof, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the enforceability of creditors' rights generally, general equitable principles and the

discretion of courts in granting equitable remedies, and subject to all required approvals of the Bankruptcy Court.

6.4     <u>Regulatory Compliance</u>.  Buyer is in compliance in all material respects with all applicable statutes, rules, regulations, and requirements of the Government Entities having jurisdiction over Buyer and the operations of Buyer.

6.5     <u>Licensure</u>.  To Buyer's Knowledge, there is no reason which would prevent Buyer from being able to qualify for and obtain the necessary licenses and regulatory approvals required for operation of the Business and the Facilities.

6.6     <u>No Brokers</u>.  There is no investment banker, broker, finder or financial intermediary that has been retained by or is authorized to act on behalf of Buyer, or any of its Affiliates, or who is or might be entitled to any fee or commission in connection with the Transactions.

6.7     <u>Eligibility for Required Governmental Authorizations</u>.  There is no pending Action that has been commenced against Buyer or any of its Affiliates that challenges, or may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Transactions contemplated hereby, and to Buyer's Knowledge, no such Action has been threatened.  To Buyer's Knowledge, neither Buyer nor its Affiliates has, since January 1, 2014, had any license or certificate of authority for ownership or operation of any skilled nursing facility, assisted living facility or continuing care retirement community revoked in a manner which could reasonably be the basis of a denial of licensure to Buyer with respect to the Facilities.  To Buyer's Knowledge, there are no material citations or deficiencies currently outstanding with respect to any skilled nursing facility, assisted living facility or continuing care retirement community owned or operated by Buyer or its Affiliates which could reasonably be the basis of a denial of licensure to Buyer with respect to the Facilities.

6.8     <u>No Financing Contingency</u>.  The purchase by Buyer of the Purchased Assets is not conditioned upon financing, and Buyer herein acknowledges and represents that it shall be ready, willing and able (including, having the necessary funds) to consummate the sale of the Purchased Assets as contemplated by this Stalking Horse Asset Purchase Agreement on the Closing Date and to operate the Facilities in the Ordinary Course of Business after the Closing.

**ARTICLE VII**
**ADDITIONAL AGREEMENTS**

7.1     <u>Bankruptcy Matters</u>.

(a)     Seller shall file a motion for final decree in Seller's 2013 Bankruptcy Case within ten (10) Business Days of the Execution Date, and shall file the new Bankruptcy Case within fourteen (14) Business Days of the entry of such final decree (the "<u>New Petition Date</u>").

(b)     On the New Petition Date, Seller shall file with the Bankruptcy Court in the Bankruptcy Case (i) a motion seeking, among other things, an order authorizing the sale of substantially all of Seller's assets free and clear of Liens, claims, encumbrances and interests, other than Permitted Exceptions, and entry of the Sale Order, and (ii) a plan of liquidation (the "Liquidating Plan") seeking an order approving the Transactions, and shall use commercially reasonable efforts to cause the Bankruptcy Court to (1) enter the Bidding Procedures Order in substantially the form attached hereto as Exhibit A-1, with such changes as are reasonably satisfactory to Buyer; (2) enter the Sale Order in substantially the form attached hereto as Exhibit A-2, with such changes as are reasonably satisfactory to Buyer, as expeditiously as possible, and (3) confirm the Liquidating Plan, as expeditiously as possible.  Unless waived or extended by Buyer, the Bidding Procedures Order shall be entered by no later than April 25, 2016, and the Sale Order shall be entered no later than June 13, 2016.

(c)     Seller shall provide Buyer with copies of all material motions, orders, applications and supporting papers and notices prepared by Seller (including, without limitation, forms of orders and notices to interested parties), relating to this Stalking Horse Asset Purchase Agreement, the Bidding Procedures Order, the Sale Order or the Transactions, as soon as practicable, prior to being filed with the Bankruptcy Court, and shall consult as reasonably as is practicable with Buyer or its counsel prior to taking any significant action in connection with the Bankruptcy Case with respect to the Transactions. Without the consent of the Buyer, Seller shall not take any significant action in connection with the Bankruptcy Case with respect to the Transactions that is inconsistent with the Transactions and terms contemplated by this Stalking Horse Asset Purchase Agreement, except as consistent with the Bidding Procedures Order, unless Seller's board of directors has determined in good faith that the failure to take such action would violate their fiduciary duties. All papers forwarded to Buyer under this section may be provided in draft form and shall be treated as confidential in accordance with Section 7.8. Notwithstanding any provisions to the contrary herein, Seller shall not seek to amend or modify any material provision of the Bidding Procedures Order or the Sale Order without the consent of the Buyer, which consent shall not be unreasonably withheld.

(d)     Seller's obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to Section 9.2(b) shall constitute administrative expenses (which shall be superpriority administrative expense claims) of Seller under section 364(c)(1) of the Bankruptcy Code.  The Break-Up Fee and Expense Reimbursement shall be payable from (i) the first proceeds of any Alternative Transaction (ii) to the extent that such first proceeds from an Alternative Transaction would be insufficient (such as including without limitation a credit bid) Debtor shall require any credit bidder to be obligated to first pay the Break-Up Fee and Expense Reimbursement in cash as a condition of the credit bid, or shall use commercially reasonably efforts to insure that sufficient cash assets remain in the estate to pay immediately the Break-Up Fee and Expense Reimbursement or (iii) in the event that Seller's obligation to pay the Break-Up Fee and Expense Reimbursement arises due to the Bankruptcy Court's approval of the Liquidating Plan, the Break-Up Fee and the Expense Reimbursement shall be payable from Seller's estate and the reorganized debtor, which has adequate funds. Seller hereby

confirms that it is critical to the process of maximizing the value of and arranging an orderly sale of the Purchased Assets to proceed by selecting Buyer to enter this Stalking Horse Asset Purchase Agreement; without Buyer having committed considerable time and expense in connection herewith Seller would have to employ a less orderly process resulting in higher costs to the estate and risk of a lower price; and, therefore, the contributions of Buyer to the process have indisputably provided a substantial benefit to Seller.

    7.2    <u>Conduct of Business</u>.

    (a)    From the Execution Date until the Closing Date, except as otherwise contemplated by this Stalking Horse Asset Purchase Agreement, authorized by the Bankruptcy Court or to the extent Buyer shall otherwise consent in writing, and subject to the requirements of the Bankruptcy Case, Seller shall: (i) conduct the Business in the Ordinary Course, (ii) make no transfers of any Purchased Assets, (iii) use commercially reasonable efforts to maintain and preserve intact the organization and advantageous business relationships of the Business and retain the services of its officers and key Employees, and (iv) take no action which would materially adversely affect or materially delay the ability of Buyer to obtain any necessary Approvals for the Transactions contemplated hereby or to perform its covenants under this Stalking Horse Asset Purchase Agreement.

    (b)    During the period from the Execution Date to the Closing Date, except as expressly contemplated or permitted by this Stalking Horse Asset Purchase Agreement, the Bidding Procedures Order, any order relating to the Bankruptcy Case, as expressly required by applicable Law, or Buyer's consent, and subject to the requirements of the Bankruptcy Case, Seller shall not:

    (i)    incur any indebtedness for borrowed money, assume, guarantee, endorse or otherwise as an accommodation become responsible for the obligations of any other Person in excess of $50,000 or $150,000 in the aggregate, or make any loans or advances or renewals thereof to any Person;

    (ii)    make or pay any distribution, whether payable in cash, property or otherwise;

    (iii)    sell, transfer, mortgage, license, encumber or otherwise dispose of any of the Purchased Assets; provided, however, Seller shall be permitted to dispose of obsolete or broken and un-repairable personal property in the Ordinary Course;

    (iv)    make any investment either by purchase of stock or securities, contributions to capital, property transfers, or purchase of any property or assets of any other Person;

    (v)    amend or terminate any Transferred Contract, including without limitation any Residency Agreement or Medicare Provider Agreement;

(vi)    reduce pricing or make any material concessions under any Transferred Contract, including without limitation any Residency Agreement or Medicare Provider Agreement;

(vii)    materially change any terms, including without limitation any financial terms, under any Residency Agreements or offered to Prospective Residents;

(viii)    increase the compensation or fringe benefits of any Employees, other than increases in the Ordinary Course, or release Employees from any confidentiality, non-compete, or similar agreements;

(ix)    amend its Governance Documents, or change the members of its board of directors or other similar governing body of Seller, in any manner which would constitute an Alternative Transaction;

(x)    enter into any new Material Contract, other than new Residency Agreements entered into in the Ordinary Course;

(xi) enter into any new line of business;

(xii) acquire or agree to acquire, by merging or consolidating with, or by purchasing an equity interest in, or all or a portion of the assets of, or by any other manner, any other Person, or engage in any divestiture, merger, consolidation, conversion or dissolution;

(xiii) change any Tax election, file any amended Tax Return, enter into any closing agreement, settle or compromise any Liability with respect to Taxes, agree to any adjustment of any Tax attribute, change (or make a request to any taxing authority to change) any of its methods of reporting income or deductions;

(xiv) take any action that is intended or could reasonably be expected to violate any applicable Law; or

(xv) agree or commit to do any of the foregoing.

7.3    Employee Matters.

(a)    Subject to the provisions of Section 7.3(b) hereto, Buyer is not obligated to hire the Employees, and may interview and discuss potential employment with all Employees; provided, however, Buyer shall use commercially reasonable efforts to employ at least 75% of the Employees.  Prior to Closing, Buyer will provide Seller with a list of the Employees to whom Buyer has made an offer of employment that has been accepted to be effective upon the Closing (the "Transferred Employees").  Such offers of employment shall be on such terms and at such salary or wage and benefit levels

as Buyer may determine.  Effective as of the Closing, Seller agrees to terminate the employment of all of the Transferred Employees.

(b)    In respect of notices and payments relating to events occurring prior to the Closing or as a result of the Transactions, Buyer shall be responsible for and assume any Liability of Seller for any and all payments, fines, and penalties, if any, under the Worker Adjustment and Retraining Notification Act, the Florida Worker Adjustment and Retraining Act and any other applicable state or local mini-WARN acts (collectively, the "<u>WARN Acts</u>") in connection with the Transactions (including any such Liability for failure to furnish required notices under the WARN Acts).

(c)    Nothing expressed or implied in this Section 7.3 will confer upon any Employee or any legal representative of any such Person, any rights or remedies, including any right to employment or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Stalking Horse Asset Purchase Agreement.  Nothing in this Stalking Horse Asset Purchase Agreement (i) will limit or restrict in any way the right of Buyer to modify, amend, terminate or establish employee benefit plans or arrangements in whole or in part at any time after the Closing Date, (ii) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement, or (iii) is intended to confer upon any individual (including Employees, retirees, or dependents or beneficiaries of Employees or retirees) any right as a third-party beneficiary of this Stalking Horse Asset Purchase Agreement.

7.4    <u>Vacation Pay</u>.

(a)    Buyer hereby agrees to assume an amount equal to the gross amount of earned and accrued vacation and personal holiday pay (plus FICA, federal unemployment Taxes, social security, state payroll and other Taxes related to the foregoing) as of the Closing Date for all Transferred Employees, and Buyer shall pay the Transferred Employees such assumed employee benefits when and as due.  Further, other than the amounts expressly assumed in this paragraph, Seller will timely pay all other obligations owed to Employees through the Closing Date.

(b)    Prior to the execution of this Stalking Horse Asset Purchase Agreement, Seller shall have tendered to Buyer a preliminary listing dated as of the date thereof detailing all of current Employees along with their individual accrued employee benefits, which listing shall be updated five (5) Business Days prior to the Closing Date and again, as of Closing Date and delivered to Buyer on the Closing Date.

(c)    As of 11:59 p.m. on the day before the Closing Date, all Transferred Employees shall cease participation in all employee benefit plans, except with respect to benefits accrued as of, or claims incurred on or prior to, such time, all such accrued benefits and claims being Excluded Liabilities.  Beginning at 12:01 a.m. on the Closing Date, Buyer will provide employee benefit coverage for Transferred Employees under new or existing plans sponsored by Buyer.

7.5     <u>Expenses</u>.  Regardless of whether the Transactions contemplated by this Stalking Horse Asset Purchase Agreement are consummated, each of the Parties shall pay all of its expenses relating to the Transactions contemplated by this Stalking Horse Asset Purchase Agreement, including, the fees and expenses of its Representatives; provided, however, that this paragraph shall not affect Buyer's right to any Expense Reimbursement.

7.6     <u>Access to Information</u>.

(a)     At all times prior to the Closing Date, Seller shall permit Buyer and its counsel and other professional advisors to have reasonable access to the Business, the Facilities, the Employees, and all non-privileged records and assets relating to the same (excluding patient care information subject to HIPAA) to perform due diligence, and make, or have made, copies thereof; provided, however, that such access shall be during normal business hours, upon reasonable prior notice and in a manner so as minimize any interference with the normal business operations of the Business; and further provided, that until the consummation of the Transactions contemplated in this Stalking Horse Asset Purchase Agreement, Buyer agrees that Buyer shall not contact or otherwise communicate with any Residents, patients or other occupants of any of the Facilities without obtaining the prior consent of Seller (not to be unreasonably withheld or delayed) and allowing a Representative of Seller to be present at the time of any meetings with any Residents.  To the extent confidential patient or other information protected by HIPAA is inadvertently disclosed to Buyer, Buyer shall hold such information in strictest confidence, shall notify Seller of its receipt of such information, and shall promptly thereafter return such information to Seller and destroy any and all copies thereof. This Section shall survive the closing of the Transactions.

(b)     Following the Closing, unless otherwise prohibited by Law, each Party will afford each other Party, its counsel and its accountants, reasonable access to the books, records and other data relating to the Business, including, but not limited to the Excluded Assets owned by Seller, and the right to make copies and extracts therefrom, to the extent that such access may be reasonably required by the requesting Party in connection with (i) the preparation of Tax Returns, (ii) compliance with the requirements of any Government Entity, (iii) any actual or threatened legal Action, (iv) Seller's 2013 Bankruptcy Case or the Bankruptcy Case, or (v) for any other legitimate or proper business purpose; provided, however, that such access shall be during normal business hours, upon reasonable prior notice and in a manner so as minimize any interference with the normal business operations.

(c)     No Party shall be entitled to charge any other Party for the cost of providing copies of any Contracts, books, records and other information to such other Party.

7.7     [<u>Intentionally omitted.</u>]

7.8     <u>Publicity; Confidentiality</u>.  A Party may only issue a press release or make a public statement concerning this Stalking Horse Asset Purchase Agreement and the

Transactions if such press release or public statement is made in form and substance, and at a time, to which all other Parties have consented after good faith consultation, subject to Seller's obligations arising under Seller's 2013 Bankruptcy Case, or in the Bankruptcy Case. Following the Closing, no Party shall unreasonably withhold its consent regarding the general announcement of the purchase and sale contemplated hereunder. Otherwise, no Party hereto shall make any public disclosure concerning this Stalking Horse Asset Purchase Agreement, the Transactions, or the existence of and/or particulars of any negotiations related hereto, including the terms, conditions, consideration to be paid or other facts related to this Stalking Horse Asset Purchase Agreement, except to the extent that public disclosure is required by applicable Law or is otherwise made to a Government Entity or the Bankruptcy Court, in which case, to the extent practicable, the Parties will use their reasonable best efforts to reach mutual agreement on disclosure language prior to making such disclosure. Seller and the Buyer will, and will cause their Representatives to, maintain in confidence all written information obtained in confidence from the other Party in connection with this Stalking Horse Asset Purchase Agreement or the Transactions, including this Stalking Horse Asset Purchase Agreement and the terms hereof (the "Confidential Information"), unless the use or disclosure of such Confidential Information is reasonably necessary in connection with (a) obtaining any approval; (b) the Bankruptcy Case; (c) negotiations with the holders of Seller's debt and other obligations (and each of the foregoing party's Representatives) and applicable state regulatory authorities; (d) the negotiation of the terms of this Stalking Horse Asset Purchase Agreement or the Transactions; or (e) a valid court order. Notwithstanding the foregoing, Debtor may disclose this Stalking Horse Asset Purchase Agreement as authorized and directed by the Bidding Procedures Order. Confidential Information shall not include information that is or becomes publicly known through no wrongful act of any Party hereto.

7.9    Transferred Contracts.  Seller agrees to assume in the Bankruptcy Case and assign to Buyer any Contract that is designated by Buyer to Seller on or before the Closing and as set forth on the final updated Schedule 7.9(a) hereto (including, without limitation, the Residency Agreements and Medicare Provider Agreements, the "Transferred Contracts"), and to reject any Contract that is not a Transferred Contract (the "Rejected Contracts"), which are anticipated to be set forth on the final updated Schedule 7.9(b) hereto. Within fifteen (15) Business Days following the Execution Date, Buyer shall provide to Seller, and on the date of filing the Bankruptcy Case, Seller shall file with the Court and serve on all required notice parties, contract assumption and rejection schedules (the "Contract Schedules") setting out: (i) all Transferred Contracts, which Buyer wishes to be assumed by Seller and assigned by Seller to Buyer at Closing; and (ii) all Rejected Contracts, which Buyer wishes to be rejected as of Closing; provided, however, notwithstanding the foregoing, the Buyer shall assume all Residency Agreements with Residents and provided further that except for the Residency Agreements, Buyer shall have the right until the earlier of Closing or determination of Cure Amounts, in its sole and absolute discretion (including without limitation because a Cure Amount is determined to be greater than anticipated), to determine whether a Contract is to be a Transferred Contract or a Rejected Contract, and assumption and assignment or rejection shall be effective only upon the Closing, subject to the filing of a notice of closing and contract treatment (the "Closing Notice"), to be filed within two (2)

Business Days after Closing. At Buyer's request, Seller shall also file and serve any updates to the Contract Schedules which may be made prior to the filing of the Closing Notice. The list of Transferred Contracts and the list of Rejected Contracts shall together comprise all of the Contracts to which Seller is a party, and any Contract which is not a Transferred Contract (or subject to a pending motion to become a Transferred Contract) will be a Rejected Contract; provided however that in the event a Contract for insurance or indemnity in favor of Seller exists and Buyer does not designate such Contract as either a Transferred or Rejected Contract, such Contract for insurance or indemnity benefits shall remain in force. Assumption and assignment of the Transferred Contracts shall include any ancillary or related agreements, or rights appurtenant thereto, pursuant to which Seller has rights or licenses granted in connection with or under the Transferred Contracts, so long as such ancillary or related agreements do not create additional obligations of Seller or Buyer beyond those set out in the Transferred Contracts (unless Buyer subsequently agrees to such obligations). Buyer shall pay all Cure Amounts in connection with assumption and assignment of any Transferred Contracts to Buyer. Pursuant to section 365 of the Bankruptcy Code and as requested by parties to the Transferred Contracts and required by the Bankruptcy Court, the Buyer shall provide adequate assurance of future performance under and with respect to the Transferred Contracts. After the Closing Date, Seller shall be released from any further Liability under the Transferred Contracts as provided for under section 365(k) of the Bankruptcy Code.

      7.10   <u>Required Creditor Notices</u>.  Seller shall serve notice of the Sale Motion the Bidding Procedures Order and any other required notice of sale upon all creditors and all other parties entitled to notice of the Transaction, in form and substance reasonably acceptable to Buyer, as required by the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Court's local rules (collectively, the "<u>Required Creditor Notices</u>").

      7.11   <u>Permits and Governmental Approvals Cooperation</u>.  Subject to the requirements set forth in Section 7.17, Buyer and Seller shall use commercially reasonable efforts to obtain all governmental approvals (or exemptions therefrom) necessary or required to allow Buyer and Seller to perform their obligations under this Stalking Horse Asset Purchase Agreement and assist and cooperate with each other and their respective Representatives and counsel in obtaining all Permits, governmental consents, approvals, certifications (including Medicare), Provider Agreements, and licenses which are necessary or appropriate and in the preparation of any document or other material which may be required by any Governmental Entity as a predicate to or as a result of the Transactions contemplated herein.

      7.12   <u>Preservation and Access to Records After Closing</u>.  After the Closing, Seller and Buyer shall each keep and preserve in their original form all medical and other records of the Facilities existing as of the Closing, and which constitute a part of the Excluded Assets or Purchased Assets. For purposes of this Stalking Horse Asset Purchase Agreement, the term "<u>records</u>" includes all documents, electronic data and other compilations of information in any form. Buyer acknowledges that as a result of entering into this Stalking Horse Asset Purchase Agreement and operating the Facilities it will

gain access to Resident, patient and other information which is subject to rules and regulations regarding confidentiality. Buyer agrees to abide by any such rules and regulations relating to the Confidential Information it acquires. Buyer agrees to maintain the patient records delivered to Buyer at the Closing at the Facilities after Closing in accordance with applicable Law (including, if applicable, Section 1861(v)(i)(I) of the Social Security Act (42 U.S.C. §1395(v)(l)(i)), the privacy requirements of the Administrative Simplification subtitle of HIPAA and applicable state requirements with respect to medical privacy and requirements of relevant insurance carriers, all in a manner consistent with the maintenance of patient records generated at the Facilities after Closing. Buyer will allow Seller and its Representatives, including its counsel and accountants, access to the records transferred to Buyer at the Closing, including reasonable access to workspace at the Facilities, consistent with the provisions of Section 7.8.

7.13    <u>Cooperation on Tax Matters</u>.  Following the Closing, the parties shall reasonably cooperate with each other and shall make available to one another, as reasonably requested and at the expense of the requesting party, and to any taxing authority, any information which may be relevant to determining the amounts payable under this Stalking Horse Asset Purchase Agreement, and shall preserve all such information, records and documents (to the extent a part of the Purchased Assets delivered to Buyer at Closing) at least until the expiration of any applicable statute of limitations or extensions thereof. Seller shall be responsible for filing any and all Tax Returns and Tax documentation relating to the Business, the Facilities, or Seller's operations relating to periods prior to the Closing Date.

7.14    <u>Tax and Medicare Effects</u>.  None of the Parties (nor such Parties' counsel or accountants) has made or is making any representations to any other Party (nor such Party's counsel or accountants) concerning any of the Tax or Medicare effects of the Transactions provided for in this Stalking Horse Asset Purchase Agreement as each Party hereto represents that each has obtained, or may obtain, independent Tax and Medicare advice with respect thereto and upon which it, if so obtained, has solely relied.

7.15    <u>Covenants Relating to Residency Agreements</u>.  Buyer agrees that all Residency Agreements of current Residents shall be Transferred Contracts to be assumed by Seller and assigned to Buyer and honored in all respects by Buyer; provided, however, Buyer's obligations under this Section 7.15 are expressly subject to any and all defenses, causes of action, claims, other rights or privileges that Seller or Buyer may have under the applicable Residency Agreement(s), including, without limitation, defenses based on a Resident's failure to pay all Monthly Service Fees and other fees and assessments with respect to each such applicable Residency Agreement.

7.16    <u>Cost Reports</u>.  Seller, at its expense, shall prepare and timely file all terminating and other cost reports required by law to be filed under the Medicare programs for the periods ending on or prior to the Closing Date (the "<u>Seller's Cost Reports</u>"), which reports shall be prepared in accordance with applicable Law and past practice. Buyer shall have the right to consult with Seller and will be provided copies of proposed Seller's Cost Reports no less than ten (10) Business Days prior to their filing by

Seller. Buyer shall forward to Seller all correspondence relating to Seller's Cost Reports within five (5) Business Days after receipt by Buyer. Buyer shall forward to Seller any demand by payors for payments on Seller's Cost Reports within three (3) Business Days of Buyer's receipt. Seller shall retain all rights and obligations to Seller's Cost Reports. Seller will have the right to appeal any Medicare determinations relating to Seller's Cost Reports, and shall appeal any determinations if so requested by Buyer at Buyer's expense. Buyer shall further be permitted, at Buyer's sole expense, to participate in any meetings with CMS in respect to Seller's Cost Reports and to be provided with copies of all audit correspondence. In the event Seller desires to open, re-file or amend any of Seller's Cost Reports, Seller agrees to provide Buyer with at least ten (10) days prior notice prior to taking such Action and agrees to consult with Buyer during such ten (10) Business Days period.

7.17   <u>Regulatory Filings</u>.  Within five (5) Business Days after entry of the Sale Order, Buyer shall promptly file all applications and documents which are or may be reasonable and necessary to obtain the consent of the OIR or any other Government Entity to accomplish the Transactions.  Buyer shall diligently prosecute such applications and take any other actions which are or may be reasonable and necessary to obtain the consent of the OIR or any other Government Entity to consummate the Transactions.

7.18   <u>Title and Survey</u>.

(a)   <u>Title Insurance Commitment</u>.   Prior to the date hereof, Thames Markey & Heekin, P.A. has delivered to Buyer a commitment to issue an Owner's Policy of Title Insurance ("<u>Title Commitment</u>") issued by First American Title Insurance Company (the "<u>Title Company</u>") in its current ALTA form, in the amount of the Purchase Price, showing title to the fee interest in the Land Premises to be in Seller.

(b)   <u>Survey</u>.  In addition, prior to the date hereof, Seller has delivered to Buyer a survey of the Land Premises (and improvements thereon) from CRESurveys, Inc. ("<u>Survey</u>").  Seller shall have no obligation to cause the Survey to be amended or updated other than to conform the legal description for the Land Premises to the legal description of the Land Premises that will be insured under the Owner's Policy of Title Insurance issued pursuant to Section 7.18(a).  If Buyer desires to cause the Survey to be amended or updated, Buyer shall undertake such actions at its sole cost and expense.

(c)   <u>Title and Survey</u>.  Seller shall comply with its obligations under Section 4.2(a)(vi) of this Agreement and take such other actions, including, without limitation, the satisfaction of the applicable items listed on Schedule B-1 of the Title Commitment as may be required in order for the Title Company to issue, as of the Closing Date, an Owner's Policy of Title Insurance insuring Buyer's fee simple estate in the Land Premises subject only to the Permitted Exceptions. As used herein, "<u>Permitted Exceptions</u>" means: *ad valorem* Taxes for the 2016 year and subsequent years; rights of Residents under the Residency Agreements; and the "<u>Conditions to Title</u>" set forth on <u>Exhibit G</u> attached hereto.

7.19    <u>Misdirected Payments</u>.  The Parties covenant and agree to promptly remit to the other Party any payments received, which payments are on or in respect of accounts or notes receivable owned by (or are otherwise payable to) such other Party. In addition, and without limitation, in the event of a determination by any governmental or third-party payor that payments to Seller or the Facilities resulted in an overpayment or other determination that funds previously paid by any program or plan to Seller or the Facility must be repaid, Seller shall be responsible for repayment of said monies (or defense of such Actions) if such overpayment or other repayment determination was for services rendered prior to the Closing Date, and Buyer shall be responsible for repayment of said monies (or defense of such Actions) if such overpayment or other repayment determination was for services rendered after the Closing Date.

7.20    <u>Change of Name and Case Caption</u>.  If not already provided in the Sale Order or Confirmation Order, then within five (5) Business Days of the Closing, Seller shall file a motion with the Bankruptcy Court to change the name of Seller and the case caption to any name that does not include the words "Glenmoor" and shall refrain from using any name incorporating the words "Glenmoor" or any derivative thereof, except to the extent necessary for winding up Seller's affairs, defending any claims brought against or prosecuting any claim brought by the estate in the Bankruptcy Case.

7.21    <u>Release</u>.  One day following Closing, Seller and its estate shall be deemed to have released and discharged any claims or causes of action (including without limitation under Chapter 5 of the Bankruptcy Code) against all (a) Residents and Prospective Residents, (b) Affiliates of Residents, (c) counter-parties to Transferred Contracts (except to the extent such claims or causes of action are assigned to Buyer under this Stalking Horse Asset Purchase Agreement), and (d) except for the obligations under this Stalking Horse Asset Purchase Agreement or under any other agreement or instrument executed by Buyer and Buyer's Affiliates in connection with the Transaction, Buyer and Buyer's Affiliates.

7.22    <u>Third-Party Confidentiality Agreements</u>. In connection with Closing, to the extent assignable without the prior written consent of the other party, Seller will assign to Buyer its rights under any confidentiality or non-disclosure agreements entered into with other bidders or potentially interested parties who were given any confidential or proprietary information involving Seller's business.

7.23    <u>Exclusivity</u>.

(a)    From the date of execution of this Stalking Horse Asset Purchase Agreement through the earlier of the date of the Bidding Procedures Order or the termination of this Stalking Horse Asset Purchase Agreement, Seller and its Affiliates shall not, and shall not permit their investment banker, attorney, advisor or other representative to, directly or indirectly, directly or indirectly (i) solicit, initiate, encourage, facilitate or take any other action designed to facilitate any inquiries or proposals regarding any merger, consolidation, sale of assets, assumption of liabilities, or similar Transactions involving Seller that, if consummated, would constitute a Potential Alternative Sale (as defined below); (ii) participate in any discussions or negotiations

with third parties regarding a Potential Alternative Sale; or (iii) enter into any agreement regarding any Potential Alternative Sale; provided however that Seller is not restricted from responding to any inquiries in respect of the Bidding Procedures Order (and prior to the issuance of the Bidding Procedures Order, Seller may engage in any of the activities in clause (i), (ii) or (iii) above in furtherance of the sale process reasonably anticipated to be authorized by the Bidding Procedures Order).

(b)     As used in this Stalking Horse Asset Purchase Agreement, "Potential Alternative Sale" means any of (i) a transaction pursuant to which any Person or group of Persons (other than Buyer), directly or indirectly, replace 40% or more of the existing ownership of Seller, (ii) a merger, consolidation or other business combination involving Seller, (iii) any transaction pursuant to which any Person or group of Persons (other than Buyer) acquires or would acquire control of any of the Purchased Assets, or (iv) any other consolidation, business combination, recapitalization, restructuring, reorganization or similar transaction involving Seller, other than the Transactions; provided, however, notwithstanding the foregoing, the Liquidating Plan shall under no circumstances be deemed to be an Alternative Transaction.

(c)     Except as authorized, directed, and otherwise permitted in the Bidding Procedures Order (or, prior to the issuance of the Bidding Procedures Order, in furtherance of the sale process reasonably anticipated to be authorized by such Order), Seller and its Representatives will immediately cease and cause to be terminated any existing discussions or negotiations with any Persons (other than Buyer) conducted heretofore with respect to any of the foregoing. Except as authorized in the Bidding Procedures Order after its entry (or, prior to the issuance of the Bidding Procedures Order, in furtherance of the sale process reasonably anticipated to be authorized by such Order), Seller agrees not to release any third party from the confidentiality provisions of any agreement to which Seller is or may become a party. Seller will take reasonable efforts to ensure that its Representatives and Affiliates are aware of the requirements of this Section 7.23.

7.24     No Survival of Representations and Warranties. Buyer and Seller acknowledge and agree that the Seller's representations and warranties contained in Article V shall expire and be of no further force or effect on and after the Closing Date.

## ARTICLE VIII
## CONDITIONS PRECEDENT

8.1     Conditions to the Obligations of Buyer.  The obligations of Buyer to effect the Transactions are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by Buyer:

(a)     the representations and warranties of Seller set forth in this Stalking Horse Asset Purchase Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as if made at and as of the Closing Date (except where such representations or warranties are made expressly as of a specific date, and then as of such date);

(b)      Seller shall have performed in all material respects all obligations required to be performed by it under this Stalking Horse Asset Purchase Agreement at or prior to the Closing, including, without limitation that the Purchased Assets are conveyed free and clear of all Liens, claims, interests, encumbrances, Liabilities and successor liability, subject only to the Assumed Liabilities and Permitted Exceptions;

(c)      Seller shall have executed, as applicable, and delivered to Buyer all of the documents and other items required to be delivered by it at the Closing pursuant to Section 4.2(a) hereto;

(d)      no Action shall be pending or threatened before any Government Entity that seeks to or does, and no Law shall be in effect that does, prevent consummation of any of the Transactions;

(e)      since the Execution Date there shall not have occurred any event, change or circumstance that could reasonably be expected to constitute a material adverse effect with respect to the Business or any of the Facilities;

(f)      the Court Approval shall have been obtained and be in full force and effect and, if required by Buyer, the Sale Order shall have become a Final Order;

(g)      as of the Closing Date, Buyer shall have been assigned (or shall have received assurances reasonably satisfactory to Buyer that it will be assigned) the Medicare Provider Agreements and Transferred Contracts (subject to compliance with Section 7.9);

(h)      as of the Closing Date, Buyer shall have received assurances reasonably satisfactory to Buyer that the appropriate Government Entity, including, without limitation, the OIR, is prepared to approve the Transactions contemplated herein and issue the following: (i) Standard Nursing Home Certificate, (ii) Standard Assisted Living Facility Certificate, (iii) Florida Annual Resale Certificate for Sales Tax, (iv) Continuing Care Facility Certificate, (v) Food Hygiene – Assisted Living Facility Sanitation Certificate, and (vi) Group Care – Assisted Living Facility Operating Permit;

(i)      as of the Closing Date, the Buyer shall have been assigned (or shall have received assurances reasonably satisfactory to Buyer that it will be assigned) the Medicare Provider Agreements;

(j)      as of the Closing Date, the Buyer shall have received assurances reasonably satisfactory to Buyer that all Permits required for operation of the Business have been or will be transferred or issued in time to prevent any interruption of the Business; and

(k)      the Title Company is prepared to issue, as of the Closing Date, an Owner's Policy of Title Insurance pursuant to Section 7.18(a) hereof insuring Buyer's fee simple estate in the Land Premises subject only to the Permitted Exceptions and attaching

a "Florida Survey Endorsement" upon payment by Seller of the premium for such policy (it being acknowledged and agreed said premium shall be at Seller's sole cost and expense).

        8.2     <u>Conditions to the Obligations of Seller</u>.  The obligations of Seller to effect the Transactions are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by Seller:

        (a)     the representations and warranties of Buyer set forth in this Stalking Horse Asset Purchase Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as if made at and as of the Closing Date (except where such representations or warranties are made expressly as of a specific date, and then as of such date);

        (b)     Buyer shall have performed in all material respects all obligations required to be performed by it under this Stalking Horse Asset Purchase Agreement at or prior to the Closing;

        (c)     Buyer shall have executed, as applicable, and delivered to Seller all of the documents and other items required to be delivered at the Closing pursuant to Section 4.2(b) hereto;

        (d)     Buyer shall have delivered the Deposit and Closing Cash Payment to the Escrow Agent;

        (e)     no Action shall be pending or threatened before any Government Entity that seeks to or does, and no Law shall be in effect that will, prevent consummation of any of the Transactions;

        (f)     Seller shall have received approvals or other assurances reasonably acceptable to Seller from all Governmental Entities, including, without limitation, the OIR, whose approval is required to consummate the Transactions contemplated herein;

        (g)     the Bankruptcy Court shall have entered the Sale Order; and

        (h)     the Court Approval shall have been obtained and be in full force and effect.

## ARTICLE IX
## TERMINATION

        9.1     <u>Events of Termination</u>.  This Stalking Horse Asset Purchase Agreement may be terminated and the Transactions contemplated hereby may be abandoned at any time prior to the Closing:

        (a)     by mutual written consent of the Parties;

(b)    by any Party, if the Closing Date shall not have occurred within seventy-five (75) days of entry of the Sale Order (the "Outside Closing Date"), provided, however that the right to terminate this Stalking Horse Asset Purchase Agreement under this Section 9.1(b) shall not be available to any Party whose failure to fulfill any obligation under this Stalking Horse Asset Purchase Agreement shall be the cause of the failure of the Closing Date to occur on or before the Outside Closing Date; provided, further, that in the event that the condition to Closing set forth in Section 8.1(h) and Section 8.1(i) have not been satisfied by the Outside Closing Date, then the Outside Closing Date will be extended to one hundred and five (105) days after entry of the Sale Order;

(c)    by Seller, if there has been a material breach of any covenant or condition, or any representation or warranty of Buyer and Seller has notified Buyer of such breach in writing, and the breach has not been cured (if capable of being cured) within ten (10) Business Days after delivery of such notice (and if not capable of being cured, immediately);

(d)    by Buyer, if there has been a material breach of any covenant or condition, or any representation or warranty of Seller and Buyer has notified Seller of such breach in writing, and the breach has not been cured (if capable of being cured) within ten (10) Business Days after delivery of such notice (and if not capable of being cured, immediately);

(e)    by any Party, if there shall be any Law of any Government Entity that makes consummation of the Transactions illegal or otherwise prohibited or if any judgment, injunction, order or decree of any competent authority prohibiting such Transactions is entered and such judgment, injunction, order or decree shall have become final and non-appealable;

(f)    by Buyer, if the Bidding Procedures Order is not entered on or by April 25, 2016, the Sale Order is not entered on or by June 13, 2016, or if Seller's Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code;

(g)    by any Party, if an Alternative Transaction is approved by the Bankruptcy Court, subject to payment by Seller to Buyer of the Break-Up Fee and Expense Reimbursement in accordance with Section 9.2(b) below;

(h)    by Buyer, in accordance with Section 10.16 hereof; or

(i)    by Buyer, during the Due Diligence Period for any reason or no reason whatsoever, other than due to Buyer's financing.

9.2    Effect of Termination.

(a)    In the event that this Stalking Horse Asset Purchase Agreement shall be terminated pursuant to Section 9.1, all further obligations of the Parties under this Stalking Horse Asset Purchase Agreement shall terminate without further Liability or obligation of any Party to any other Party hereunder except for those provisions that expressly survive the termination of this Stalking Horse Asset Purchase Agreement and

as provided below; <u>provided, however</u> that no Party shall be released from Liability hereunder, subject to the express provisions of this Stalking Horse Asset Purchase Agreement, if this Stalking Horse Asset Purchase Agreement is terminated and the Transactions abandoned by reason of (i) failure of such Party to have performed its obligations hereunder, or (ii) any knowing misrepresentation made by such Party of any matter set forth herein.  Upon any termination hereunder, Seller shall promptly direct the Escrow Agent to release the Deposit to Buyer; provided, however, that in the event that this Stalking Horse Asset Purchase Agreement is terminated by Seller pursuant to Section 9.1(b) or Section 9.1(c), Escrow Agent shall release to Seller the entire Deposit, as liquidated damages, in complete satisfaction of any and all claims and causes of action arising in and out of any breach or default of this Stalking Horse Asset Purchase Agreement by Buyer.

(b)     In the event that this Stalking Horse Asset Purchase Agreement is terminated pursuant to Section 9.1(g), then Seller shall pay Buyer, from proceeds of an Alternative Transaction, Seven Hundred Thousand Dollars ($700,000) (the "Break-Up Fee") and Buyer's actual out of pocket expenses incurred and appropriately documented, as requested by Seller in its reasonable discretion, in connection with the Transactions (including attorneys' fees) up to One Hundred Fifty Thousand Dollars ($150,000) (the "Expense Reimbursement") in complete satisfaction of any and all claims and causes of action arising in and out of any breach or default of this Stalking Horse Asset Purchase Agreement by Seller.

(c)     In the event that this Stalking Horse Asset Purchase Agreement is terminated pursuant to Section 9.1(d), then Seller shall pay Buyer the Expense Reimbursement in complete satisfaction of any and all claims and causes of action arising in and out of any breach or default of this Stalking Horse Asset Purchase Agreement by Seller.

(d)     Notwithstanding anything else herein, Buyer shall be entitled at most to payment of a single Break-Up Fee and Expense Reimbursement, and Buyer shall not be entitled to the Break-Up and Expense Reimbursement in the event the Transactions as contemplated in this Stalking Horse Asset Purchase Agreement closes with Buyer.

## **ARTICLE X**
## **MISCELLANEOUS**

10.1    Additional Assurances.    The provisions of this Stalking Horse Asset Purchase Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; provided, however, at the request of a Party, the other Party or Parties shall execute such additional instruments and take such additional actions as the requesting Party may deem necessary to effectuate this agreement.

10.2    Consents, Approvals and Discretion.    Except as herein expressly provided to the contrary, whenever this Stalking Horse Asset Purchase Agreement requires any

consent or approval to be given by a Party, or whenever a Party must or may exercise discretion, the Parties agree that such consent or approval shall not be unreasonably withheld or delayed and such discretion shall be reasonably exercised.

10.3    <u>Legal Fees and Costs</u>.  In the event a Party elects to incur legal expenses to enforce or interpret any provision of this Stalking Horse Asset Purchase Agreement by judicial proceedings, the prevailing Party will be entitled to recover such legal expenses, including, without limitation, reasonable attorneys' fees, costs, and necessary disbursements at all court levels, in addition to any other relief to which such Party shall be entitled. For the avoidance of doubt, any legal expenses to which Buyer is entitled under this Section 10.3 shall be in addition to and not in lieu of any other payments to which Buyer is entitled under this Stalking Horse Asset Purchase Agreement, including, without limitation, the Expense Reimbursement.

10.4    <u>Choice of Law</u>.  The Parties agree that this Stalking Horse Asset Purchase Agreement shall be governed by and construed in accordance with the Laws of the State of Florida without regard to conflict of Laws principles.

10.5    <u>Assignment</u>.  No Party may assign this Stalking Horse Asset Purchase Agreement without the prior written consent of the other Party, except to an Affiliate of such assigning Party.  Notwithstanding the foregoing, Buyer shall have the right, without the prior written consent of Seller, to assign all or a portion of its rights and/or obligations under this Stalking Horse Asset Purchase Agreement to any Person or Persons so long as such Person or Persons are controlled, directly or indirectly, by one or both of HCP, Inc. and/or Life Care Companies, LLC and so long as such assignment shall not materially delay the consent of the OIR or any other Government Entity to the Transactions.

10.6    <u>Waiver of Breach</u>.  The waiver by any Party of a breach or violation of any provision of this Stalking Horse Asset Purchase Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  This Stalking Horse Asset Purchase Agreement may only be amended, or rights hereunder waived, by agreement in writing by the Party to be charged.

10.7    <u>Notice</u>.  Any notice, demand, or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when (i) personally delivered, (ii) received by overnight delivery sent via nationally recognized overnight courier, (iii) three (3) Business Days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, or (iv) one (1) Business Day after being sent by electronic mail, addressed as follows:

|  |  |
|---|---|
| If to Seller: | D.  Bruce Jones, CEO |
|  | Life Care St. Johns, Inc. |
|  | 1000 Vicar's Landing Way |
|  | Ponte Vedra Beach, Florida 32082 |
|  | Email: bjones@vicarslanding.com |
|  |  |
| With copy to: | Richard R.  Thames, Esq. |

Charles H. Keller, Esq.
Thames Markey & Heekin, P.A.
50 North Laura Street, Suite 1600
Jacksonville, Florida 32202
Email: rrt@tmhlaw.net, chk@tmhlaw.net

If to Buyer:          Tom Mathisen
                      Capital Square
                      400 Locust Street, Suite 820
                      Des Moines, IA 50309
                      Email: mathisentom@lcsnet.com

                      HCP, Inc.
                      1920 Main Street, Suite 1200
                      Irvine, CA 92614
                      Attention:  Kendall Young
                      Email:  kyoung@HCPI.COM

With copy to:         Faegre Baker Daniels LLP
                      311 S. Wacker Drive, Suite 4300
                      Chicago, IL 60606
                      Attention: George R. Mesires
                      Email: george.mesires@faegrebd.com

and to:               Skadden, Arps, Slate, Meagher & Flom LLP
                      Four Times Square
                      New York, NY 10036
                      Attention:  Evan R. Levy, Esq.
                      Email: evan.levy@skadden.com

or to such other address, and to the attention of such other person or officer as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party.

10.8    Severability.  In the event any provision of this Stalking Horse Asset Purchase Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice, or disturb the validity of the remainder of this Stalking Horse Asset Purchase Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

10.9    Gender and Number.  Whenever the context of this Stalking Horse Asset Purchase Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural.

10.10  <u>Divisions and Headings</u>.  The divisions of this Stalking Horse Asset Purchase Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Stalking Horse Asset Purchase Agreement.

10.11  <u>Survival</u>.  The representations and warranties of the Parties contained herein shall expire upon and shall not survive the Closing for any purpose whatsoever.

10.12  <u>Accounting Date; Accounting Definition</u>.  The Transactions contemplated hereby shall be effective for accounting purposes as of 12:01 a.m. on the Closing Date, prevailing Eastern Time, unless otherwise agreed in writing by Seller and Buyer.  All accounting terms used herein which are not expressly defined in this Stalking Horse Asset Purchase Agreement shall have the respective meanings given to them in accordance with GAAP on the Execution Date.

10.13  <u>Third-Party Beneficiaries</u>.  The terms and provisions of this Stalking Horse Asset Purchase Agreement are intended solely for the benefit of Buyer and Seller and their respective permitted successors or assigns, and it is not the intention of the Parties to confer, and this Stalking Horse Asset Purchase Agreement shall not confer, third-party beneficiary rights upon any other Person.

10.14  <u>Force Majeure</u>.  Whenever a period of time is prescribed herein for action to be taken by a Party, such Party shall not be liable or responsible for, and there shall be excluded from the computation for any period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions, or any other cause of any kind whatsoever which is beyond the reasonable control of such Party.

10.15  <u>Entire Agreement; Amendment</u>.  This Stalking Horse Asset Purchase Agreement supersedes all previous Contracts or understandings, including any offers, letters of intent, proposals or letters of understanding, and constitutes the entire agreement of whatsoever kind or nature existing between or among the Parties respecting the within subject matter, and no Party shall be entitled to benefits other than those specified herein.  As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect.  The Parties specifically acknowledge that in entering into and executing this Stalking Horse Asset Purchase Agreement, the Parties rely solely upon the representations and agreements contained in this Stalking Horse Asset Purchase Agreement and no others.  All prior representations or agreements, whether written or verbal, not expressly incorporated herein are superseded, and no changes in or additions to this Stalking Horse Asset Purchase Agreement shall be recognized unless and until made in writing and signed by all Parties hereto.  The schedules and exhibits hereto constitute an integral and material part of this Stalking Horse Asset Purchase Agreement, are incorporated herein by reference, and shall be considered part of this Stalking Horse Asset Purchase Agreement for all purposes.

10.16   Risk of Loss.  In the event that all or any part of the Purchased Assets are damaged or destroyed by fire, windstorm or any other casualty on or prior to the Closing, Seller shall immediately notify Buyer of such damage or destruction.  In the event that such damage or destruction is in the aggregate more than One Hundred Thousand Dollars ($100,000), Buyer shall have the option to: (x) terminate this Stalking Horse Asset Purchase Agreement by written notice delivered to Seller within ten (10) Business Days after Buyer's receipt of notice of such damage or destruction, in which case the Deposit shall be returned to Buyer and the Parties shall have no further obligations hereunder, or (y) proceed with the Transactions without abatement of the Purchase Price, in which case (i) all insurance proceeds relating to such damage or casualty shall be deemed to have been absolutely and irrevocably assigned to and be payable directly to Buyer, (ii) after the Closing, Buyer shall have the right to conduct all settlement proceedings with respect to such insurance claims, and (iii) Seller shall deliver to Buyer through Escrow an unconditional assignment of all such insurance proceeds.  If this Stalking Horse Asset Purchase Agreement is not terminated, Seller shall not be obligated to repair any damage or destruction.

10.17   SUBMISSION TO JURISDICTION.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION, AND ANY APPELLATE COURT ARISING THEREFROM, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS STALKING HORSE ASSET PURCHASE AGREEMENT, THE TRANSACTIONS OR ANY OF THE DOCUMENTS ENTERED INTO IN CONNECTION HEREWITH OR FOR THE RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH COURT.  EACH OF THE PARTIES AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND BINDING ON SUCH PARTY.

10.18   WAIVER OF JURY TRIAL.  EACH PARTY TO THIS STALKING HORSE ASSET PURCHASE AGREEMENT HEREBY UNCONDITIONALLY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS STALKING HORSE ASSET PURCHASE AGREEMENT, ANY OF THE DOCUMENTS RELATED HERETO, ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS STALKING HORSE ASSET PURCHASE AGREEMENT OR ANY RELATED TRANSACTION.

10.19   Time of Essence.  Time is of the essence under this Stalking Horse Asset Purchase Agreement.

10.20   Constituent Liability.  No constituent member or partner in or agent of Buyer, nor any advisor, trustee, director, officer, employee, beneficiary, shareholder, member, partner, participant, representative or agent of any partnership, limited liability

company, corporation, trust or other entity that has or acquires a direct or indirect interest in Buyer, shall have any personal liability, directly or indirectly, under or in connection with this Stalking Horse Asset Purchase Agreement or any agreement made or entered into under or pursuant to the provisions of this Stalking Horse Asset Purchase Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Seller and its successors and assigns and, without limitation, all other persons and entities, shall look solely to Buyer's assets for the payment of any claim or for any performance, and Seller, on behalf of itself and its successors and assigns, hereby waives any and all such personal liability. Notwithstanding anything to the contrary contained in this Stalking Horse Asset Purchase Agreement, neither the negative capital account of any constituent member or partner in Buyer (or in any other constituent member or partner of Buyer), nor any obligation of any constituent member or partner in Buyer (or in any other constituent member or partner of Buyer) to restore a negative capital account or to contribute capital to Buyer (or to any other constituent member or partner of Buyer), shall at any time be deemed to be the property or an asset of Buyer or any such other constituent member or partner (and neither Seller nor any of its successors or assigns shall have any right to collect, enforce or proceed against or with respect to any such negative capital account or a member's or partner's obligation to restore or contribute).

10.21    Section 1031 Exchange.    Seller and/or Buyer may, for the purpose of treating all or part of its sale or acquisition of the Properties as a like-kind exchange of property under Section 1031 of the Internal Revenue Code, assign certain rights that it has under this Stalking Horse Asset Purchase Agreement, including its right to sell or acquire the Properties pursuant to this Stalking Horse Asset Purchase Agreement, to one or more qualified intermediaries, and to provide notice of such assignment to the other party, provided that no such assignment shall release the assigning party from its obligations hereunder and no such assignment shall delay the Closing hereunder. The non-assigning party shall not incur any costs in connection with such exchange. The assigning party agrees to save, indemnify, protect and defend the other party (with counsel reasonably satisfactory to such other party) from and against and hold the other party harmless from any and all expenses and/or liabilities arising from such assignment and exchange and the other party shall not be required to take title to any other property. The provisions of this Section 10.21 shall survive the Closing.

10.22    Designation of Reporting Person.    In order to assure compliance with the requirements of Section 6045 of the Code, and any related reporting requirements of the Code, the parties hereto agree as follows:

(a)    Escrow Agent as Reporting Person.    Escrow Agent agrees to assume all responsibilities for information reporting required under Section 6045(e) of the Code, Seller and Buyer shall designate the Escrow Agent as the person to be responsible for all information reporting under Section 6045(e) of the Code (the "Reporting Person").

(b)    Information to the Reporting Person.    Sellers and Buyer hereby agree:

48

(i)    to provide the Reporting Person all information and certifications regarding such party, as reasonably requested by the Reporting Person or otherwise required to be provided by a party to the transaction described herein under Section 6045 of the Code; and

(ii)    to provide the Reporting Person such party's taxpayer identification number and a statement (on Internal Revenue Service Form W-9 or an acceptable substitute form, or on any other form the applicable current or future Code sections and regulations might require and/or any form requested by the Reporting Person), signed under penalties of perjury, stating that the taxpayer identification number supplied by such party to the Reporting Person is correct.

10.23    <u>Execution in Counterparts</u>.    For the convenience of the Parties, this Stalking Horse Asset Purchase Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.    Signature and acknowledgement pages may be detached from the counterparts and attached to a single copy of this Stalking Horse Asset Purchase Agreement to physically form one document.    Facsimile or email transmissions of any executed original and/or retransmission of any executed facsimile or email transmission shall be deemed to be the same as the delivery of an executed original.    At the request of any Party hereto, the other Parties hereto shall confirm facsimile or email transmissions by executing duplicate original documents and delivering the same to the requesting Party or Parties.

*[signatures on following page]*

IN WITNESS WHEREOF, the Parties hereto have caused this Stalking Horse Asset Purchase Agreement to be executed in multiple originals by their authorized officers, all as of the Execution Date.

**BUYER:**                                    **SELLER:**

**LCS GLENMOOR LLC**                          **LIFE CARE ST.  JOHNS, INC.**

By: _____                By: _____
Name: Joel Nelson                            Name: D.  Bruce Jones
Its: President & COO                          Its: Chief Executive Officer

IN WITNESS WHEREOF, the Parties hereto have caused this Stalking Horse Asset Purchase Agreement to be executed in multiple originals by their authorized officers, all as of the Execution Date.

BUYER:                              SELLER:

LCS GLENMOOR LLC                    LIFE CARE ST. JOHNS, INC.


By: _____        By: _____
Name: _____        Name: D. Bruce Jones
Its: _____        Its: Chief Executive Officer

1390.5

# EXHIBIT A-1

**Form of Bidding Procedures Order**

[Exhibit begins on next page.]

**EXHIBIT A-1**

**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | |
| | | |
| LIFE CARE ST. JOHNS, INC., | ) | Case No.: |
| a Florida not-for-profit corporation | | |
| doing business as GLENMOOR,[1] | ) | Chapter 11 |
| | | |
| Debtor. | ) | |
| | | |
| _____ | ) | |

**ORDER (A) APPROVING BIDDING PROCEDURES AND
OVERBID PROTECTIONS IN CONNECTION WITH SALE OF ASSETS;
(B) APPROVING THE FORM AND MANNER OF NOTICE; AND (C)
APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT
OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

This chapter 11 case came before the Court upon the motion filed by debtor, Life Care St. Johns, Inc., a Florida not-for-profit corporation doing business as Glenmoor ("Glenmoor" or "Debtor"), seeking the entry of an order (a) authorizing Debtor to sell substantially all of its assets (except the 11 acre undeveloped parcel adjacent to the operational facilities) free and clear of liens, claims and interests; (b) approving bidding procedures and overbid protections in connection therewith; (c) approving the form and manner of notice; and (d) approving assumption and assignment procedures with respect to

---

[1] The Federal Employer Identification Number for the Debtor is 59-3474627.  The address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

executory contracts and unexpired leases (the "Motion") [Docket No. _____]; the Court

having reviewed the Motion, and conducted a hearing to consider (a) approval of the bidding

procedures and overbid protections in connection with the sale of substantially all assets of

the Debtor (except the 11 acre undeveloped parcel adjacent to the operational facilities); (b)

the form and manner of notice of the relief sought in the Motion; (c) the procedures for

assumption and assignment of executory contracts and unexpired leases; and (d) the

scheduling of a subsequent hearing to approve the sale of substantially all assets of the

Debtor (except the 11 acre undeveloped parcel adjacent to the operational facilities) free and

clear of liens, claims and interests (the "Hearing"); and having heard statements of counsel

and any evidence presented in support of the relief requested in the Motion at the Hearing;

and it appearing that due and proper notice of the Motion was provided; and it appearing that

the relief requested in the Motion is in the best interests of Glenmoor, its estate, and all other

parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it

further appearing that the legal and factual bases set forth in the Motion and at the Hearing

establish just cause for the relief granted herein; and after due deliberation thereon, the Court

makes the following findings of fact and conclusions of law:

**Findings of Fact and Conclusions of Law:**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and

1409.

2.      Glenmoor has articulated good and sufficient reasons for (a) the approval of the Bidding Procedures, attached hereto as **Exhibit A** and incorporated herein by reference, (b) the granting of a break-up fee (the "Break-Up Fee") and expense reimbursement (the "Expense Reimbursement") to LCS Glenmoor, LLC ("LCS") in its role as Stalking Horse Bidder, as provided herein, in the Stalking Horse APA,[2] and in the Bidding Procedures, (c) the approval of the proposed procedures for the assumption and assignment of the Assumed Contracts (the "Assumption and Assignment Procedures"), and (d) the approval of the form and manner of notice (the "Contract Assumption Notice"), attached hereto as **Exhibit B**, of the deadline to object to the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Assumed Contracts") and for determining the cure amounts in connection therewith (the "Cure Amounts").

3.      Notice of the Motion was good and sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures or any other form of relief granted herein is or shall be required.

4.      All amounts, if any, to be paid by Glenmoor to LCS pursuant to the Stalking Horse APA, including the Break-up Fee and Expense Reimbursement, shall be paid in accordance with the terms and conditions of the Stalking Horse APA, and (a) are reasonable and appropriate in light of the size and nature of the proposed Sale, the commitments that have been made and the efforts that have been and will be expended by LCS, (b) are necessary to induce LCS to continue to pursue the Sale and to continue to be bound by the Stalking Horse APA, (c) are fair, reasonable and equitable in all respects under the

---

[2]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

circumstances, (d) were negotiated by the parties at arm's length and in good faith, and (e) represent an exercise of Glenmoor's sound business judgment. Further, all such amounts to be paid to LCS, including the Break-up Fee and Expense Reimbursement, are actual and necessary costs and expenses of preserving Glenmoor's estate within the meaning of §§ 503(b) and 507(a)(2) of the Bankruptcy Code.

5.      The Break-up Fee and Expense Reimbursement induced LCS to submit a bid that will serve as a minimum floor bid on which Glenmoor, its creditors and other bidders may rely.  LCS has provided a material benefit to Glenmoor and its creditors by increasing the likelihood that the best possible price for the Purchased Assets will be received.

6.      The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Purchased Assets.

7.      The transactions contemplated by the Stalking Horse APA are undertaken by LCS without collusion and in good faith, as that term is defined in § 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the transactions (including the assumption and assignment of the Assumed Contracts), unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.

8.      Neither Glenmoor nor LCS have engaged in any action or inaction that would cause or permit the transactions contemplated by the Stalking Horse APA to be avoided or costs or damages to be imposed under § 363(n) of the Bankruptcy Code.  The consideration provided by LCS for the Purchased Assets under the Stalking Horse APA is fair and reasonable and the sale may not be avoided under § 363(n) of the Bankruptcy Code.

- 4 -

9.      The Motion and the Contract Assumption Notice are reasonably calculated to provide counterparties to the Assumed Contracts with proper notice of the intended assumption and assignment of their executory contracts or unexpired leases, any Cure Amounts relating thereto and the Assumption and Assignment Procedures.

**It Is Ordered:**

1.      The Motion is GRANTED to the extent set forth herein.

2.      That portion of the Motion requesting (a) the scheduling of an Auction, (b) the scheduling of a Sale Hearing, and (c) the approval of the form and manner of notice of the Auction and Sale (the "Sale Notice") is granted.   The Auction shall be held before the Honorable Jerry A. Funk, in Courtroom 4D, United States Courthouse, 300 North Hogan Street, Jacksonville, Florida on **[April 14, 2016]** beginning at ___:_____ __.m.

3.      The Bidding Procedures are hereby approved and shall govern the sale process.   Bids that do not conform to the Bid Procedures will not be considered for participation in the Auction.  Glenmoor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

4.      The deadline to submit a Qualified Bid (as defined in the Bidding Procedures) shall be **[April 12, 2016]** (the "Bid Deadline").

5.      As further described in the Bidding Procedures, Glenmoor shall conduct the Auction if a Qualified Bid, other than the LCS bid under the Stalking Horse APA, is received prior to the Bid Deadline.   The Debtor shall serve notice of the time and place for the Auction on all Qualified Bidders, including LCS, in accordance with the Motion.   If no timely, conforming Qualified Bids other than the LCS bid under the Stalking Horse APA are

submitted by the Bid Deadline, the Auction will not be held, LCS will be the Successful Bidder, and Glenmoor will seek authority to consummate the transactions contemplated by the Stalking Horse APA with LCS at the Sale Hearing.

6.      Any obligations of Glenmoor contained in the Stalking Horse APA that are intended to be performed prior to entry of an order by this Court approving the sale, are hereby authorized and are fully enforceable as of the date of entry of this Order.

7.      The Court will hold the Sale Hearing in Courtroom 4D, United States Courthouse, 300 North Hogan Street, Jacksonville, Florida on **[April 14, 2016] at ___:_____ __.m.**.

8.      Objections, if any, to the Sale of the Purchased Assets must (a) be in writing, (b) state the basis of such objection with specificity, (c) conform to the Bankruptcy Rules, (d) be filed with the Court electronically by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, so as to be actually received no later than 4:00 p.m. (Eastern Time) seven (7) days before the Sale Hearing (the "Sale Objection Deadline"), provided, however, that objections to the assumption and assignment of the Assumed Contracts and the proposed Cure Amounts should be filed in accordance with the Assumption and Assignment Procedures set forth herein.

9.      The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion of any objection to the Motion and the consummation and performance of the Sale, and shall be deemed to constitute such party's consent to the Sale and the transactions and documents related thereto.

10.     The Break-up Fee, Expense Reimbursement and other bid protections as set forth in the Stalking Horse APA are hereby approved, and any and all objections to the bid

protections that were not consensually resolved at or before the Hearing are hereby overruled.

11.     Glenmoor is authorized and directed to pay any and all amounts owing to LCS in accordance with the terms of the Stalking Horse APA, including the Break-up Fee and Expense Reimbursement, without further order of the Court.

12.     If LCS becomes entitled to payment from Glenmoor under the Stalking Horse APA for, among other things, the Break-up Fee or the Expense Reimbursement, then LCS shall be, and hereby is, granted an allowed administrative claim under § 503(b)(1) of the Bankruptcy Code in Glenmoor's chapter 11 case in an amount equal to such amounts and, if applicable, the Break-up Fee and Expense Reimbursement shall be paid in accordance with the terms of this Order.

13.     LCS has agreed to assume all active Residence and Care Contracts subject to the provisions of Section 7.9 of the Stalking Horse APA.  Any Qualified Bid must likewise provide for the assumption of the active Residence and Care Contracts and all Entrance Fee refund liabilities coming due after February 28, 2014.  With respect to all other executory contracts and unexpired leases, the following Assumption and Assignment Procedures shall govern:

> (a)     Initial Contract Designations.  On or before **[TBD]**, Glenmoor shall file with this Court and serve on each non-debtor counterparty to an executory contract or unexpired lease with Glenmoor (each, a "Non-Debtor Counterparty") that Glenmoor may assume and assign to LCS or the Successful Bidder, a notice of assumption and assignment of executory contracts and unexpired leases in substantially the form of the Contract Assumption Notice attached hereto as **Exhibit B**. Glenmoor shall attach to the Contract Assumption Notice a list identifying the Non-Debtor Counterparties to the Assumed Contracts and the corresponding Cure Amounts under the Assumed Contracts. In addition, Glenmoor shall serve a copy of the Contract Assumption

Notice on a Non-Debtor Counterparty's counsel of record, if any, as of the date of the Contract Assumption Notice ("Counsel of Record").

(b)     Information in Assumption Notice.  For each Assumed Contract, on the Contract Assumption Notice, Glenmoor shall either (i) indicate the proposed Cure Amounts relating to such Assumed Contract or (ii) provide an amount representing the proposed Cure Amounts for multiple Assumed Contracts with the same Non-Debtor Counterparty, subject, upon request, to providing greater detail to a Non-Debtor Counterparty to identify on a contract-by-contract basis the proposed applicable Cure Amounts to the extent reasonably available.  On a Contract Assumption Notice, Assumed Contracts may be listed individually or in groups of agreements with the Non-Debtor Counterparty, as long as the Non-Debtor Counterparty is provided with sufficient information to identify the contracts to be assumed and assigned.  The Contract Assumption Notice also may identify any additional proposed terms or conditions of assumption and assignment.

(c)     If a party other than LCS is the Successful Bidder, or if a transaction other than the Sale to LCS is consummated for the Purchased Assets in accordance with the Bidding Procedures, then these Assumption and Assignment Procedures may be modified if necessary by further order of this Court.

(d)     Additional Contract Assumption Designations.  LCS or the Successful Bidder, as the case may be, may designate, up to **[TBD]**, (the "Assumption Designation Deadline"), additional executory contracts and unexpired leases as agreements to be assumed by Glenmoor and assigned to LCS or the Successful Bidder pursuant to the Stalking Horse APA or the APA executed by the Successful Bidder.  Glenmoor shall serve a Contract Assumption Notice on each of the Non-Debtor Counterparties to such Assumed Contracts and their counsel of record, if any, indicating (i) that the notice recipient is a Non-Debtor Counterparty to one or more executory contracts or unexpired leases with Glenmoor that Glenmoor intends to assume and assign to LCS or the Successful Bidder and (ii) the corresponding Cure Amount under the Assumed Contracts as of the date of such Contract Assumption Notice.

(e)     Contract Removal Designations.  In accordance with the Stalking Horse APA or the APA executed by the Successful Bidder, LCS or the Successful Bidder may remove executory contracts and unexpired leases as agreements to be assumed by Glenmoor and assigned to LCS or the Successful Bidder pursuant to the Stalking Horse APA or the APA executed by the Successful Bidder (the "Removed Contracts") until three (3) Business Days following entry of a final order

determining all Cure Amounts and adequate assurance (if any) required for such contract. Upon notice by LCS or the Successful Bidder to Glenmoor of a removal of a specific Removed Contract, or a group thereof, Glenmoor shall serve a notice (a "Removal Notice") on each of the Non-Debtor Counterparties to such Removed Contracts and their Counsel of Record, indicating that the notice recipient is a Non-Debtor Counterparty to one or more executory contracts or unexpired leases with Glenmoor that Glenmoor no longer intends to assume and assign to LCS or the Successful Bidder in connection with the Sale.

(f)     Section 365 Objections. Objections, if any ("§ 365 Objections"), to the proposed Cure Amounts, or to the proposed assumption and assignment of the Assumed Contracts, including objections related to adequate assurance of future performance or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, LCS or the Successful Bidder for purposes of § 365(c)(l) of the Bankruptcy Code, must (a) be in writing; (b) state with specificity the nature of such objection and the alleged Cure Amounts (with appropriate documentation in support thereof); (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of this Court, and (d) be filed with the Court and served on the Key Parties so as to be received no later than the deadline to file objections to the Sale.

(g)     Section 365 Hearing. If any of Glenmoor, the Non-Debtor Counterparty or LCS or the Successful Bidder determines that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Assumed Contract and/or the Cure Amounts will be determined by the Court at the Sale Hearing, unless Glenmoor, LCS or the Successful Bidder and the Non-Debtor Counterparty to the Assumed Contract in dispute agree otherwise. If the Court determines at a § 365 Hearing that the Assumed Contract cannot be assumed and assigned, or establishes Cure Amounts that LCS or the Successful Bidder is not willing to pay, then such executory contract or unexpired lease shall no longer be considered an Assumed Contract.

(h)     Consent to Assumption and Assignment. Any Non-Debtor Counterparty to an Assumed Contract who fails to file a timely § 365 Objection to the proposed Cure Amounts or the proposed assumption and assignment of an Assumed Contract by the § 365 Objection Deadline is deemed to have consented to (i) such Cure Amounts, (ii) the assumption and assignment of such Assumed Contract, (iii) the related relief requested in the Sale Motion and (iv) the Sale. Such party

- 9 -

shall be forever barred and estopped from objecting to the Cure Amounts, the assumption and assignment of the Assumed Contract, adequate assurance of future performance, the relief requested in the Sale Motion, whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, LCS or the Successful Bidder for purposes of § 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against Glenmoor, its estate and LCS or the Successful Bidder with respect to such party's executory contract(s) or unexpired lease(s).

(i)    Resolution of Assumption/Assignment Issues.    If the Non-Debtor Counterparty to an Assumed Contract fails to timely assert a § 365 Objection as described in subparagraph (f) above, or upon the resolution of any timely § 365 Objection by agreement of the parties or order of the Court approving an assumption and assignment, such Assumed Contract shall be deemed to be assumed, without the need for provision of adequate assurance by Glenmoor, and assigned to LCS or the Successful Bidder and the proposed Cure Amount related to such Assumed Contract shall be established and approved in all respects.

(j)    Conditions on Assumption and Assignment.    Glenmoor' decision to assume and assign the Assumed Contracts is subject to Court approval and consummation of the Sale.  Accordingly, subject to the satisfaction of conditions above to address any cure or assignment disputes, Glenmoor shall be deemed to have assumed and assigned to LCS or the Successful Bidder each of the Assumed Contracts as of the date of and effective only upon the Closing, and absent such Closing, each of the Assumed Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by Glenmoor under the Bankruptcy Code.  Assumption and assignment of the Assumed Contracts also is subject to the rights of LCS or the Successful Bidder set forth in subparagraphs (c) and (d) above. LCS or the Successful Bidder shall have no rights in and to a particular Assumed Contract until such time as the particular Assumed Contract has been identified by LCS or the Successful Bidder as an Assumed Contract and is assumed and assigned in accordance with the procedures set forth herein.

14.    Notice of the Motion, constitutes good, sufficient and timely notice, and no other or further notice shall be required, other than service of a copy of this Order by first class mail postage prepaid upon the Notice Parties.

15.    Notwithstanding Rules 6004(h), 6006(d), 7062, or 9041 of the Federal Rules of Bankruptcy Procedure or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution of this Order.

16.    The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order

American Legal Claim Services is directed to serve copies of this Order on interested parties within 3 days of the entry of this Order.

**<u>Exhibit A – Bidding Procedures</u>**



**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| In re | ) |
| | ) |
| LIFE CARE ST. JOHNS, INC., | )   Case No.: |
| a Florida not-for-profit corporation | ) |
| doing business as GLENMOOR,[3] | )   Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) |
| _____ | ) |

**BIDDING PROCEDURES**

These Bidding Procedures (the "Bidding Procedures") set forth the process by which

Life Care St. Johns, Inc., a Florida not-for-profit corporation doing business as Glenmoor

("Glenmoor" or  "Debtor") is authorized to conduct the sale (the "Sale") by auction (the

"Auction") of substantially all of Glenmoor's assets, defined as the "Purchased Assets" in the

Stalking Horse APA, dated February _____, 2016 (as may be amended) (the " Stalking Horse

APA") between Glenmoor, as seller, and LCS Glenmoor, LLC ("LCS"), as buyer, or such

other Asset Purchase Agreement submitted at or prior to the Auction and subsequently

determined by the Debtor to be the highest and best offer for the Purchased Assets and

approved by the Bankruptcy Court.  Capitalized terms used herein but not otherwise defined

shall have the meanings set forth in the Stalking Horse APA.

These Bidding Procedures have been approved by an order dated March __, 2016 (the

"Sales Procedures Order"), entered by the United States Bankruptcy Court for the Middle

---

[3]  The Federal Employer Identification Number for the Debtor is 59-3474627.  The address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

District of Florida, Jacksonville Division (the "Bankruptcy Court"), in which the Chapter 11 bankruptcy case, Case No. **[TBD]** of Glenmoor is pending.

**Assets to be Sold**

1.      These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in the Auction, thereby competing to make the highest and best offer for all or substantially all of the Purchased Assets, as identified in further detail and defined in the Stalking Horse APA.

**Obtaining Due Diligence Access**

2.      Any entity (other than LCS) interested in the Purchased Assets (a "Potential Bidder") must deliver an executed confidentiality agreement (each, a "Confidentiality Agreement") reasonably acceptable to Glenmoor and containing terms in the aggregate no less favorable to Glenmoor in any material respect (other than with respect to the effective periods and the non-disclosure and non-solicitation provisions contained therein, all of which terms shall be commercially reasonable) than those contained in the confidentiality agreement by and between LCS and Glenmoor.  After Glenmoor's receipt of an executed Confidentiality Agreement, Glenmoor shall provide each Potential Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request. The due diligence period will end on April 12, 2016 (the "Bid Deadline").

3.      In connection with the provision of due diligence information to Potential Bidders, Glenmoor shall not furnish any confidential information relating to Glenmoor, the

Purchased Assets, or the Sale to any person except a Potential Bidder or such bidder's duly-authorized representatives to the extent provided in the Confidentiality Agreement.

4.    Glenmoor shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.  No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

**Bid Requirements**

5.    To participate in the Auction, prior to the Bid Deadline, a Potential Bidder (other than LCS) must deliver to Glenmoor a written irrevocable offer that must:

(a)    be in writing;

(b)    authorize Glenmoor to provide the bid to LCS and the Bond Trustee ;

(c)    equal or exceed $25,400,000, which is the sum of the following: (i) the Sales Proceeds of $24,450,000; (ii) the Break-up Fee of $700,000; (iii) the Expense Reimbursement of $150,000; and (iv) the minimum bid increment of $100,000 (such aggregate sum, the "Minimum Bid Amount") (all of which must be in cash, and/or the assumption of administrative expense liabilities, except in the event of a credit bid by the Bond Trustee);

(d)    constitute a good faith, bona fide offer to purchase all of the Purchased Assets, and to assume the Assumed Liabilities, including the Residence and Care Contracts of current residents and all Entrance Fee refund obligations arising after February 28, 2014, and the consummation of the transactions contemplated in the Stalking Horse APA.

(e)    be accompanied by a clean and duly executed copy of the Stalking Horse APA and the documents set forth as exhibits thereto, along with copies that are marked to reflect the amendments and modifications from the Stalking Horse APA executed with LCS, which may not be on terms less favorable in the aggregate to Glenmoor or inconsistent with these Bidding Procedures;

(f)     identify with particularity each and every condition to closing, including the executory contracts and unexpired leases for which assumption and assignment is required;

(g)     not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval (other than court approval and issuance of licenses necessary to operate Glenmoor), or (iii) the outcome or completion of a due diligence review by the Potential Bidder; and

(h)     must remain irrevocable until 48 hours after the Auction.

6.     In addition to the above, each Potential Bidder must:

(a)     provide Glenmoor and the Bond Trustee, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of Glenmoor (in consultation with the Bond Trustee), that such Potential Bidder has the financial wherewithal and ability to consummate the acquisition of the Purchased Assets, and the assumption of the Assumed Contracts, including current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring Glenmoor, current audited financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtor, demonstrating such Potential Bidder's ability to timely close the proposed transaction and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed and assigned;

(b)     fully disclose the identity of each entity that will be bidding for or purchasing the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;

(c)     on or before the Bid Deadline, submit a cash deposit equal to 1,375,000 by wire transfer of immediately available funds to an account or accounts established pursuant to an escrow agreement (the "Good Faith Deposit"); and

- 4 -

(d)     not be entitled to any break-up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

7.     Bids fulfilling all of the preceding requirements shall be deemed to be "Qualified Bids," and those parties submitting Qualified Bids shall be deemed to be "Qualified Bidders."  Within twelve hours after receipt of a Qualified Bid, Glenmoor shall provide such Qualified Bid to the Bond Trustee and LCS.  Within one (1) Business Day after the Bid Deadline, Glenmoor, shall determine, in consultation with the Bond Trustee, which Potential Bidders are Qualified Bidders and will notify the Potential Bidders and LCS whether their bids constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction.  The Stalking Horse APA submitted by LCS shall be deemed a Qualified Bid.

**Bid Deadline**

8.     Binding bids must be actually received by Glenmoor no later than 5:00 p.m. (prevailing Eastern Time) on April 12, 2016 (the "Bid Deadline").

**Evaluation of Qualified Bids**

9.     Prior to the Auction, Glenmoor, in consultation with the Bond Trustee, shall evaluate Qualified Bids and identify the Qualified Bid that is, in Glenmoor's judgment, the highest and best bid (the "Starting Bid").  Within 24 hours of such determination, Glenmoor shall notify LCS as to which Qualified Bid is the Starting Bid.  Glenmoor shall distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**No Qualified Bids**

10.     If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the Stalking Horse APA will be deemed the Successful Bid (as defined herein), and Glenmoor will pursue entry of an order by the Bankruptcy Court approving the Stalking Horse APA and authorizing the sale of the Purchased Assets to LCS.

**Auction**

11.     If one or more Qualified Bids are received by the Bid Deadline, then Glenmoor shall conduct an auction (the "Auction") with respect to the Purchased Assets. The Auction shall be conducted before and at the direction of the Honorable Jerry A. Funk, Chief United States Bankruptcy Judge, in the Bryan Simpson United States Courthouse, Room 4D, 300 North Hogan Street, Jacksonville, Florida 32202, if one or more Qualified Bids are received by the Bid Deadline.  The Debtor shall request that the Bankruptcy Court conduct the Auction on or before April 15, 2016.

12.     The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

> (a)     the Auction will be conducted openly;

> (b)     only the Qualified Bidders, including LCS, shall be entitled to bid at the Auction;

> (c)     the Qualified Bidders, including LCS, shall appear in person at the Auction, or through duly-authorized representatives;

> (d)     only such authorized representatives of each of the Qualified Bidders, LCS, Glenmoor, the Bond Trustee, and their respective advisors shall be permitted to attend the Auction;

> (e)     bidding at the Auction shall begin at the Starting Bid;

(f) subsequent bids at the Auction, including any bids by LCS, shall be made in minimum increments of $100,000;

(g) LCS shall receive a credit equal to the amount of the Break-up Fee and the Expense Reimbursement when bidding at the Auction;

(h) each participating bidder will be informed of the terms of the previous bids;

(i) the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

(j) each bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale and is not in violation of § 363(n) of the Bankruptcy Code; and

(k) absent irregularities in the conduct of the Auction, the Bankruptcy Court will not consider bids made after the Auction is closed.

**Acceptance of the Successful Bid**

13.     Upon the conclusion of the Auction (if the Auction is conducted), Glenmoor, in the exercise of its reasonable, good-faith business judgment and after consulting with the Bond Trustee, shall identify the highest and best bid (the "Successful Bid").  In determining which Qualified Bid is the Successful Bid, the Debtor may consider, after consultation with the Bond Trustee (unless the Bond Trustee chooses to bid at the Auction), among other things: (1) the amount of the purchase price; (2) the form of consideration being offered; (3) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (4) the net benefit to the Debtor's estate and all of its constituents, and the effect of the Sale Transaction on the residents of the Debtor; (5) the extent of such Qualified Bidder's background and experience operating a CCRC; (6) licensure qualification issues; and (7) any other facts, including but not limited to, all other non- economic factors.   Before the conclusion of the Auction, the Debtor shall inform each of the Bidders of the decision

regarding designation of the Successful Bid, and the Qualified Bidder who submitted such Successful Bid shall be required to execute a definitive asset purchase agreement at such time. The Debtor shall present the Successful Bid to the Bankruptcy Court for approval at the Sale Hearing.

14.     The Qualified Bidder having submitted a Successful Bid will be deemed the "Successful Bidder."  The Successful Bidder and Glenmoor shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

15.     The Bankruptcy Court will conduct a hearing to approve the Sale to the Successful Bidder on **[April 14, 2016]** at ____:_____ __.m.  Glenmoor will request the Bankruptcy Court make certain findings regarding the Auction, including, among other things, that (a) the Auction was conducted and the Successful Bidder was selected in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid as defined in these Bidding Procedures, and (d) consummation of the Sale contemplated by the Successful Bid will provide the highest and best value for the Purchased Assets, and is in the best interests of Glenmoor and its estate; *provided, however*, that the Successful Bid may be for a subset of the Purchased Assets if it otherwise constitutes a Qualified Bid (including that it satisfies the requirements of these Bidding Procedures) and is the highest and best bid as determined by Glenmoor in accordance with these Bidding Procedures.

16.     If an Auction is held, Glenmoor shall be deemed to have accepted a Qualified Bid only when (a) such bid is declared the Successful Bid at the Auction and (b) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon

approval by the Bankruptcy Court of the Successful Bid and the entry of an order approving such Successful Bid.

**Designation of Back-Up Bidder**

17.     If for any reason the Successful Bidder fails to consummate the purchase of the Purchased Assets within the time permitted after the entry of the order approving the Sale to the Successful Bidder, then the Qualified Bidder with the second highest or otherwise best bid for the Purchased Assets (the "Back-Up Bidder"), as determined by Glenmoor, after consultation with the Bond Trustee, at the conclusion of the Auction and announced at that time to all the bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best bid, and Glenmoor and the Back-Up Bidder will be authorized, but not required, to consummate the Sale with the Back-Up Bidder as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court.

**Break-Up Fee and Expense Reimbursement**

18.     If the sale closes with an entity other than LCS, Glenmoor shall be obligated to pay to LCS from the proceeds of such sale, by wire transfer in immediately available funds to an account designated by LCS, all amounts due to LCS, including the Break-up Fee and the Expense Reimbursement, in each instance in accordance with the applicable provisions of the Stalking Horse APA.

**Return of Good Faith Deposit**

19.     The Good Faith Deposit of the Successful Bidder shall, upon consummation of the purchase of the Purchased Assets, be credited to the purchase price paid for the Purchased Assets.  If the Successful Bidder fails to consummate the purchase of the Purchased Assets (other than as a result of a material breach of the Stalking Horse APA by Glenmoor), then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, Glenmoor.

20.     The Good Faith Deposit of any unsuccessful Qualified Bidders (except for LCS) will be returned within fifteen (15) days after the Sale Hearing or upon the permanent withdrawal of the proposed Sale of the Purchased Assets.  The Good Faith Deposit of LCS shall be returned in accordance with the terms of the Stalking Horse APA.

**<u>Exhibit B - Contract Assumption Notice</u>**



UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| LIFE CARE ST. JOHNS, INC., | ) | Case No.: |
| a Florida not-for-profit corporation | | |
| doing business as GLENMOOR,[4] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |

NOTICE OF PROPOSED ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

PLEASE TAKE NOTICE THAT the above-captioned debtor ("Glenmoor") filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Bankruptcy Court") on February _____, 2016 (the "Petition Date").

PLEASE TAKE FURTHER NOTICE THAT on [February __, 2016], in connection with the proposed sale (the "Sale") of substantially all of Glenmoor's assets (except the 11 acre undeveloped parcel adjacent to the operational facilities) (the "Purchased Assets") to LCS Glenmoor, LLC ( "LCS") or any other Successful Bidder for the Purchased Assets at an auction for the Purchased Assets (the "Auction"), Glenmoor filed a motion [Docket No. _____] (the "Sale Motion") seeking, among other things, the entry of an order approving (a) bidding procedures governing the Sale, (b) the form of asset purchase agreement for the Purchased Assets, (c) payment of a break-up fee and expense

_____

[4] The Federal Employer Identification Number for the Debtor is 59-3474627.  The address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

reimbursement to LCS in certain instances, including if LCS is not the Successful Bidder at the Auction, (d) the form and manner of notices; and (e) procedures relating to the assumption and assignment of executory contracts and unexpired leases in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE THAT** on **[March __, 2016]**, the Bankruptcy Court entered an order [Docket No. _____] (the "Bidding Procedures Order") granting certain of the relief sought in the Sale Motion, including, among other things, approving (a) the bidding procedures (the "Bidding Procedures") for the Sale of the Purchased Assets and (b) procedures for the assumption and assignment of executory contracts and unexpired leases (the "Assumption and Assignment Procedures"). Copies of the Bidding Procedures Order (which incorporates the Assumption and Assignment Procedures) and the Bidding Procedures are enclosed herein.

**PLEASE TAKE FURTHER NOTICE THAT** upon the closing of the Sale, in accordance with the terms of the Stalking Horse APA, Glenmoor intends to assume and assign to LCS or any other Successful Bidder the executory contracts and unexpired leases (collectively, the "Assumed Contracts") set forth on **Exhibit 1** hereto. In addition, the cure amounts, if any, necessary for the assumption and assignment of the Assumed Contracts (the "Cure Amounts") are set forth on **Exhibit 1**.

**YOU ARE RECEIVING THIS NOTICE BECAUSE LCS HAS IDENTIFIED YOU AS A COUNTERPARTY TO AN ASSUMED CONTRACT**. Under the terms of the Assumption and Assignment Procedures, LCS, or the Successful Bidder may modify the list of Assumed Contracts until **[TBD]**.

- 2 -

**Obtaining Additional Information**

Additional copies of the Bidding Procedures Order, the Bidding Procedures and any other related documents are available upon request to American Legal Claims Services, LLC, Glenmoor's noticing agent by visiting their website at www.americanlegalservices.com.

**Important Dates and Deadlines**

The deadline to submit a Qualified Bid is **April 12, 2016**.

The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "Sale Order") is April 7, 2016 (the "Sale Objection Deadline").

The Debtor shall request that the Bankruptcy Court conduct the Auction on or before April 14, 2016.  The Auction shall be conducted before and at the direction of the Honorable Jerry A. Funk, Chief United States Bankruptcy Judge, in the Bryan Simpson United States Courthouse, Room 4D, 300 North Hogan Street, Jacksonville, Florida 32202, if one or more Qualified Bids are received by the Bid Deadline.

A hearing (the "Sale Hearing") to consider the proposed Sale will be held on **[April 14, 2016] at ____:_____ __.m.**, in the Bryan Simpson United States Courthouse, Room 4D, 300 North Hogan Street, Jacksonville, Florida 32202

**Filing Assumption and Assignment Objections**

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of an Assumed Contract, including any objection relating to the Cure Amount and/or adequate assurance of future performance, must: (a) be in writing;

(b) state with specificity the nature of such objection and alleged Cure Amount, including applicable and appropriate documentation in support of such alleged Cure Amount; (c) comply with the Federal Rules of Bankruptcy Procedure; and (d) be filed with the Bankruptcy Court and served so as to be actually received on or before the Sale Objection Deadline.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties:

> Richard R. Thames, Esq.
> Thames Markey & Heekin, P.A.
> 50 North Laura Street, Suite 1600
> Jacksonville, Florida  32202
>
> Daniel Bleck, Esq.
> Mintz Levin Cohn Ferris Glovsky and Popeo PC
> One Financial Center
> Boston, Massachusetts 02111

**CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION: ANY COUNTERPARTY TO AN ASSUMED CONTRACT WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF AN ASSUMED CONTRACT IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON EXHIBIT 1, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO**

**THE ASSUMED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.**

75.7



## EXHIBIT A-2

**Form of Sale Order**

[Exhibit begins on next page.]

**EXHIBIT A-2**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re                                      )

LIFE CARE ST. JOHNS, INC.,                 )        Case No.:
a Florida not-for-profit corporation
doing business as GLENMOOR,[1]             )        Chapter 11

               Debtor.                     )

_____           )

## ORDER AUTHORIZING THE SALE OF
## SUBSTANTIALLY ALL THE DEBTOR'S ASSETS TO
## LCS GLENMOOR, LLC AND AMENDING STYLE OF CASE

This chapter 11 case came before the Court upon the motion filed by Life Care St.

Johns, Inc., a Florida not-for-profit corporation doing business as Glenmoor ("Glenmoor

or "Debtor") for entry of orders, pursuant to §§ 105(a), 363, 365, 503 and 507 of title 11

of the United States Code (the "Bankruptcy Code"), and rules 2002, 6004, 6006, 9007,

9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

(a) authorizing the sale of substantially all of its assets (except the 11 acre undeveloped

parcel adjacent to the operational facilities) free and clear of liens, claims and interests,

---

[1]    The Federal Employer Identification Number for the Debtor is 59-3474627.   The address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

(b) approving bidding procedures and overbid protections in connection with the Sale[2] of the Purchased Assets, (c) approving the form and manner of notice, and (d) approving procedures for assumption and assignment of executory contracts and unexpired leases (the "Motion") [Docket No. _____]; the Court having reviewed the Motion, having conducted an auction on April _____, 2016 (the "Auction") in accordance with (i) the Order (A) Approving Bidding Procedures and Overbid Protections in Connection Therewith; (B) Approving the Form and Manner of Notice; and (C) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases [Docket No. _____] (the "Sale Procedures Order"); the Court having conducted a hearing (the "Hearing") to approve the sale to **LCS Glenmoor, LLC** ("LCS") as provided in the Sale Procedures Motion and the Bidding Procedures; and the Court having heard argument of counsel and any evidence presented in support of the relief requested in the Motion; there being no objections to the sale, and it appearing that the relief requested in the Motion is in the best interests of Glenmoor, its estate, and its creditors and other parties in interest; and after due deliberation thereon, the Court makes the following findings of fact and conclusions of law:

**Findings of Fact and Conclusions of Law:**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

---

[2] Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the Motion, the Bidding Procedures or the APA.

2.      Glenmoor has established the necessary facts to support the entry of an Order for the sale of substantially all of the Purchased Assets as provided in the APA (as defined below) to LCS.

3.      Glenmoor conducted the Auction for the Sale of the Purchased Assets in accordance with the Sale Procedures Order and before and at the direction of the Court. The Auction was conducted openly;  all Qualified Bidders were entitled to bid at the Auction; each bidder confirmed on the record of the Auction that it had not engaged in any collusion with respect to the bidding or the Sale; the bidding at the Auction was electronically recorded, thereby providing an accurate record of the bidding at the Auction; there were no irregularities in the conduct of the Auction;  LCS was selected as the Successful Bidder in accordance with the Bidding Procedures; the Auction was fair in substance and procedure; the Successful Bid was a Qualified Bid;  and consummation of the Sale contemplated by the Successful Bid will provide the highest or otherwise best value for the Purchased Assets and is in the best interests of Glenmoor and its estate.  The Purchased Assets have been the subject of a full and robust marketing and sale process, and the Debtor's determination, in consultation with its primary creditor constituencies, that the APA  constitutes the highest and best offer for the Purchased Assets is a valid and sound exercise of Glenmoor's business judgment.  No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to Glenmoor's estate than LCS, and the terms set forth in the APA are fair and reasonable and constitute the highest and best offer for the Purchased Assets, and will provide a greater recovery for Glenmoor's estate in respect of the Purchased Assets than would be provided by any other available alternative.

4.      Glenmoor has full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and, except for the approval of the licensure transfers by the State of Florida Department of Insurance, no further consents or approvals are required for Glenmoor to consummate the transactions contemplated by the APA.

5.      Glenmoor has fully complied with §§ 363 and 1123(a)(5)(D) of the Bankruptcy Code with respect to the sale of its assets.  All persons claiming an interest in the property to be sold received due and proper notice of the proposed sale and of the opportunity to object to same.

6.      LCS is not an "insider" of Glenmoor, as that term is defined in § 101(31) of the Bankruptcy Code.

7.      Pursuant to Bankruptcy Code § 363(m), the APA was negotiated at arm's-length and entered into in good faith by the respective parties thereto and their agents and representatives, and LCS is entitled to all of the benefits and protections of § 363(m) of the Bankruptcy Code, in that: (i) LCS has not violated § 363(n) of the Bankruptcy Code by any action or inaction; (ii) no common identity of directors or controlling stockholders exists between LCS and Glenmoor; and (iii) the negotiation and execution of the APA and any other agreements or instruments related thereto was without collusion, at arm's-length and in good faith.

8.      Glenmoor (through its agents) served by first class mail copies of (a) the Sales Procedures Order, (b) the Bidding Procedures, and (c) the Sale Notice upon the U.S. Trustee, counsel to the Creditors' Committee (if any), all known creditors of Glenmoor as identified on Glenmoor's schedules of assets and liabilities; all taxing authorities having jurisdiction over any of the Purchased Assets, including the Internal

Revenue Service, all parties that have requested notice pursuant to Bankruptcy Rule 2002, all persons or entities known or reasonably believed to have asserted a lien in any of the Purchased Assets, all persons or entities known or reasonably believed to have expressed an interest in purchasing the Purchased Assets and the counterparties to each of the assumed contracts.  Such notice complies fully with Bankruptcy Rule 2002, and was reasonably calculated to provide timely and adequate notice of the Sale and the Auction to Glenmoor's creditors and other parties in interest, and also to those who have expressed an interest in bidding on the Purchased Assets.

**It Is Therefore Ordered:**

9.      This Order is deemed to be the Sale Order as provided in the APA.

10.     The APA and all other ancillary documents, and all of the terms and conditions thereof, are hereby authorized and approved.

11.     Glenmoor may sell the Purchased Assets free and clear of all liens because one or more of the standards set forth in §§ 363(f)(1)-(5) of the Bankruptcy Code has or have been satisfied.  Those holders of liens against Glenmoor, its estate or any of the Purchased Assets who did not object to the Sale or the Motion are deemed to have consented to the Sale pursuant to § 363(f)(2) of the Bankruptcy Code.

12.     Pursuant to § 363(b) of the Bankruptcy Code, Glenmoor is authorized, directed and empowered to take any and all actions necessary or appropriate to: (i) consummate the Sale of the Purchased Assets to LCS pursuant to and in accordance with the terms and conditions of the APA; (ii) close the Sale as contemplated in the APA and this Order; and (iii) execute and deliver, perform under, consummate, implement and close fully the APA, together with all additional instruments and documents that may be

reasonably necessary or desirable to implement the APA and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA and such other ancillary documents.

13.    Pursuant to §§ 105(a), 363, 365 and 1123(a)(5)(D) of the Bankruptcy Code, Glenmoor is authorized to transfer the Purchased Assets to LCS on the Closing Date. The Purchased Assets shall be transferred to LCS upon and as of the Closing Date, or at such other time as specified pursuant to the terms of the APA, and such transfer shall constitute a legal, valid, binding and effective transfer of such Purchased Assets, and, upon Glenmoor's receipt of the Purchase Price, shall be free and clear of all liens, claims (as that term is defined in § 101(5) of the Bankruptcy Code), interests, encumbrances, and other interests with all such liens, claims (as that term is defined in § 101(5) of the Bankruptcy Code), interests, encumbrances, and other interests to attach to the Purchase Price with the same validity, priority, force and effect that they now have as against such Purchased Assets, subject to any claims and defenses Glenmoor and its estate may possess with respect thereto; provided, however, that the Bond Trustee's claim shall be deemed an allowed first priority claim secured by the proceeds of the Sale, and shall not be subject to objection or counterclaim.

14.    The transfer of the Purchased Assets to LCS will be as of the Closing Date a legal, valid and effective transfer of such assets, and vests or will vest LCS with all right, title and interest of Glenmoor to the Purchased Assets free and clear of all liens, claims (as that term is defined in § 101(5) of the Bankruptcy Code), interests, encumbrances, and other interests accruing, arising or relating to any time prior to the Closing Date.

- 6 -

15. The terms and provisions of this Order shall be binding in all respects upon LCS and Glenmoor, any trustees appointed pursuant to Chapter 11 or Chapter 7 of the Bankruptcy Code, the estate, all creditors and interest holders of Glenmoor, all interested parties and their respective successors and assigns, including, but not limited to, any creditor asserting a lien in the Purchased Assets.

16. Neither LCS nor any of its respective affiliates, successors or assigns, shall, as a result of any action taken in connection with the purchase of the Purchased Assets: (a) be considered a successor to Glenmoor for any purpose, including but not limited to successor employer; (b) have, *de facto* or otherwise, merged with or into Glenmoor; or (c) are a continuation or substantial continuation of any of Glenmoor or any enterprise of Glenmoor.

17. All persons and entities are hereby forever prohibited and enjoined from taking any action that would interfere with the ability of Glenmoor to sell and transfer the Purchased Assets to LCS in accordance with the terms of the APA and this Order. Nothing herein shall, however, be construed as a limitation on the Debtor's regulatory agencies to approve or disapprove of LCS as a licensed operator of Glenmoor's facilities.

18. All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to LCS at the Closing.

19. Except as expressly permitted or otherwise specifically provided by the APA or this Order, all persons and entities holding liens, claims or interests in the Purchased Assets arising under or out of, in connection with, or in any way relating to Glenmoor, the Purchased Assets, the operation of Glenmoor's business prior to the Closing Date or the transfer of the Purchased Assets to LCS hereby are forever barred,

- 7 -

estopped and permanently enjoined from asserting against LCS or its successors or assigns, their property or the Purchased Assets, such persons' or entities' interests in and to the Purchased Assets. On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release liens and claims on or against the Purchased Assets, if any, as provided for herein, as such liens or claims may have been recorded or may otherwise exist.

20.    If any person or entity that has filed statements or other documents or agreements evidencing liens on, claims against, or interests in, the Purchased Assets shall not have delivered to Glenmoor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, claims, and easements, and any other documents necessary for the purpose of documenting the release of all liens which the person or entity has or may assert with respect to the Purchased Assets, Glenmoor is hereby authorized and directed, and LCS is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

21.    A certified copy of this Order may be filed with the appropriate clerk or recorded with the recorder to evidence conclusively the release or cancellation of the liens and other encumbrances of record with respect to the Purchased Assets.

22.    This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the

duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

23.    Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against LCS or its successors and assigns, or the Purchased Assets, with respect to any (a) lien or claim arising under, out of, in connection with or in any way relating to Glenmoor, LCS, the Purchased Assets, or the operation of the Purchased Assets prior to the Closing of the Sale, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against LCS or its successors, assets or properties; (ii) attaching, collecting or recovering in any manner any judgment, award, decree or order against LCS or its successors, assets or properties; (iii) creating, perfecting or enforcing any Lien or other encumbrance against LCS, its successors, assets or properties; (iv) asserting any defense, setoff, right of subrogation or recoupment of any kind against any obligation due LCS or its successors, whether under the Purchased Assets or otherwise; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to issue or renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets.

24.     Other than as provided in the APA, LCS shall not have any liability or other obligation of the Debtor arising under or related to the Purchased Assets.  Without limiting the generality of the foregoing, LCS shall not be liable for any claims against Glenmoor or any of its predecessors or affiliates, and LCS shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to Glenmoor or any obligations of Glenmoor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing.  The Sale does not amount to a consolidation, merger or *de facto* merger of LCS and Glenmoor or its estate, there is not substantial continuity between LCS and Glenmoor, there is no continuity of enterprise between LCS and Glenmoor, LCS is not a mere continuation of Glenmoor or its estate, and LCS does not constitute a successor to Debtor or Debtor's estate.

25.     The transactions contemplated by the APA are undertaken by LCS without collusion and in good faith, as that term is defined in § 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale.  LCS is a good faith purchaser within the meaning of § 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of § 363(m) of the Bankruptcy Code.

26.     The consideration provided by LCS for the Purchased Assets pursuant to the APA shall be deemed to constitute reasonably equivalent value, fair consideration,

and fair market value for the assets under the Bankruptcy Code and under the laws of the United States, any state, territory or possession.

27.    LCS shall have no liability or responsibility for any liability or other obligation of Glenmoor arising under or related to the Purchased Assets other than for any liabilities specifically assumed pursuant to the APA.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in the APA, LCS shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, and LCS shall have no successor liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereinafter arising, whether fixed or contingent, with respect to Glenmoor or any obligations of Glenmoor arising prior to the Closing Date, including, but not limited to, liabilities in any way relating to the operation of the Debtor's business prior to the Closing Date.

28.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

29.    The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

30.    The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate. The Bond Trustee shall be given notice of any such modification, amendment or supplementation, and shall be deemed to accept the modification, amendment or

supplementation if it does not object to the modification, amendment or supplementation within three (3) business days after receiving notice thereof.

31.     The APA and the transactions and instruments contemplated thereby shall be specifically enforceable against and binding upon, and not subject to rejection or avoidance by Glenmoor.

32.     Pursuant to §§ 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale and LCS's rights to amend the schedules of assumed and rejected contracts and leases prior to closing pursuant to the Sale Procedures Order, Glenmoor's assumption and assignment to LCS, and LCS's assumption on the terms set forth in the APA, of the assumed contracts and leases is hereby approved, and the requirements of § 365(b)(1) of the Bankruptcy Code with respect thereto are satisfied.

33.     Debtor is hereby authorized and directed in accordance with §§ 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to LCS, effective upon the Closing Date of the Sale, the Assumed Contracts free and clear of all claims, liens, and interests of any kind or nature whatsoever and (b) execute and deliver to LCS such documents or other instruments as may be necessary to assign and transfer the assumed contracts and leases to LCS.

34.     The assumed contracts and leases assigned to LCS pursuant to the APA (the "Assumed Contracts") shall be transferred to, and remain in full force and effect for the benefit of, LCS in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in §§ 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to § 365(k) of the Bankruptcy Code, Debtor shall be

relieved from any further liability with respect to the Assumed Contracts after such assignment to and assumption by LCS, except as provided in the APA.

35.    All defaults or other obligations of Glenmoor under the Assumed Contracts arising or accruing prior to the date of this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in § 365(b)(2) of the Bankruptcy Code) shall be cured by LCS at the Closing Date or as soon thereafter as reasonably practicable.

36.    To the extent a counterparty to an Assumed Contract failed to timely object to a cure amount pursuant to the procedures for objecting to the assumption and assignment and cure of any executory contracts or unexpired leases previously established by the Court, such cure amounts shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the cure amount at any time, and such cure amount, when paid, shall completely cure all existing defaults and revive the Assumed Contract to which it relates.

37.    The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which Glenmoor is a party or which will be assigned by Glenmoor to LCS, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

38.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this Order shall govern.  To the extent the terms of this Order are inconsistent with the terms of the APA agreed to by the parties, the terms of the APA shall govern.  The provisions of this Order are non-severable and mutually dependent.

40.     Nothing contained in any order entered in this bankruptcy proceeding subsequent to entry of this Order, nor in any chapter 11 plans confirmed in this Chapter 11 Case, shall conflict with or derogate from the provisions of the APA or the terms of this Order.

41.     To the extent applicable, the automatic stay pursuant to § 362 of the Bankruptcy Code is hereby lifted with respect to Debtor to the extent necessary, without further order of the Court (a) to allow LCS to give Debtor any notice provided for in the APA, and (b) to allow the parties to take any and all actions permitted by or contemplated in the APA.

42.     Notice of the Motion constitutes good, sufficient and timely notice, and no other or further notice shall be required, other than service of a copy of this Order by first class mail postage prepaid upon the Notice Parties.

43.     Notwithstanding Rules 6004(h), 6006(d), 7062, or 9014 of the Federal Rules of Bankruptcy Procedure or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution of this Order.

44.     LCS desires to continue using "Glenmoor" in the conduct of its business. To avoid confusion in the marketplace between Debtor and LCS, the caption of this case

is hereby amended to delete the reference to "doing business as Glenmoor."  The caption

of this case should henceforth be reflected as follows:

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | |
| | | |
| LIFE CARE ST. JOHNS, INC., | ) | Case No.: |
| a Florida not-for-profit corporation, | | |
| | ) | Chapter 11 |
| Debtor. | | |
| _____ | ) | |

45.     The Court shall retain jurisdiction over any matter or dispute arising from

or relating to the implementation of this Order.

American Legal Claims Services, Inc. is directed to serve a copy of this Order on
interested parties who are non-CM/ECF users and file a proof of service within three days
of entry of the Order.
94.4

# EXHIBIT B

# FACILITIES

The land referred to herein below is situated in the County of St. Johns, State of Florida, and is described as follows:

PARCEL A

Northwest Parcel 12

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the Westerly line of said section, a distance of 794.29 feet; thence South 75°04'08" East leaving said section line, a distance of 1005.91 feet to the Point of Beginning; thence North 67°18'44" East, a distance of 83.75 feet; thence South 48°28'02" East, a distance of 49.55 feet; thence South 47°07'46" East, a distance of 67.82 feet; thence South 86°31'04" East, a distance of 308.18 feet; thence South 22°20'24" East, a distance of 181.75 feet; thence South 17°43'07" East, a distance of 592.76 feet; thence South 48°47'39" East, a distance of 84.28 feet to a point lying on a curve, said curve being concave Easterly having a radius of 100.00 feet; thence Southerly along the arc of said curve, an arc distance of 129.49 feet, said arc being subtended by a chord bearing of South 02°55'59" East and a chord distance of 120.63 feet to the point of reverse curve of a curve, said curve being concave Westerly having a radius of 150.00 feet; thence Southerly along the arc of said curve, an arc distance of 248.58 feet, said arc being subtended by a chord bearing of South 07°26'43" West and a chord distance of 221.09 feet to the point of tangency of said curve; thence South 54°55'11" West, a distance of 122.79 feet to the point of curve of a curve, concave Southeasterly having a radius of 500.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 308.79 feet, said arc being subtended by a chord bearing of South 37°13'39" West and a chord distance of 303.90 feet to the point of tangency of said curve; thence South 19°32'07" West, a distance of 262.67 feet to the point of curve of a curve, said curve being concave Northwesterly having a radius of 293.73 feet; thence Southwesterly along the arc of said curve, an arc distance of 288.27 feet, said arc being subtended by a chord bearing of South 47°39'02" West and a chord distance of 276.84 feet to the point of tangency of said curve; thence South 75°45'56" West, a distance of 125.65 feet to the point of curve of a curve, concave Southeasterly having a radius of 55.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 43.03 feet, said arc being subtended by a chord bearing of South 53°21'17" West and a chord distance of 41.94 feet to the point of tangency of said curve; thence South 30°56'39" West, a distance of 55.03 feet to the point of curve of a curve, concave Northwesterly having a radius of 105.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 91.70 feet; said arc being subtended a chord bearing of South 55°57'52 " West and a chord distance of 88.82 feet to the point of tangency of said curve; thence South 80°59'05" West, a distance of 235.50 feet to the point of curve of a curve, concave Southeasterly having a radius of 125.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 181.31 feet, said arc being subtended by a chord bearing of South 39°25'52" West and a chord distance of 165.83 feet to the point of reverse curve of a curve, concave Westerly having radius of 260.00 feet; thence Southerly along the arc of said curve, an arc distance of 118.39 feet, said arc being subtended by a chord bearing of South 10°55'44" West and a chord distance of 117.37 feet to the point of reverse curve of a curve, said curve being concave Easterly having a radius of 359.00 feet; thence Southerly along of said curve an arc distance of 113.19 feet, said arc being subtended by a chord bearing of South 14°56'27" West and a chord distance of 112.72 feet to the point of reverse curve of a curve, said curve being concave Northwesterly having a radius of

60.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 83.58 feet, said arc being subtended to a chord bearing of South 45°49'24" West and a chord distance of 76.99 feet to a point on said curve; thence North 04°51'23" East, a distance of 180.93 feet; thence North 09°28'47" West, a distance of 65.62 feet; thence North 00°56'26" East, a distance of 70.94 feet; thence North 02°31'11" West, a distance of 63.96 feet; thence North 05°27'34" West, a distance of 59.07 feet; thence North 04°53'23" West, a distance of 34.17 feet; thence North 43°54'07" East, a distance of 35.85 feet; thence North 30°31'06" East, a distance of 52.71 feet; thence North 08°26'37" East, a distance of 37.22 feet; thence North 28°29'33" West, a distance of 68.00 feet; thence North 34°56'05" East, a distance of 39.87 feet; thence North 03°28'40" East, a distance of 42.85 feet; thence North 26°11'28" West, a distance of 34.85 feet; thence South 78°18'46" West, a distance of 69.88 feet; thence North 17°50'44" East, a distance of 82.04 feet; thence North 01°04'08" West, a distance of 52.62 feet; thence North 26°45'44" West, a distance of 52.72 feet; thence North 08°37'23" West, a distance of 71.21 feet; thence North 49°58'30" East, a distance of 51.20 feet; thence North 37°03'10" East, a distance of 42.51 feet; thence North 23°05'00" East, a distance of 29.24 feet; thence North 52°42'33" East, a distance of 89.81 feet ; thence North 39°49'53" East, distance of 37.88 feet; thence North 40°59'30" East a distance of 54.14 feet; thence North 25°43'49" East, a distance of 36.24 feet; thence North 01°24'14" East, a distance of 51.32 feet; thence North 33°39'36" East, a distance of 62.76 feet; thence South 89°15'21" West, a distance of 58.49 feet; thence North 49°35'49" East, a distance of 73.15 feet; thence North 00°49'34" West, a distance of 61.21 feet; thence North 33°54'26" East, a distance of 51.85 feet; thence North 08°05'20" East, a distance of 56.90 feet; thence North 16°05'44" East, a distance of 17.23 feet; thence North 18°30'02" East, a distance of 67.33 feet; thence North 50°36'17" East, a distance of 42.65 feet; thence North 20°28'46" East, a distance of 50.48 feet; thence North 31°40'46" East, a distance of 50.71 feet; thence North 23°20'10" East, a distance of 108.38 feet; thence North 00°17'13" East, a distance of 42.81 feet; thence North 41°10'10" West, a distance of 48.28 feet; thence North 49°27'01" West, a distance of 56.19 feet; thence North 27°08'28" East, a distance of 33.22 feet; thence North 75°55'47" East, a distance of 55.30 feet; thence North 22°52'19" East, a distance of 44.70 feet; thence North 71°25'48" West, a distance of 46.22 feet; thence North 12°53'54" West, a distance of 67.27 feet; thence South 62°30'14" East, a distance of 50.17 feet; thence North 23°43'48" East, a distance of 54.28 feet; thence North 48°32'34 " West, a distance of 51.43 feet; thence South 81°10'17 " East, a distance of 32.67 feet; thence North 00°07'47" East, a distance of 53.89 feet; thence North 83 °08 '49 " East, a distance of 58.62 feet; thence South 78°51'35" East, a distance of 51.51 feet; thence North 50°41'43" East, a distance of 46.88 feet; thence North 67°29'11" East, a distance of 49.38 feet; thence North 15°16'53" West, a distance of 66.99 feet; thence North 26°11'10" West, a distance of 33.82 feet; thence North 06°38'03" West, a distance of 56.00 feet; thence North 03°21'28" East, a distance of 63.24 feet; thence North 41°14'49" West, a distance of 62.47 feet to the Point of Beginning.

LESS AND EXCEPT THE FOLLOWING THREE PARCELS:

Parcel 1

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the Westerly line of said section, a distance of 794.29 feet; thence South 75°04'08" East leaving said Section line, a distance of 1005.91 feet to the Point of Beginning; thence North 67°18'44" East, a distance of 83.75 feet; thence South 48°28'02" East, a distance of 49.55 feet; thence South 47°07'46" East, a distance of 67.82 feet; thence South 86°31'04 " East, a distance of 308.18 feet; thence South 22°20'24" East, a distance of 181.75 feet; thence South 17°04'07" East, a distance of 592.76 feet; thence South 48°47'39" East, a distance of 84.28 feet to the point of beginning; said point lying on a curve, concave Easterly having a radius of 100.00 feet; thence Southerly along the arc of said curve, an arc

distance of 129.49 feet, said arc being subtended by a chord bearing of South 02°55'59" East and a chord distance of 120.63 feet to the point of reverse curve of a curve, said curve being concave Southwesterly having a radius of 150.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 60.03 feet, said arc being subtended by a chord bearing of South 28°33'51" East and a chord distance of 59.63 feet to a point on said curve; thence North 38°52'55" West, a distance of 53.45 feet to the point of curve of a curve, concave Easterly, having a radius of 100.00 feet; thence Northerly along the arc of said curve, an arc distance of 141.06 feet, said arc being subtended by a chord bearing of North 00°29'44" West, and a chord distance of 131.24 feet to the point of beginning.

Parcel 2

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the Westerly line of said section, a distance of 794.29 feet; thence South 75°04'08" East leaving said section line, a distance of 1005.91 feet; thence North 67°18'44" East, a distance of 83.75 feet; thence South 48°28'02" East, a distance of 49.55 feet; thence South 47°07'46" East, a distance of 67.82 feet; thence South 86°31'04" East, a distance of 308.18 feet; thence South 22°20'24" East, a distance of 181.75 feet; thence South 17°43'07" East, a distance of 592.76 feet; thence South 48°47'39" East, a distance of 84.28 feet to a point on a curve, concave Easterly having a radius of 100.00 feet; thence Southerly along the arc of said curve, an arc distance of 129.49 feet, said arc being subtended by a chord bearing of South 02°55'59" East and a chord distance of 120.63 feet to the point of reverse curve of a curve, said curve being concave Westerly having a radius of 150.00 feet; thence Southerly along the arc of said curve, an arc distance of 248.58 feet, said arc being subtended by a chord bearing of South 07°26'43" West and a chord distance of 221.09 feet to the point of tangency of said curve; thence South 54°55'11" West, a distance of 122.79 feet to the point of curve of a curve, concave Southeasterly having a radius of 500.00 feet; thence Southwesterly, along the arc of said curve, an arc distance of 200.22 feet, said arc being subtended by a chord bearing of South 43°26'53 " West, and a chord distance of 198.88 feet to the Point of Beginning; thence continue Southwesterly, along the arc of said curve, an arc distance of 108.57 feet, said arc being subtended by a chord bearing of South 25°45'22" West and a chord distance of 108.36 feet to the point of tangency of said curve; thence South 19°32'07" West, a distance of 229.74 feet; thence North 18°32'11" East, a distance of 74.25 feet to a point on a curve, concave Southwesterly, having a radius of 325.00 feet; thence Northwesterly, along the arc of said curve, an arc distance of 143.96 feet, said arc being subtended by a chord bearing of North 14°55'10" West, and a chord distance of 142.78 feet to a point on said curve; thence North 52°21'05 " East, a distance of 173.11 feet to the Point of Beginning.

Parcel 3

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the Westerly line of said section, a distance of 794.29 feet; thence South 75°04'08" East leaving said section line, a distance of 1005.91 feet; thence North 67°18'44" East, a distance of 83.75 feet; thence South 48°28'02" East, a distance of 49.55 feet; thence South 47°07'46 " East, a distance of 67.82 feet; thence South 86°31'04" East, a distance of 308.18 feet; thence South 22°20'24" East, a distance of 181.75 feet; thence South 17°43'07" East, a distance of 592.76 feet; thence South 48°47'39" East, a distance of 84.28 feet to a point lying on a curve, said curve being concave Easterly having a radius of 100.00 feet; thence Southerly along the arc of said curve, an arc distance of 129.49 feet, said arc being subtended by a chord bearing of South 02°55'59" East and a chord distance of 120.63 feet

to the point of reverse curve of a curve, said curve being concave Westerly having a radius of 150.00 feet; thence Southerly along the arc of said curve, an arc distance of 248.58 feet, said arc being subtended by a chord bearing of South 07°26'43" West and a chord distance of 221.09 feet to the point of tangency of said curve; thence South 54°55'11" West, a distance of 122.79 feet to the point of curve of a curve, concave Southeasterly having a radius of 500.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 308.79 feet, said arc being subtended by a chord bearing of South 37°13'39" West and a chord distance of 303.90 feet to the point of tangency of said curve; thence South 19°32'07" West, a distance of 262.67 feet to the point of curve of a curve, said curve being concave Northwesterly having a radius of 293.73 feet; thence Southwesterly along the arc of said curve, an arc distance of 40.99 feet, said arc being subtended by a chord bearing of South 23°32'00" West and a chord distance of 40.96 feet to the Point of Beginning; thence continue, Southwesterly, along the arc of said curve, an arc distance of 247.28 feet, said arc being subtended by a chord bearing of South 51°38'55" West, and a chord distance of 240.04 feet to the point of tangency of said curve; thence South 75°45'56" West, a distance of 125.65 feet to the point of curve of a curve, concave Southeasterly having a radius of 55.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 43.03 feet, said arc being subtended by a chord bearing of South 53°21'17" West and a chord distance of 41.94 feet to the point of tangency of said curve; thence South 30°56'39" West, a distance of 55.03 feet to the point of curve of a curve, concave Northwesterly having a radius of 105.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 91.70 feet, said arc being subtended by a chord bearing of South 55°57'52" West and a chord distance of 88.82 feet to the point of tangency of said curve; thence South 80°59'05" West, a distance of 197.53 feet; thence North 58°13'29" East, a distance of 161.08 feet; thence North 57°17'24" East, a distance of 187.83 feet; thence South 86°13'46" East, a distance of 127.56 feet to a point on a curve, concave Northwesterly, having a radius of 312.00 feet; thence Northeasterly, along the arc of said curve, an arc distance of 276.69 feet, said arc being subtended by a chord bearing of North 54°40'27" East, and a chord distance of 267.71 feet to the Point of Beginning.

And Further Excepting the following Parcels:

Parcel 1, Swap Parcel to Northwest 11

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence North 03°28'56" East, a distance of 152.07 feet to the Point of Beginning; thence North 22°20'24" West, a distance of 181.75 feet; thence South 86°31'04" East, a distance of 79.17 feet; thence South 03°28'56" West a distance of 163.60 feet to the Point of Beginning.

Parcel 3, Swap Parcel to Northwest 11

A part of section 44, Township 6 South, Range 28 East, St. Johns County, Florida more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence South 32°40'18" East, a distance of 213.15 feet to the Point of Beginning; thence continue South 32°40'18" East, a distance of 168.93 feet; thence South 70°30'28" West, a distance of 43.61 feet; thence North 17°43'07" West a distance of 164.56 feet to the Point of Beginning.

PARCEL B:

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the Westerly line of said section, a distance of 794.29 feet; thence South 75°04'08" East leaving said section line, a distance of 1005.91 feet; thence North 67°18'44" East, a distance of 83.75 feet; thence South 48°28'02" East, a distance of 49.55 feet; thence South 47°07'46" East, a distance of 67.82 feet; thence South 86°31'04" East, a distance of 308.18 feet; thence South 22°20'24" East, a distance of 181.75 feet; thence South 17°43'07" East, a distance of 592.76 feet; thence South 48°47'39" East, a distance of 84.28 feet to a point lying on a curve, concave Easterly having a radius of 100.00 feet; thence Southerly along the arc of said curve, an arc distance of 129.49 feet, said arc being subtended by a chord bearing of South 02°55'59" East and a chord distance of 120.63 feet to the point of reverse curve of a curve, said curve being concave Southwesterly having a radius of 150.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 60.03 feet, said arc being subtended by a chord bearing of South 28°33'51" East and a chord distance of 59.63 feet to the Point of Beginning; thence South 38°52'55" East, a distance of 29.33 feet; thence North 55°00'29" East, a distance of 27.93 feet to the point of curve of a curve, concave Southwesterly, having a radius of 45.29 feet; thence Southeasterly along the arc of said curve, an arc distance of 141.31 feet, said arc being subtended by a chord bearing of South 38°02'19" East, and a chord distance of 90.57 feet to the point of tangency of said curve; thence South 51°20'55" West, a distance of 50.00 feet; thence South 52°19'22" West, a distance of 163.79 feet to a point on a curve, concave Northwesterly, having a radius of 18.00 feet; thence Southwesterly, along the arc of said curve, an arc distance of 36.07 feet, said arc being subtended by a chord bearing of South 52°07'15" West, and a chord distance of 30.33 feet to a point on said curve; thence South 52°17'24" West, a distance of 158.67 feet to a point on a curve, concave Northwesterly, having a radius of 18.00 feet; thence Southwesterly, along the arc of said curve, an arc distance of 36.05 feet, said arc being subtended by a chord bearing of South 52°17'02" West, and a chord distance of 30.32 feet to a point on said curve; thence South 52°21'05" West, a distance of 62.37 feet to a point on a curve, concave Southeasterly, having a radius of 500.00 feet; thence Northeasterly, along the arc of said curve, an arc distance of 200.22 feet, said arc being subtended by a chord bearing of North 43°26'53" East, and a chord distance of 198.88 feet to the point of tangency of said curve; thence North 54°55'11" East, a distance of 122.79 feet to the point of curve of a curve concave Northwesterly, having a radius of 150.00 feet; thence Northeasterly, along the arc of said curve, an arc distance of 188.55 feet, said arc being subtended by a chord bearing of North 18°54'37 " East, and a chord distance of 176.38 feet to the Point of Beginning.

TOGETHER WITH THE FOLLOWING PARCEL:

Parcel 2, Swap Parcel to Northwest 12

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet: thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in Official Records Book 1291, Page 403 for the Point of Beginning; thence North 03°28'56" East, a distance of 152.07 feet; thence South 17°43'07" East, a distance of 347.71 feet; thence North 32°40'18" West, a distance of 213.15 feet to the Point of Beginning.

TOGETHER WITH A NON-EXCLUSIVE PERPETUAL EASEMENT OVER THE FOLLOWING DESCRIBED LANDS:

Royal Pines Park Way

A part of the Antonio Huertas Grant, Section 38, together with a part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 7123.49 feet; thence South 53°13'38" East along a line to its intersection with the Northwesterly right of way line of International Golf Parkway (a 100 foot right of way as proposed), a distance of 2224.53 feet; thence North 50°29'50" East along said proposed Northwesterly right of way line, a distance of 2492.30 feet; thence North 44°29'54" East continuing along said proposed Northwesterly right of way line, a distance of 906.96 feet to the Point of Beginning, said point being on a curve, concave Westerly having a radius of 50.00 feet; thence Northwesterly leaving said right of way line and along the arc of said curve, an arc distance of 78.54 feet, said arc being subtended by a chord bearing of North 00°30'06" West and a chord distance of 70.71 feet to the point of tangency of said curve; thence North 45°30'05" West, a distance of 71.99 feet to the point of a curve of a curve concave Northeasterly having a radius of 550.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 261.20 feet, said arc being subtended by a chord bearing of North 31°53'47" West and a chord distance of 258.75 feet to the point of tangency of said curve; thence North 18°17'27" West a distance of 211.97 feet to the point of a curve of a curve, concave Easterly having a radius of 550.00 feet; thence Northerly along the arc of said curve, an arc distance of 266.10 feet, said arc being subtended by a chord bearing of North 04°25'50" West and a chord distance of 263.51 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve, an arc distance of 438.51 feet, said arc being subtended by a chord bearing of North 08°30'59" West and a chord distance of 431.37 feet to the point of reverse curve of a curve, concave Easterly having a radius of 800.00 feet; thence Northerly along the arc of said curve, an arc distance of 623.81 feet, said arc being subtended by a chord bearing of North 04°07'27" West and a chord distance of 608.12 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve an arc distance of 328.09 feet, said arc being subtended by a chord bearing of North 04°47'13" East and a chord distance of 325.10 feet to the point of reverse curve, concave Easterly having a radius of 600.00 feet; thence Northerly along the arc of said curve, an arc distance of 314.77 feet, said arc being subtended by a chord bearing of North 06°23'19" East and a chord distance of 311.17 feet to the point of tangency of said curve; thence North 21°25'04" East, a distance of 2.70 feet to the point of curve of a curve, concave Westerly having a radius of 1000.00 feet; thence Northerly along the arc of said curve, an arc distance of 832.14 feet, said arc being subtended by a chord bearing of North 02°25'17" West and a chord distance of 808.34 feet to the point of tangency of said curve; thence North 26°15'38" West a distance of 206.92 feet to the point of curve of a curve, concave Northeasterly having a radius of 1050.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 448.34 feet, said arc being subtended by a chord bearing of North 14°01'42" West and a chord distance of 444.94 feet to a point of compound curve of a curve, concave Southeasterly having a radius of 550.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 609.03 feet, said arc being subtended by a chord bearing of North 29°55'35" East and a chord distance of 578.39 feet to a point of reverse curve of a curve, concave Northwesterly having a radius of 185.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 230.24 feet, said arc being subtended by a chord bearing of North 25°59'45" East and a chord distance of 215.67 feet to a point of cusp of a curve, said point lying on the Westerly right of way line of WGV Boulevard, said curve being concave Westerly having a

radius of 2500.00 feet; thence Southerly along said Westerly right of way line and along the arc of said curve, an arc distance of 216.78 feet, said arc being subtended by a chord bearing of South 07°10'25" East and a chord distance of 216.71 feet to the point of reverse curve of a curve, concave Northeasterly having a radius of 550.00 feet; thence Southeasterly, continuing along said Westerly right of way line and along the arc of said curve, an arc distance of 599.77 feet, said arc being subtended by a chord bearing of South 35°55'47" East and a chord distance of 570.49 feet to the point of cusp of a curve, concave Northeasterly having a radius of 556.50 feet; thence Northwesterly leaving said Westerly right of way line of WGV Boulevard and along the arc of said curve, an arc distance of 320.51 feet, said arc being subtended by a chord bearing of North 52°45'08" West and a chord distance of 316.10 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 562.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 95.37 feet, said arc being subtended by a chord bearing of North 29°18'05" West and a chord distance of 95.25 feet to the point of reverse curve of a curve, concave Southerly having a radius of 135.00 feet; thence Westerly along the arc of said curve, an arc distance of 262.48 feet, said arc being subtended by a chord bearing of North 80°08'23" West and a chord distance of 223.05 feet to the point of compound curve of a curve, concave Southeasterly having a radius of 450.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 360.94 feet, said arc being subtended by a chord bearing of South 21°10'56" West and a chord distance of 351.34 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 950.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 405.64 feet; said arc being subtended by a chord bearing of South 14°01'42" East and a chord distance of 402.56 feet to the point of tangency of said curve, thence South 26°15'38" East, a distance of 405.77 feet to the point of curve of a curve, concave Westerly having a radius of 650.00 feet; thence Southerly along the arc of said curve, an arc distance of 540.89 feet, said arc being subtended by a chord bearing of South 02°25'17" East and a chord distance of 525.42 feet to the point of tangency of said curve; thence South 21°25'04" West, a distance of 201.54 feet to the point of curve of a curve, concave Easterly having a radius of 500.00 feet; thence Southerly along the arc of said curve, an arc distance of 262.31 feet, said arc being subtended by a chord bearing of South 06°23'19" West and a chord distance of 259.31 feet to the point of reverse curve of a curve concave Westerly having a radius of 800.00 feet; thence Southerly along the arc of said curve, an arc distance of 334.19 feet, said arc being subtended by a chord bearing of South 03°19'36" West and a chord distance of 331.76 feet to the point of reverse curve of a curve, concave Easterly having a radius of 700.00 feet; thence Southerly along the arc of said curve, an arc distance of 469.50 feet, said arc being subtended by a chord bearing of South 03°55'14" East and a chord distance of 460.75 feet to the point of reverse curve of a curve, concave Westerly having a radius of 1050.00 feet; thence Southerly along the arc of said curve, an arc distance of 606.08 feet, said arc being subtended by a chord bearing of South 06°35'56" East and a chord distance of 597.70 feet to the point of reverse curve of a curve, concave Easterly having a radius of 450.00 feet; thence Southerly along the arc of said curve, an arc distance of 221.70 feet, said arc being subtended by a cord bearing of South 04°10'37" East and a chord distance of 219.47 feet to the point of tangency of said curve; thence South 18°17'27" East, a distance of 211.97 feet to the point of curve of a curve, concave Northeasterly having a radius of 450.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 213.71 feet, said arc being subtended by a chord bearing of South 31°53'47" East and a chord distance of 211.71 feet to the point of tangency of said curve; thence South 45°30'05" East, a distance of 71.99 feet to the point of curve of a curve, concave Northerly having a radius of 50.00 feet; thence Easterly along the arc of said curve, an arc distance of 78.54 feet, said arc being subtended by a chord bearing of North 89°29'55" East and a chord distance of 70.71 feet to the point of cusp at the aforesaid proposed Northwesterly right of way line of International Golf Parkway; thence South 44°29'54" West along said proposed Northwesterly right of way line, a distance of 200.00 feet to the Point of Beginning

AND TOGETHER WITH ACCESS EASEMENT AS SET FORTH IN OFFICIAL RECORDS BOOK 1468,

PAGE 1409, AS RECORDED IN THE PUBLIC RECORDS OF ST. JOHNS COUNTY, FLORIDA, DESCRIBED AS FOLLOWS:

NORTHWEST PARCELS 11A AND 12 ACCESS EASEMENT:

PART OF SECTION 44, TOWNSHIP 6 SOUTH, RANGE 28 EAST, ST. JOHNS COUNTY, FLORIDA, MORE PARTICULARLY DESCRIBED AS FOLLOWS: FOR A POINT OF REFERENCE, COMMENCE AT THE NORTHWEST CORNER OF SAID SECTION 44; THENCE SOUTH 14°55'52" WEST ALONG THE WEST LINE OF SAID SECTION 44, A DISTANCE OF 1312.29 FEET; THENCE SOUTH 75°04'08" EAST LEAVING SAID WESTERLY LINE OF SECTION 44, A DISTANCE OF 1865.19 FEET TO THE POINT OF BEGINNING; THENCE NORTH 70°20'25" EAST, A DISTANCE OF 151.54 FEET TO THE POINT OF CURVE OF A CURVE, CONCAVE SOUTHERLY HAVING A RADIUS OF 440.00 FEET; THENCE EASTERLY ALONG THE ARC OF SAID CURVE, AN ARC DISTANCE OF 346.72 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 87°05'05" EAST AND A CHORD DISTANCE OF 337.82 FEET TO A POINT ON SAID CURVE; THENCE NORTH 24°54'33" EAST, A DISTANCE OF 10.73 FEET TO A POINT ON A CURVE, SAID CURVE BEING CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 440.00 FEET; THENCE SOUTHEASTERLY ALONG THE ARC OF SAID CURVE, AN ARC DISTANCE OF 40.08 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 62°42'38" EAST AND A CHORD DISTANCE OF 40.07 FEET TO THE POINT OF TANGENCY OF SAID CURVE; THENCE SOUTH 60°06'02" EAST, A DISTANCE OF 25.69 FEET TO THE POINT OF CURVE OF A CURVE, CONCAVE NORTHWESTERLY HAVING A RADIUS OF 50.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE, AN ARC DISTANCE OF 71.01 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 79°12'45" EAST AND A CHORD DISTANCE OF 65.19 FEET TO THE POINT OF CUSP OF A CURVE, SAID CURVE BEING CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 550.00 FEET; THENCE SOUTHWESTERLY ALONG THE ARC OF SAID CURVE AND ALONG THE NORTHWESTERLY RIGHT-OF-WAY LINE OF ROYAL PINES PARKWAY (A RIGHT-OF-WAY OF VARYING WIDTH, AS RECORDED IN OFFICIAL RECORDS BOOK 1185, PAGE 740, EXHIBITS A, D AND E, AS AMENDED BY OFFICIAL RECORDS BOOK 1198, PAGE 872, EXHIBITS A, B AND C, BOTH OF THE PUBLIC RECORDS OF SAID COUNTY), AN ARC DISTANCE OF 175.44 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 29°23'16" WEST AND A CHORD DISTANCE OF 174.70 FEET TO A POINT ON SAID RIGHT-OF-WAY LINE AND THE POINT OF CUSP OF A CURVE, SAID CURVE BEING CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 50.00 FEET; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE LEAVING SAID NORTHWESTERLY RIGHT-OF-WAY LINE OF ROYAL PINES PARKWAY, AN ARC DISTANCE OF 71.01 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 20°26' 14" WEST AND A CHORD DISTANCE OF 65.19 FEET TO THE POINT OF TANGENCY OF SAID CURVE; THENCE NORTH 61°07'25" WEST, A DISTANCE OF 38.20 FEET TO THE POINT OF CURVE OF A CURVE, CONCAVE SOUTHERLY HAVING A RADIUS OF 360.00 FEET; THENCE WESTERLY ALONG THE ARC OF SAID CURVE, AN ARC DISTANCE OF 304.96 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 85°23'30" WEST AND A CHORD DISTANCE OF 295.92 FEET TO THE POINT OF TANGENCY OF SAID CURVE; THENCE SOUTH 70°20'25" WEST, A DISTANCE OF 154.25 FEET; THENCE NORTH 17°43'07" WEST, A DISTANCE OF 80.05 FEET TO THE POINT OF BEGINNING.

## EXHIBIT C

## ADJACENT PARCEL

The land referred to herein below is situated in the County of St. Johns, State of Florida, and is described as follows:

Parcel A:

Northwest Parcel 11A

Part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows; for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1295.90 feet; thence South 75°04'08" East leaving said Westerly line of Section 44, a distance of 1910.39 feet to the Point of Beginning; thence North 32°40'18" West, a distance of 394.90 feet; thence North 03°28'56" East along a line to its intersection with conservation easement no. 29, a distance of 315.67 feet; thence South 68°38'38" East along said conservation easement, a distance of 65.34 feet; thence North 57°00'25" East continuing along said conservation easement, a distance of 56.53 feet; thence North 36°47'19" East along said conservation easement, a distance of 33.66 feet; thence North 56°23'17" West along said conservation easement, a distance of 38.85 feet; thence North 41°26'16" East along said conservation easement, a distance of 50.16 feet; thence North 77°43'45" East along said conservation easement, a distance of 51.00 feet; thence South 65°06'09" East along said conservation easement, a distance of 21.10 feet; thence North 73°35'01" East along said conservation easement, a distance of 24.11 feet; thence South 67°48'15" East continuing along said easement line, a distance of 61.16 feet; thence South 02°10'02" West continuing along said easement line, a distance of 31.16 feet; thence South 46°29'48" East continuing along said easement line, a distance of 47.46 feet; thence South 68°03'16" East continuing along said easement line, a distance of 69.09 feet; thence North 71°08'08" East continuing along said easement line, a distance of 54.32 feet, thence North 82°51'41" East continuing along said easement line, a distance of 63.97 feet; thence South 81°18'54 " East continuing along said easement line a distance of 44.30 feet; thence North 12°19'30" East continuing along said easement line, a distance of 52.59 feet to the point of curve of a curve, concave Southwesterly having a radius of 130.00 feet; thence Southeasterly along the arc of said curve continuing along said easement line, an arc distance of 392.43 feet, said arc being subtended by a chord bearing of South 81°11'47" East and a chord distance of 259.51 feet to the point of tangency of said curve; thence South 05°16'55" West along a Westerly line of said conservation easement, a distance of 325.44 feet; thence South 24°54'33" West continuing along said easement line and its Southerly projection thereof to its intersection with the Northerly right of way line of Parcel 11A access easement, a distance of 345.54 feet to a point lying on a curve, said curve being concave Southeasterly having a radius of 440.00 feet; thence Southwesterly along the arc of said curve and along said Northerly right of way line, an arc distance of 431.03 feet; said arc being subtended by a chord bearing of South 87°25'35" West and a chord distance of 414.00 feet to the point of tangency of said curve; thence South 59°21'36" West continuing along said Northerly right of way line, a distance of 2l.64 feet to the Point of Beginning.

PARCEL B:

Parcel 1, Swap Parcel to Northwest 11

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more

particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence North 03°28'56" East, a distance of 152.07 feet to the Point of Beginning; thence North 22°20'24" West, a distance of 181.75 feet; thence South 86°31'04" East, a distance of 79.17 feet; thence South 03°28'56" West a distance of 163.60 feet to the Point of Beginning.

PARCEL C:

Parcel 3, Swap Parcel to Northwest 11

A part of section 44, Township 6 South, Range 28 East, St. Johns County, Florida more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence South 32°40'18" East, a distance of 213.15 feet to the Point of Beginning; thence continue South 32°40'18" East, a distance of 168.93 feet; thence South 70°30'28" West, a distance of 43.61 feet; thence North 17°43'07" West a distance of 164.56 feet to the Point of Beginning.

LESS AND EXCEPT THE FOLLOWING DESCRIBED LAND:

Parcel 2, Swap Parcel to Northwest 12

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet: thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in Official Records Book 1291, Page 403 for the Point of Beginning; thence North 03°28'56" East, a distance of 152.07 feet; thence South 17°43'07" East, a distance of 347.71 feet; thence North 32°40'18" West, a distance of 213.15 feet to the Point of Beginning.

LESS AND EXCEPT THE FOLLOWING DESCRIBED LAND:

Parcel 4, Parcel from Northwest 11

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1311.88 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1869.64 feet; thence North 70°30'28" East, a distance of 43.61 feet to Point of Beginning; thence continue North 70°30'28" East, a distance of 107.92 feet to a point on a curve, being concave Southeasterly, having a radius of 440.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 84.30 feet, said arc being subtended by a chord bearing of South 64°51'05" West and a chord distance of 84.18 feet to the point of tangency of said curve; thence South 59°21'36" West, a distance of 21.63 feet; thence North 32°40'18" West, a distance of 12.82 feet to the Point of Beginning.

TOGETHER WITH A NON-EXCLUSIVE PERPETUAL EASEMENT OVER THE FOLLOWING DESCRIBED LANDS:

Royal Pines Park Way

A part of the Antonio Huertas Grant, Section 38, together with a part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 7123.49 feet; thence South 53°13'38" East along a line to its intersection with the Northwesterly right of way line of International Golf Parkway (a 100 foot right of way as proposed), a distance of 2224.53 feet; thence North 50°29'50" East along said proposed Northwesterly right of way line, a distance of 2492.30 feet; thence North 44°29'54" East continuing along said proposed Northwesterly right of way line, a distance of 906.96 feet to the Point of Beginning, said point being on a curve, concave Westerly having a radius of 50.00 feet; thence Northwesterly leaving said right of way line and along the arc of said curve, an arc distance of 78.54 feet, said arc being subtended by a chord bearing of North 00°30'06" West and a chord distance of 70.71 feet to the point of tangency of said curve; thence North 45°30'05" West, a distance of 71.99 feet to the point of a curve of a curve concave Northeasterly having a radius of 550.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 261.20 feet, said arc being subtended by a chord bearing of North 31°53'47" West and a chord distance of 258.75 feet to the point of tangency of said curve; thence North 18°17'27" West a distance of 211.97 feet to the point of a curve of a curve, concave Easterly having a radius of 550.00 feet; thence Northerly along the arc of said curve, an arc distance of 266.10 feet, said arc being subtended by a chord bearing of North 04°25'50" West and a chord distance of 263.51 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve, an arc distance of 438.51 feet, said arc being subtended by a chord bearing of North 08°30'59" West and a chord distance of 431.37 feet to the point of reverse curve of a curve, concave Easterly having a radius of 800.00 feet; thence Northerly along the arc of said curve, an arc distance of 623.81 feet, said arc being subtended by a chord bearing of North 04°07'27" West and a chord distance of 608.12 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve an arc distance of 328.09 feet, said arc being subtended by a chord bearing of North 04°47'13" East and a chord distance of 325.10 feet to the point of reverse curve, concave Easterly having a radius of 600.00 feet; thence Northerly along the arc of said curve, an arc distance of 314.77 feet, said arc being subtended by a chord bearing of North 06°23'19" East and a chord distance of 311.17 feet to the point of tangency of said curve; thence North 21°25'04" East, a distance of 2.70 feet to the point of curve of a curve, concave Westerly having a radius of 1000.00 feet; thence Northerly along the arc of said curve, an arc distance of 832.14 feet, said arc being subtended by a chord bearing of North 02°25'17" West and a chord distance of 808.34 feet to the point of tangency of said curve; thence North 26°15'38" West a distance of 206.92 feet to the point of curve of a curve, concave Northeasterly having a radius of 1050.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 448.34 feet, said arc being subtended by a chord bearing of North 14°01'42" West and a chord distance of 444.94 feet to a point of compound curve of a curve, concave Southeasterly having a radius of 550.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 609.03 feet, said arc being subtended by a chord bearing of North 29°55'35" East and a chord distance of 578.39 feet to a point of reverse curve of a curve, concave Northwesterly having a radius of 185.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 230.24 feet, said arc being subtended by a chord bearing of North 25°59'45" East and a chord distance of 215.67 feet to a point of cusp of a curve, said point lying on the Westerly right of way line of WGV Boulevard, said curve being concave Westerly having a radius of 2500.00 feet; thence Southerly along said Westerly right of way line and along the arc of said curve, an arc distance of 216.78 feet, said arc being subtended by a chord bearing of South 07°10'25" East and a chord distance of 216.71 feet to the point of reverse curve of a curve, concave Northeasterly having a radius of 550.00 feet; thence Southeasterly, continuing

along said Westerly right of way line and along the arc of said curve, an arc distance of 599.77 feet, said arc being subtended by a chord bearing of South 35°55'47" East and a chord distance of 570.49 feet to the point of cusp of a curve, concave Northeasterly having a radius of 556.50 feet; thence Northwesterly leaving said Westerly right of way line of WGV Boulevard and along the arc of said curve, an arc distance of 320.51 feet, said arc being subtended by a chord bearing of North 52°45'08" West and a chord distance of 316.10 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 562.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 95.37 feet, said arc being subtended by a chord bearing of North 29°18'05" West and a chord distance of 95.25 feet to the point of reverse curve of a curve, concave Southerly having a radius of 135.00 feet; thence Westerly along the arc of said curve, an arc distance of 262.48 feet, said arc being subtended by a chord bearing of North 80°08'23" West and a chord distance of 223.05 feet to the point of compound curve of a curve, concave Southeasterly having a radius of 450.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 360.94 feet, said arc being subtended by a chord bearing of South 21°10'56" West and a chord distance of 351.34 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 950.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 405.64 feet; said arc being subtended by a chord bearing of South 14°01'42" East and a chord distance of 402.56 feet to the point of tangency of said curve, thence South 26°15'38" East, a distance of 405.77 feet to the point of curve of a curve, concave Westerly having a radius of 650.00 feet; thence Southerly along the arc of said curve, an arc distance of 540.89 feet, said arc being subtended by a chord bearing of South 02°25'17" East and a chord distance of 525.42 feet to the point of tangency of said curve; thence South 21°25'04" West, a distance of 201.54 feet to the point of curve of a curve, concave Easterly having a radius of 500.00 feet; thence Southerly along the arc of said curve, an arc distance of 262.31 feet, said arc being subtended by a chord bearing of South 06°23'19" West and a chord distance of 259.31 feet to the point of reverse curve of a curve concave Westerly having a radius of 800.00 feet; thence Southerly along the arc of said curve, an arc distance of 334.19 feet, said arc being subtended by a chord bearing of South 03°19'36" West and a chord distance of 331.76 feet to the point of reverse curve of a curve, concave Easterly having a radius of 700.00 feet; thence Southerly along the arc of said curve, an arc distance of 469.50 feet, said arc being subtended by a chord bearing of South 03°55'14" East and a chord distance of 460.75 feet to the point of reverse curve of a curve, concave Westerly having a radius of 1050.00 feet; thence Southerly along the arc of said curve, an arc distance of 606.08 feet, said arc being subtended by a chord bearing of South 06°35'56" East and a chord distance of 597.70 feet to the point of reverse curve of a curve, concave Easterly having a radius of 450.00 feet; thence Southerly along the arc of said curve, an arc distance of 221.70 feet, said arc being subtended by a cord bearing of South 04°10'37" East and a chord distance of 219.47 feet to the point of tangency of said curve; thence South 18°17'27" East, a distance of 211.97 feet to the point of curve of a curve, concave Northeasterly having a radius of 450.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 213.71 feet, said arc being subtended by a chord bearing of South 31°53'47" East and a chord distance of 211.71 feet to the point of tangency of said curve; thence South 45°30'05" East, a distance of 71.99 feet to the point of curve of a curve, concave Northerly having a radius of 50.00 feet; thence Easterly along the arc of said curve, an arc distance of 78.54 feet, said arc being subtended by a chord bearing of North 89°29'55" East and a chord distance of 70.71 feet to the point of cusp at the aforesaid proposed Northwesterly right of way line of International Golf Parkway; thence South 44°29'54" West along said proposed Northwesterly right of way line, a distance of 200.00 feet to the Point of Beginning

AND TOGETHER WITH A NON-EXCLUSIVE PERPETUAL EASEMENT OVER THE FOLLOWING DESCRIBED LANDS:

North Parcel 11A access easement:

Part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1295.90 feet; thence South 75°04'08" East leaving said Westerly line of Section 44, a distance of 1910.39 feet to the Point of Beginning; thence North 59°21'36" East, a distance of 21.64 feet to the point of curve of a curve, concave Southerly having a radius of 440.00 feet; thence Easterly along the arc of said curve, an arc distance of 457.03 feet said arc being subtended by a chord bearing of North 89°07'10" East and a chord distance of 436.76 feet to the point of tangency of said curve; thence South 61°07'25" East a distance of 38.20 feet to the point of curve of a curve concave, Northwesterly having a radius of 50.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 71.01 feet; said arc being subtended by a chord bearing of North 78°11'23" East and a chord distance of 65.19 feet to the point of cusp of a curve said curve being concave Southeasterly having a radius of 550.00 feet; thence Southwesterly along the arc of said curve and along the Northwesterly right of way line of Royal Pines Parkway (a right of way of varying width), an arc distance of 165.63 feet, said arc being subtended by a chord bearing of South 28°52'34" West and a chord distance of 165.00 feet to a point on said right of way line and the point of cusp of a curve, said curve being concave Southwesterly having a radius of 50.00 feet: thence Northwesterly along the arc of said curve leaving said Northwesterly right of way line of Royal Pines Parkway, an arc distance of 71.01 feet, said arc being subtended by a chord bearing of North 20°26'41" West and a chord distance of 65.19 feet to the point of tangency of said curve; thence North 61°07'25" West, a distance of 35.77 feet to the point of curve of a curve, concave Southerly having a radius of 360.00 feet; thence Westerly along the arc of said curve, an arc distance of 373.94 feet, said arc being subtended by a chord bearing of South 89°07'10" West and a chord distance of 357.35 feet to the point of tangency of said curve; thence South 59°21'36" West, a distance of 18.80 feet; thence North 32°40'18" West, a distance of 80.05 feet to the Point of Beginning.

## **EXHIBIT D**

## **Form of Escrow Agreement**

[Exhibit begins on next page.]

## ESCROW AGREEMENT

This **ESCROW AGREEMENT** (this "Agreement") dated as of March 15, 2016, is by and among **LIFE CARE ST. JOHNS, INC.**, a Florida not-for-profit corporation, d/b/a Seller ("Seller"), **LCS GLENMOOR, LLC**, an Iowa limited liability company ("Buyer"), and **TD BANK, N.A.**, as escrow agent ("Escrow Agent"). Buyer, Seller and Escrow Agent are sometimes referred to in this Agreement as a "Party" or collectively as the "Parties".

### WITNESSETH:

A.     Buyer and Seller have entered into a Stalking Horse Asset Purchase Agreement, dated as of March 21, 2016 (the "Purchase Agreement"). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

B.     Pursuant to the Purchase Agreement, Buyer will acquire substantially all of the assets of Seller relating to the operation of the Facilities.

C.     The Purchase Agreement provides for the payment of One Million, Three Hundred Seventy Five Thousand Dollars ($1,375,000) (the "Deposit") to Escrow Agent, which shall be held, administered and disbursed by Escrow Agent in accordance with the terms and conditions of this Agreement.   In the event of a discrepancy between the Purchase Agreement and this Agreement, this Agreement shall prevail.

D.     Escrow Agent is willing to accept the Deposit and to hold and distribute the same in accordance with the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the premises and the mutual agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     Establishment of Escrow Funds.  Pursuant to the terms of the Purchase Agreement, Buyer shall deposit with Escrow Agent, via wire transfer of funds pursuant to Escrow Agent's wiring instructions attached hereto as Exhibit A, the Deposit which represents a portion of the Purchase Price (as such term is defined in the Purchase Agreement) to be paid by Buyer to Seller under the Purchase Agreement (such sum is referred to hereinafter as the "Escrow Funds").  Buyer and Seller hereby designate and appoint the Escrow Agent as the Escrow Agent to receive, hold and disburse the Escrow Funds, and the Escrow Agent hereby accepts such appointment to receive, hold and disburse the Escrow Funds, upon the terms and subject to the conditions set forth in this Agreement. The Escrow Funds shall be held in escrow by Escrow Agent and administered and disbursed by Escrow Agent pursuant to the terms and conditions of this Agreement.

1

2.     Investment of Escrow Funds.

(a)     Escrow Agent shall invest any or all of the Escrow Funds, and any undistributed income or interest earned or accrued with respect thereto, upon receipt of written direction from Buyer and Seller, in any of the following: (i) obligations issued or guaranteed by the United States of America or any agency or instrumentality thereof; (ii) certificates of deposit (including money market certificates and similar instruments) of or accounts with national banks, holding companies of national banks or corporations endowed with trust powers having, in any case, capital and surplus in excess of One Hundred Million and No/100 Dollars ($100,000,000) at the time of investment; (iii) commercial paper at the time of investment rated A-1 by Standard & Poor's Corporation or Prime-1 by Moody's Investor's Service, Inc.; (iv) obligations issued by any state or municipality of the United States; and (v) the TDAM U.S. Treasury Money Market Fund.

(b)     In the absence of written investment instructions from Buyer and Seller, Escrow Agent shall hold the Escrow Funds uninvested.

(c)     The Escrow Agent shall have no liability for any loss sustained to the Escrow Funds by reason of any investment made in accordance with this Section 3 or for any failure to invest all or any part of the Escrow Funds.

3.     Claims against the Escrow Funds.

(a)     Distributions of the Escrow Funds.  At such time as Escrow Agent receives written notice from both Buyer and Seller, setting forth the identity of the Party to whom the Escrow Funds (or portions thereof) are to be disbursed and further setting forth the specific section of the Purchase Agreement pursuant to which the disbursement of the Escrow Funds (or portions thereof) is being requested, Escrow Agent shall disburse the Escrow Funds pursuant to such notice.

(b)     Seller and Buyer acknowledge that Escrow Agent is merely a stakeholder and has no interest in the Escrow Funds.  Notwithstanding the provisions of Section 3(a) above, in the event of a dispute between Buyer and Seller sufficient in the sole reasonable discretion of Escrow Agent to justify its doing so or in the event that Escrow Agent has not disbursed the Escrow Funds on or before September 1, 2016, Escrow Agent shall be entitled to tender into the registry or custody of any court of competent jurisdiction in Camden County, New Jersey, the Escrow Funds, together with such legal pleadings as it may deem appropriate, and thereupon be discharged from all further duties and liabilities under this Agreement. Any such legal action may be brought in such court as Escrow Agent shall determine to have jurisdiction thereof.

4.     Escrow Agent.

(a)     The Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature, and no other duties shall be implied.  The Escrow Agent shall neither be responsible for, nor

chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document to which the Parties are a party, in connection herewith, if any, nor shall the Escrow Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement.  For purposes of this Agreement, in the event of any conflict between the terms and provisions of this Agreement and any other agreement among the Parties, the terms and conditions of this Agreement shall control.  The Escrow Agent may rely upon and shall not be liable for reasonably acting or refraining from acting upon any written notice, document, instruction or request furnished to it hereunder and believed in good faith by it to be genuine and to have been signed or presented by the proper party or parties without inquiry and without requiring substantiating evidence of any kind.  The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.

(b)     The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that a final adjudication of a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to either Party.  In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the Parties which eliminates such ambiguity or uncertainty to the satisfaction of Escrow Agent or by a final and non-appealable order of the Bankruptcy Court.  The Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same.  In addition, the Escrow Agent may, in its sole discretion, petition (by means of an interpleader action or any other appropriate method) the Bankruptcy Court for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, all Escrow Funds, after deduction and payment to the Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by the Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(c)     The Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited or this Agreement, or to appear in, prosecute or defend any such legal action or proceeding.  The Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions

hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any Party, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the reasonable opinion or instruction of such counsel.

(d)     Whether or not any action or transaction authorized or contemplated hereby shall be undertaken or consummated, Seller and Buyer hereby agree to indemnify, protect, save and keep harmless the Escrow Agent and its respective successors, assigns, agents and servants, from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs, expenses and disbursements (including legal fees and attorneys' disbursements) of whatsoever kind and nature which may be imposed on, incurred by or asserted against the Escrow Agent at any time, by reason of or arising out of the execution and delivery of this Agreement, the establishment of the Escrow Account, the acceptance by the Escrow Agent of the funds herein described, the purchase, retention or disposition of investments made hereunder or the proceeds thereof, or any payment, transfer or other application of funds or securities by the Escrow Agent in accordance with the provisions of this Agreement; provided, however, that Seller and Buyer shall not be required to indemnify the Escrow Agent for any expense, loss, costs, disbursements, damages or liability resulting from its own gross negligence or willful misconduct.  The indemnities contained in this section shall survive the termination of this Agreement.

(e)     The Escrow Agent undertakes to perform all duties which are expressly set forth herein for a fee as described in Schedule 1, which shall be promptly paid in equal shares by Seller and Buyer.  The Escrow Agent shall also be entitled to reimbursement by the Company for all reasonable expenses, disbursements and advances actually incurred or made by the Escrow Agent in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ), exclusive of any such expense, disbursement or advance that may arise from its own gross negligence or willful misconduct.

5.     Successor Escrow Agent.   The Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect.  If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following receipt of the notice of resignation, the Escrow Agent may petition the Bankruptcy Court for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the Parties.   The Escrow Agent's sole responsibility after such thirty (30) day notice period expires shall be to hold the Escrow Funds (without any obligation to reinvest the same) and to deliver the same to a designated substitute escrow agent, if any, or in accordance with the directions of the Bankruptcy Court, at which time of delivery Escrow Agent's obligations hereunder shall cease and terminate.  The Escrow Agent shall have the right to make demand on Seller and Buyer for any amount due and owing to the Escrow Agent under this Agreement.

Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's corporate trust line of business may be transferred, shall be the Escrow Agent under this Agreement without further act.

      6.      Disclosures; TIN; Tax Reporting.

      (a)    *Patriot Act Disclosure*.    Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.  Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm Seller and Buyer's identity including without limitation name, address and organizational documents ("identifying information").  Seller and Buyer agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

      (b)    *Taxpayer Identification Numbers ("TIN")*.  Seller and Buyer shall provide the Escrow Agent with their respective fully executed Internal Revenue Service ("IRS") Form W-8, or W-9 and/or other reasonably required documentation.  Each of Seller and Buyer represents to the Escrow Agent that its correct TIN assigned by the IRS, or any other taxing authority, is set forth in the forms delivered to Escrow Agent.

      (c)    *Tax Reporting*.  All interest or other income earned under this Agreement shall be allocated to Buyer and reported, as and to the extent required by law, by the Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 10425 (or other appropriate form) as income earned from the Escrow Funds by Buyer whether or not said income has been distributed during such year.  Seller and Buyer acknowledge and agree that Escrow Agent shall have no responsibility for the preparation and/or filing of any income, franchise or any other tax return with respect to the Escrow Funds.  The Parties further acknowledge and agree that any taxes payable from the income earned on the investment of any sums held in the Escrow Funds shall be paid by Buyer.  In the absence of written direction as provided herein, all proceeds of the Escrow Funds shall be retained in the Escrow Funds and reinvested from time to time by the Escrow Agent as provided in this Agreement. Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to the required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

      7.      Termination of Agreement.  This Agreement (other than Section 3(c)) shall terminate upon the distribution of the Escrow Funds as provided by the terms of this Agreement, unless sooner terminated by written agreement of Seller, Buyer and Escrow

Agent.  Upon distribution of the Escrow Funds in accordance with this Agreement, Escrow Agent shall be released of all liability and responsibility under this Agreement.

        8.    <u>Miscellaneous</u>.

        (a)    *Waiver*.  A waiver of any of the provisions of this Agreement shall not constitute and shall not be deemed a waiver of any other provision of this Agreement, whether or not similar, nor shall such waiver constitute a continuing waiver unless otherwise expressly provided in writing. Except as otherwise provided in this Agreement, any failure of the Parties to comply with any obligation, representation, warranty, covenant, agreement, or condition herein may be waived by the Party entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver.

        (d)    *Entire Agreement; Amendment*.  This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions of the Parties, whether oral or written.

        (e)    *Amendment and Termination*.  This Agreement may be amended only by the express written consent of the Parties, which consent on the part of the Escrow Agent shall not be unreasonably withheld or delayed if the duties or responsibilities of the Escrow Agent are not increased by such amendment.

        (d)    <u>*Notices*</u>.   All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered if by hand or overnight courier, (ii) three days after depositing for mailing by first-class registered mail, return receipt requested, postage prepaid, or (iii) when e-mailed, provided that, concurrently therewith, a copy is delivered by one of the methods identified in (i) or (ii) to the Parties at the following addresses (or to such other address as a Party, may have specified by notice given to the other Parties pursuant to this provision):

| | |
|---|---|
| If to Seller: | D.  Bruce Jones, CEO |
| | Life Care St. Johns, Inc. |
| | 1000 Vicar's Landing Way |
| | Ponte Vedra Beach, Florida 32082 |
| | Email: bjones@vicarslanding.com |
| | |
| With copy to: | Richard R.  Thames, Esq. |
| | Charles H. Keller, Esq. |
| | Thames Markey & Heekin, P.A. |
| | 50 North Laura Street, Suite 1600 |
| | Jacksonville, Florida 32202 |
| | Email: rrt@tmhlaw.net, chk@tmhlaw.net |

| | |
|---|---|
| If to Buyer: | Tom Mathisen<br>Capital Square<br>400 Locust Street, Suite 820<br>Des Moines, IA 50309<br>Email: mathisentom@lcsnet.com |
| | HCP, Inc.<br>1920 Main Street, Suite 1200<br>Irvine, CA 92614<br>Attention:  Kendall Young<br>Email:  kyoung@HCPI.COM |
| With copy to: | Faegre Baker Daniels LLP<br>311 S. Wacker Drive, Suite 4300<br>Chicago, IL 60606<br>Attention: George R. Mesires<br>Email: george.mesires@faegrebd.com |
| and to: | Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, NY 10036<br>Attention:  Evan R. Levy, Esq.<br>Email: evan.levy@skadden.com |
| If to Escrow Agent: | TD Bank, N.A.<br>1006 Astoria Blvd.<br>Cherry Hill, NJ 08034<br>Attention: Stephen R. Schaaf, Vice President<br>Email: Stephen.Schaaf@TD.com |

Attorneys for any of the Parties may send notices on behalf of their clients.

(e)    *Headings*.  The headings in this Agreement are for reference purposes and shall not affect the meaning or interpretation of this Agreement.

(f)    *Applicable Law; Consent to Jurisdiction*.  This Agreement shall be governed by and construed in accordance with the laws of the Florida.  The Bankruptcy Court shall have exclusive jurisdiction over the interpretation and enforcement of this Agreement.  The Parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement.

(g)    *Severability*.  If any term or provision of this Agreement or the application thereof to any entity or person or circumstance is or to any extent shall become invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to entities, persons, or circumstances other than those held invalid or unenforceable under the laws now or hereafter in effect in the jurisdiction governing

7

this Agreement, shall not be affected thereby, and each term and provision shall be held valid and enforceable to the greatest possible extent.

(h)    *Counterparts*.  This Agreement may be executed in one or more counterparts.  Each such counterpart, when executed and delivered, shall be an original, but all such counterparts together shall constitute a single document.  Signature and acknowledgement pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.  Executed signature pages may be delivered by facsimile or pdf email and, when so delivered, shall have the same force and effect as an original.

(i)    *Construction*.  The Parties and their respective legal counsel actively participated in the negotiation and drafting of this Agreement, and in the event of any ambiguity or mistake herein, or any dispute among the Parties with respect to the provisions hereof, no provision of this Agreement shall be construed unfavorably against any of the Parties on the ground that he, it, or his or its counsel was the drafter thereof.

(j)    *Time of Essence*.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

[SIGNATURES BEGIN ON NEXT PAGE]

The Parties hereto have executed this Escrow Agreement effective as of the date first written above.

"SELLER"

**LIFE CARE ST.  JOHNS, INC.**

By: _____
Name: D.  Bruce Jones
Its: Chief Executive Officer

"BUYER"

**LCS GLENMOOR, LLC**

By: _____
Name: _____
Its: _____

"ESCROW AGENT"

**TD BANK, N.A.**

By: _____
Name:  Stephen R. Schaaf
Its: Vice President

**EXHIBIT "A"**

**<u>WIRING INSTRUCTIONS</u>**

TD Bank, N.A.
Cherry Hill, NJ
ABA #:011600033
F/C: Trustee Clearing Account
A/C #: 0060157930
Attention: Stephen R. Schaaf, Vice President

**SCHEDULE 1**

**ESCROW AGENT FEES**

$3,000 per annum

# EXHIBIT E

**Form of Bill of Sale**

[Exhibit begins on next page.]

## BILL OF SALE

This **BILL OF SALE** (this "Bill of Sale"), dated as of [_____], 2016, is by and between **LIFE CARE ST. JOHNS, INC.**, doing business as Glenmoor, a Florida not-for-profit corporation (the "Seller") and **LCS GLENMOOR, LLC**, an Iowa limited liability company ("Buyer"). Capitalized terms used, and not otherwise defined, in this Bill of Sale have the meanings given to them in that certain Asset Purchase Agreement, dated March 21, 2016, by and between Seller and Buyer (the "Purchase Agreement").

## AGREEMENT

1. Subject to the terms and conditions of the Purchase Agreement, Seller, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby sells, transfers and delivers to Buyer, Seller's interest, right and title in and to the Purchased Assets, free and clear of any and all Liens and encumbrances, other than Permitted Exceptions.

2. This Bill of Sale is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement. This Bill of Sale is made without representation and warranty except as provided in or pursuant to the Purchase Agreement. This Bill of Sale is in all respects subject to the provisions of the Purchase Agreement and is not intended in any way to supersede, limit or qualify any provision of the Purchase Agreement.

3. This Bill of Sale shall be governed by the internal substantive laws of the State of Florida. All of the conditions, provisions, and terms contained in this Bill of Sale shall be binding upon, and shall inure to the benefit of, each of the parties and their respective assigns and successors.

[The remainder of this page has been left blank intentionally.]

**IN WITNESS WHEREOF**, the Parties have executed this Bill of Sale as of the date first written above.

**LIFE CARE ST. JOHNS, INC.**

By:_____

Name:_____

Title:_____

## **EXHIBIT F**

## **Form of Assignment and Assumption Agreement**

[Exhibit begins on next page.]

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This **ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Agreement"), dated as of [_____], 2016, is by and between **LIFE CARE ST. JOHNS, INC.**, doing business as Glenmoor, a Florida not-for-profit corporation ("Assignor"), and **LCS GLENMOOR, LLC**, an Iowa limited liability company ("Assignee"). Capitalized terms used, and not otherwise defined, in this Agreement have the meanings given to them in that certain Asset Purchase Agreement, dated March 21, 2015, by and between Assignor and Assignee (the "Purchase Agreement"). Assignor and Assignee may individually be referred to as a "Party" and collectively as the "Parties."

## PREAMBLE

Assignor desires to assign, convey and transfer to Assignee, and Assignee desires to acquire, assume and receive from Assignor, all of Assignor's interest, right and title in and to, and duties and obligations under, all of the Assumed Liabilities pursuant to the conditions, provisions and terms contained in this Agreement and the Purchase Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual agreements, covenants, representations and warranties contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Assignment and Assumption.  Assignor hereby (a) assigns, conveys and transfers to Assignee, all of Assignor's interest, right and title in and to each of the Assumed Liabilities, and (b) delegates to Assignee, all of Assignor's duties and obligations under each of the Assumed Liabilities, all on the conditions, provisions and terms contained in this Agreement and the Purchase Agreement. Assignee hereby (a) accepts the assignment, conveyance and transfer of all of Assignor's interest, right and title in and to each of the Assumed Liabilities, and (b) agrees and covenants to assume, be bound by, discharge, pay and perform all of Assignor's duties and obligations under each of the Assumed Liabilities, all on the conditions, provisions and terms contained in this Agreement and the Purchase Agreement.

2.      Mutual Representations and Warranties.  Each Party represents and warrants to the other Party, as to itself that:

(a)      It has the absolute and full legal right, capacity and power to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions contemplated hereby; and

(b)      This Agreement (i) has been, or upon the execution and delivery hereof will be, duly and validly executed and delivered by such Party, and (ii) constitutes, or upon execution and delivery hereof will constitute, a binding and valid obligation of such Party, enforceable against such Party in accordance with the conditions, provisions and terms contained herein, subject to applicable bankruptcy, fraudulent conveyance, insolvency, moratorium, reorganization and similar Laws affecting creditors' remedies and rights generally, and, as to enforceability, to general principles of equity.

3.      Reference to Purchase Agreement.  Nothing contained in this Agreement will in any way supersede, modify, amend, waive or otherwise affect any of the provisions set forth in the Purchase Agreement, including without limitation, any of the representations, warranties, covenants and agreements set forth therein, this Agreement being intended only to give effect to the sale, conveyance,

transfer, assignment and delivery by Assignor to Assignee (as an assignee pursuant to the Purchase Agreement) of the assets identified herein pursuant to the Purchase Agreement.

4.    <u>Miscellaneous</u>.  This Agreement shall be governed by the internal substantive laws of the State of Florida.  All of the conditions, provisions and terms contained in this Agreement shall be binding upon, and shall inure to the benefit of, each of the Parties and their respective assigns and successors. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto, and all third party rights are expressly negated.   No amendment or modification of this Agreement shall be valid unless the amendment or modification is in writing and signed by the party against whom such amendment or modification is to be enforced.

[The remainder of this page has been left blank intentionally.]

**IN WITNESS WHEREOF**, the Parties have executed this Assignment and Assumption Agreement as of the date first written above.

**LIFE CARE ST. JOHNS, INC.**

By:_____
Name:_____
Title:_____


_____


By:_____
Name:_____
Title:_____

Signature Page to Assignment and Assumption Agreement

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This **ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Agreement"), dated as of [_____], 2016, is by and between **LIFE CARE ST. JOHNS, INC.**, doing business as Glenmoor, a Florida not-for-profit corporation ("Assignor"), and **LCS GLENMOOR, LLC**, an Iowa limited liability company ("Assignee"). Capitalized terms used, and not otherwise defined, in this Agreement have the meanings given to them in that certain Asset Purchase Agreement, dated March 21, 2016, by and between Assignor and Assignee (the "Purchase Agreement"). Assignor and Assignee may individually be referred to as a "Party" and collectively as the "Parties."

### PREAMBLE

Assignor desires to assign, convey and transfer to Assignee, and Assignee desires to acquire, assume and receive from Assignor, all of Assignor's interest, right and title in and to, and duties and obligations under, all of the Transferred Contracts pursuant to the conditions, provisions and terms contained in this Agreement and the Purchase Agreement.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual agreements, covenants, representations and warranties contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Assignment and Assumption.  Assignor hereby (a) assigns, conveys and transfers to Assignee, all of Assignor's interest, right and title in and to each of the Transferred Contracts and any ancillary or related agreements pursuant to Section 7.9 of the Purchase Agreement, and (b) delegates to Assignee, all of Assignor's duties and obligations under each of the Transferred Contract, all on the conditions, provisions and terms contained in this Agreement and the Purchase Agreement.  Assignee hereby (a) accepts the assignment, conveyance and transfer of all of Assignor's interest, right and title in and to each of the Transferred Contracts and any ancillary or related agreements pursuant to Section 7.9 of the Purchase Agreement, and (b) agrees and covenants to assume, be bound by, discharge, pay and perform all of Assignor's duties and obligations under each of the Transferred Contracts, all on the conditions, provisions and terms contained in this Agreement and the Purchase Agreement.

2.      Mutual Representations and Warranties.  Each Party represents and warrants to the other Party, as to itself that:

        (a)      It has the absolute and full legal right, capacity and power to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions contemplated hereby; and

        (b)      This Agreement (i) has been, or upon the execution and delivery hereof will be, duly and validly executed and delivered by such Party, and (ii) constitutes, or upon execution and delivery hereof will constitute, a binding and valid obligation of such Party, enforceable against such Party in accordance with the conditions, provisions and terms contained herein, subject to applicable bankruptcy, fraudulent conveyance, insolvency, moratorium, reorganization and similar Laws affecting creditors' remedies and rights generally, and, as to enforceability, to general principles of equity.

3.      Reference to Purchase Agreement.  Nothing contained in this Agreement will in any way supersede, modify, amend, waive or otherwise affect any of the provisions set forth in the Purchase Agreement, including without limitation, any of the representations, warranties, covenants and

agreements set forth therein, this Agreement being intended only to give effect to the sale, conveyance, transfer, assignment and delivery by Assignor to Assignee (as an assignee pursuant to the Purchase Agreement) of the assets identified herein pursuant to the Purchase Agreement.

4.    <u>Miscellaneous</u>.  This Agreement shall be governed by the internal substantive laws of the State of Florida.  All of the conditions, provisions and terms contained in this Agreement shall be binding upon, and shall inure to the benefit of, each of the Parties and their respective assigns and successors. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto, and all third party rights are expressly negated.  No amendment or modification of this Agreement shall be valid unless the amendment or modification is in writing and signed by the party against whom such amendment or modification is to be enforced.

[The remainder of this page has been left blank intentionally.]

**IN WITNESS WHEREOF**, the Parties have executed this Assignment and Assumption Agreement as of the date first written above.

**LIFE CARE ST. JOHNS, INC.**

By:_____

Name:_____

Title:_____


_____


By:_____

Name:_____

Title:_____

## EXHIBIT G

**Conditions to Title**

## Permitted Exceptions

[Exhibit begins on next page.]

## EXHIBIT G

## Permitted Exceptions

1.      Covenants, Conditions and Restrictions as set forth in Special Warranty Deed  recorded in Official Records Book 1468, page 1380; provided however, under Item 5, Use and Density Restrictions, with reference to Section 5.5 the subject property is not affected by the Declaration of Covenants, Easements and Restrictions, World Golf Village Golf Course and Hall of Fame as referenced therein, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

2.      Saint Johns DRI Development Order approved under St. Johns County, Florida Resolution No. 91130, as modified by Modification of Saint Johns DRI Development Order under Resolution No. 91183, as noticed under Notification of DRI Development Order recorded in Official Records Book 922, Page 219, as further modified by Modification of Saint Johns DRI Development Order under Resolution No. 94-211, Resolution No. 95-06, Resolution 96-102 and Resolution No. 96-233, as noticed under Notification of DRI/Development Order recorded in Official Records Book 1091, page 1119, and Notification of DRI/Development Order recorded in Official Records Book 1217, page 437, and as further modified by Modification of Saint Johns DRI Development Order under Resolution 98-126, as noticed under Notification of DRI/Development Order recorded in Official Records Book 1338, page 205; modified by Modification of Saint Johns Development of Regional Impact Development Order on September 28, 1998, under Resolution 98-179 as noticed under Notice of DRI/Development Order Modification recorded in Official Records Book 1354, page 1883, and as further modified by Modification of Saint Johns DRI\Development Order Modification under Resolution 99-20, and noticed under Notice of DRI\Development Order Modification recorded in Official Records Book 1388, page 1323, and as further modified by Modification of Saint Johns DRI/Development Order Modification under Resolution 99-173, and noticed under Notice of DRI/Development Order Modification recorded in Official Records Book 1459, page 983, as further modified by Modification of Saint Johns Development of Regional Impact Development Order on March 26, 2002, as noticed under Notice of DRI/Development Order Modification recorded in Official Records Book 1746, page 1893, noticed under Notice of DRI/Development Order Modification recorded in Official Records Book 1989, page 1917, and Notice of DRI/ Development Order Modification recorded July 1, 204 in Official Records Book 2233 page 424, and further notices of modification under Resolution 2006-290 recorded in Book 2803, page 1362, and Resolution No. 2011-335, recorded in Book 3505, page 607.

3.      Water and Wastewater Utility Service Agreement, Between Northwest Utilities I, Inc., SJH Partnership, Ltd. and St. Johns County, Florida dated January 24, 1995, as recorded in Official Records Book 1094, Page 332, together with Partial Assignment and Assumption of Saint Johns Water and Wastewater Utility Service Agreement between IT LAND ASSOCIATES, LLC, a Florida limited liability company and LEVITT AND SONS AT WORLD GOLF VILLAGE, LLC, a Florida limited liability company, as recorded August 10, 2004, in Official Records Book 2259, page 524.

4.     Declaration of Covenants, Conditions, Restrictions and Easements for Saint Johns Northwest Master, which contains provisions for a private charge or assessments, recorded in Book 1185, page 595, supplemented in Book 1373, page 627 and Book 3091, page 1467, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

5.     Declaration of Covenants, Conditions, Restrictions and Easements, for Saint Johns - Northwest Commercial which contains provisions for a private charge or assessments, recorded in Book 1185, page 645, Notice of Relocation recorded in Official Records Book 1198, page 866, together with Supplementary Declaration recorded in Official Records Book 1198, page 948, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c). **NOTE:** affects only that portion of the lands described on Schedule A underlying the right of way easements for Royal Pines Park Way and North Parcel 11A access easement.

6.     Declaration of Covenants, Conditions, Restrictions and Easements, Saint Johns Northwest Residential, which contains provisions for a private charge or assessments, recorded in Book 1185, page 740; First Amendment recorded in Official Records Book 1198, page 872, Supplemental Declaration recorded in Official Records Book 1198, page 890; Supplementary Declaration recorded in Official Records Book 1230, page 1358; Supplementary Declaration recorded in Official Records Book 1252, page 1479, Supplementary Declaration recorded in Official Records Book 1279, page 286; and Supplementary Declaration recorded in Official Records Book 1314, page 1544, partial assignment in Official Records Book 1316, page 1274, and further supplemented in Official Records Book 1373, page 630, as corrected by Corrective Supplement recorded in Official Records Book 1460, page 263, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

7.     Memorandum Of Declaration Of Voluntary Payment Obligations recorded in Official Records Book 1185, page 1831.

8.     Impact Fee Credit Agreements (Park Impact Fees) recorded in Official Records Book 1278, page 1584.

9.     Impact Fee Credit Agreement (Road Impact Fees) as contained in the instrument, recorded November 24, 1997 in Official Records Book 1278, page 1596; Addendum To Road Impact Fee Credit Agreement recorded in Official Records Book 1391, page 590, Addendum To Road Impact Fee Credit Agreement recorded in Official Records Book 1391, page 1826 and Addendum To Road Impact Fee Credit Agreement recorded in Official Records Book 1563, page 800, AND addendum to Road Impact Fee Credit Agreement recorded in Official Records Book 2107 page 1420, Official Records Book 2709, page 868, Official Records Book 3258, page 444, and Official Records Book 3327, page 865.

10.     Terms Conditions set forth in Access Easement to Life Care St. Johns, Inc. recorded in Book 1468, Page 1409.

11.     Assignment of Development Rights for the benefit of Life Care St. Johns, Inc. recorded in Book 1468, Page 1418.

12.     Grant of Easement to Comcast of Greater Florida/Georgia, Inc. recorded in Book 3125, Page 1125.

13.     Easement granted to Florida Power & Light Company by instrument recorded in Book 3008, page 1666.

14.     Concurrent rights of others to use the easement described in Exhibit B hereof.

## SCHEDULE 1.1

**Entrance Fees Pursuant to Residency Contracts**

**Promissory Notes as of January 31, 2016**

| | |
|---|---|
| AKEL, MICHAEL | $286,650 |
| CHISOLM, COLIN | $197,950 |
| DONOR, MARY | $250,275 |
| HUMPHREY, JOAN | $218,000 |
| RAMUNDO, ONEIDA | $181,875 |
| SMITH, EARNEST | $280,250 |
| WHITE, GERALD | $355,250 |
| **TOTAL** | **$1,770,250** |

[Schedule 1.1 continues on the next page.]

Report: STANDARD, BY NAME [S]  Filter: CURRENT CENSUS
File: GLMO1_2015Glenmoor_at_St._Johns  Date: FEBRUARY 3, 2016

| Resident Name | ResidentID | Entry Cont | Gen | Entry Date | Birthdate | Entry Unit Type | Entry Unit | Entry Cont Type | EntryCont TotEntFees |
|---|---|---|---|---|---|---|---|---|---|
| ADAMSON, DOLORES | 9141 | ADAMSON(DOLORES) 914 | F | 12/19/2012 | 09/16/1929 | 2 Br Traditional | 2208 | 35 75% Ref (Type A) | 302,500 |
| AITKEN, BARBARA | 9153 | AITKEN(BARBARA&CHARL | F | 08/29/2014 | 12/22/1930 | 2 Br Traditional | 2208 | 124 New Trad. (Type | 235,000 |
| AITKEN, CHARLES | 91531 | AITKEN(BARBARA&CHARL | M | 08/29/2014 | 08/16/1930 | 2 Br Traditional | 2208 | 124 New Trad. (Type | 235,000 |
| ALLEN, CAROLYN | 22230 | ALLEN (CAROLYN + WIN | F | 06/22/2009 | 01/06/1937 | 3 Br Grande | 1106 | 31 Trad. (Type A) be | 307,100 |
| ALLEN, MARK | 91631 | ALLEN(RITA&MARK) 916 | M | 04/30/2015 | 06/20/1927 | Berkshire Terrace | 701 | 126 New Trad. (Type | 376,700 |
| ALLEN, RITA | 9163 | ALLEN(RITA&MARK) 916 | F | 04/30/2015 | 06/10/1934 | Berkshire Terrace | 701 | 126 New Trad. (Type | 376,700 |
| ALLEN, WINSTON | 22231 | ALLEN (CAROLYN + WIN | M | 11/01/2010 | 04/13/1929 | 3 Br Grande | 1106 | 31 Trad. (Type A) be | 307,100 |
| BAILEY, JAMES | 546 | BAILEY (JAMES+DORIS) | M | 06/30/2004 | 09/10/1924 | 2 Br Patio Home | 640 | 11 90% Ref Plan Full | 430,250 |
| BAKER, MARILYN | 1016 | BAKER(MARILYN& WILLI | F | 12/31/2010 | 10/12/1934 | 2 Br Traditional | 1202 | 31 Trad. (Type A) be | 203,400 |
| BAKER, WILLIAM | 1017 | BAKER(MARILYN& WILLI | M | 12/31/2010 | 10/07/1930 | 2 Br Traditional | 1202 | 31 Trad. (Type A) be | 203,400 |
| BARRUS, DON | 190 | BARRUS (DON+MARY) 28 | M | 11/29/2005 | 10/30/1924 | Balmora Cottage | 516 | 11 90% Ref Plan Full | 287,700 |
| BARRUS, MARY | 191 | BARRUS (DON+MARY) 28 | F | 11/29/2005 | 10/21/1927 | Balmora Cottage | 516 | 11 90% Ref Plan Full | 287,700 |
| BASH, JEAN | 9047 | BASH (WALLACE E+JEAN | F | 07/09/2001 | 12/18/1917 | Grande Estate Home | 400 | 11 90% Ref Plan Full | 449,400 |
| BASH, WALLACE E | 47 | BASH (WALLACE E+JEAN | M | 07/09/2001 | 07/26/1917 | Grande Estate Home | 400 | 11 90% Ref Plan Full | 449,400 |
| BENEDETTO, JOAN | 7121 | BENEDETTO (JOAN + MI | F | 12/31/2009 | 11/19/1931 | Berkshire Terrace | 712 | 31 Trad. (Type A) be | 344,700 |
| BENEDETTO, MIKE | 71214 | BENEDETTO (JOAN + MI | M | 12/31/2009 | 09/01/1928 | Berkshire Terrace | 712 | 31 Trad. (Type A) be | 344,700 |
| BENNER, RAYMOND | 5042 | BENNER (ALICE+ RAYMO | M | 12/30/2009 | 04/09/1941 | Balmora Cottage | 504 | 35 75% Ref (Type A) | 350,000 |
| BOLONKIN, IDA | 9124 | BOLONKIN(IDA) 9124 | F | 12/28/2011 | 12/16/1922 | 2 Br Classic | 2311 | 35 75% Ref (Type A) | 298,500 |
| BRINSFIELD, CARROLL | 72 | BRINSFIELD (DEBBIE+C | M | 08/02/2001 | 05/31/1938 | 3 Br Patio Home | 605 | 10 Trad. Plan Full S | 265,900 |
| BRINSFIELD, DEBBIE | 9072 | BRINSFIELD (DEBBIE+C | F | 08/02/2001 | 04/21/1949 | 3 Br Patio Home | 605 | 10 Trad. Plan Full S | 265,900 |
| BROWN, NELSON | 91671 | BROWN(PAULA/NELSON) | M | 06/30/2015 | 07/04/1943 | Grande Estate Home | 420 | 124 New Trad. (Type | 395,900 |
| BROWN, PAULA | 9167 | BROWN(PAULA/NELSON) | F | 06/30/2015 | 01/08/1949 | Grande Estate Home | 420 | 124 New Trad. (Type | 395,900 |
| BROWN, ROBERT | 6612 | BROWN (JANE+ ROBERT) | M | 12/30/2009 | 01/09/1925 | Classic Estate Home | 400 | 31 Trad. (Type A) be | 369,500 |
| BRUCE, NORA | 131 | BRUCE (W.R.+NORA) 13 | F | 05/12/2005 | 07/14/1924 | Balmora Cottage | 512 | 11 90% Ref Plan Full | 295,000 |
| BRUCE, W.R. | 130 | BRUCE (W.R.+NORA) 13 | M | 05/12/2005 | 04/19/1922 | Balmora Cottage | 512 | 11 90% Ref Plan Full | 295,000 |
| BUCK, BARBARA | 124 | BUCK (PHILIP+BARBARA | F | 06/23/2005 | 02/12/1927 | Grande Estate Home | 604 | 14 75% Ref Plan Full | 513,300 |
| BUCK, PHILIP | 123 | BUCK (PHILIP+BARBARA | M | 06/23/2005 | 07/19/1929 | Grande Estate Home | 604 | 14 75% Ref Plan Full | 513,300 |
| BURNS, VIRGIL | 554 | BURNS (VIRGIL+DOROTH | M | 09/30/2004 | 08/03/1923 | Balmora Cottage | 504 | 11 90% Ref Plan Full | 295,000 |
| CANADA, PATTI | 9128 | CANADA(PATTI) 9128 | F | 06/11/2012 | 05/09/1933 | 2 Br Classic | 1305 | 31 Trad. (Type A) be | 250,000 |
| CARPENTER, JANES | 370 | CARPENTER (JANES+DIA | M | 03/31/2003 | 02/22/1934 | Grande Estate Home | 309 | 11 90% Ref Plan Full | 240,149 |
| CASON, DONALD | 7280 | CASON (DONALD + JOAN | M | 03/31/2008 | 11/15/1922 | Berkshire Terrace | 728 | 35 75% Ref (Type A) | 410,000 |
| CASON, JOAN | 728 | CASON (DONALD + JOAN | F | 03/31/2008 | 04/16/1927 | Berkshire Terrace | 728 | 35 75% Ref (Type A) | 410,000 |
| CELANO, DOROTHY | 9164 | CELANO(DOROTHY) 9164 | F | 04/08/2015 | 11/07/1924 | 1 Br Deluxe | 4109 | 99 Rental | 0 |
| CHALMERS, DAVID | 499 | CHALMERS (DAVID+KATH | M | 03/31/2003 | 10/06/1920 | 2 Br Traditional | 3104 | 11 90% Ref Plan Full | 268,922 |
| CHALMERS, KATHARINE | 4990 | CHALMERS (DAVID+KATH | F | 03/31/2003 | 06/09/1912 | 2 Br Traditional | 3104 | 11 90% Ref Plan Full | 268,922 |
| CHISOLM, COLIN | 91601 | CHISOLM(ELIZABETH & | M | 01/16/2015 | 08/12/1934 | Grande Estate Home | 400 | 124 New Trad. (Type | 395,900 |
| CHISOLM, ELIZABETH | 9160 | CHISOLM(ELIZABETH & | F | 01/16/2015 | 03/01/1938 | Grande Estate Home | 400 | 124 New Trad. (Type | 395,900 |
| COBB, SAMUEL | 9146 | COBB(SAMUEL) 9146 | M | 07/31/2013 | 05/31/1930 | 2 Br Classic | 1305 | 25 50% Ref Unbund (T | 295,380 |
| COLBURN, E. PARKER | 706 | COLBURN (E. PARKER+M | M | 10/05/2006 | 03/31/1920 | 3 Br Grande | 3206 | 30 Trad. after 2005 | 278,200 |
| COLBURN, MIRIAM | 707 | COLBURN (E. PARKER+M | F | 10/05/2006 | 10/15/1920 | 3 Br Grande | 3206 | 30 Trad. after 2005 | 278,200 |
| COLEMAN, CAROLYN | 9118 | COLEMAN (ROBERT + CA | F | 08/22/2011 | 01/20/1933 | Berkshire Terrace | 716 | 24 Trad Unbund (Type | 254,200 |
| COLEMAN, ROBERT | 91181 | COLEMAN (ROBERT + CA | M | 08/22/2011 | 09/26/1943 | Berkshire Terrace | 716 | 24 Trad Unbund (Type | 254,200 |
| COOK, EDWARD | 91091 | COOK(JACKIE+EDWARD) | M | 03/28/2011 | 05/07/1924 | 1 Br Deluxe | 3103 | 31 Trad. (Type A) be | 148,800 |
| COOK, JACKIE | 9109 | COOK(JACKIE+EDWARD) | F | 03/28/2011 | 07/10/1933 | 1 Br Deluxe | 3103 | 31 Trad. (Type A) be | 148,800 |
| CRENIER, ALEXANDRA | 309 | CRENIER (PETER+ALEXA | F | 06/06/2006 | 07/23/1934 | 2 Br Patio Home | 636 | 11 90% Ref Plan Full | 471,100 |
| CRENIER, PETER | 308 | CRENIER (PETER+ALEXA | M | 06/06/2006 | 09/03/1931 | 2 Br Patio Home | 636 | 11 90% Ref Plan Full | 471,100 |
| CROSBY, SERENA | 128 | CROSBY (SERENA) 128 | F | 05/15/2005 | 07/09/1925 | 3 Br Patio Home | 608 | 11 90% Ref Plan Full | 467,030 |
| CRUM, HOWARD | 91341 | CRUM(JANET + HOWARD) | M | 09/20/2012 | 05/12/1931 | 2 Br Classic | 3205 | 35 75% Ref (Type A) | 348,700 |
| CRUM, JANET | 9134 | CRUM(JANET + HOWARD) | F | 09/20/2012 | 09/11/1932 | 2 Br Classic | 3205 | 35 75% Ref (Type A) | 348,700 |
| DE BAUERNFEIND, JOSE | 13 | DE BAUERNFEIND (JOSE | M | 07/13/2001 | 11/07/1916 | 2 Br Classic | 4311 | 11 90% Ref Plan Full | 266,855 |
| DE BAUERNFEIND, MARJ | 9013 | DE BAUERNFEIND (JOSE | F | 07/13/2001 | 06/11/1921 | 2 Br Classic | 4311 | 11 90% Ref Plan Full | 266,855 |
| DE POLO, MARIO | 528 | DE POLO (MARIO+ANNE) | M | 02/10/2004 | 12/08/1918 | 2 Br Patio Home | 616 | 11 90% Ref Plan Full | 382,994 |
| DEEM, PATRICIA | 324 | DEEM (PATRICIA & WIL | F | 08/01/2008 | 07/02/1928 | Grande Estate Home | 324 | 35 75% Ref (Type A) | 224,420 |

Report: STANDARD, BY NAME [S]  Filter: CURRENT CENSUS
File: GLM01_2015Glenmoor_at_St._Johns  Date: FEBRUARY 3, 2016

| Resident Name | ResidentID | Entry Cont | Gen | Entry Date | Birthdate | Entry Unit Type | Entry Unit | Entry Cont Type | EntryCont TotEntFees |
|---|---|---|---|---|---|---|---|---|---|
| DEEM, WILLIAM | 3242 | DEEM (PATRICIA & WIL | M | 08/01/2008 | 10/02/1927 | Grande Estate Home | 324 | 35 75% Ref (Type A) | 224,420 |
| DOBBINS, FAY | 1931 | DOBBINS (FAY) 1931 | F | 09/25/2012 | 08/27/1935 | 2 Br Classic | 3105 | 35 75% Ref (Type A) | 328,300 |
| DUDZIAK, EMILY | 188 | DUDZIAK (LEONARD+EMI | F | 10/31/2005 | 05/01/1922 | Grande Estate Home | 304 | 14 75% Ref Plan Full | 503,800 |
| DUNDORE, HARRY | 91261 | DUNDORE(LESLIE+HARRY | M | 05/21/2012 | 06/25/1935 | 2 Br Patio Home | 632 | 31 Trad. (Type A) be | 348,700 |
| DUNDORE, LESLIE | 9126 | DUNDORE(LESLIE+HARRY | F | 05/21/2012 | 06/15/1936 | 2 Br Patio Home | 632 | 31 Trad. (Type A) be | 348,700 |
| EDSON, DELORES | 9168 | EDSON(DELORES/JAMES) | F | 07/09/2015 | 12/21/1933 | Grande Estate Home | 665 | 124 New Trad. (Type | 355,900 |
| EDSON, JAMES | 91681 | EDSON(DELORES/JAMES) | M | 07/09/2015 | 03/08/1930 | Grande Estate Home | 665 | 124 New Trad. (Type | 355,900 |
| EVANS, ANITA | 1006 | EVANS (ANITA + DOUGL | F | 05/20/2010 | 06/27/1933 | 2 Br Patio Home | 640 | 31 Trad. (Type A) be | 311,960 |
| EVANS, DOUGLAS | 1005 | EVANS (ANITA + DOUGL | M | 05/01/2010 | 03/08/1932 | 2 Br Patio Home | 640 | 31 Trad. (Type A) be | 311,960 |
| FINN, JOHN | 14001 | FINN(MARIANNE&JOHN) | M | 03/26/2014 | 03/24/1939 | Classic Estate Home | 301 | 126 New Trad. (Type | 442,000 |
| FINN, MARIANNE | 14002 | FINN(MARIANNE&JOHN) | F | 03/26/2014 | 12/18/1938 | Classic Estate Home | 301 | 126 New Trad. (Type | 442,000 |
| FORD, BONNIE | 9108 | FORD(BONNIE) 9108 | F | 03/04/2011 | 05/11/1937 | 2 Br w/Den | 1301 | 31 Trad. (Type A) be | 218,100 |
| FREDERICK, KAY | 315 | FREDERICK (PAUL+KAY) | F | 08/14/2006 | 06/22/1918 | 2 Br w/Den | 2107 | 30 Trad. after 2005 | 263,200 |
| FREDERICK, PAUL | 314 | FREDERICK (PAUL+KAY) | M | 08/14/2006 | 12/31/1917 | 2 Br w/Den | 2107 | 30 Trad. after 2005 | 263,200 |
| FUREY, CLEMENT | 1008 | FUREY(MARTHA + CLEME | M | 12/01/2010 | 07/24/1922 | 2 Br w/Den | 3301 | 35 75% Ref (Type A) | 321,200 |
| FUREY, MARTHA | 1007 | FUREY(MARTHA + CLEME | F | 12/01/2010 | 03/11/1926 | 2 Br w/Den | 3301 | 35 75% Ref (Type A) | 321,200 |
| GALBIATI, JANE | 305 | GALBIATI (LOUIS+JANE | F | 04/10/2006 | 03/31/1929 | 2 Br Patio Home | 620 | 11 90% Ref Plan Full | 471,100 |
| GALBIATI, LOUIS | 304 | GALBIATI (LOUIS+JANE | M | 04/10/2006 | 02/17/1925 | 2 Br Patio Home | 620 | 11 90% Ref Plan Full | 471,100 |
| GILLESPIE, EDITH | 725 | GILLESPIE (EDITH +JU | F | 05/21/2008 | 08/13/1933 | Berkshire Terrace | 725 | 35 75% Ref (Type A) | 395,000 |
| GILROY, NANCY | 1011 | GILROY(NANCY + RUPER | F | 09/30/2010 | 04/25/1929 | Classic Estate Home | 305 | 31 Trad. (Type A) be | 283,600 |
| GILROY, RUPERT | 1012 | GILROY(NANCY + RUPER | M | 09/30/2010 | 07/17/1931 | Classic Estate Home | 305 | 31 Trad. (Type A) be | 283,600 |
| GORDON, CLAUDIA | 5120 | GORDON (STANLY+CLAUD | F | 06/28/2003 | 09/10/1938 | 2 Br Patio Home | 544 | 11 90% Ref Plan Full | 402,906 |
| GORDON, STANLY | 512 | GORDON (STANLY+CLAUD | M | 06/28/2003 | 11/22/1922 | 2 Br Patio Home | 544 | 11 90% Ref Plan Full | 402,906 |
| GOSSETT, EARL | 91331 | GOSSETT (RHODA + EAR | M | 09/13/2012 | 01/28/1933 | 2 Br Classic | 4311 | 24 Trad Unbound (Type | 214,400 |
| GOSSETT, RHODA | 9133 | GOSSETT (RHODA + EAR | F | 09/13/2012 | 03/20/1933 | 2 Br Classic | 4311 | 24 Trad Unbund (Type | 214,400 |
| GOTCHER, NOLAN | 1023 | GOTCHER(LOTTIE+NOLAN | M | 02/22/2010 | 06/20/1931 | 2 Br Classic | 4311 | 31 Trad. (Type A) be | 274,250 |
| GRACK, DOLORES | 9138 | GRACK(DOLORES) 9138 | F | 12/20/2012 | 09/29/1930 | 1 Br Deluxe | 2109 | 25 50% Ref Unbund (T | 188,000 |
| GRAHAM, KATHLEEN | 5441 | GRAHAM (KATHLEEN+ WI | F | 12/28/2009 | 03/14/1933 | 2 Br Patio Home | 544 | 35 75% Ref (Type A) | 449,100 |
| GRAHAM, WILLIAM | 5442 | GRAHAM (KATHLEEN+ WI | M | 12/28/2009 | 07/13/1930 | 2 Br Patio Home | 544 | 35 75% Ref (Type A) | 449,100 |
| GREENBERG, JACK | 91551 | GREENBERG(RITA & JAC | M | 11/19/2014 | 04/05/1931 | Grande Estate Home | 428 | 127 New 75% Ref (Typ | 686,400 |
| GREENBERG, RITA | 9155 | GREENBERG(RITA & JAC | F | 11/19/2014 | 01/28/1935 | Grande Estate Home | 428 | 127 New 75% Ref (Typ | 686,400 |
| GUINN, OVEDA | 701 | GUINN (OVEDA) 701 | F | 02/28/2008 | 04/05/1934 | Berkshire Terrace | 701 | 35 75% Ref (Type A) | 395,000 |
| GUTRU, GRACE | 704 | GUTRU (GRACE) 704 | F | 10/31/2006 | 06/16/1914 | 1 Br Deluxe | 4309 | 30 Trad. after 2005 | 155,700 |
| HAGAN, SUZANNE | 9145 | HAGAN (SUZANNE) 9145 | F | 08/30/2013 | 09/20/1930 | Balmora Cottage | 512 | 31 Trad. (Type A) be | 280,000 |
| HALL, DOROTHY | 149 | HALL (ROBERT+DOROTHY | F | 07/27/2005 | 04/07/1923 | 2 Br Classic | 3305 | 11 90% Ref Plan Full | 368,900 |
| HALL, ROBERT | 148 | HALL (ROBERT+DOROTHY | M | 07/27/2005 | 09/15/1923 | 2 Br Classic | 3305 | 11 90% Ref Plan Full | 368,900 |
| HANSEN, SARA | 4550 | SCIANO (ROSALIE)+HAN | F | 03/01/2002 | 08/28/1919 | 2 Br Patio Home | 625 | 11 90% Ref Plan Full | 369,900 |
| HART, HARRIET | 721 | HART (HARRIET+SHERBU | F | 03/26/2008 | 10/16/1934 | Berkshire Terrace | 721 | 35 75% Ref (Type A) | 410,000 |
| HARTSHORN, DAVID | 169 | HARTSHORN (DAVID+MAR | M | 07/19/2005 | 09/11/1925 | 2 Br Patio Home | 645 | 14 75% Ref Plan Full | 431,100 |
| HARTSHORN, MARY LANE | 170 | HARTSHORN (DAVID+MAR | F | 07/19/2005 | 08/17/1927 | 2 Br Patio Home | 645 | 14 75% Ref Plan Full | 431,100 |
| HAYDEN, NORMA | 4730 | HAYDEN (VIRGIL+NORMA | F | 06/25/2002 | 03/22/1923 | 2 Br Traditional | 1304 | 11 90% Ref Plan Full | 274,500 |
| HAYDEN, VIRGIL | 473 | HAYDEN (VIRGIL+NORMA | M | 06/25/2002 | 10/17/1921 | 2 Br Traditional | 1304 | 11 90% Ref Plan Full | 274,500 |
| HAYS, RUSHTON | 9110 | HAYS(RUSHTON) 9110 | M | 03/22/2011 | 11/04/1932 | 3 Br Patio Home | 533 | 31 Trad. (Type A) be | 305,800 |
| HEILMAN, EGBERT | 155 | HEILMAN (EGBERT+INNA | M | 08/01/2005 | 07/08/1918 | Grande Estate Home | 537 | 11 90% Ref Plan Full | 503,800 |
| HEILMAN, INNA | 156 | HEILMAN (EGBERT+INNA | F | 08/01/2005 | 01/26/1920 | Grande Estate Home | 537 | 11 90% Ref Plan Full | 503,800 |
| HEISLER, SHIRLEY | 307 | HEISLER (AUGUST+SHIR | F | 05/30/2006 | 04/23/1925 | Grande Estate Home | 408 | 11 90% Ref Plan Full | 580,240 |
| HELLSTROM, ERIC | 9104 | HELLSTROM (ERIC) 910 | M | 09/05/2002 | 03/04/1930 | Private Nursing | 24 | 50 Direct Entrant to | 50,000 |
| HELLSTROM, LAURA | 4880 | HELLSTROM (LAURA) 48 | F | 10/28/2002 | 09/10/1930 | 1 Br Deluxe | 2209 | 11 90% Ref Plan Full | 192,900 |
| HELMICK, CLAUDETTE | 9125 | HELMICK (CLAUDETTE + | F | 04/30/2012 | 08/28/1939 | 3 Br Grande | 4212 | 31 Trad. (Type A) be | 303,600 |
| HELMICK, JACK | 91251 | HELMICK (CLAUDETTE + | M | 04/30/2012 | 08/08/1934 | 3 Br Grande | 4212 | 31 Trad. (Type A) be | 303,600 |
| HELMLY, MARILYN | 9162 | HELMLY(MARILYN&VERNO | F | 03/11/2015 | 12/24/1940 | Berkshire Terrace | 713 | 125 New 50% Ref (Typ | 423,300 |
| HELMLY, VERNON | 91621 | HELMLY(MARILYN&VERNO | M | 03/11/2015 | 12/23/1940 | Berkshire Terrace | 713 | 125 New 50% Ref (Typ | 423,300 |
| HERSHISER, ANNE | 2222 | HERSHISER (ANNE+JOHN | F | 06/22/2009 | 12/26/1939 | 1 Br Deluxe | 1103 | 35 75% Ref (Type A) | 220,100 |
| HERSHISER, JOHN | 2223 | HERSHISER (ANNE+JOHN | M | 06/22/2009 | 09/28/1939 | 1 Br Deluxe | 1103 | 35 75% Ref (Type A) | 220,100 |

Report: STANDARD, BY NAME [S]  Filter: CURRENT CENSUS
File: GLM01_2015Glenmoor_at_St._Johns  Date: FEBRUARY 3, 2016

| Resident Name | ResidentID | Entry Cont | Gen | Entry Date | Birthdate | Entry Unit Type | Entry Unit | Entry Cont Type | EntryCont TotEntFees |
|---|---|---|---|---|---|---|---|---|---|
| HIRSCHMAN, HELEN | 724 | HIRSCHMAN (HELEN+HEN | F | 07/09/2008 | 07/23/1940 | Berkshire Terrace | 724 | 35 75% Ref (Type A) | 410,000 |
| HIRSCHMAN, HENRY | 7240 | HIRSCHMAN (HELEN+HEN | M | 07/09/2008 | 09/14/1933 | Berkshire Terrace | 724 | 35 75% Ref (Type A) | 410,000 |
| HORNER, MARJORIE | 1014 | HORNER(MARJORIE) 101 | F | 11/23/2010 | 06/21/1927 | 2 Br w/Den | 2307 | 26 Trad. (Type B) (N | 261,700 |
| HUDSON, AUDREY | 9004 | HUDSON (PERRY E+AUDR | F | 06/15/2001 | 04/03/1921 | 3 Br Grande | 3306 | 11 90% Ref Plan Full | 349,900 |
| HUDSON, PERRY E | 4 | HUDSON (PERRY E+AUDR | M | 06/15/2001 | 07/11/1917 | 3 Br Grande | 3306 | 11 90% Ref Plan Full | 349,900 |
| HUMPHREY, JOAN | 9172 | HUMPHREY(JOAN) 9172 | F | 09/10/2015 | 09/26/1931 | 3 Br Patio Home | 529 | 126 New Trad. (Type | 436,000 |
| HUMPHREY, PAUL | 91721 | HUMPHREY(JOAN) 9172 | M | 09/10/2015 | 05/10/1931 | 3 Br Patio Home | 529 | 126 New Trad. (Type | 436,000 |
| JACKSON, CARLA | 9115 | JACKSON/CARLA&FRED 9 | F | 06/28/2011 | 10/06/1935 | Classic Estate Home | 316 | 24 Trad Unbund (Type | 318,000 |
| JACKSON, FRED | 91151 | JACKSON/CARLA&FRED 9 | M | 06/28/2011 | 06/04/1933 | Classic Estate Home | 316 | 24 Trad Unbund (Type | 318,000 |
| JACOBS, FRANCES | 9111 | JACOBS(FRANCES + WIL | F | 03/30/2011 | 07/23/1935 | Balmora Cottage | 520 | 24 Trad Unbund (Type | 236,100 |
| JACOBS, WILLIAM | 91111 | JACOBS(FRANCES + WIL | M | 03/30/2011 | 03/25/1930 | Balmora Cottage | 520 | 24 Trad Unbund (Type | 236,100 |
| JONES, JACQUELINE | 9049 | JONES (MERLYN C+JACQ | F | 06/04/2001 | 08/03/1921 | 2 Br Patio Home | 629 | 10 Trad. Plan Full S | 258,900 |
| JONES, MERLYN C | 49 | JONES (MERLYN C+JACQ | M | 06/04/2001 | 06/01/1920 | 2 Br Patio Home | 629 | 10 Trad. Plan Full S | 258,900 |
| KAMSLER, MILTON | 311 | KAMSLER (MILTON+RUTH | M | 06/23/2006 | 07/12/1923 | Classic Estate Home | 316 | 14 75% Ref Plan Full | 515,500 |
| KAMSLER, RUTH | 312 | KAMSLER (MILTON+RUTH | F | 06/23/2006 | 01/01/1923 | Classic Estate Home | 316 | 14 75% Ref Plan Full | 515,500 |
| KASTNER, CHRISTOPHER | 718 | KASTNER (CHRISTOPHER | M | 12/20/2006 | 11/07/1925 | 3 Br Patio Home | 601 | 30 Trad. after 2005 | 369,000 |
| KASTNER, ELAINE | 719 | KASTNER (CHRISTOPHER | F | 12/20/2006 | 04/03/1925 | 3 Br Patio Home | 601 | 30 Trad. after 2005 | 369,000 |
| KAUFMAN, EDNA | 9042 | KAUFMAN (LEONARD E+E | F | 08/10/2001 | 12/08/1931 | 2 Br Traditional | 1104 | 11 90% Ref Plan Full | 249,900 |
| KERN, JAMES | 180 | KERN (JAMES+SHIRLEY) | M | 02/15/2005 | 10/05/1919 | Balmora Cottage | 521 | 11 90% Ref Plan Full | 295,000 |
| KERN, SHIRLEY | 181 | KERN (JAMES+SHIRLEY) | F | 02/15/2005 | 05/04/1920 | Balmora Cottage | 521 | 11 90% Ref Plan Full | 295,000 |
| KIRK, BOBBIE | 9149 | KIRK(BOBBIE) 9149 | F | 06/03/2014 | 07/11/1930 | 2 Br Traditional | 3102 | 124 New Trad. (Type | 219,300 |
| KLARMAN, LYNN | 9076 | KLARMAN (WALLACE+LYN | F | 11/09/2001 | 05/23/1940 | Grande Estate Home | 313 | 11 90% Ref Plan Full | 498,900 |
| KLARMAN, WALLACE | 76 | KLARMAN (WALLACE+LYN | M | 11/09/2001 | 05/27/1931 | Grande Estate Home | 313 | 11 90% Ref Plan Full | 498,900 |
| KNAUER, DONNA | 9096 | KNAUER (DONNA+WILLIA | F | 09/17/2001 | 02/24/1928 | Grande Estate Home | 404 | 11 90% Ref Plan Full | 498,900 |
| KNAUER, WILLIAM JR | 96 | KNAUER (DONNA+WILLIA | M | 09/17/2001 | 08/07/1924 | Grande Estate Home | 404 | 11 90% Ref Plan Full | 498,900 |
| KOTOS, CATHERINE | 9113 | KOTOS(CATHERINE & PE | F | 04/27/2011 | 12/08/1938 | 3 Br Patio Home | 628 | 31 Trad. (Type A) be | 323,100 |
| KOTOS, PETER | 91131 | KOTOS(CATHERINE & PE | M | 04/27/2011 | 03/26/1931 | 3 Br Patio Home | 628 | 31 Trad. (Type A) be | 323,100 |
| KWIATKOWSKI, PEARL | 4210 | KWIATKOWSKI (PEARL) | F | 04/17/2008 | 08/21/1924 | 2 Br Traditional | 4210 | 35 75% Ref (Type A) | 318,300 |
| LANE, JACQUELYN | 9144 | LANE(JACQUELYN + STU | F | 06/28/2013 | 08/28/1931 | 3 Br Patio Home | 625 | 28 Trad. Bund (Type | 275,230 |
| LANE, STUART | 91441 | LANE(JACQUELYN + STU | M | 06/28/2013 | 10/03/1936 | 3 Br Patio Home | 625 | 28 Trad. Bund (Type | 275,230 |
| LARSON, ERLING | 91371 | LARSON (JAN & ERLING | M | 12/10/2012 | 08/24/1924 | Grande Estate Home | 324 | 24 Trad Unbund (Type | 337,500 |
| LARSON, JAN | 9137 | LARSON (JAN & ERLING | F | 12/10/2012 | 09/15/1955 | Grande Estate Home | 324 | 24 Trad Unbund (Type | 337,500 |
| LAWRENCE, MARGARET | 9131 | LAWRENCE(MARGARET + | F | 06/29/2012 | 06/30/1925 | 2 Br Traditional | 2308 | 31 Trad. (Type A) be | 205,000 |
| LAWRENCE, ROBERT | 91311 | LAWRENCE(MARGARET + | M | 06/29/2012 | 06/25/1925 | 2 Br Traditional | 2308 | 31 Trad. (Type A) be | 205,000 |
| LAZENBY, DEXTER | 752 | LAZENBY (DEXTER+JEAN | M | 09/28/2007 | 06/22/1926 | 2 Br Patio Home | 652 | 34 75% Ref after 200 | 494,600 |
| LAZENBY, JEAN | 7520 | LAZENBY (DEXTER+JEAN | F | 09/28/2007 | 07/02/1926 | 2 Br Patio Home | 652 | 34 75% Ref after 200 | 494,600 |
| LENAHAN, BETTY | 4107 | LENAHAN (BETTY) 4107 | F | 12/30/2008 | 06/04/1926 | 2 Br w/Den | 4107 | 35 75% Ref (Type A) | 385,000 |
| LONSDALE, CLAIRE | 5070 | LONSDALE (RICHARD+CL | F | 11/01/2003 | 07/20/1921 | 3 Br Patio Home | 624 | 11 90% Ref Plan Full | 408,594 |
| LONSDALE, RICHARD | 507 | LONSDALE (RICHARD+CL | M | 11/01/2003 | 12/01/1918 | 3 Br Patio Home | 624 | 11 90% Ref Plan Full | 408,594 |
| LOUTTIT, EUGENIE | 9154 | LOUTTIT(EUGENIE/RICH | F | 11/04/2014 | 03/20/1930 | Berkshire Terrace | 717 | 126 New Trad. (Type | 339,000 |
| LOUTTIT, RICHARD | 91541 | LOUTTIT(EUGENIE/RICH | M | 11/04/2014 | 12/05/1932 | Berkshire Terrace | 717 | 126 New Trad. (Type | 339,000 |
| LUTZ, BETTY | 720 | LUTZ (BETTY+WILLIAM) | F | 04/10/2008 | 07/23/1926 | Berkshire Terrace | 720 | 35 75% Ref (Type A) | 406,000 |
| LUTZ, WILLIAM | 7200 | LUTZ (BETTY+WILLIAM) | M | 04/10/2008 | 08/08/1927 | Berkshire Terrace | 720 | 35 75% Ref (Type A) | 406,000 |
| MALONEY, DORIS | 14001 | MALONEY (DORIS & JOS | F | 03/25/2014 | 06/16/1930 | 2 Br Classic | 4211 | 131 New Trad. (Type | 291,000 |
| MALONEY, JOSEPH | 140011 | MALONEY (DORIS & JOS | M | 03/25/2014 | 05/30/1922 | 2 Br Classic | 4211 | 131 New Trad. (Type | 291,000 |
| MAROHN, LUTHER ALFON | 79 | MAROHN (LUTHER ALFON | M | 07/27/2001 | 08/07/1915 | 1 Br Deluxe | 4309 | 10 Trad. Plan Full S | 122,950 |
| MAZURA, JOAN | 9158 | MAZURA(JOAN/WALTER) | F | 12/12/2014 | 09/21/1930 | Classic Estate Home | 312 | 124 New Trad. (Type | 354,300 |
| MAZURA, WALTER | 91581 | MAZURA(JOAN/WALTER) | M | 12/12/2014 | 02/20/1930 | Classic Estate Home | 312 | 124 New Trad. (Type | 354,300 |
| MCCONNELL, ROBERT | 5130 | MCCONNELL(ROBERT) 51 | M | 10/03/2008 | 10/14/1926 | Balmora Cottage | 513 | 35 75% Ref (Type A) | 401,600 |
| MCDONALD, MARGIE | 9080 | MCDONALD (WILLIAM+MA | F | 06/01/2001 | 09/28/1918 | Classic Estate Home | 316 | 10 Trad. Plan Full S | 289,900 |
| MCDONALD, WILLIAM | 80 | MCDONALD (WILLIAM+MA | M | 06/01/2001 | 09/21/1926 | Classic Estate Home | 316 | 10 Trad. Plan Full S | 289,900 |
| MCELWEE, JACKIE | 9147 | MCELWEE(JACKIE) 9147 | F | 06/29/2013 | 03/28/1936 | 2 Br w/Den | 2107 | 25 50% Ref Unbund (T | 338,500 |
| MCGRAW, JANIS | 23122 | MCGRAW (JANIS + WILL | F | 10/31/2008 | 06/25/1924 | 3 Br Grande | 2312 | 31 Trad. (Type A) be | 166,400 |
| MCGRAW, WILLIAM | 23123 | MCGRAW (JANIS + WILL | M | 10/31/2008 | 02/11/1924 | 3 Br Grande | 2312 | 31 Trad. (Type A) be | 166,400 |

Report: STANDARD, BY NAME [S]  Filter: CURRENT CENSUS
File: GLM01_2015Glenmoor_at_St._Johns  Date: FEBRUARY 3, 2016

| Resident Name | ResidentID | Entry Cont | Gen | Entry Date | Birthdate | Entry Unit Type | Entry Unit | Entry Cont Type | EntryCont TotEntFees |
|---|---|---|---|---|---|---|---|---|---|
| MCKINNEY, JAMES | 23564 | MCKINNEY (JAMES) 235 | M | 09/16/2009 | 06/03/1940 | Berkshire Terrace | 700 | 31 Trad. (Type A) be | 242,400 |
| MCQUADE, FRANK | 160 | MCQUADE (FRANK+CATHE | M | 07/18/2005 | 05/30/1918 | 2 Br w/Den | 2307 | 11 90% Ref Plan Full | 300,900 |
| MESSENGER, CYRIL | 477 | MESSENGER (CYRIL+LAU | M | 12/03/2002 | 03/26/1922 | 2 Br w/Den | 3101 | 10 Trad. Plan Full S | 297,400 |
| MESSENGER, LAURA | 4770 | MESSENGER (CYRIL+LAU | F | 12/03/2002 | 08/19/1924 | 2 Br w/Den | 3101 | 10 Trad. Plan Full S | 297,400 |
| MILLER, AGATHA | 30020 | MILLER (AGATHA + ROG | F | 07/20/2009 | 10/17/1925 | 3 Br Patio Home | 601 | 35 75% Ref (Type A) | 500,000 |
| MILLER, JOHN | 9136 | MILLER(JOHN) 9136 | M | 09/28/2012 | 06/06/1942 | 2 Br Traditional | 2310 | 24 Trad Unbund (Type | 176,700 |
| MILLER, MARTHA | 566 | MILLER (WAYDE+MARTHA | F | 10/19/2004 | 07/24/1936 | 2 Br w/Den | 528 | 11 90% Ref Plan Full | 430,250 |
| MILLER, ROGER | 300201 | MILLER (AGATHA + ROG | M | 07/20/2009 | 02/02/1928 | 3 Br Patio Home | 601 | 35 75% Ref (Type A) | 500,000 |
| MILLER, WAYDE | 565 | MILLER (WAYDE+MARTHA | M | 10/19/2004 | 09/02/1933 | 2 Br w/Den | 528 | 11 90% Ref Plan Full | 430,250 |
| MITCHELL, GERALD | 714 | MITCHELL (GERALD+STE | M | 10/16/2006 | 08/29/1927 | Grande Estate Home | 536 | 34 75% Ref after 200 | 528,800 |
| MITCHELL, STEPHANIE | 715 | MITCHELL (GERALD+STE | F | 10/16/2006 | 12/28/1940 | Grande Estate Home | 536 | 34 75% Ref after 200 | 528,800 |
| MORELAND, JIM | 91481 | MORELAND(MARY RUTH & | M | 11/06/2013 | 12/06/1931 | Classic Estate Home | 664 | 31 Trad. (Type A) be | 425,000 |
| MORELAND, MARY RUTH | 9148 | MORELAND(MARY RUTH & | F | 11/06/2013 | 12/08/1932 | Classic Estate Home | 664 | 31 Trad. (Type A) be | 425,000 |
| MYERS, ALICE | 70400 | MYERS (ALICE+HOWARD) | F | 05/07/2008 | 03/24/1924 | Berkshire Terrace | 704 | 35 75% Ref (Type A) | 410,000 |
| MYERS, HOWARD | 7040 | MYERS (ALICE+HOWARD) | M | 05/07/2008 | 05/16/1921 | Berkshire Terrace | 704 | 35 75% Ref (Type A) | 410,000 |
| NALVEN, FRANCES | 6641 | NALVEN (FRANCES + RO | F | 09/30/2009 | 07/20/1931 | Classic Estate Home | 664 | 35 75% Ref (Type A) | 482,600 |
| NALVEN, ROBERT | 6642 | NALVEN (FRANCES + RO | M | 09/30/2009 | 04/11/1931 | Classic Estate Home | 664 | 35 75% Ref (Type A) | 482,600 |
| NESS, ROBERT | 7080 | NESS (VIRGINIA+ROBER | M | 06/30/2008 | 08/29/1927 | Berkshire Terrace | 708 | 35 75% Ref (Type A) | 410,000 |
| NESS, VIRGINIA | 70800 | NESS (VIRGINIA+ROBER | F | 06/30/2008 | 02/17/1927 | Berkshire Terrace | 708 | 35 75% Ref (Type A) | 410,000 |
| ORNER, ANNE | 91322 | ORNER(ANNE) 91322 | F | 01/19/2015 | 01/28/1936 | 2 Br w/Den | 3201 | 123 New 75% Ref (Typ | 372,600 |
| PADGETT, MAUDE | 702 | PADGETT (MAUDE) 702 | F | 10/30/2006 | 12/27/1922 | 3 Br Grande | 2112 | 34 75% Ref after 200 | 350,900 |
| PEARCY, CAROLYN | 139 | PEARCY (PHILIP+CAROL | F | 05/18/2005 | 06/17/1923 | 2 Br Classic | 4111 | 11 90% Ref Plan Full | 319,600 |
| PEARCY, PHILIP | 138 | PEARCY (PHILIP+CAROL | M | 05/18/2005 | 12/10/1923 | 2 Br Classic | 4111 | 11 90% Ref Plan Full | 319,600 |
| PETING, DONNA | 31716 | PETING (DONNA + FRED | F | 06/30/2009 | 11/03/1927 | 2 Br w/Den | 4307 | 35 75% Ref (Type A) | 322,500 |
| PETING, FRED | 317160 | PETING (DONNA + FRED | M | 06/30/2009 | 09/30/1924 | 2 Br w/Den | 4307 | 35 75% Ref (Type A) | 322,500 |
| PEYTON, BETTY | 9117 | PEYTON (SEMUEL + BET | F | 08/31/2011 | 01/23/1932 | 2 Br w/Den | 3201 | 35 75% Ref (Type A) | 214,400 |
| PEYTON, SEMUEL | 91171 | PEYTON (SEMUEL + BET | M | 08/31/2011 | 10/26/1929 | 2 Br w/Den | 3201 | 35 75% Ref (Type A) | 214,400 |
| PICKWICK, LUCILE | 206 | PICKWICK (LUCILE) 20 | F | 10/26/2005 | 02/20/1917 | 2 Br Patio Home | 641 | 11 90% Ref Plan Full | 431,100 |
| PIPKORN, JUSTIN | 7250 | GILLESPIE (EDITH +JU | M | 05/21/2008 | 09/18/1933 | Berkshire Terrace | 725 | 35 75% Ref (Type A) | 395,000 |
| PRENTICE, ALICE | 32224 | PRENTICE (ALICE+EUGE | F | 06/30/2009 | 08/07/1926 | 2 Br Patio Home | 644 | 31 Trad. (Type A) be | 305,300 |
| PRENTICE, EUGENE | 322242 | PRENTICE (ALICE+EUGE | M | 06/30/2009 | 05/12/1930 | 2 Br Patio Home | 644 | 31 Trad. (Type A) be | 305,300 |
| RAMUNDO, ONEIDA | 9170 | RAMUNDO(ONEIDA) 9170 | F | 08/18/2015 | 01/21/1948 | 2 Br Traditional | 4108 | 124 New Trad. (Type | 242,500 |
| RAYMOND, ADELAIDE | 9107 | RAYMOND(ADELAIDE + W | F | 01/27/2011 | 11/03/1932 | Grande Estate Home | 656 | 31 Trad. (Type A) be | 346,000 |
| RAYMOND, WILL | 91071 | RAYMOND(ADELAIDE + W | M | 01/27/2011 | 12/09/1929 | Grande Estate Home | 656 | 31 Trad. (Type A) be | 346,000 |
| REIMAN(MCCARTHY, BA | 146 | REIMAN/MCCARTHY (BAR | F | 08/16/2005 | 01/01/1936 | 2 Br Patio Home | 632 | 14 75% Ref Plan Full | 406,100 |
| REIMAN, PATRICIA | 9083 | REIMAN (PETER+PATRIC | F | 09/10/2001 | 06/04/1931 | Grande Estate Home | 325 | 10 Trad. Plan Full S | 309,158 |
| REIMAN, PETER | 83 | REIMAN (PETER+PATRIC | M | 09/10/2001 | 05/16/1931 | Grande Estate Home | 325 | 10 Trad. Plan Full S | 309,158 |
| RIGG, KENT | 7000 | RIGG (KENT) 7000 | M | 05/19/2008 | 05/03/1931 | Berkshire Terrace | 700 | 35 75% Ref (Type A) | 395,000 |
| ROBINSON, MALCOLM | 913 | ROBINSON (MARY & MAL | M | 11/30/2012 | 06/13/1935 | Grande Estate Home | 304 | 31 Trad. (Type A) be | 415,900 |
| ROBINSON, MARY | 912 | ROBINSON (MARY & MAL | F | 11/30/2012 | 05/05/1937 | Grande Estate Home | 304 | 31 Trad. (Type A) be | 415,900 |
| ROTH, COLLEEN | 9161 | ROTH(COLLEEN&TOM) 91 | F | 03/03/2015 | 09/13/1926 | Grande Estate Home | 408 | 126 New Trad. (Type | 463,600 |
| ROTH, TOM | 91611 | ROTH(COLLEEN&TOM) 91 | M | 03/03/2015 | 10/31/1925 | Grande Estate Home | 408 | 126 New Trad. (Type | 463,600 |
| RUSSEY, STEPHEN | 91591 | RUSSEY(CLAUDIA/STEPH | M | 12/19/2014 | 09/22/1941 | Grande Estate Home | 660 | 126 New Trad. (Type | 457,600 |
| SCHAR, FRANCES | 9156 | SCHAR(FRANCES) 9156 | F | 11/25/2014 | 06/15/1931 | Balmora Cottage | 524 | 99 Rental | 5,000 |
| SCHINDLER, CARL | 91121 | SCHINDLER(MARY JANE | M | 03/31/2011 | 01/01/1923 | 2 Br Traditional | 4308 | 31 Trad. (Type A) be | 203,400 |
| SCHUH, MOLLY | 144 | SCHUH (ROBERT+MOLLY) | F | 01/26/2005 | 10/27/1927 | Grande Estate Home | 300 | 11 90% Ref Plan Full | 498,830 |
| SCHUH, ROBERT | 143 | SCHUH (ROBERT+MOLLY) | M | 01/26/2005 | 04/11/1924 | Grande Estate Home | 300 | 11 90% Ref Plan Full | 498,830 |
| SCHUSTER, JOHN | 751 | SCHUSTER (JOHN+VERA) | M | 07/13/2007 | 04/19/1926 | Balmora Cottage | 525 | 30 Trad. after 2005 | 303,900 |
| SCHUSTER, VERA | 7510 | SCHUSTER (JOHN+VERA) | F | 07/13/2007 | 02/23/1931 | Balmora Cottage | 525 | 30 Trad. after 2005 | 303,900 |
| SCIANO, ROSALIE | 455 | SCIANO (ROSALIE)+HAN | F | 03/01/2002 | 10/10/1924 | 2 Br Patio Home | 625 | 11 90% Ref Plan Full | 369,900 |
| SCULL, EDWARD | 85 | SCULL (EDWARD+MADELO | M | 08/10/2001 | 08/20/1924 | 2 Br w/Den | 4307 | 10 Trad. Plan Full S | 221,130 |
| SCULL, MADELON (LENN | 9085 | SCULL (EDWARD+MADELO | F | 08/10/2001 | 07/12/1918 | 2 Br w/Den | 4307 | 10 Trad. Plan Full S | 221,130 |
| SHANNON, LESLIE | 9045 | SHANNON (THOMAS+LESL | F | 08/24/2001 | 01/21/1918 | 2 Br Classic | 1105 | 11 90% Ref Plan Full | 289,900 |
| SHANNON, THOMAS | 45 | SHANNON (THOMAS+LESL | M | 08/24/2001 | 07/01/1916 | 2 Br Classic | 1105 | 11 90% Ref Plan Full | 289,900 |

Report: STANDARD, BY NAME [S]  Filter: CURRENT CENSUS
File: GLM01_2015Glenmoor_at_St._Johns  Date: FEBRUARY 3, 2016

| Resident Name | ResidentID | Entry Cont | Gen | Entry Date | Birthdate | Entry Unit Type | Entry Unit | Entry Cont Type | EntryCont TotEntFees |
|---|---|---|---|---|---|---|---|---|---|
| SHEALY, LON | 665 | SHEALY (LON*MIRIAM) | M | 12/12/2003 | 05/16/1924 | Grande Estate Home | 321 | 11 90% Ref Plan Full | 528,834 |
| SHEALY, MIRIAM | 6650 | SHEALY (LON*MIRIAM) | F | 12/12/2003 | 10/14/1922 | Grande Estate Home | 321 | 11 90% Ref Plan Full | 528,834 |
| SHEPHERD, BURT | 754 | SHEPHERD (BURT*MILDR | M | 12/01/2007 | 11/11/1927 | 2 Br w/Den | 1101 | 34 75% Ref after 200 | 384,100 |
| SHEPHERD, MILDRED | 7540 | SHEPHERD (BURT*MILDR | F | 12/01/2007 | 01/08/1928 | 2 Br w/Den | 1101 | 34 75% Ref after 200 | 384,100 |
| SHORT, AUDREY | 310 | SHORT (AUDREY) 310 | F | 06/16/2006 | 11/01/1923 | Classic Estate Home | 308 | 14 75% Ref Plan Full | 515,500 |
| SHUTE, JESSIE GAIL | 9150 | SHUTE (JESSIE GAIL) 9 | F | 06/30/2014 | 02/27/1937 | 2 Br Traditional | 2210 | 126 New Trad. (Type | 275,600 |
| SMITH, EARNEST | 471 | SMITH (EARNEST*ELIZA | M | 12/11/2002 | 04/03/1930 | 3 Br Grande | 3106 | 11 90% Ref Plan Full | 368,900 |
| SMITH, ELIZABETH | 4710 | SMITH (EARNEST*ELIZA | F | 12/11/2002 | 03/26/1936 | 3 Br Grande | 3106 | 11 90% Ref Plan Full | 368,900 |
| SNYDER, NANCY | 9053 | SNYDER (NOEL*NANCY) | F | 07/07/2001 | 12/10/1935 | 2 Br Traditional | 3302 | 10 Trad. Plan Full S | 154,900 |
| SNYDER, NOEL | 53 | SNYDER (NOEL*NANCY) | M | 07/07/2001 | 01/18/1933 | 2 Br Traditional | 3302 | 10 Trad. Plan Full S | 154,900 |
| SPINK, LINNEA | 9028 | SPINK (SYDNEY A*LINN | F | 08/10/2001 | 06/23/1919 | 2 Br Traditional | 1202 | 10 Trad. Plan Full S | 210,000 |
| SPINK, SYDNEY A | 28 | SPINK (SYDNEY A*LINN | M | 08/10/2001 | 04/14/1930 | 2 Br Traditional | 1202 | 10 Trad. Plan Full S | 210,000 |
| SPOONER, MORTON | 506 | SPOONER (MORTON*NELS | M | 08/01/2003 | 01/16/1924 | 2 Br w/Den | 2207 | 11 90% Ref Plan Full | 323,210 |
| SPOONER, NELSINE | 5060 | SPOONER (MORTON*NELS | F | 08/01/2003 | 11/10/1928 | 2 Br w/Den | 2207 | 11 90% Ref Plan Full | 323,210 |
| STERLING, JOHN D | 86 | STERLING (LUANN*JOHN | M | 08/30/2001 | 08/03/1921 | 2 Br Traditional | 1204 | 10 Trad. Plan Full S | 184,730 |
| STERLING, LUANN | 9086 | STERLING (LUANN*JOHN | F | 08/30/2001 | 10/07/1923 | 2 Br Traditional | 1204 | 10 Trad. Plan Full S | 184,730 |
| STEVENSON, FRANCES | 204 | STEVENSON (J.E.*FRAN | F | 12/31/2005 | 09/06/1923 | 3 Br Grande | 2212 | 11 90% Ref Plan Full | 368,900 |
| STEVENSON, J.E. | 203 | STEVENSON (J.E.*FRAN | M | 12/31/2005 | 10/17/1924 | 3 Br Grande | 2212 | 11 90% Ref Plan Full | 368,900 |
| STOUGHTON, RICHARD | 9157 | STOUGHTON(RICHARD) 9 | M | 12/05/2014 | 05/14/1927 | 3 Br Grande | 4312 | 99 Rental | 5,000 |
| STRICKLAND, JULIE | 9169 | STRICKLAND(JULIE/TOM | F | 07/27/2015 | 11/22/1934 | 2 Br Patio Home | 532 | 124 New Trad. (Type | 327,300 |
| STRICKLAND, TOM | 91691 | STRICKLAND(JULIE/TOM | M | 07/27/2015 | 04/08/1932 | 2 Br Patio Home | 532 | 124 New Trad. (Type | 327,300 |
| TANNER, RICHARD | 9130 | TANNER(RICHARD) 9130 | M | 06/15/2012 | 10/23/1928 | 1 Br Deluxe | 2309 | 24 Trad Unbund (Type | 130,700 |
| TETMEYER, SUE | 9143 | TETMEYER(SUE*WILLIAM | F | 06/14/2013 | 05/26/1939 | 2 Br Traditional | 3204 | 31 Trad. (Type A) be | 235,000 |
| TETMEYER, WILLIAM | 91431 | TETMEYER(SUE*WILLIAM | M | 06/14/2013 | 08/23/1936 | 2 Br Traditional | 3204 | 31 Trad. (Type A) be | 235,000 |
| THORNTON, WINFRED | 716 | THORNTON (WINFRED) 7 | F | 10/09/2006 | 07/09/1928 | 2 Br Classic | 1205 | 34 75% Ref after 200 | 329,600 |
| THORSNESS, GAYLEE | 9166 | THORSNESS(GAYLEE&LEO | F | 05/27/2015 | 11/06/1932 | 2 Br Patio Home | 652 | 126 New Trad. (Type | 366,900 |
| THORSNESS, LEO | 91661 | THORSNESS(GAYLEE&LEO | M | 05/27/2015 | 02/14/1932 | 2 Br Patio Home | 652 | 126 New Trad. (Type | 366,900 |
| TICKLER, DOROTHY | 9027 | TICKLER (RICHARD B+D | F | 07/27/2001 | 02/25/1926 | Classic Estate Home | 301 | 11 90% Ref Plan Full | 429,900 |
| TICKLER, RICHARD B | 27 | TICKLER (RICHARD B+D | M | 07/27/2001 | 12/27/1921 | Classic Estate Home | 301 | 11 90% Ref Plan Full | 429,900 |
| TINGLEY, ANN | 14003 | TINGLEY (ANN) 14003 | F | 03/26/2014 | 04/23/1929 | Berkshire Terrace | 705 | 127 New 75% Ref (Typ | 472,000 |
| TURNER, CLARE | 4790 | TURNER (THOMAS*CLARE | F | 12/31/2002 | 09/13/1929 | 3 Br Grande | 1306 | 11 90% Ref Plan Full | 368,900 |
| TURNER, THOMAS | 479 | TURNER (THOMAS*CLARE | M | 12/31/2002 | 02/18/1927 | 3 Br Grande | 1306 | 11 90% Ref Plan Full | 368,900 |
| VANDEBERG, JIM | 91141 | VANDEBERG(KATHY & JI | M | 04/29/2011 | 02/28/1939 | Classic Estate Home | 308 | 24 Trad Unbund (Type | 329,000 |
| VANDEBERG, KATHY | 9114 | VANDEBERG(KATHY & JI | F | 04/29/2011 | 03/17/1938 | Classic Estate Home | 308 | 24 Trad Unbund (Type | 329,000 |
| VANDENBERG, ERNEST | 61 | VANDENBERG (ERNEST+F | M | 06/21/2001 | 07/15/1926 | 2 Br Traditional | 4308 | 11 90% Ref Plan Full | 250,705 |
| VANDENBERG, FLORENCE | 9061 | VANDENBERG (ERNEST+F | F | 06/21/2001 | 03/31/1933 | 2 Br Traditional | 4308 | 11 90% Ref Plan Full | 250,705 |
| VOSS, DOROTHY | 1102 | VOSS (DOROTHY) 1102 | F | 03/27/2008 | 02/16/1914 | 2 Br Traditional | 1102 | 31 Trad. (Type A) be | 235,700 |
| WATSON, MARGARET | 497 | WATSON (MARGARET) 49 | F | 03/06/2003 | 06/22/1922 | 1 Br Deluxe | 3203 | 11 90% Ref Plan Full | 204,474 |
| WHITE, GERALD | 91711 | WHITE(MARILYN/GERALD | M | 09/02/2015 | 07/26/1938 | Grande Estate Home | 424 | 127 New 75% Ref (Typ | 710,500 |
| WHITE, MARILYN | 9171 | WHITE(MARILYN/GERALD | F | 09/02/2015 | 05/08/1938 | Grande Estate Home | 424 | 127 New 75% Ref (Typ | 710,500 |
| WHITMORE, ELEANOR | 183 | WHITMORE (ELEANOR) 1 | F | 03/08/2005 | 10/02/1925 | Balmora Cottage | 509 | 11 90% Ref Plan Full | 285,000 |
| WILLIAMS, EARNEST | 163 | WILLIAMS (EARNEST+JA | M | 04/28/2005 | 01/15/1925 | Grande Estate Home | 633 | 11 90% Ref Plan Full | 503,800 |
| WILLIAMS, JANE | 164 | WILLIAMS (EARNEST+JA | F | 04/28/2005 | 02/12/1925 | Grande Estate Home | 633 | 11 90% Ref Plan Full | 503,800 |
| WILLIAMSON, LUCY | 9165 | WILLIAMSON(LUCY&TED) | F | 04/30/2015 | 10/11/1932 | Berkshire Terrace | 709 | 124 New Trad. (Type | 313,700 |
| WILLIAMSON, TED | 91651 | WILLIAMSON(LUCY&TED) | M | 04/30/2015 | 04/25/1933 | Berkshire Terrace | 709 | 124 New Trad. (Type | 313,700 |
| WILSON, ADELINE | 6600 | WILSON (HUGH*ADELINE | F | 11/30/2003 | 05/11/1925 | 2 Br Classic | 2211 | 11 90% Ref Plan Full | 299,480 |
| WILSON, HUGH | 660 | WILSON (HUGH+ADELINE | M | 11/30/2003 | 06/22/1922 | 2 Br Classic | 2211 | 11 90% Ref Plan Full | 299,480 |
| WINCHESTER, JACK | 648 | WINCHESTER(SHEILA JA | M | 10/23/2002 | 11/13/1921 | 2 Br Patio Home | 648 | 10 Trad. Plan Full S | 245,955 |
| WINCHESTER, SHEILA | 6480 | WINCHESTER(SHEILA JA | F | 10/23/2002 | 10/23/1923 | 2 Br Patio Home | 648 | 10 Trad. Plan Full S | 245,955 |
| WOODALL, BETTY | 2250 | WOODALL (WELDON+BETT | F | 03/13/2002 | 05/12/1927 | Grande Estate Home | 412 | 11 90% Ref Plan Full | 473,955 |
| ZEIER, DIANE | 9142 | ZEIER(DIANE) 9142 | F | 05/14/2013 | 01/02/1936 | 2 Br Traditional | 4208 | 31 Trad. (Type A) be | 238,500 |

Grand count: 266

## SCHEDULE 2.1

### Licenses, Permits, etc.

1.      Group Care - Assisted Living Facility Operating Permit No. 55-51-00146 issued by the State of Florida, Department of Health [expires 09/30/2016].

2.      Food Hygiene - Assisted Living Facility Sanitation Certificate No. 55-48-00435 issued by the State of Florida, Department of Health [expires 09/30/2016].

3.      Food Hygiene - Assisted Living Facility Sanitation Certificate No. 55-48-00174 issued by the State of Florida, Department of Health [expires 09/30/2016].

4.      Centers for Medicare & Medicaid Services, Clinical Laboratory Improvement Amendments, Certificate of Waiver No. 10D0993234, issued by the Division of Laboratory Services, Survey and Certification Group, Center for Medicaid and State Operations [expires 11/6/2017].

5.      Standard Nursing Home Certificate No. 19676, License No. SNF130471020 issued by the State of Florida, Agency for Health Care Administration, Division of Health Quality Assurance [30 Beds] [expires 11/18/2017].

6.      2013 Florida Annual Resale Certificate for Sales Tax Certificate No. 65-8012108681-8 [expires 12/31/2015].

7.      Florida Certificate of Operation for Hydraulic Passenger Elevator, License Number 59966, 3 Landings [expires 08/01/2016].

8.      Florida Certificate of Operation for Hydraulic Passenger Elevator, License Number 59967, 3 Landings [expires 08/01/2016].

9.      Florida Certificate of Operation for Hydraulic Passenger Elevator, License Number 60231, 2 Landings [expires 08/01/2016].

10.     Retailer of Alcoholic Beverage License No. BEV6501347, Series 4COP, Type SRX, issued by the State of Florida, Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco [expires 09/30/2016].

11.     Florida Department of Health, Operating Permit, Biomedical Waste – Nursing Home, Permit No. 55-64-00585 [expires 09/30/2016].

12.     Department of Health, Division of Medical Quality Assurance Pharmacy License No. PH18183, Control No. 69797 [expires 02/28/2017].

13.     Department of Health, Division of Medical Quality Assurance Pharmacy License No. PH18184, Control No. 69444 [expires 02/28/2017].

14.    Standard Assisted Living Facility Certificate No. 45914, License No. AL10105 issued by the State of Florida, Agency for Health Care Administration, Division of Health Quality Assurance [36 Private Pay Residents] [expires 11/19/2017].

15.    Continuing Care Facility No. 88172, Certificate No. 99-59-3474627 issued by the Florida Office of Insurance Regulation [issued on 11/23/1999].

16.    Swimming Pool Operating Permit No. 55-60-00379 issued by the State of Florida, Department of Health [expires 06/30/2016].

17.    Certificates of Occupancy issued by St. Johns County, Florida – Building Department:

Permit #100614 – Community Center w/ Pool House [dated 8/16/2001]
Permit #100791 – Multi-Family [dated 10/18/2001]
Permit #100793 – Multi-Family [dated 10/18/2001]
Permit #100796 – Assisted Living Facility [dated 11/15/2001]

18.    Certificate of Need – Certificate No. 9063 issued by the State of Florida, Agency for Health Care Administration dated November 4, 1998.

## <u>SCHEDULE 2.2(n)</u>

**Additional Excluded Assets**

1.      All rights in and to the name and trademark "Retirement Redefined" which is owned by Life Care Ponte Vedra, Inc. and used by Life Care St. Johns, Inc.

2.      All rights in and to the following computer software, which is owned by Life Care Ponte Vedra, Inc. and used by Life Care St. Johns, Inc.:

> A.      ECS Software
>
> B.      Timeclocks Software

**<u>SCHEDULE 3.5(c)</u>**

**2015 Ad Valorem Taxes and Non-Ad Valorem Assessments**

[Exhibit begins on next page.]

# Dennis W. Hollingsworth Tax Collector

*generated on 11/19/2015 11:08:49 AM EST*

## Tax Record

Last Update: 11/19/2015 11:08:50 AM EST

[ Register for eBill ]

### Ad Valorem Taxes and Non-Ad Valorem Assessments

The information contained herein does not constitute a title search and should not be relied on as such.

| Account or Parcel Number | Tax Type | Tax Year |
|---|---|---|
| 029232-0000 | REAL ESTATE | 2015 |

| Mailing Address | Physical Address |
|---|---|
| LIFE CARE ST JOHNS INC<br>235 TOWERVIEW DR<br>SAINT AUGUSTINE FL 32092-0000<br><br>BANKRUPTCY | 235 TOWERVIEW DR |

| Exempt Amount | Taxable Value | |
|---|---|---|
| $6,721,438.00 | $13,570,028.00 | |

**Exemption Detail**
19    6721438

**Millage Code**
300

**Escrow Code**

**Legal Description**
44-06-28 40.12 Acres 1-2 PT OF GRANT TO Z KINGSLEY NORTHWEST PARCEL 12 (EX PT IN OR3244/1028) OR1468/1380 &3244/1033 &3244/1033

| Ad Valorem Taxes | | | | | |
|---|---|---|---|---|---|
| **Taxing Authority** | **Rate** | **Assessed Value** | **Exemption Amount** | **Taxable Value** | **Taxes Levied** |
| COUNTY | | | | | |
| GENERAL COUNTY | 5.1475 | 20,291,466 | 6,721,438 | $13,570,028 | $69,851.72 |
| ROAD | 0.7100 | 20,291,466 | 6,721,438 | $13,570,028 | $9,634.72 |
| HEALTH | 0.0171 | 20,291,466 | 6,721,438 | $13,570,028 | $232.05 |
| SCHOOL | | | | | |
| SCHOOL - STATE LAW | 4.9800 | 20,291,466 | 6,721,438 | $13,570,028 | $67,578.74 |
| SCHOOL - LOCAL BOARD | 2.2480 | 20,291,466 | 6,721,438 | $13,570,028 | $30,505.42 |
| SJRWMD | 0.3023 | 20,291,466 | 6,721,438 | $13,570,028 | $4,102.22 |
| FIRE | 1.4625 | 20,291,466 | 6,721,438 | $13,570,028 | $19,846.17 |
| MOSQUITO | 0.1773 | 20,291,466 | 6,721,438 | $13,570,028 | $2,405.97 |
| FL INLAND NAV DISTRICT | 0.0320 | 20,291,466 | 6,721,438 | $13,570,028 | $434.24 |

| | Total Millage | 15.0767 | Total Taxes | $204,591.25 |
|---|---|---|---|---|

| Non-Ad Valorem Assessments | | | |
|---|---|---|---|
| Code | Levying Authority | | Amount |
| | | | |
| | | Total Assessments | $0.00 |

| Taxes & Assessments | $204,591.25 |
| --- | --- |
| **If Paid By** | **Amount Due** |
| **11/30/2015** | **$196,407.60** |
| 12/31/2015 | $198,453.51 |
| 1/31/2016 | $200,499.42 |
| 2/29/2016 | $202,545.34 |
| 3/31/2016 | $204,591.25 |

| Prior Year Taxes Due |
| --- |
| NO DELINQUENT TAXES |

Click Here To Pay Now

# Dennis W. Hollingsworth Tax Collector

*generated on 11/19/2015 11:09:43 AM EST*

## Tax Record

Last Update: 11/19/2015 11:09:44 AM EST

Register for eBill

### Ad Valorem Taxes and Non-Ad Valorem Assessments

The information contained herein does not constitute a title search and should not be relied on as such.

| Account or Parcel Number | Tax Type | Tax Year |
|---|---|---|
| 325605-0000 | PERSONAL PROPERTY | 2015 |

**Mailing Address**
LIFE CARE ST JOHNS INC
235 TOWERVIEW DR
SAINT AUGUSTINE FL 32092-0000

BANKRUPTCY

**Physical Address**
235 TOWERVIEW DR

| Exempt Amount | Taxable Value | |
|---|---|---|
| $25,000.00 | $546,548.00 | |

**Exemption Detail**
A1     25000

**Millage Code**
300

**Escrow Code**

**Legal Description**
623110/ 235 TOWERVIEWDR SAINT AUGUSTINE SAINT AUGUSTINE

### Ad Valorem Taxes

| Taxing Authority | Rate | Assessed Value | Exemption Amount | Taxable Value | Taxes Levied |
|---|---|---|---|---|---|
| COUNTY | | | | | |
| GENERAL COUNTY | 5.1475 | 571,548 | 25,000 | $546,548 | $2,813.36 |
| ROAD | 0.7100 | 571,548 | 25,000 | $546,548 | $388.05 |
| HEALTH | 0.0171 | 571,548 | 25,000 | $546,548 | $9.35 |
| SCHOOL | | | | | |
| SCHOOL - STATE LAW | 4.9800 | 571,548 | 25,000 | $546,548 | $2,721.81 |
| SCHOOL - LOCAL BOARD | 2.2480 | 571,548 | 25,000 | $546,548 | $1,228.64 |
| SJRWMD | 0.3023 | 571,548 | 25,000 | $546,548 | $165.22 |
| FIRE | 1.4625 | 571,548 | 25,000 | $546,548 | $799.33 |
| MOSQUITO | 0.1773 | 571,548 | 25,000 | $546,548 | $96.90 |
| FL INLAND NAV DISTRICT | 0.0320 | 571,548 | 25,000 | $546,548 | $17.49 |

| Total Millage | 15.0767 | Total Taxes | $8,240.15 |
|---|---|---|---|

### Non-Ad Valorem Assessments

| Code | Levying Authority | Amount |
|---|---|---|
| | | |
| | Total Assessments | $0.00 |
| | Taxes & Assessments | $8,240.15 |

| If Paid By | Amount Due |
|---|---|
| **11/30/2015** | **$7,910.54** |
| 12/31/2015 | $7,992.95 |
| 1/31/2016 | $8,075.35 |
| 2/29/2016 | $8,157.75 |
| 3/31/2016 | $8,240.15 |

| Prior Year Taxes Due |
|---|
| NO DELINQUENT TAXES |

Click Here To Pay Now

## SCHEDULE 3.5(e)

**Prepaid Utility Deposits\***

| Provider | Deposit |
|---|---|
| FPL Energy Services, Inc. | $2,000 |
| St. Johns County Utility Dept. | N/A |
| Florida Power & Light Company | $68,436 |

## SCHEDULE 5.2(b)

### Seller's Government Entity Approvals

1.  Florida Agency for Health Care Administration, Division of Health Quality Administration.

2.  Florida Office of Insurance Regulation.

3.  Florida Department of Health.

4.  Florida Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco.

5.  Division of Laboratory Services, Center for Medicaid and State Operations.

6.  To the extent transferable, approvals required in connection with the Licenses, Permits, etc. set forth on Schedule 2.1.

7.  CMS approval.

8.  Transfer of Medicare Provider Agreements.

**SCHEDULE 5.2(c)**

**Conflicts**

The consideration for this Transaction is less than the secured indebtedness owed under (i) the Series 2014A and 2014A Health Care Refunding Revenue Bonds issued by the St. Johns County Industrial Development Authority (Glenmoor Project), and (ii) the promissory notes provided to the Refund Queue Claim Holders' Distribution Trust pursuant to the Plan of Reorganization.  Seller is not in compliance with Contracts related to the Bonds and/or the Indenture.

Seller is not in compliance with the Debtor's Reserve Accounts.

Seller is not in compliance with past-due entrance fee refund payments owed by Seller to former residents of Seller or their estates, also known as the Refund Queue Obligations, as more particularly described in Seller's 2013 Bankruptcy Case, and pursuant to Florida Statutes, Chapter 651.

Seller is not in compliance with the terms and conditions of that certain Forbearance Agreement dated July 6, 2015, between Seller and the Bond Trustee.

Seller is not in compliance with the terms and conditions of that certain Restructuring Agreement dated July 6, 2015, between Seller and U.S. Bank National Association.

All matters reflected in Section B-1 of the Title Commitment, including without limitation, the following:

1.      Mortgage in the original principal amount of (a) Note No. One $41,711,250.00 (b) Note No. Two $15,434,643.75, executed by Life Care St. Johns, Inc., a Florida not-for-profit corporation, doing business as Glenmoor in favor of UMB Bank, N.A., as master Trustee, recorded April 17, 2014 in Book 3869, page 1.

2.      Second Mortgage in the original principal amount of $4,700,378.40, executed by Life Care St. Johns, Inc., a Florida not-for-profit corporation, doing business as Glenmoor in favor of U.S. Bank National Association, as Trustee of the Refund Queue Claim Holder's Distribution Trust dated as of April 6, 2014, the date hereof, for the benefit of the Refund Queue Claim Holders, recorded April 17, 2014 in Book 3869, page 78.

3.      Mortgage in the original principal amount of (a) Note No. One $41,711,250.00 (b) Note No. Two $15,434,643.75, executed by Life Care St. Johns, Inc., a Florida not-for-

profit corporation, doing business as Glenmoor in favor of UMB Bank, N.A., as master Trustee, recorded April 17, 2014 in Book 3869, page 155.

4.      Third Mortgage in the original principal amount of $3,133,585.60, executed by Life Care St. Johns, Inc., a Florida not-for-profit corporation, doing business as Glenmoor in favor of U.S. Bank National Association, as Trustee of the Refund Queue Claim Holder's Distribution Trust dated as of April 6, 2014, the date hereof, for the benefit of the Refund Queue Claim Holders, recorded April 17, 2014 in Book 3869, page 223.

5.      UCC-1 Financing Statement naming St. Johns County Industrial Development Authority as secured party and Life Care St. Johns, Inc. as debtor, filed April 17, 2014, recorded in Book 3869, page 250.

6.      UCC-1 Financing Statement naming St. Johns County Industrial Development Authority as secured party and Life Care St. Johns, Inc. as debtor, filed April 17, 2014, recorded in Book 3869, page 266.

## __SCHEDULE 5.4(a)__

### Collateral Assignments and Liens

See <u>Schedule 5.2(c)</u>, which is incorporated herein by this reference.

## <u>SCHEDULE 5.6</u>

## Financial Statements

Reference is made to the Seller's 2013 Bankruptcy Case and the Bankruptcy Case, including all schedules and pleadings referenced therein.

Seller is not in compliance with the Debtor's Reserve Accounts.

Seller is not in compliance with past-due entrance fee refund payments owed by Seller to former residents of Seller or their estates, also known as the Refund Queue Obligations, as more particularly described in Seller's 2013 Bankruptcy Case, and pursuant to Florida Statutes, Chapter 651.

Seller is not in compliance with the terms and conditions of that certain Forbearance Agreement dated July 6, 2015, between Seller and the Bond Trustee.

Seller is not in compliance with the terms and conditions of that certain Restructuring Agreement dated July 6, 2015, between Seller and U.S. Bank National Association.

Seller is not in compliance with Contracts related to the Bonds and/or the Indenture.

## **SCHEDULE 5.7**

### **Compliance with Laws**

Reference is made to the Seller's 2013 Bankruptcy Case and the Bankruptcy Case, including all schedules and pleadings referenced therein.

Seller is not in compliance with the Debtor's Reserve Accounts.

Seller is not in compliance with past-due entrance fee refund payments owed by Seller to former residents of Seller or their estates, also known as the Refund Queue Obligations, as more particularly described in Seller's 2013 Bankruptcy Case, and pursuant to Florida Statutes, Chapter 651.

Seller is not in compliance with the terms and conditions of that certain Forbearance Agreement dated July 6, 2015, between Seller and the Bond Trustee.

Seller is not in compliance with the terms and conditions of that certain Restructuring Agreement dated July 6, 2015, between Seller and U.S. Bank National Association.

Seller is not in compliance with Contracts related to the Bonds and/or the Indenture.

## SCHEDULE 5.8

**Environmental Matters**

Matters addressed in Phase I Environmental Site Assessment dated November 11, 2015, prepared by EMG, under Project No. 116523.15R – 001.135, a copy of which was previously provided to Buyer.

## SCHEDULE 5.9

### Pending Litigation or Adversarial Proceedings

Reference is made to the Seller's 2013 Bankruptcy Case and the Bankruptcy Case, including all schedules and pleadings referenced therein.

Seller is not in compliance with the Debtor's Reserve Accounts.

Seller is not in compliance with past-due entrance fee refund payments owed by Seller to former residents of Seller or their estates, also known as the Refund Queue Obligations, as more particularly described in Seller's 2013 Bankruptcy Case, and pursuant to Florida Statutes, Chapter 651.

Seller is not in compliance with the terms and conditions of that certain Forbearance Agreement dated July 6, 2015, between Seller and the Bond Trustee.

Seller is not in compliance with the terms and conditions of that certain Restructuring Agreement dated July 6, 2015, between Seller and U.S. Bank National Association.

Seller is not in compliance with Contracts related to the Bonds and/or the Indenture.

## **SCHEDULE 5.10**

### **Taxes Being Appealed**

None.

**SCHEDULE 5.11**

**Intellectual Property**

1.      United States Patent and Trademark Registration Nos. 3255936 [Live Service Mark], and 3298115 [Dead Service Mark].

2.      Trade name "Glenmoor"

3.      Website [www.glenmoor.com](www.glenmoor.com)

## SCHEDULE 5.12

**Employee Relations**

LCPS Management, Inc. and its employees provide management services to Glenmoor pursuant to a Management Agreement dated April 16, 2014.  None of the employees of LCPS Management, Inc. are employees of Glenmoor.

## SCHEDULE 5.13(a)

### Material Contracts

See Schedule 7.9(a), which is incorporated herein by this reference.

All Contracts related to the Bonds and/or the Indenture.

All Contracts reflected in Section B-1 of the Title Commitment.

## SCHEDULE 5.13(c)

### Defaults under Material Contracts

Reference is made to the Seller's 2013 Bankruptcy Case and the Bankruptcy Case, including all schedules and pleadings referenced therein.

Seller is not in compliance with the Debtor's Reserve Accounts.

Seller is not in compliance with past-due entrance fee refund payments owed by Seller to former residents of Seller or their estates, also known as the Refund Queue Obligations, as more particularly described in Seller's 2013 Bankruptcy Case, and pursuant to Florida Statutes, Chapter 651.

Seller is not in compliance with the terms and conditions of that certain Forbearance Agreement dated July 6, 2015, between Seller and the Bond Trustee.

Seller is not in compliance with the terms and conditions of that certain Restructuring Agreement dated July 6, 2015, between Seller and U.S. Bank National Association.

Seller is not in compliance with Contracts related to the Bonds and/or the Indenture.

## **SCHEDULE 6.2(b)**

### **Buyer's Governmental Approvals**

See <u>Schedule 5.2(b)</u>, which is incorporated herein by this reference.

**<u>SCHEDULE 7.9(a)</u>**

**Transferred Contracts**

| | |
|---|---|
| Abacus Contracting, LLC<br>1008 Loring Avenue, Suite 29<br>Orange Park, Florida  32073 | General contracting work<br>(Contract per project) |
| American Data Services<br>Post Office Box 640<br>Sauk City, Wisconsin  53583 | Electronic medical records system<br>(working on breaking up the companies, ongoing contract) |
| American Health Associates, Inc.<br>2831 Corporate Way<br>Hollywood, Florida  33025 | Contract for laboratory services<br>(9/7/09, auto renewal, 30 day term notice) |
| Atkinson's Healthcare Providers<br>Attn:  Robert Allen, President<br>Post Office Box 7023<br>Orange Park, Florida  32073 | Skilled nursing pharmacy services agreement<br>(6/1/10, continuous, 30 day term) |
| Jennifer L. Beall<br>Dysphagia Decision Solutions, LLC<br>4400 North Altamaha Street<br>St. Augustine, Florida  32092 | Independent contract agreement<br>(8/15/13, continuous, 30 day term) |
| Joseph W. Bonura, DPM<br>19 Burning Sands Lane<br>Palm Coast, Florida  32137 | Contract for podiatry services<br>(11/1/01, continuous, 60 day term) |
| Earnest Carames, M.D.<br>16 St. Johns Medical Park Drive<br>St. Augustine, Florida  32086 | Medical director agreement<br>(1/1/07, auto renewal, 90 day term) |
| Century Ambulance Service, Inc.<br>Attn:  Melanie Delaney<br>2144 Rosselle Street<br>Jacksonville, Florida  32204 | Ambulance and medical services agreement<br>(3/17/15, annual, 30 day term) |
| Community Hospice of Northeast Florida, Inc.<br>Attn:  Carlos Bosque, Executive VP<br>4266 Sunbeam Road<br>Jacksonville, Florida  32257 | Nursing Facility Services Agreement<br>(4/1/09, auto renewal, 60 day term) |
| Cintas Shredding<br>(don't have address) | Currently an "additional site" on the Vicar's Landing contract – to be terminated at sale |
| Flagler Hospital, Inc.<br>Attn:  James D. Conzemius, President<br>400 Health Park Boulevard<br>St. Augustine, Florida  32086 | Patient Transfer Agreement<br>(11/12/01, auto renewal, 30 day term) |
| Ring Power<br>(don't have address) | Generator Service Agreement<br>(4/2/14 – 4/1/18, 30 day term |
| Michael Hoffman<br>7128 Greenfern Lane<br>Jacksonville, Florida  32277 | Medical records consultant agreement<br>(12/2/12, continuous, no notice period defined) |
| Jacksonville Mobile Imaging Services<br>First Coast Mobile Imaging Services<br>4237 Salisbury Road, Suite 306<br>Jacksonville, Florida  32216 | Mobile imaging and monitoring services agreement<br>(5/11/09, auto renewal, 30 day term) |
| Konica Minolta Business Solutions<br>21146 Network Place<br>Chicago, Illinois  60673 | Lease agreement for BizHub 423 and BizHub C452 copy machines, FS-527 floor finisher<br>(3/1/11 for a 60 month period) |

| | |
|---|---|
| Sharon Lucks, RD, LD<br>4743 Seaboard Avenue<br>Jacksonville, Florida 32210 | Agreement for services of consultant dietician<br>(8/23/02, auto renewal, 30 day term) |
| Medco, Inc.<br>653 Kingsley Avenue<br>Orange Park, Florida 32073 | Agreement for primary supplier of durable medical equipment<br>(10/6/01, auto renewal, no term notice defined) |
| Terminix<br>(don't have address) | Pest control and termite<br>(3/6/15 – 3/5/19, paid for four year period) |
| Valley Crest<br>(don't have address) | Landscape maintenance and tree trimming<br>(1/1/15 – 12/31/15, 30 day term) |
| Otis Elevator Company<br>6631 Executive Park Court<br>Jacksonville, Florida 32216 | Maintenance and service agreement for (3) hydraulic Otis Elevators<br>(4/1/11, auto renewal, 60 day term) |
| Pitney Bowes Global Financial Services<br>Post Office Box 371887<br>Pittsburgh, Pennsylvania 15250 | Meter rental, soft-guard subscription and service level agreement for two postage meters<br>(8/31/11, 60 month period) |
| ProMed Waste Solutions<br>320 Enterprise Street<br>Ocoee, Florida 34761 | Service Agreement for disposal of biohazardous waste<br>(8/16/12, auto renewal, 60 day term) |
| Salon Operations, Inc.<br>305 Oleander Street<br>Neptune Beach, Florida 32266 | Lease of salon facilities<br>(4/29/11, auto renewal, 30 day term) |
| SimplexGrinnell<br>10255 Fortune Parkway, Suite 120<br>Jacksonville, Florida 32256 | Five year alarm monitoring and service agreement for four wet pipe sprinkler systems, backflows, fire alarm, nurse call and kitchen hood<br>(Various start dates, expirations 12/31/15, 2/29/16 and 5/31/16, 30 day term) |
| Sirius XM Radio, Inc.<br>Post Office Box 9001399<br>Louisville, Kentucky 40290 | One year agreement for XM Select Service<br>(Auto renewal each July, no termination period, cancel at will) |
| Home Instead | Shared staffing agreement with home health agency – to be terminated at sale |
| W.W. Gay Mechanics Construction<br>524 Stockton Street<br>Jacksonville, Florida 32204 | HVAC service contract<br>(10/1/10, auto renewal, 30 day term) |

Medicare Provider Agreements and accompanying provider numbers (CCN: 181403100016-001; PTAN: 106040; NPI: 1053321968).

All Residency Agreements set forth on the attached schedule.

Any new Residency Agreements entered into by Seller and a Prospective Resident prior to the Closing Date.

## SCHEDULE 7.9(b)

**Rejected Contracts**