# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re                           )

LIFE CARE ST. JOHNS, INC.,     )     Case No.: 3:16-bk-1347-JAF
a Florida not-for-profit corporation
doing business as GLENMOOR,[1]   )     Chapter 11

           Debtor.       )

_____ )

## DEBTOR'S MOTION FOR ENTRY OF ORDERS (A) AUTHORIZING THE SALE OF THE 11 ACRE PARCEL ADJACENT TO ITS MAIN CAMPUS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS; (B) APPROVING BIDDING PROCEDURES IN CONNECTION THEREWITH; AND (C) AUTHORIZING PAYMENT OF REAL ESTATE SALES COMMISSION TO WALCHLE LEAR MULTIFAMILY ADVISORS

Life Care St. Johns, Inc., a Florida not-for-profit corporation doing business as Glenmoor ("Glenmoor" or "Debtor"), moves the Court, pursuant to §§ 363, 1129(b)(2) and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of orders (a) authorizing the Debtor to sell the 11 Acre Parcel (defined below) of unimproved real estate adjacent to its primary campus to LCS Glenmoor, LLC ("LCS" or the "Stalking Horse Bidder") or such other party (the "Successful Bidder") who submits a higher and better bid at the Auction (as defined below) free and clear of liens, claims and interests; (b) approving bidding procedures in connection therewith; and (c) authorizing the payment of a real estate sales commission to

---

[1] The Federal Employer Identification Number for the Debtor is 59-3474627. The address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

Walchle Lear Multifamily Advisors ("Walchle Lear") upon sale of the property, and in support of the motion states:

## Preliminary Statement

By this motion, Glenmoor seeks entry of an order authorizing the sale of the 11 acre parcel of unimproved real estate adjacent to Debtor's continuing care retirement community (the "11 Acre Parcel") to LCS for $450,000, or to such other prospective purchaser who may submit a higher and better offer following a court supervised auction of the 11 Acre Parcel.[2]  To that end, and to ensure that the sales process is open, fair and efficient, Glenmoor also seeks the entry of an order (i) scheduling an auction of the 11 Acre Parcel, and (ii) approving bid procedures to be utilized in connection therewith (the "Bid Procedures").  In the event the 11 Acre Parcel is sold, Debtor likewise seeks authorization to pay a real estate commission to Walchle Lear, the broker which Glenmoor has retained to market and sell the 11 Acre Parcel.

## Jurisdiction and Venue

1.      This Court has jurisdiction over the matters raised in this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to one or more subsections of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]  The legal description for the 11 Acre Parcel is attached hereto as **Exhibit A**.

## Background

3.      On April 11, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4.      Glenmoor is a not-for-profit organization that owns and operates a continuing care retirement community ("CCRC") in St. Johns County, Florida.  As a CCRC, Glenmoor provides "lifecare services" to its residents, each of whom reside in a residential unit.  The "lifecare" concept recognizes that the healthcare and residency needs of elderly residents vary along a continuum beginning with independent living and in many cases ending with a need for full-time nursing care.  The Glenmoor community thus includes independent residential units, an assisted living center, and a healthcare center for residents requiring round the clock nursing care.

5.      Unfortunately, the economic recession which began in late 2007 had a dramatic impact on Glenmoor, with fewer residents being able to afford the required Entrance Fees as their home equity and investments portfolios declined in value.  With fewer new residents entering the community than were moving out, significant Entrance Fee refund liabilities began to accumulate, rising to almost $8 million at their peak.  The decreasing revenues eventually led to payment and other defaults under the $59 million in Revenue Bonds issued in 2006 to support Glenmoor and refinance an earlier bond issue (the "2006 Bonds").

6.      With pressure mounting from each of these angles, Glenmoor had little choice but to seek relief under chapter 11 of the Bankruptcy Code.  Its petition was filed on July 3, 2013, and was styled as *In re Life Care St. Johns, Inc.*, debtor; United States Bankruptcy Court, Middle District of Florida, Jacksonville Division; Case No. 3:13-bk-4158-JAF (the "Initial Chapter 11 Case").

7.     Among other things, the Plan contemplated a restructuring of Glenmoor's indebtedness through (i) the exchange of the 2006 Bonds for new Series 2014A and Series 2014B Bonds; and (ii) formation of Refund Queue Claim Holders' Distribution Trust (the "Refund Queue Trust") for the benefit of prepetition Entrance Fee refund claimants, and (iii) issuance of promissory notes in favor of the Refund Queue Trust. The notes given the Refund Queue Trust were secured by a first mortgage lien on the 11 Acre Parcel.

8.     Glenmoor's Plan of Reorganization (the "Plan") was confirmed by this Court on February 28, 2014, and the Final Decree was entered almost two years later on April 6, 2016.

9.     Though Glenmoor's post-confirmation operational performance was consistent with the Plan, Glenmoor has been unable to generate sufficient revenues to fulfill the financial commitments established thereunder.   After consultation with its Bondholder constituency and the Refund Queue Trust, it was decided that Glenmoor should be sold as a going concern under § 363 of the Bankruptcy Code.

10.     Glenmoor thus retained the advisory services of DTZ as broker/investment banker to administer the sales process.   DTZ, now known as Cushman & Wakefield, specializes in the marketing and sale of retirement communities throughout the United States. DTZ in turn solicited offers from over 100 industry prospects, with a number of prospective purchasers ultimately submitting letters of intent to acquire Glenmoor's assets. After vetting the various offers with the Bond Trustee, LCS was selected as the Stalking Horse purchaser of Glenmoor's assets, with a Letter of Intent being executed on October 23, 2015.

11.     Following execution of the Letter of Intent, the parties began negotiating an asset purchase agreement spelling out in detail the terms under which Glenmoor would

4

sell, and LCS would acquire, the CCRC. Through the course of those negotiations, the Debtor decided that the 11 Acre Parcel encumbered by the Refund Queue Trust's first mortgage should be sold separately from the main campus. To that end, DTZ successfully negotiated an agreement with LCS pursuant to which LCS would also serve as the stalking horse purchaser for the 11 Acre Parcel. The final agreement of the parties regarding the purchase and sale of the 11 Acre Parcel is reflected in the Stalking Horse Real Estate APA attached hereto as **Exhibit B**.

12.     The material terms and conditions of the Stalking Horse Real Estate APA are summarized as follows:[3]

| | |
|---|---|
| Purchase Price | $450,000 |
| | The purchase price is subject to customary adjustments upward and downward as set forth in the Stalking Horse Real Estate APA. |
| Deposit | As an inducement for the Seller to enter into the Stalking Horse Real Estate APA, Buyer will deposit $25,000 (the "Deposit") with Glenmoor. |
| Stalking Horse Bid | Pursuant to sections 105, 363, 365 and/or 1129 of the Bankruptcy Code, and subject to the terms, conditions and other provisions of the Stalking Horse Real Estate APA, Buyer will serve as the stalking horse bidder for the 11 Acre Parcel, subject to a competitive auction process proposed in bidding procedures to be negotiated between Seller and Buyer. |
| Closing | Closing will occur simultaneously with the closing on LCS' acquisition of Glenmoor's operational assets. |

---

[3]   This summary is qualified in its entirety by the Stalking Horse Real Estate APA. To the extent this summary conflicts with the Stalking Horse Real Estate APA, the Stalking Horse Real Estate APA governs. Capitalized terms used in this summary but not defined herein shall have the meanings provided in the Stalking Horse Real Estate APA.

| | |
|---|---|
| Financing | It is contemplated that closing will be on an all-cash basis. Any financing placed on the 11 Acre Parcel by Buyer will be post-closing. Accordingly, the Stalking Horse Real Estate APA does not contain any financing contingencies. |
| Conditions Precedent | LCS is not required to purchase the 11 Acre Parcel unless it is the successful bidder for Glenmoor. LCS' purchase of the 11 Acre Parcel is not, however, a condition precedent to the purchase of Glenmoor's other assets. |

13.     During the negotiation of the Stalking Horse Real Estate APA, it was decided that a local commercial real estate broker should be enlisted to market the 11 Acre Parcel to ensure that the property is marketed to the active developers in the St. Augustine market, many of which would not be necessarily known to DTZ. DTZ in turn graciously agreed to except the 11 Acre Parcel from its listing contract and to waive any commission for the procuring Stalking Horse Real Estate APA.

14.     After consultation with the Oversight Committee for the Refund Queue Claim Holders' Distribution Trust, Walchle Lear was selected to continue the marketing of the 11 Acre Parcel and to administer the auction process.

## The Proposed Bid Procedures

15.     In order to ensure that the Stalking Horse Real Estate APA is in fact the highest and best offer obtainable for the 11 Acre Parcel, Glenmoor has determined that the sale to LCS should be subjected to competitive bidding on terms and procedures established by the Court.

16.     This section sets forth key provisions of the "Bid Procedures" procedures proposed by Glenmoor with respect to the proposed sales process.

17.    **_Bid Requirements._** To participate in the Auction, prior to the Bid Deadline, a Potential Bidder (other than LCS or the Refund Queue Trust) must deliver to Glenmoor a written irrevocable offer that must:

(a)    be in writing;

(b)    authorize Glenmoor to provide the bid to LCS, the Bond Trustee and the Refund Queue Trustee;

(c)    equal or exceed $475,000, which is the sum of (i) the offer submitted by LCS, and (ii) the minimum bid increment of $25,000 (such aggregate sum, the "Minimum Bid Amount") (all of which must be in cash);

(d)    constitute a good faith, bona fide offer to purchase of the 11 Acre Parcel on substantially the same terms as contemplated in the Stalking Horse Real Estate APA, the purchase of the other assets of Glenmoor as a condition precedent to closing excepted;

(e)    be accompanied by a clean and duly executed copy of an Asset Purchase Agreement and the documents set forth as exhibits thereto, along with copies that are marked to reflect the amendments and modifications from the Stalking Horse Real Estate APA executed with LCS, which may not be on terms less favorable in the aggregate to Glenmoor or materially inconsistent with these Bidding Procedures;

(f)    require a closing within fourteen days of the Sale Hearing;

(g)    identify with particularity each and every condition to closing;

(h)    not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder; and

(i)    must remain irrevocable until 48 hours after the Auction.

18.    In addition to the above, each Potential Bidder must:

(a)    provide Glenmoor, the Bond Trustee and the Refund Queue Trustee, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of Glenmoor (in consultation with the Refund Queue Trustee), that such Potential Bidder has the financial wherewithal and ability to consummate the acquisition of the 11 Acre

Parcel, including current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the 11 Acre Parcel, current audited financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtor, demonstrating such Potential Bidder's ability to timely close the proposed transaction;

(b)     fully disclose the identity of each entity that will be bidding for or purchasing the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;

(c)     on or before the Bid Deadline, submit a cash deposit equal to $50,000 by wire transfer of immediately available funds to an account or accounts established pursuant to an escrow agreement (the "Good Faith Deposit"); and

(d)     not be entitled to any break-up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

19.     Bids fulfilling all of the preceding requirements shall be deemed to be "Qualified Bids," and those parties submitting Qualified Bids shall be deemed to be "Qualified Bidders." Within twelve hours after receipt of a Qualified Bid, Glenmoor shall provide such Qualified Bid to the Bond Trustee, Refund Queue Trustee and LCS. Within one (1) Business Day after the Bid Deadline, Glenmoor, shall determine, in consultation with the Refund Queue Trustee, which Potential Bidders are Qualified Bidders and will notify the Potential Bidders and LCS whether their bids constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. The Stalking Horse APA submitted by LCS shall be deemed a Qualified Bid.

20.     ***Bid Deadline.*** Binding bids must be actually received by Glenmoor no later than 5:00 p.m. (prevailing Eastern Time) on May 30, 2016 (the "Bid Deadline").

21.     ***Evaluation of Qualified Bids.***   Prior to the Auction, Glenmoor shall evaluate Qualified Bids and, in consultation with the Bond Trustee and the Refund Queue Trustee, identify the Qualified Bid that is, in Glenmoor's judgment, the highest or otherwise best bid (the "Starting Bid").   Within 24 hours of such determination, Glenmoor shall notify LCS as to which Qualified Bid is the Starting Bid.

22.     ***Refund Queue Trust's Right to Credit Bid.***   The Refund Queue Trust shall have the right to credit bid its secured claim towards the acquisition of the 11 Acre Parcel without the necessity of submitting a formal written offer.   The Refund Queue Trust shall, however, be required to provide notice of Glenmoor prior to the Bid Deadline of its intent to exercise its credit bid rights.   Such notice shall be accompanied by the Refund Queue Trust's initial bid.   Should the Refund Queue Trust exercise its credit bid rights and be deemed the Successful Bidder (as defined below), the 11 Acre Parcel shall be conveyed to it by general warranty deed with no representations or warranties of any kind other than warranty of title.

23.     ***Acceptance of the Successful Bid.***   Upon the conclusion of the Auction (if the Auction is conducted), Glenmoor, in the exercise of its reasonable, good-faith business judgment and after consulting with the Refund Queue Trustee, shall identify the highest and best bid (the "Successful Bid").   In determining which Qualified Bid is the Successful Bid, the Debtor may consider, after consultation with the Bond Trustee and the Refund Queue Trustee (other than any one of the foregoing choosing to bid at the Auction), among other things: (1) the amount of the purchase price; (2) the form of consideration being offered; (3) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (4) the net benefit to the Debtor's estate and all of its constituents; and (5) any other facts, including but not limited to, all other non-economic factors.   Before the

conclusion of the Auction, the Debtor shall inform each of the Bidders of the decision regarding designation of the Successful Bid, and the Qualified Bidder who submitted such Successful Bid shall be required to execute a definitive asset purchase agreement at such time. The Debtor shall present the Successful Bid to the Bankruptcy Court for approval at the Sale Hearing.

### Payment of Real Estate Commission

24.     Again, the Stalking Horse Real Estate APA was procured through the efforts of DTZ. DTZ has agreed to waive its claim for any commission associated with the 11 Acre Parcel. Walchle Lear, in turn, has agreed to lower its standard commission in the event no additional offers for the 11 Acre Parcel are received, and will be compensated in accordance with the following schedule:

| DEAL SIZE | FEE |
|---|---|
| $0 - $1,200,000 | 10%[4] |
| $1,200,001 - $2,400,000 | 8% |
| $2,400,001 - $3,600,000 | 6% |
| $3,600,001 - $4,000,000 | 5% |
| Above $4,000,000 | 4% |

25.     By this motion, Glenmoor seeks permission to pay the applicable real estate commission to Walchle Lear for its efforts, conditioned upon the successful closing of the sale of the 11 Acre Parcel.

---

[4]     If the sale is to LCS Glenmoor, LLC or its affiliate, assignee or successor-in-interest, and the gross purchase price shall be more than $250,000 and equal to or less than $500,000, the fee shall be $25,000 rather than 10%.

## Relief Requested

26.    By this Motion, the Debtor seeks authorization to sell the 11 Acre Parcel to LCS on the terms stated in the Stalking Horse Real Estate APA or to the Successful Bidder on the terms stated in the APA between such Successful Bidder and the Debtor. To affect the Sale, the Debtor respectfully requests entry of two orders. First, the Debtor will seek entry of the Bidding Procedures Order, attached hereto as **Exhibit C**, to approve the proposed bid procedures and notice procedures relating to the Auction. Second, subject to the terms of the Bidding Procedures Order, at a proposed hearing (the "Sale Hearing") to be held following the conclusion of the auction following a marketing period, the Debtor will seek entry of a Sale Order approving the sale of the 11 Acre Parcel to LCS, or such other higher and better bidder pursuant to the terms of the Stalking Horse Real Estate APA or the APA of the Successful Bidder, free and clear of all claims, interests, liens, or encumbrances.

## Basis for Relief Requested

27.    Cause exists to approve the proposed Bid Procedures and to authorize the Sale. The proposed Bid Procedures are reasonable and necessary to effectuate the sale process for the 11 Acre Parcel and provide sufficient notice and opportunity to permit other bidders to participate in the Auction process. Upon conclusion of the Auction, the Debtor believes that sufficient cause will exist to enter an order approving the proposed sale to LCS as the Real Estate Stalking Horse Bidder or such higher and better bidder that results from the Auction.

28.    The Debtor, and in conjunction with agreed upon milestones contained in the Forbearance Agreement, has been actively soliciting potential purchasers or affiliates

for Glenmoor since the launch of the solicitation process in July, 2015. During that time, DTZ has contacted at least 116 non-profit and for-profit service providers. Forty-four interested parties signed confidentiality agreements and were then given access to a data room containing pertinent information and were provided access to the Glenmoor facility and its management. Ultimately, LCS submitted its final LOI on October 27, 2015 and was chosen as the Real Estate Stalking Horse Bidder. The Debtor seeks approval of the Bid Procedures in an effort to maximize the likelihood of higher and better bids from those parties that have expressed interest and appear to be qualified potential purchasers of Glenmoor.

29.     Under Bankruptcy Rule 6004(f)(1), the Debtor may sell property outside the ordinary course of business by private sale or by public auction. In this case, the Debtor believes that an auction will expose the 11 Acre Parcel to a broad and diverse market and ensure a sale to the bidder that makes the highest and best offer.

30.     The Debtor desires to receive the greatest value for the 11 Acre Parcel. Although the Debtor believes the Stalking Horse Real Estate APA represents a fair and reasonable offer, the Debtor nevertheless desires to place the Stalking Horse Real Estate APA to the test of the broader public marketplace in the hope that higher and better offers are generated for the 11 Acre Parcel. If the Bid Procedures are approved, the Debtor will further solicit competing bids for the 11 Acre Parcel following an approximately 5 week marketing period.

31.     The Bid Procedures are consistent with the Debtor's need to promote participation and active bidding. Moreover, the Bid Procedures reflect the Debtor's objective of conducting the Auction in a controlled, fair, and open fashion.

32.     The Debtor believes that the Auction and proposed Bid Procedures will promote active bidding from seriously interested parties and will identify the highest and best offer(s) for the 11 Acre Parcel. The Debtor believes that the Bid Procedures are: (a) sufficient to encourage bidding for the 11 Acre Parcel; (b) consistent with procedures previously approved by the Court in similar cases; and (c) appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Further, the Bid Procedures are designed to maximize the value received by the Debtor's bankruptcy estate for the 11 Acre Parcel while ensuring an orderly sale process.

33.     Once the Debtor articulates a valid business justification for a sale of the Debtor's assets, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (citing *Smith v. Van Gorkam*, 488 A.2d 858 (Del. 1985); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *Comm. of Asbestos-Related Litigants v. Johns-Manville (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a Debtor's management decisions").

34.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate. *See, e.g., In re Integrated Res.*, 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard under which such procedures

and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

35.     The paramount goal in any proposed auction of property of the estate is to maximize the proceeds received by the estate. *See, e.g., Four B Corp. v. Food Barn Stores (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

36.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., In re Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

37.     The Debtor further submits that it is appropriate to sell the 11 Acre Parcel free and clear of all encumbrances, pursuant to Bankruptcy Code § 363(f), with any such encumbrances attaching to the net sale proceeds of the assets, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a the sale of a debtor entity's assets free and clear of liens, claims, interests and encumbrances if:

(1)     applicable non-bankruptcy law permits sale of such property free and clear of such interests;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

38.     Because Bankruptcy Code § 363(f) is drafted in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Debtor's assets "free and clear" of liens and interests. *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005); *see also Michigan Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code § 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code § 363(f) is met); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D. N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met"); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D. N.Y. 1986).

39.     The standard for a sale under § 363(f) is satisfied because, among other things, applicable non-bankruptcy law permits the sale of such property free and clear of such interests; namely because such lienholders will be adequately protected by having their liens attach to the sale proceeds received by the Debtor for the sale of the assets to the

Buyer in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto. In addition, creditors could be compelled to accept a money satisfaction for their claims. Accordingly, § 363(f) authorizes the sale and transfer of the assets free and clear of any such encumbrances.

40.    The terms of the Stalking Horse Real Estate APA were negotiated at arm's length, without collusion, and in good faith. The prospective purchaser, LCS, has no affiliation with Glenmoor. Accordingly, the Debtor requests that the Court determine LCS to have negotiated and acted at all times in good faith and, as a result, be entitled to the protections of a good faith purchaser under § 363(m) of the Bankruptcy Code.

41.    Furthermore, the Debtor submits that the Stalking Horse Real Estate APA represents substantial value to the Debtor's estate inasmuch as it provides favorable terms for the disposition of Glenmoor for fair and reasonable consideration. *See Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646-47 (3d Cir. 1991) (reasonably equivalent value under the Bankruptcy Code); *see Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors of R.M.I., Inc, (In re R.M.I., Inc.)*, 92 F.3d 139 (3d Cir. 1996); *Salisbury v. Texas Commerce Bank-Houston (In re WCC Holding Corp.)*, 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994) (reasonably equivalent value under Texas law); *Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (Bankr. N.D. Tex. 1992); *In re China Resource Prod. (U.S.A.) Ltd. v. Favda Int'l, Inc.*, 856 F. Supp. 856, 866 (D. Del. 1994) (fair consideration under Delaware law).

42.    Furthermore, Glenmoor's Bondholder constituency has no objection to the sale of the 11 Acre Parcel as contemplated herein, and to the release of its mortgage liens on the 11 Acre Parcel in connection with the sale. Though it is anticipated that the Refund

Queue Trust will similarly consent to the release of its mortgages and security interests to facilitate a sale, the Refund Queue Trust will maintain its right to credit bid its secured debt towards acquisition of the 11 Acre Parcel.

43.    Based upon the foregoing, the Debtor submits that, to preserve and maximize the value of Glenmoor, the sale of the assets pursuant to the Stalking Horse Real Estate APA (or a higher and better offer) is an exercise of sound business judgment, is in the best interests of the Debtor and its estate, and should be approved in all respects.

44.    The transfer of the 11 Acre Parcel under the Stalking Horse Real Estate APA is intended to be a transfer under a plan of liquidation confirmed under 11 U.S.C. § 1129. Pursuant to § 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under or in connection with the Plan, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, assignments, mortgages, deeds of trust or similar documents executed in connection with the transfer of the 11 Acre Parcel to Buyer should not therefore be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax nor any Uniform Commercial Code filing or recording fee or similar or other governmental assessment. Debtor requests that the order approving the sale so provide.

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form attached hereto: (i) approving the Bid Procedures; (ii) scheduling an Auction and a Sale Hearing to approve the proposed Sale; (iii) approving the form and manner of notice of the Bid Procedures Hearing, Auction and Sale Notice, and Sale Hearing; and (v) granting such other relief as may be just and proper. Additionally, the Debtor requests that, at the Sale Hearing, the Court enter the Sale Order substantially in the

form to be filed prior to the Sale Hearing subject to the result of the Auction and to the Bid

Procedures (i) approving and authorizing the Sale; and (ii) granting such other and further

relief as may be just and proper.

**THAMES MARKEY & HEEKIN, P.A.**

*/s/ Richard R. Thames*

By _____
      Richard R. Thames

Florida Bar No. 0718459
50 N. Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 Facsimile
rrt@tmhlaw.net

Attorneys for Life Care St. Johns, Inc.

**Exhibit "A"**

Approximate 11 Acre Parcel:

Parcel A

Northwest Parcel 11A

Part of Section 44, Township 6 South, Range 28 East, St. Joins County, Florida, more particularly described as follows; for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1295.90 feet; thence South 75°04'08" East leaving said Westerly line of Section 44, a distance of 1910.39 feet to the Point of Beginning; thence North 32°40'18" West, a distance of 394.90 feet; thence North 03°28'56" East along a line to its intersection with conservation easement no. 29, a distance of 315.67 feet; thence South 68°38'38" East along said conversation easement, a distance of 65.34 feet; thence North 57°00'25" East continuing along said conservation easement, a distance of 56.53 feet; thence North 36°47'19" East along said conservation easement, a distance of 33.66 feet; thence North 56°23'17" West along said conservation easement, a distance of 38.85 feet; thence North 41°26'16" East along said conservation easement, a distance of 50.16 feet; thence North 77°43'45" East along said conservation easement, a distance of 51.00 feet, thence South 65°06'09" East along said conservation easement, a distance of 21.10 feet; thence North 73°35'01" East along said conservation easement, a distance of 24.11 feet; thence South 67°48'15" East continuing along said easement line, a distance of 61.16 feet; thence South 02°10'02" West continuing along said easement line, a distance of 31.16 feet; thence South 46°29'48" East continuing along said easement line, a distance of 47.46 feet; thence South 68°03'16" East continuing along said easement line, a distance of 69.09 feet; thence North 71°08'08" East continuing along said easement line, a distance of 54.32 feet, thence North 82°51'41" East continuing along said easement line, a distance of 63.97 feet; thence South 81°18'54 " East continuing along said easement line a distance of 44.30 feet; thence North 12°19'30" East continuing along said easement line, a distance of 52.59 feet to the point of curve of a curve, concave Southwesterly having a radius of 130.00 feet; thence Southeasterly along the arc of said curve continuing along said easement line, an arc distance of 392.43 feet, said arc being subtended by a chord bearing of South 81°11'47" East and a chord distance of 259.51 feet to the point of tangency of said curve; thence South 05°16'55" West along a Westerly line of said conservation easement, a distance of 325.44 feet; thence South 24°54'33" West continuing along said easement line and its Southerly projection thereof to its intersection with the Northerly right of way line of Parcel 11A access easement, a distance of 345.54 feet to a point lying on a curve, said curve being concave Southeasterly having a radius of 440.00 feet; thence Southwesterly along the arc of said curve and along said Northerly right of way line, an arc distance of 431.03 feet; said arc being subtended by a chord bearing of South 87°25'35" West and a chord distance of 414.00 feet to the point of tangency of said curve; thence South 59°21'36" West continuing along said Northerly right of way line, a distance of 21.64 feet to the Point of Beginning.

Parcel B

Parcel 1, Swap Parcel to Northwest 11

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence North 03°28'56" East, a distance of 152.07 feet to the Point of Beginning; thence North 22°20'24" West, a distance of 181.75 feet; thence South 86°31'04" East, a distance of 79.17 feet; thence South 03°28'56" West a distance of 163.60 feet to the Point of Beginning.


Parcel C

Parcel 3, Swap Parcel to Northwest 11

A part of section 44, Township 6 South, Range 28 East, St. Johns County, Florida more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said sect ion 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence South 32°40'18" East, a distance of 213.15 feet to the Point of Beginning; thence continue South 32°40'18" East, a distance of 168.93 feet; thence South 70°30'28" West, a distance op 43.61 feet; thence North 17°43'07" West a distance of 164.56 feet to the Point of Beginning.


LESS AND EXCEPT THE FOLLOWING DESCRIBED LANDS:

Parcel 2, Swap Parcel to Northwest 12

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet: thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in Official Records Book 1291, Page 403 for the Point of Beginning; thence North 03°28'56" East, a distance of 152.07 feet; thence South 17°43'07" East, a distance of 347.71 feet; thence North 32°40'18" West, a distance of 213.15 feet to the Point of Beginning.


Parcel 4, Parcel from Northwest 11

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1311.88 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1869.64 feet; thence North 70°30'28" East, a distance of 43.61 feet to Point of Beginning; thence continue North 70°30'28" East, a distance of 107.92 feet to a point on a curve, being concave Southeasterly, having a radius of 440.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 84.30 feet, said arc being subtended by a chord bearing of South 64°51'05" West and a chord distance of 84.18 feet to the point of tangency of said curve; thence South 59°21'36" West, a distance of 21.63 feet; thence North 32°40'18" West, a distance of 12.82 feet to the Point of Beginning.

TOGETHER WITH A NON-EXCLUSIVE PERPETUAL EASEMENT OVER THE FOLLOWING DESCRIBED LANDS:

Royal Pines Park Way

A part of the Antonio Huertas Grant, Section 38, together with a part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 7123.49 feet; thence South 53°13'38" East along a line to its intersection with the Northwesterly right of way line of International Golf Parkway (a 100 foot right of way as proposed), a distance of 2224.53 feet; thence North 50°29'50" East along said proposed Northwesterly right of way line, a distance of 2492.30 feet; thence North 44°29'54" East continuing along said proposed Northwesterly right of way line, a distance of 906.96 feet to the Point of Beginning, said point being on a curve, concave Westerly having a radius of 50.00 feet; thence Northwesterly leaving said right of way line and along the arc of said curve, an arc distance of 78.54 feet, said arc being subtended by a chord bearing of North 00°30'06" West and a chord distance of 70.71 feet to the point of tangency of said curve; thence North 45°30'05" West, a distance of 71.99 feet to the point of a curve of a curve concave Northeasterly having a radius of 550.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 261.20 feet, said arc being subtended by a chord bearing of North 31°53'47" West and a chord distance of 258.75 feet to the point of tangency of said curve; thence North 18°17'27" West a distance of 211.97 feet to the point of a curve of a curve, concave Easterly having a radius of 550.00 feet; thence Northerly along the arc of said curve, an arc distance of 266.10 feet, said arc being subtended by a chord bearing of North 04°25'50" West and a chord distance of 263.51 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve, an arc distance of 438.51 feet, said arc being subtended by a chord bearing of North 08°30'59" West and a chord distance of 431.37 feet to the point of reverse curve of a curve, concave Easterly having a radius of 800.00 feet; thence Northerly along the arc of said curve, an arc distance of 623.81 feet, said arc being subtended by a chord bearing of North 04°07'27" West and a chord distance of 608.12 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve an arc distance of

328.09 feet, said arc being subtended by a chord bearing of North 04°47'13" East and a chord distance of 325.10 feet to the point of reverse curve, concave Easterly having a radius of 600.00 feet; thence Northerly along the arc of said curve, an arc distance of 314.77 feet, said arc being subtended by a chord bearing of North 06°23'19" East and a chord distance of 311.17 feet to the point of tangency of said curve; thence North 21°25'04" East, a distance of 2.70 feet to the point of curve of a curve, concave Westerly having a radius of 1000.00 feet; thence Northerly along the arc of said curve, an arc distance of 832.14 feet, said arc being subtended by a chord bearing of North 02°25'17" West and a chord distance of 808.34 feet to the point of tangency of said curve; thence North 26°15'38" West a distance of 206.92 feet to the point of curve of a curve, concave Northeasterly having a radius of 1050.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 448.34 feet, said arc being subtended by a chord bearing of North 14°01'42" West and a chord distance of 444.94 feet to a point of compound curve of a curve, concave Southeasterly having a radius of 550.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 609.03 feet, said arc being subtended by a chord bearing of North 29°55'35" East and a chord distance of 578.39 feet to a point of reverse curve of a curve, concave Northwesterly having a radius of 185.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 230.24 feet, said arc being subtended by a chord bearing of North 25°59'45" East and a chord distance of 215.67 feet to a point of cusp of a curve, said point lying on the Westerly right of way line of WGV Boulevard, said curve being concave Westerly having a radius of 2500.00 feet; thence Southerly along said Westerly right of way line and along the arc of said curve, an arc distance of 216.78 feet, said arc being subtended by a chord bearing of South 07°10'25" East and a chord distance of 216.71 feet to the point of reverse curve of a curve, concave Northeasterly having a radius of 550.00 feet; thence Southeasterly, continuing along said Westerly right of way line and along the arc of said curve, an arc distance of 599.77 feet, said arc being subtended by a chord bearing of South 35°55'47" East and a chord distance of 570.49 feet to the point of cusp of a curve, concave Northeasterly having a radius of 556.50 feet; thence Northwesterly leaving said Westerly right of way line of WGV Boulevard and along the arc of said curve, an arc distance of 320.51 feet, said arc being subtended by a chord bearing of North 52°45'08" West and a chord distance of 316.10 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 562.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 95.37 feet, said arc being subtended by a chord bearing of North 29°18'05" West and a chord distance of 95.25 feet to the point of reverse curve of a curve, concave Southerly having a radius of 135.00 feet; thence Westerly along the arc of said curve, an arc distance of 262.48 feet, said arc being subtended by a chord bearing of North 80°08'23" West and a chord distance of 223.05 feet to the point of compound curve of a curve, concave Southeasterly having a radius of 450.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 360.94 feet, said arc being subtended by a chord bearing of South 21°10'56" West and a chord distance of 351.34 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 950.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 405.64 feet; said arc being subtended by a chord bearing of South 14°01'42" East and a chord distance of 402.56 feet to the point of tangency of said curve, thence South 26°15'38" East, a distance of 405.77 feet to the point of curve of a curve, concave Westerly having a radius of 650.00 feet; thence Southerly along the arc of said curve, an arc distance of 540.89 feet, said arc being subtended by a chord bearing of South 02°25'17" East and a chord distance of 525.42 feet

to the point of tangency of said curve; thence South 21°25'04" West, a distance of 201.54 feet to the point of curve of a curve, concave Easterly having a radius of 500.00 feet; thence Southerly along the arc of said curve, an arc distance of 262.31 feet, said arc being subtended by a chord bearing of South 06°23'19" West and a chord distance of 259.31 feet to the point of reverse curve of a curve concave Westerly having a radius of 800.00 feet; thence Southerly along the arc of said curve, an arc distance of 334.19 feet, said arc being subtended by a chord bearing of South 03°19'36" West and a chord distance of 331.76 feet to the point of reverse curve of a curve, concave Easterly having a radius of 700.00 feet; thence Southerly along the arc of said curve, an arc distance of 469.50 feet, said arc being subtended by a chord bearing of South 03°55'14" East and a chord distance of 460.75 feet to the point of reverse curve of a curve, concave Westerly having a radius of 1050.00 feet; thence Southerly along the arc of said curve, an arc distance of 606.08 feet, said arc being subtended by a chord bearing of South 06°35'56" East and a chord distance of 597.70 feet to the point of reverse curve of a curve, concave Easterly having a radius of 450.00 feet; thence Southerly along the arc of said curve, an arc distance of 221.70 feet, said arc being subtended by a cord bearing of South 04°10'37" East and a chord distance of 219.47 feet to the point of tangency of said curve; thence South 18°17'27" East, a distance of 211.97 feet to the point of curve of a curve, concave Northeasterly having a radius of 450.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 213.71 feet, said arc being subtended by a chord bearing of South 31°53'47" East and a chord distance of 211.71 feet to the point of tangency of said curve; thence South 45°30'05" East, a distance of 71.99 feet to the point of curve of a curve, concave Northerly having a radius of 50.00 feet; thence Easterly along the arc of said curve, an arc distance of 78.54 feet, said arc being subtended by a chord bearing of North 89°29'55" East and a chord distance of 70.71 feet to the point of cusp at the aforesaid proposed Northwesterly right of way line of International Golf Parkway; thence South 44°29'54" West along said proposed Northwesterly right of way line, a distance of 200.00 feet to the Point of Beginning

AND TOGETHER WITH A NON-EXCLUSIVE PERPETUAL EASEMENT OVER THE FOLLOWING DESCRIBED LANDS:

North Parcel 11A access easement:

Part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1295.90 feet; thence South 75°04'08" East leaving said Westerly line of Section 44, a distance of 1910.39 feet to the Point of Beginning; thence North 59°21'36" East, a distance of 21.64 feet to the point of curve of a curve, concave Southerly having a radius of 440.00 feet; thence Easterly along the arc of said curve, an arc distance of 457.03 feet said arc being subtended by a chord bearing of North 89°07'10" East and a chord distance of 436.76 feet to the point of tangency of said curve; thence South 61°07'25" East a distance of 38.20 feet to the point of curve of a curve concave, Northwesterly having a radius of 50.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 71.01 feet; said arc being subtended by a chord bearing of North 78°11'23" East and a chord distance of 65.19 feet to the point of cusp of a curve said curve being concave Southeasterly having a radius of 550.00 feet; thence

23

Southwesterly along the arc of said curve and along the Northwesterly right of way line of Royal Pines Parkway (a right of way of varying width), an arc distance of 165.63 feet, said arc being subtended by a chord bearing of South 28°52'34" West and a chord distance of 165.00 feet to a point on said right of way line and the point of cusp of a curve, said curve being concave Southwesterly having a radius of 50.00 feet: thence Northwesterly along the arc of said curve leaving said Northwesterly right of way line of Royal Pines Parkway, an arc distance of 71.01 feet, said arc being subtended by a chord bearing of North 20°26'41" West and a chord distance of 65.19 feet to the point of tangency of said curve; thence North 61°07'25" West, a distance of 35.77 feet to the point of curve of a curve, concave Southerly having a radius of 360.00 feet; thence Westerly along the arc of said curve, an arc distance of 373.94 feet, said arc being subtended by a chord bearing of South 89°07'10" West and a chord distance of 357.35 feet to the point of tangency of said curve; thence South 59°21'36" West, a distance of 18.80 feet; thence North 32°40'18" West, a distance of 80.05 feet to the Point of Beginning.

## Exhibit "B"

### Stalking Horse Real Estate APA

## STALKING HORSE REAL ESTATE PURCHASE AGREEMENT

**THIS STALKING HORSE REAL ESTATE PURCHASE AGREEMENT** (the "Stalking Horse Real Estate Purchase Agreement") is made and entered into as of March 21, 2016 (the "Execution Date"), by and between **LIFE CARE ST. JOHNS, INC.**, a Florida not-for-profit corporation, d/b/a Glenmoor ("Glenmoor" or the "Seller"), and **LCS GLENMOOR, LLC**, an Iowa limited liability company ("Buyer"). Each of the foregoing parties is referred to as a "Party," and collectively as the "Parties".

## RECITALS

A.    Glenmoor owns and operates a continuing care retirement community ("CCRC") consisting of (i) 157 independent living units comprised of 70 one- to three-bedroom apartment homes, 30 patio homes, 31 estate homes and 26 cottages (collectively, the "Independent Living Facilities"), (ii) an assisted living center with 36 assisted living suites (the "Assisted Living Facility"), and (iii) a health center containing 30 sheltered nursing beds, all in private rooms (the "Skilled Nursing Facility," and, together with the Independent Living Facilities and the Assisted Living Facility, the "Facilities"), located on a 40 acre site in World Golf Village, St. Johns County, St. Augustine, Florida. Glenmoor also owns an 11 acre undeveloped parcel adjacent to the Facilities (the "Adjacent Parcel").

B.    The Facilities are owned by Glenmoor in fee, and are located on a parcel of land legally described on Exhibit B attached hereto.  The Adjacent Parcel is owned by Glenmoor in fee, and is legally described on Exhibit C attached hereto.

C.    On July 3, 2013, Glenmoor (also referred to herein as the "Debtor"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), styled *In re: Life Care St. Johns, Inc.*, Case No. 3:13-bk-4158-JAF (the "Seller's 2013 Bankruptcy Case").

D.    Glenmoor's Disclosure Statement [Dkt. 271] and Plan of Reorganization [Dkt. 270] were filed in Seller's 2013 Bankruptcy Case on November 27, 2013, and on February 28, 2014, the Bankruptcy Court entered an order confirming Glenmoor's Plan of Reorganization [Dkt. 377]. The final decree in Seller's 2013 Bankruptcy Case has not yet been entered.

E.    Seller now believes, after consultation with its financial advisors and consideration of the available alternatives, that a sale of substantially all of Seller's assets, including the Adjacent Parcel, is necessary to maximize value and is in the best interests of Seller, its estates, creditors and other parties-in-interest, including the residents and prospective residents of Glenmoor.

F.      Pursuant to the terms and conditions of a separate Stalking Horse Asset Purchase Agreement (the "Stalking Horse Asset Purchase Agreement") dated of even date herewith, Buyer has agreed to purchase from Seller substantially all of the assets of Seller relating to the operation of the Facilities, other than the Adjacent Parcel and certain excluded assets (as defined below).

G.      Simultaneously with Buyer's execution of the Stalking Horse Asset Purchase Agreement, Buyer desires to purchase from Seller the Adjacent Parcel upon the terms and conditions set forth in this Stalking Horse Real Estate Purchase Agreement.

H.      Buyer agrees to provide the stalking horse bid for the Adjacent Parcel in accordance with the terms of this Stalking Horse Real Estate Purchase Agreement.

I.      The transactions contemplated by this Stalking Horse Real Estate Purchase Agreement (the "Transactions") will be subject to the approval of the Bankruptcy Court and certain other conditions, as expressly set forth hereunder.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the premises and the agreements, covenants, representations and warranties hereinafter set forth and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS; INTERPRETATION

1.1      Definitions.   These terms shall have, for all purposes of this Stalking Horse Real Estate Purchase Agreement, the following meanings:

"Action" means any action, claim, proceeding, litigation, arbitration, mediation, suit, investigation or regulatory inquiry (whether civil, criminal, administrative or judicial), or any appeal therefrom or any material demand letter threatening the initiation of any of the foregoing.

"Affiliate" shall mean, as to the entity in question, any person or entity that directly or indirectly controls, is controlled by or is under common control with, the entity in question and the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity whether through ownership of voting securities, by contract or otherwise.

"Alternative Transaction" shall mean a transaction consummated in accordance with the Bidding Procedures Order.

"Assisted Living Facility" has the meaning set forth in paragraph A of the Recitals hereto.

2

"Bankruptcy Case" shall mean the bankruptcy case to be filed by Seller in the Bankruptcy Court under chapter 11 of title 11 of the United States Code.

"Bankruptcy Code" has the meaning set forth in paragraph C of the Recitals hereto.

"Bankruptcy Court" has the meaning set forth in paragraph C of the Recitals hereto.

"Bidding Procedures Order" means the order, in substantially the form attached hereto as Exhibit A-1, which is to be entered by the Bankruptcy Court in the Bankruptcy Case.

"Business Day" means any day except Saturday, Sunday or any day on which commercial banks are authorized or required by Law to close in St. Augustine, Florida.

"Buyer" has the meaning set forth in the Preamble hereto.

"CCRC" has the meaning set forth in paragraph A of the Recitals hereto.

"Closing" has the meaning set forth in Section 4.1 hereto.

"Closing Date" has the meaning set forth in Section 4.1 hereto.

"Closing Cash Payment" means the Purchase Price, as adjusted pursuant to Section 3.2 hereto.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" has the meaning set forth in Section 7.5 hereto.

"Court Approval" means the entry of the Sale Order by the Bankruptcy Court, together with all other orders of the Bankruptcy Court necessary to effect the Transactions.

"Damages" means any loss, Liability, fine, penalty, judgment, award, cost or expense (including, without limitation, reasonable attorneys' fees or any other reasonable out-of-pocket expenses incurred in connection with any Action).

"Debtor" has the meaning set forth in paragraph C of the Recitals hereto.

"Deed" has the meaning set forth in Section 4.2(a)(i) hereto.

"Deposit" shall mean the amount of Twenty Five Thousand Dollars ($25,000) deposited by Buyer with the Escrow Agent in connection with this Stalking Horse Real Estate Purchase Agreement, and any interest that may accrue thereon prior to the Closing.

"Due Diligence Period" means the period ending at 5:00 P.M PT on February 9, 2016.

"Escrow Agent" has the meaning set forth in Section 3.1 hereto.

"Execution Date" has the meaning set forth in the Preamble hereto.

"Facilities" has the meaning set forth in paragraph A of the Recitals hereto.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, the operation or effect of which has not been reversed, stayed, modified, amended, vacated or supplemented and as to which order or judgment the time to appeal or seek review, rehearing, reargument or certiorari has expired and as to which no appeal or petition for review, rehearing, reargument or certiorari has been filed and remains pending.

"Governance Documents" means, with respect to any entity, all documents (i) pursuant to which the legal existence of the entity is established; (ii) that were adopted or approved by the owners, board of directors, managers or other similar management authority of the entity and set forth provisions for the regulation and management of the entity's internal affairs; and (iii) that are binding upon any owners of the entity and establish the governance, economic and/or other rights of such owners in their capacity as such.

"Government Entity" means any federal, state, local or foreign government, court, agency, commission, department or other authority or instrumentality.

"Knowledge of Buyer" or "Buyer's Knowledge" means the actual knowledge of the following individuals: Tom Mathisen and Kendall Young.

"Knowledge of Seller" or "Seller's Knowledge" means the actual knowledge of the following individuals: D. Bruce Jones (CEO), Dale F. Pirkle (COO), Debra Neitzel (Director of Human Resources), Kimberly Brown (Comptroller) and Candace Bowling (Director of Financial Services).

"Laws" means all applicable federal, state, local and foreign laws (including common law), codes, statutes, rules, regulations, ordinances and policies, and all applicable orders, judgments, arbitration awards, decrees, administrative or judicial promulgations, injunctions, determinations, permits of, agreements with, and rulings of or by any Government Entity.

"Liability" means any debt, liability, commitment or obligation of any kind, character or nature whatsoever, whether known or unknown, asserted or unasserted, liquidated or unliquidated, secured or unsecured, accrued, fixed, absolute, contingent or otherwise, and whether due or to become due.

4

"Liens" means all mortgages, claims (including all claims as defined in § 101(5) of the Bankruptcy Code), leases, options, hypothecations or similar restrictions, liens, pledges, security interests, and charging orders and any other encumbrance, right or interest of any kind or character, whether vested or contingent, that evidences or secures a debt or payment obligation or adverse ownership interest in the property or rights in question, whether imposed by agreement, understanding, law, equity or otherwise, or liens, interests or encumbrances both now existing or hereafter arising which would encumber the Adjacent Parcel arising under any agreement binding on Seller or its property or arising from any act of Seller or arising pursuant to any right, title or interest, lien or encumbrance which could hereafter be asserted as a result of the transfer of the Adjacent Parcel by Seller with any such lien to attach solely to the proceeds of sale contemplated herein.

"Liquidating Plan" has the meaning set forth in Section 7.1(b) hereto.

"New Petition Date" has the meaning set forth in Section 7.1(a) hereto.

"Outside Closing Date" has the meaning set forth in Section 9.1(b) hereto.

"Party" and "Parties" have the meanings set forth in the Preamble to this Stalking Horse Real Estate Purchase Agreement.

"Permitted Exceptions" has the meaning set forth in Section 7.8(c) hereto.

"Person" means an individual, a sole proprietorship, a partnership, a corporation, an association, an institution, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization, or a Government Entity or any other legal organization or entity.

"Plan of Reorganization" means the Chapter 11 plan confirmed by the Bankruptcy Court in Seller's 2013 Bankruptcy Case.

"Potential Alternative Sale" has the meaning set forth in Section 7.9(b) hereto.

"Purchase Price" means Four Hundred Fifty Thousand Dollars ($450,000).

"Representatives" means, with respect to any Person, the directors, officers, employees, financial advisors, attorneys, accountants, consultants, agents and other authorized representatives of such Person.

"Sale Order" means the order, in substantially the form attached hereto as Exhibit A-2, which is to be entered by the Bankruptcy Court in the Bankruptcy Case approving the consummation of the Transactions.

"Seller" has the meaning set forth in the Preamble hereto.

"Seller's 2013 Bankruptcy Case" has the meaning set forth in paragraph C of the Recitals hereto.

"Stalking Horse Asset Purchase Agreement" has the meaning set forth in paragraph F of the Recitals hereto.

"Stalking Horse Real Estate Purchase Agreement" shall mean this real estate purchase agreement.

"Survey" has the meaning set forth in Section 7.8(b) hereto.

"Taxes" means all taxes, assessments, charges, duties, fees, levies or other governmental charges (including interest, penalties or additions associated therewith), including, without limitation, income, franchise, capital stock, real property, personal property, tangible, estimated withholding, employment, payroll, social security, unemployment compensation, disability, transfer, sales, use, franchise, excise, gross receipts, value-added and all other taxes of any kind imposed by any Government Entity, whether disputed or not, whether inchoate, accrued, invoiced, levied, or otherwise, and any charges, interest or penalties imposed or that may be imposed thereon by any Government Entity.

"Title Commitment" has the meaning set forth in Section 7.8(a) hereto.

"Title Company" has the meaning set forth in Section 7.8(a) hereto.

"Transactions" has the meaning set forth in paragraph I of the Recitals hereto.

## ARTICLE II
## THE PURCHASE AND SALE

2.1     Adjacent Parcel.  Subject to the terms, conditions and other provisions of this Stalking Horse Real Estate Purchase Agreement, and subject to Court Approval and higher and better bids in accordance with the Bidding Procedures Order, at the Closing, Seller shall grant, sell, assign, transfer and deliver to Buyer, and Buyer shall purchase from Seller, all right, title and interest of Seller in, to, and under the Adjacent Parcel, which is located in World Golf Village, St. Johns County, St. Augustine, Florida, and more particularly described in the legal description set forth on Exhibit C attached hereto, together with all easements and other rights appurtenant thereto, free and clear of any and all Liens and encumbrances, other than Permitted Exceptions.  The Adjacent Parcel is also identified as Parcel ID# 029231-0000.

6

## ARTICLE III
## DEPOSIT; CONSIDERATION

3.1     Deposit.  As an inducement for Seller to enter into this Stalking Horse Real Estate Purchase Agreement, Buyer will deposit within three (3) Business Days of the Execution Date the Deposit with Thames Markey & Heekin, P.A., as escrow agent (the "Escrow Agent"), pursuant to an escrow agreement in substantially the same form as attached hereto as Exhibit D (the "Escrow Agreement").  The Deposit shall be non-refundable, except in the circumstances described in Section 9.2 hereto.

3.2     Consideration.  In consideration for the sale, assignment, and conveyance of Seller's right, title, and interest in, to and under the Adjacent Parcel, Buyer shall at the Closing pay the Closing Cash Payment, minus the Deposit and subject to the adjustments set forth in Section 3.3 hereto, for the account of the Debtor, by wire transfer of immediately available funds to the Escrow Agent to be disbursed in accordance with the terms and conditions of this Agreement and the Sale Order:

3.3     Costs.

(a)     Seller's Title.  Seller shall pay on the Closing Date the cost of: (i) the title search, basic title premium for the Title Commitment and Owner's Policy of Title Insurance to be issued pursuant to Section 7.8(a) hereto; and (ii) recording fees or title insurance endorsements with respect to clearing public records of items that are not Permitted Exceptions per Section 7.8(c).

(b)     Buyer's Title Charges.  Buyer shall be responsible for the cost of: (i) recording fees of the Deed; (ii) the cost of any endorsements to the Title Commitment and Owner's Policy of Title Insurance to be issued pursuant to Section 7.8(a) hereto (other than extended coverage) and of any simultaneously issued lender's title policy; and (iii) the cost of recording fees for any Buyer financing documents.

(c)     Transfer Taxes.  Seller shall pay for all transfer or conveyance Taxes imposed in connection with the purchase and sale of the Adjacent Parcel and Assumed Liabilities, if any.

(d)     Survey.  On the Closing Date, in addition to the Closing Cash Payment, the Buyer shall reimburse Seller for the cost of the Survey.

(e)     Real Estate Taxes.  *Ad valorem* real and personal property Taxes, and any general or special assessments levied, which are due and payable for the year of Closing, shall be prorated as of the date of Closing based upon 110% of the 2015 *Ad valorem* real property taxable value and total millage rate, using the payment amount due by November 30, 2015, as set forth in the 2015 St. Johns County Tax Collector Ad Valorem Taxes and Non-Ad Valorem Assessments attached hereto as Schedule 3.3(e), which proration shall be a final settlement between Buyer and Seller. Any such prorated amount that is allocated to Seller hereunder shall reduce the Closing Cash Payment; provided, however, Buyer covenants and agrees that Buyer shall be responsible for, and

shall pay, all such charges, assessments and Taxes for all periods prior to, on and after the Closing.

### ARTICLE IV
### CLOSING

4.1     Closing.  The closing of the Transactions (the "Closing") shall occur as soon as reasonably practicable, but in any event no later than the fifth (5th) Business Day, following the day upon which all of the conditions to Closing have been satisfied or waived (other than those conditions which by their terms cannot be satisfied until the Closing), at the offices of Thames Markey & Heekin, P.A. in Jacksonville, Florida or pursuant to a customary escrow arrangement acceptable to Seller and Buyer.  The date on which the Closing actually occurs, or the date on which Buyer and Seller agree the Closing is deemed to occur, is referred to herein as the "Closing Date".

4.2     Closing Deliveries.

(a)     At Closing, Seller shall execute and deliver to Buyer:

(i)     a special warranty deed, in such form as shall be agreed upon by Buyer, acting reasonably, executed by Seller conveying Seller's title to the Adjacent Parcel to Buyer, subject to the Permitted Exceptions (the "Deed");

(ii)     a certificate executed by its principal executive officer as to the satisfaction of the conditions in Sections 8.1(a), 8.1(b) and 8.1(c) hereto or identifying in any material respect in which any representation of Seller is no longer true and correct;

(iii)     a certificate that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code, in such form as shall be agreed upon by Buyer, acting reasonably;

(iv)     customary title affidavits and indemnities, and such other reasonable documents as may be required to permit issuance of a policy of title insurance insuring title in the manner set forth in Section 7.8;

(v)     possession of the Adjacent Parcel;

(vi)     a closing settlement statement reflecting the Closing Cash Payment, minus the Deposit and subject to the adjustments set forth in Section 3.3 hereof, in such form as shall be agreed upon by Buyer, acting reasonably; and

(vii)     a certificate executed by the Secretary or other authorized officer of Seller (x) as to the incumbency of the individual(s) signing this Stalking Horse Real Estate Purchase Agreement and all other agreements to which it is a party on behalf of Seller, and (y) certifying that the resolutions of the board of directors (or other similar governing body) approving this Stalking Horse Real

8

Estate Purchase Agreement and the Transactions (a copy of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented.

(b)    At Closing, Buyer shall execute and deliver to Seller:

(i)    the Closing Cash Payment and (via direction of Buyer to the Escrow Agent) the Deposit;

(ii)    a certificate executed by its principal executive officer as to the satisfaction of the conditions in Sections 8.2(a) and 8.2(b) hereto;

(iii)    a closing settlement statement reflecting the Closing Cash Payment, minus the Deposit and subject to the adjustments set forth in Section 3.3 hereof, in such form as shall be agreed upon by Seller, acting reasonably; and

(iv)    a certificate executed by the Secretary or other authorized officer of Buyer (x) as to the incumbency of the individual(s) signing this Stalking Horse Real Estate Purchase Agreement and the other agreements to which it is a party on behalf of Buyer, and (y) certifying that the resolutions of the board of directors or other similar governing body of Buyer approving this Stalking Horse Real Estate Purchase Agreement and the Transactions (copies of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented.

(c)    At the Closing, each Party shall execute and deliver such other instruments of transfer and/or assignment, certificates, deeds, bills of sale, evidence of filing and/or recording, and other documents as are required pursuant to the terms of this Stalking Horse Real Estate Purchase Agreement or applicable law or are reasonably necessary to effectuate the Transactions, including customary documents required in order for title policies to be issued by the Title Company to Buyer at Closing.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to the required approval of the Bankruptcy Court, and except as expressly set forth in the disclosure schedules attached hereto and incorporated by reference herein, as of the Execution Date and as of the Closing Date, Seller represents and warrants to Buyer the following:

5.1    Existence and Capacity.    Seller is a not-for-profit corporation, duly organized and validly existing in good standing under the Laws of the State of Florida. Seller has the requisite power and authority to enter into this Stalking Horse Real Estate Purchase Agreement and to perform all of its obligations contemplated hereunder.

5.2    Powers; Consents; Absence of Conflicts with Other Agreements, etc.    The execution, delivery, and performance of this Stalking Horse Real Estate Purchase

Agreement by Seller, and the consummation of the Transactions contemplated herein and therein by Seller:

(a)        have been duly authorized by all necessary and appropriate board action, none of which actions have been modified or rescinded and all of which remain in full force and effect;

(b)        except as set forth on Schedule 5.2(b) hereto and subject to the requirements of the Bankruptcy Case, do not require any approval or consent of, or filing with, any Government Entity or authority bearing on the validity of this Stalking Horse Real Estate Purchase Agreement which is required by Law or the regulations of any such agency or authority or the approval of any other third party, except to the extent any failure to so comply would not reasonably be expected to have a material adverse effect;

(c)        except as set forth on Schedule 5.2(c) hereto and subject to the requirements of the Bankruptcy Case, will neither conflict with, nor result in any breach or contravention of, or the creation of any Lien under, any indenture, agreement, contract, lease, instrument or understanding, written or oral, to which it is a party or by which it is bound;

(d)        will not violate any Laws of any Government Entity to which it or the Adjacent Parcel may be subject; and

(e)        will not violate any judgment, decree, writ or injunction of any court or Government Entity to which it or the Adjacent Parcel may be subject.

5.3        Binding Agreement.  This Stalking Horse Real Estate Purchase Agreement constitutes a valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, subject only to all required approvals of the Bankruptcy Court, general equitable principles and the discretion of courts in granting equitable remedies.

5.4        Real Property.

(a)        Except as set forth on Schedule 5.4(a), Seller has not collaterally assigned or granted any Liens encumbering the Adjacent Parcel; and Seller is not obligated under or a party to, any option, right of first refusal or other contractual right to purchase the Adjacent Parcel or any portion thereof or interest therein.

(b)        With respect to the Adjacent Parcel, there are no tenants or other Persons or entities occupying any space in the Adjacent Parcel.

(c)        There is no pending or, to Seller's Knowledge, threatened action, suit, or proceeding, including without limitation, condemnation proceeding, affecting Seller or the Adjacent Parcel or any portion thereof by or before any court, municipal department, commissioner, board, bureau or agency; nor are there any pending, or to Seller's Knowledge, presently contemplated public improvements in, about or outside the Adjacent Parcel which will in any manner affect access to the Adjacent Parcel; nor is

there any such Action affecting the Adjacent Parcel or, to Seller's Knowledge, presently contemplated, which will in any manner affect Buyer upon or after the consummation of the Transactions.

5.5    Title to Adjacent Parcel.  At the Closing, Seller will assign and convey to Buyer title to the Adjacent Parcel free and clear of all Liens except the Permitted Exceptions.

5.6    Compliance with Laws.  Except as set forth on Schedule 5.6, the Adjacent Parcel is not in violation of any applicable statutes, rules, regulations, and requirements of the Government Entities having jurisdiction over Seller and the Adjacent Parcel, except to the extent any failure to so comply would not reasonably be expected to have a material adverse effect.

5.7    Environmental Matters.  Except as set forth on Schedule 5.7 hereto, to Seller's Knowledge: (a) no hazardous material has been stored or exists in, on, under or around the Adjacent Parcel other than asbestos, PCBs, and lead emanating from lead-based paint; (b) Seller has not caused or suffered any hazardous materials to be used, released, discharged, placed or disposed of at, on or under the Adjacent Parcel or any real property adjacent thereto except in compliance with applicable environmental laws, rules and regulations; and (c) no underground storage tanks are located on the Adjacent Parcel, and no portion of the Adjacent Parcel has ever been used as a dump for waste material. Seller has not received any written notice from any Government Entity or any written complaint from any third party with respect to its alleged noncompliance with, or potential Liability under, any applicable environmental laws, rules or regulations involving the Adjacent Parcel, nor does it have a reasonable basis to expect the issuance of such a notice or complaint.

5.8    Litigation and Proceedings.  Schedule 5.8 is an accurate list of all pending litigation or adversarial proceedings with respect to the Adjacent Parcel. Except as set forth on Schedule 5.8, and except for Actions that would not have a material adverse effect on the Adjacent Parcel, (a) Seller is not in default under any order of any court or federal, state, municipal, or other governmental department and (b) there are no Actions pending, or to the Knowledge of Seller, threatened against or related to the Adjacent Parcel, at law or in equity, or before or by any federal, state, municipal, or other governmental department, including, without limitation, claims for successor liability under any theory of law or equity or otherwise or claims that Buyer is not a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

5.9    Taxes.  Seller has filed in a timely manner all federal, state and local Tax Returns applicable to the Adjacent Parcel that are required to be filed by it, except to the extent any failure to so file would not reasonably be expected to have a material adverse effect, and to Seller's Knowledge, each such return is true and correct in all material respects and was prepared in substantial compliance with applicable Laws. There are no taxes or tax valuations applicable to the Adjacent Parcel currently being appealed by or on behalf of Seller. No deficiencies for any Taxes applicable to the Adjacent Parcel have been asserted against Seller or, to Seller's Knowledge, threatened, and no audit of any

11

Tax Returns applicable to the Adjacent Parcel is currently pending or, to Seller's Knowledge, threatened. Seller has not waived any statute of limitations or has not agreed to any extensions of time with respect to a Tax assessment or deficiency applicable to the Adjacent Parcel. There are no Liens on the Adjacent Parcel for unpaid Taxes (other than statutory Liens for real estate Taxes not yet due and payable). Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code.

5.10   CONDITION OF ADJACENT PARCEL. THE ADJACENT PARCEL IS BEING SOLD BY SELLER "AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED". EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER MAKES NO ADDITIONAL REPRESENTATIONS OR WARRANTIES OF ANY KIND TO BUYER, INCLUDING, WITHOUT LIMITATION, AS TO (A) THE VALUE, NATURE, QUALITY, OR CONDITION OF THE ADJACENT PARCEL, INCLUDING THE WATER, SOIL, AND GEOLOGY; (B) THE INCOME TO BE DERIVED FROM THE ADJACENT PARCEL; (C) THE COMPLIANCE OF OR BY THE ADJACENT PARCEL WITH ANY LAWS, RULES, ORDINANCES, OR REGULATIONS OF ANY APPLICABLE GOVERNMENT ENTITY; (D) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE ADJACENT PARCEL; OR (E) ANY OTHER MATTER WITH RESPECT TO THE ADJACENT PARCEL. BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS EXPERIENCED IN THE OWNERSHIP AND OPERATION OF REAL ESTATE SIMILAR TO THE ADJACENT PARCEL AND THAT BUYER, PRIOR TO THE CLOSING, WILL HAVE INSPECTED THE ADJACENT PARCEL AND FULLY REVIEWED AND EVALUATED THE ADJACENT PARCEL TO ITS SATISFACTION AND IS QUALIFIED TO MAKE SUCH INSPECTIONS AND EVALUATIONS. BUYER ACKNOWLEDGES THAT, EXCEPT AS SET FORTH HEREIN IT IS FULLY RELYING ON BUYER'S (OR BUYER'S REPRESENTATIVES') INSPECTIONS OF THE ADJACENT PARCEL AND NOT UPON ANY STATEMENT (ORAL OR WRITTEN) WHICH MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY SELLER OR ANY OF ITS REPRESENTATIVES. BUYER ACKNOWLEDGES THAT BUYER HAS (OR BUYER'S REPRESENTATIVES HAVE), OR PRIOR TO THE EXPIRATION OF THE INSPECTION PERIOD WILL HAVE, THOROUGHLY INSPECTED AND EXAMINED THE ADJACENT PARCEL TO THE EXTENT DEEMED NECESSARY BY BUYER IN ORDER TO ENABLE BUYER TO EVALUATE THE CONDITION OF THE ADJACENT PARCEL, THE MATTERS DISCLOSED BY THE TITLE COMMITMENT, SURVEY AND OTHER INFORMATION RELATED TO THE ADJACENT PARCEL AND ALL OTHER ASPECTS OF THE ADJACENT PARCEL, AND BUYER ACKNOWLEDGES THAT, EXCEPT AS SET FORTH HEREIN, BUYER IS RELYING SOLELY UPON ITS OWN (OR ITS REPRESENTATIVES') INSPECTION, EXAMINATION AND EVALUATION OF THE ADJACENT PARCEL AND ITS CONDITION. BOTH PARTIES HEREBY AGREE THAT FROM AND AFTER THE CLOSING NEITHER PARTY NOR THEIR RESPECTIVE EMPLOYEES, PARTNERS, OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, ATTORNEYS, AFFILIATES, PARENT COMPANIES, SUBSIDIARIES, SUCCESSORS OR ASSIGNS SHALL BE

LIABLE TO THE OTHER PARTY OR THEIR RESPECTIVE EMPLOYEES, PARTNERS, OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, ATTORNEYS, AFFILIATES, PARENT COMPANIES, SUBSIDIARIES, SUCCESSORS OR ASSIGNS, FOR ANY SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL, OR OTHER DAMAGES RESULTING OR ARISING FROM OR RELATED TO THE OWNERSHIP, USE, CONDITION, LOCATION, MAINTENANCE, REPAIR OR OPERATION OF THE ADJACENT PARCEL, AND THE PARTIES RELEASE AND WAIVE ANY CLAIMS OR CAUSES OF ACTION THEY MAY HAVE RELATING TO THE SAME. BUYER ACKNOWLEDGES THAT ANY CONDITION OF THE ADJACENT PARCEL THAT BUYER DISCOVERS OR DESIRES TO CORRECT OR IMPROVE PRIOR TO OR AFTER THE CLOSING SHALL BE AT BUYER'S SOLE EXPENSE. EXCEPT AS PROVIDED HEREIN, BUYER EXPRESSLY WAIVES (TO THE EXTENT ALLOWED BY APPLICABLE LAW) ANY CLAIMS UNDER FEDERAL, STATE OR OTHER LAW THAT BUYER MIGHT OTHERWISE HAVE AGAINST SELLER AND ITS EMPLOYEES, PARTNERS, OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, ATTORNEYS, AFFILIATES, PARENT COMPANIES, SUBSIDIARIES, SUCCESSORS OR ASSIGNS RELATING TO THE USE, CHARACTERISTICS OR CONDITION OF THE ADJACENT PARCEL, EXCEPT TO THE EXTENT SUCH CLAIMS ARISE OUT OF SELLER'S FRAUD OR WILLFUL MISCONDUCT. ANY REPAIRS PAID FOR BY SELLER PURSUANT TO THIS AGREEMENT, IF ANY, SHALL BE DONE WITHOUT ANY WARRANTY OR REPRESENTATION BY SELLER, AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER IN CONNECTION WITH SUCH REPAIRS.

5.11   No Brokers.   Except for the broker retained by Seller to market the Adjacent Parcel (which is expected to be Walchle Lear), who will be paid by Seller pursuant to a separate agreement between Seller and such broker, there is no investment banker, broker, finder or financial intermediary that has been retained by or is authorized to act on behalf of Seller or any Affiliate, or who is or might be entitled to any fee or commission in connection with the Transactions.

5.12   OFAC.   Neither Seller nor any of Seller's Affiliates, nor any of their respective brokers or other agents acting in any capacity in connection with the Transactions contemplated by this Stalking Horse Real Estate Purchase Agreement, is or will be (a) conducting any business or engaging in any transaction or dealing with any person appearing on the U.S. Treasury Department's OFAC list of prohibited countries, territories, "specifically designated nationals" or "blocked persons" (each a "Prohibited Person") (which lists can be accessed at the following web address: http://www.ustreas.gov/offices/enforcement/ofac/), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (b) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (c) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting

13

Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (d) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (e) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (i) any U.S. anti-money laundering law, (ii) the Foreign Corrupt Practices Act, (iii) the U.S. mail and wire fraud statutes, (iv) the Travel Act, (v) any similar or successor statutes or (vi) any regulations promulgated under the foregoing statutes.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as expressly set forth in the disclosure schedules attached hereto and incorporated by reference herein, as of the Execution Date and as of the Closing Date, Buyer represents and warrants to Seller the following:

6.1     Existence and Capacity.  Buyer is a limited liability company, duly organized and validly existing in good standing under the Laws of the State of Iowa. Buyer has the requisite power and authority to enter into this Stalking Horse Real Estate Purchase Agreement, to perform its obligations hereunder, and to conduct its business as now being conducted.  Buyer is properly registered to do business as a foreign entity in the State of Florida and all other states in which it does business.

6.2     Powers; Consents; Absence of Conflicts With Other Agreements, etc.  The execution, delivery, and performance of this Stalking Horse Real Estate Purchase Agreement by Buyer and all other agreements referenced herein, or ancillary hereto, to which Buyer is a party, and the consummation of the Transactions contemplated herein by Buyer:

(a)     are within its corporate powers, are not in contravention of Law or of the terms of its Governance Documents, and have been duly authorized by all necessary and appropriate corporate actions, none of which action have been modified or rescinded and all of which remain in full force and effect;

(b)     except as set forth on Schedule 6.2(b) hereto, do not require any approval or consent of, or filing with, any Government Entity or authority bearing on the validity of this Stalking Horse Real Estate Purchase Agreement which is required by Law or the regulations of any such Government Entity;

(c)     will neither conflict with, nor result in any breach or contravention of, or the creation of any lien, charge or encumbrance under, any indenture, agreement, lease, instrument or understanding to which it is a party or by which it is bound;

(d)     will not violate any Law of any Government Entity to which it may be subject; will not violate any judgment, decree, writ, or injunction of any court or Government Entity to which it may be subject; and

14

(e)    are not in contravention or violation of the terms of the Governance Documents of Buyer.

6.3    <u>Binding Agreement</u>.  This Stalking Horse Real Estate Purchase Agreement and all agreements to which Buyer will become a party pursuant hereto are and will constitute the valid and legally binding obligations of Buyer and are and will be enforceable against Buyer in accordance with the respective terms hereof and thereof, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies, and subject to all required approvals of the Bankruptcy Court.

6.4    <u>No Brokers</u>.  There is no investment banker, broker, finder or financial intermediary that has been retained by or is authorized to act on behalf of Buyer, or any of its Affiliates, or who is or might be entitled to any fee or commission in connection with the Transactions.

6.5    <u>No Financing Contingency</u>.  The purchase by Buyer of the Adjacent Parcel is not conditioned upon financing, and Buyer herein acknowledges and represents that it shall be ready, willing and able (including, having the necessary funds) to consummate the sale of the Adjacent Parcel as contemplated by this Stalking Horse Real Estate Purchase Agreement on the Closing Date.

## ARTICLE VII
## ADDITIONAL AGREEMENTS

7.1    <u>Bankruptcy Matters</u>.

(a)    Seller shall file a motion for final decree in Seller's 2013 Bankruptcy Case within ten (10) Business Days of the Execution Date, and shall file the new Bankruptcy Case within fourteen (14) Business Days of the entry of such final decree (the "<u>New Petition Date</u>").

(b)    On the New Petition Date, Seller shall file with the Bankruptcy Court in the Bankruptcy Case (i) motions seeking, among other things, an order authorizing the sale of substantially all of Seller's assets, including the Adjacent Parcel, free and clear of Liens, claims, encumbrances and interests, other than Permitted Exceptions, and entry of the Sale Order, and (ii) a plan of liquidation (the "<u>Liquidating Plan</u>") seeking an order approving the Transactions, and shall use commercially reasonable efforts to cause the Bankruptcy Court to (1) enter the Bidding Procedures Order in substantially the form attached hereto as <u>Exhibit A-1</u> (the "<u>Bidding Procedures Order</u>"), with such changes as are reasonably satisfactory to Buyer; (2) enter the Sale Order in substantially the form attached hereto as <u>Exhibit A-2</u>, with such changes as are reasonably satisfactory to Buyer, as expeditiously as possible, and (3) confirm the Liquidating Plan, as expeditiously as possible.  Unless waived or extended by Buyer, the Bidding Procedures Order shall be entered by no later than April 25, 2016, and the Sale Order shall be entered no later than June 13, 2016.

(c)    Seller shall provide Buyer with copies of all material motions, orders, applications and supporting papers and notices prepared by Seller (including, without limitation, forms of orders and notices to interested parties), relating to this Stalking Horse Real Estate Purchase Agreement, the Bidding Procedures Order, the Sale Order or the Transactions, as soon as practicable, prior to being filed with the Bankruptcy Court, and shall consult as reasonably as is practicable with Buyer or its counsel prior to taking any significant action in connection with the Bankruptcy Case with respect to the Transactions. Without the consent of the Buyer, Seller shall not take any significant action in connection with the Bankruptcy Case with respect to the Transactions that is inconsistent with the Transactions and terms contemplated by this Stalking Horse Real Estate Purchase Agreement, except as consistent with the Bidding Procedures Order, unless Seller's board of directors has determined in good faith that the failure to take such action would violate their fiduciary duties. All papers forwarded to Buyer under this section may be provided in draft form and shall be treated as confidential in accordance with Section 7.5. Notwithstanding any provisions to the contrary herein, Seller shall not seek to amend or modify any material provision of the Bidding Procedures Order or the Sale Order without the consent of the Buyer, which consent shall not be unreasonably withheld.

7.2    <u>Conduct of Business</u>.  During the period from the Execution Date to the Closing Date, except as expressly contemplated or permitted by this Stalking Horse Real Estate Purchase Agreement, authorized by the Bankruptcy Court or to the extent Buyer shall otherwise consent in writing, and subject to the requirements of the Bankruptcy Case, Seller shall not: (a) sell, transfer, mortgage, license, encumber or otherwise dispose of all or any portion of the Adjacent Parcel; (b) amend its Governance Documents, or change the members of its board of directors or other similar governing body of Seller, in any manner which would constitute an Alternative Transaction; (c) take any action that is intended or could reasonably be expected to violate any applicable Law; or (d) agree or commit to do any of the foregoing.

7.3    <u>Expenses</u>.  Regardless of whether the Transactions contemplated by this Stalking Horse Real Estate Purchase Agreement are consummated, each of the Parties shall pay all of its expenses relating to the Transactions contemplated by this Stalking Horse Real Estate Purchase Agreement, including, the fees and expenses of its Representatives.

7.4    <u>Access to Information</u>.  At all times prior to the Closing Date, Seller shall permit Buyer and its counsel and other professional advisors to have reasonable access to the Adjacent Parcel and all non-privileged records and assets relating to the same to perform due diligence, and make, or have made, copies thereof; provided, however, that such access shall be during normal business hours, upon reasonable prior notice. This Section shall survive the closing of the Transactions.

7.5    <u>Publicity; Confidentiality</u>.  A Party may only issue a press release or make a public statement concerning this Stalking Horse Real Estate Purchase Agreement and the Transactions if such press release or public statement is made in form and substance, and at a time, to which all other Parties have consented after good faith consultation,

subject to Seller's obligations arising under Seller's 2013 Bankruptcy Case, or in the Bankruptcy Case. Following the Closing, no Party shall unreasonably withhold its consent regarding the general announcement of the purchase and sale contemplated hereunder. Otherwise, no Party hereto shall make any public disclosure concerning this Stalking Horse Real Estate Purchase Agreement, the Transactions, or the existence of and/or particulars of any negotiations related hereto, including the terms, conditions, consideration to be paid or other facts related to this Stalking Horse Real Estate Purchase Agreement, except to the extent that public disclosure is required by applicable Law or is otherwise made to a Government Entity or the Bankruptcy Court, in which case, to the extent practicable, the Parties will use their reasonable best efforts to reach mutual agreement on disclosure language prior to making such disclosure. Seller and the Buyer will, and will cause their Representatives to, maintain in confidence all written information obtained in confidence from the other Party in connection with this Stalking Horse Real Estate Purchase Agreement or the Transactions, including the terms hereof (the "Confidential Information"), unless the use or disclosure of such Confidential Information is reasonably necessary in connection with (a) obtaining any approval; (b) the Bankruptcy Case; (c) negotiations with the holders of Seller's debt and other obligations (and each of the foregoing party's Representatives) and applicable state regulatory authorities; (d) the negotiation of the terms of this Stalking Horse Real Estate Purchase Agreement or the Transactions; or (e) a valid court order. Notwithstanding the foregoing, Debtor may disclose this Stalking Horse Real Estate Purchase Agreement as authorized and directed by the Bidding Procedures Order. Confidential Information shall not include information that is or becomes publicly known through no wrongful act of any Party hereto.

7.6     Required Creditor Notices. Seller shall serve notice of the Sale Motion the Bidding Procedures Order and any other required notice of sale upon all creditors and all other parties entitled to notice of the Transaction, in form and substance reasonably acceptable to Buyer, as required by the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Court's local rules (collectively, the "Required Creditor Notices").

7.7     Cooperation on Tax Matters. Following the Closing, the parties shall reasonably cooperate with each other and shall make available to one another, as reasonably requested and at the expense of the requesting party, and to any taxing authority, any information which may be relevant to determining the amounts payable under this Stalking Horse Real Estate Purchase Agreement, and shall preserve all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof. Seller shall be responsible for filing any and all Tax Returns and Tax documentation relating to the Adjacent Parcel relating to periods prior to the Closing Date.

7.8     Title and Survey.

(a)     Prior to the date hereof, Thames Markey & Heekin, P.A. has delivered to Buyer a commitment to issue an Owner's Policy of Title Insurance ("Title Commitment") issued by First American Title Insurance Company (the "Title

Company") in its current ALTA form, in the amount of the Purchase Price, showing title to the fee interest in the Land Premises to be in Seller.

(b)     Survey.  In addition, prior to the date hereof, Seller has delivered to Buyer a survey of the Land Premises (and improvements thereon) from CRESurveys, Inc. ("Survey").  Seller shall have no obligation to cause the Survey to be amended or updated other than to conform the legal description for the Land Premises to the legal description of the Land Premises that will be insured under the Owner's Policy of Title Insurance issued pursuant to Section 7.8(a).  If Buyer desires to cause the Survey to be amended or updated, Buyer shall undertake such actions at its sole cost and expense.

(c)     Title and Survey.  Seller shall comply with its obligations under Section 4.2(a)(iv) of this Agreement and take such other actions, including, without limitation, the satisfaction of the applicable items listed on Schedule B-1 of the Title Commitment as may be required in order for the Title Company to issue, as of the Closing Date, an Owner's Policy of Title Insurance insuring Buyer's fee simple estate in the Land Premises subject only to the Permitted Exceptions. As used herein, "Permitted Exceptions" means: ad valorem Taxes for the 2016 year and subsequent years; and the "Conditions to Title" set forth on Exhibit E attached hereto.

7.9     Exclusivity.

(a)     From the date of execution of this Stalking Horse Real Estate Purchase Agreement through the earlier of the date of the Bidding Procedures Order or the termination of this Stalking Horse Real Estate Purchase Agreement, Seller and its Affiliates shall not, and shall not permit their investment banker, attorney, advisor or other representative to, directly or indirectly, directly or indirectly (i) solicit, initiate, encourage, facilitate or take any other action designed to facilitate any inquiries or proposals regarding any merger, consolidation, sale of assets, assumption of liabilities, or similar Transactions involving Seller that, if consummated, would constitute a Potential Alternative Sale (as defined below); (ii) participate in any discussions or negotiations with third parties regarding a Potential Alternative Sale; or (iii) enter into any agreement regarding any Potential Alternative Sale; provided however that Seller is not restricted from responding to any inquiries in respect of the Bidding Procedures Order (and prior to the issuance of the Bidding Procedures Order, Seller may engage in any of the activities in clause (i), (ii) or (iii) above in furtherance of the sale process reasonably anticipated to be authorized by the Bidding Procedures Order).

(b)     As used in this Stalking Horse Real Estate Purchase Agreement, "Potential Alternative Sale" means any transaction pursuant to which any Person or group of Persons (other than Buyer) acquires or would acquire the Adjacent Parcel; provided, however, notwithstanding the foregoing, the Liquidating Plan shall under no circumstances be deemed to be an Alternative Transaction.

(c)     Except as authorized, directed, and otherwise permitted in the Bidding Procedures Order (or, prior to the issuance of the Bidding Procedures Order, in furtherance of the sale process reasonably anticipated to be authorized by such Order),

18

Seller and its Representatives will immediately cease and cause to be terminated any existing discussions or negotiations with any Persons (other than Buyer) conducted heretofore with respect to the Adjacent Parcel. Except as authorized in the Bidding Procedures Order after its entry (or, prior to the issuance of the Bidding Procedures Order, in furtherance of the sale process reasonably anticipated to be authorized by such Order), Seller agrees not to release any third party from the confidentiality provisions of any agreement applicable to the Adjacent Parcel to which Seller is or may become a party. Seller will take reasonable efforts to ensure that its Representatives and Affiliates are aware of the requirements of this Section 7.9.

7.10    No Survival of Representations and Warranties. Buyer and Seller acknowledge and agree that the Seller's representations and warranties contained in Article V shall expire and be of no further force or effect on and after the Closing Date.

## ARTICLE VIII
## CONDITIONS PRECEDENT

8.1    Conditions to the Obligations of Buyer. The obligations of Buyer to effect the Transactions are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by Buyer:

(a)    the representations and warranties of Seller set forth in this Stalking Horse Real Estate Purchase Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as if made at and as of the Closing Date (except where such representations or warranties are made expressly as of a specific date, and then as of such date);

(b)    Seller shall have performed in all material respects all obligations required to be performed by it under this Stalking Horse Real Estate Purchase Agreement at or prior to the Closing, including, without limitation that the Adjacent Parcel is conveyed free and clear of all Liens, claims, interests, encumbrances, Liabilities and successor liability, subject only to the Permitted Exceptions;

(c)    Seller shall have executed, as applicable, and delivered to Buyer all of the documents and other items required to be delivered by it at the Closing pursuant to Section 4.2(a) hereto;

(d)    no Action shall be pending or threatened before any Government Entity that seeks to or does, and no Law shall be in effect that does, prevent consummation of any of the Transactions;

(e)    since the Execution Date there shall not have occurred any event, change or circumstance that could reasonably be expected to constitute a material adverse effect with respect to the Adjacent Parcel;

(f)    the Court Approval shall have been obtained and be in full force and effect and, if required by Buyer, the Sale Order shall have become a Final Order;

19

(g)    the Title Company is prepared to issue, as of the Closing Date, an Owner's Policy of Title Insurance pursuant to Section 7.8(a) hereof insuring Buyer's fee simple estate in the Adjacent Parcel subject only to the Permitted Exceptions and attaching a "Florida Survey Endorsement" upon payment by Seller of the premium for such policy (it being acknowledged and agreed said premium shall be at Seller's sole cost and expense); and

(h)    Buyer is the successful bidder for the Facilities following a competitive sale process through Seller's Bankruptcy Case and the closing under the Stalking Horse Asset Purchase Agreement shall have occurred or will occur simultaneously.

8.2    Conditions to the Obligations of Seller.  The obligations of Seller to effect the Transactions are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by Seller:

(a)    the representations and warranties of Buyer set forth in this Stalking Horse Real Estate Purchase Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as if made at and as of the Closing Date (except where such representations or warranties are made expressly as of a specific date, and then as of such date);

(b)    Buyer shall have performed in all material respects all obligations required to be performed by it under this Stalking Horse Real Estate Purchase Agreement at or prior to the Closing;

(c)    Buyer shall have executed, as applicable, and delivered to Seller all of the documents and other items required to be delivered at the Closing pursuant to Section 4.2(b) hereto;

(d)    Buyer shall have delivered the Deposit and Closing Cash Payment to the Escrow Agent;

(e)    no Action shall be pending or threatened before any Government Entity that seeks to or does, and no Law shall be in effect that will, prevent consummation of any of the Transactions;

(f)    the Bankruptcy Court shall have entered the Sale Order; and

(g)    the Court Approval shall have been obtained and be in full force and effect.

**ARTICLE IX**
**TERMINATION**

9.1     Events of Termination.     This Stalking Horse Real Estate Purchase Agreement may be terminated and the Transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)     by mutual written consent of the Parties;

(b)     by any Party, if the Closing Date shall not have occurred within thirty (30) days of the closing under the Stalking Horse Asset Purchase Agreement (the "Outside Closing Date"), provided, however that the right to terminate this Stalking Horse Real Estate Purchase Agreement under this Section 9.1(b) shall not be available to any Party whose failure to fulfill any obligation under this Stalking Horse Real Estate Purchase Agreement shall be the cause of the failure of the Closing Date to occur on or before the Outside Closing Date;

(c)     by Seller, if there has been a material breach of any covenant or condition, or any representation or warranty of Buyer and Seller has notified Buyer of such breach in writing, and the breach has not been cured (if capable of being cured) within ten (10) Business Days after delivery of such notice (and if not capable of being cured, immediately);

(d)     by Buyer, if there has been a material breach of any covenant or condition, or any representation or warranty of Seller and Buyer has notified Seller of such breach in writing, and the breach has not been cured (if capable of being cured) within ten (10) Business Days after delivery of such notice (and if not capable of being cured, immediately);

(e)     by any Party, if there shall be any Law of any Government Entity that makes consummation of the Transactions illegal or otherwise prohibited or if any judgment, injunction, order or decree of any competent authority prohibiting such Transactions is entered and such judgment, injunction, order or decree shall have become final and non-appealable;

(f)     by Buyer, if the Bidding Procedures Order is not entered on or by April 25, 2016; the Sale Order is not entered on or by June 13, 2016, or if Seller's Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code;

(g)     by any Party, if an Alternative Transaction is approved by the Bankruptcy Court;

(h)     by Buyer, in accordance with Section 10.16 hereof;

(i)     by Buyer, during the Due Diligence Period for any reason or no reason whatsoever, other than due to Buyer's financing; or

(j)    by Buyer, if Buyer is not the successful bidder under the Stalking Horse Asset Purchase Agreement or if the closing thereunder otherwise fails to occur.

9.2    <u>Effect of Termination</u>.  In the event that this Stalking Horse Real Estate Purchase Agreement shall be terminated pursuant to Section 9.1, all further obligations of the Parties under this Stalking Horse Real Estate Purchase Agreement shall terminate without further Liability or obligation of any Party to any other Party hereunder except for those provisions that expressly survive the termination of this Stalking Horse Real Estate Purchase Agreement and as provided below; <u>provided, however</u> that no Party shall be released from Liability hereunder, subject to the express provisions of this Stalking Horse Real Estate Purchase Agreement, if this Stalking Horse Real Estate Purchase Agreement is terminated and the Transactions abandoned by reason of (i) failure of such Party to have performed its obligations hereunder, or (ii) any knowing misrepresentation made by such Party of any matter set forth herein.  Upon any termination hereunder, Seller shall promptly direct the Escrow Agent to release the Deposit to Buyer; provided, however, that, in the event that this Stalking Horse Real Estate Purchase Agreement is terminated by Seller pursuant to Section 9.1(b) or Section 9.1(c), Escrow Agent shall release to Seller the Deposit, as liquidated damages, in complete satisfaction of any and all claims and causes of action arising in and out of any breach or default of this Stalking Horse Real Estate Purchase Agreement by Buyer.

## ARTICLE X
## MISCELLANEOUS

10.1    <u>Additional Assurances</u>.  The provisions of this Stalking Horse Real Estate Purchase Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; provided, however, at the request of a Party, the other Party or Parties shall execute such additional instruments and take such additional actions as the requesting Party may deem necessary to effectuate this agreement.

10.2    <u>Consents, Approvals and Discretion</u>.  Except as herein expressly provided to the contrary, whenever this Stalking Horse Real Estate Purchase Agreement requires any consent or approval to be given by a Party, or whenever a Party must or may exercise discretion, the Parties agree that such consent or approval shall not be unreasonably withheld or delayed and such discretion shall be reasonably exercised.

10.3    <u>Legal Fees and Costs</u>.  In the event a Party elects to incur legal expenses to enforce or interpret any provision of this Stalking Horse Real Estate Purchase Agreement by judicial proceedings, the prevailing Party will be entitled to recover such legal expenses, including, without limitation, reasonable attorneys' fees, costs, and necessary disbursements at all court levels, in addition to any other relief to which such Party shall be entitled.

10.4   <u>Choice of Law</u>.  The Parties agree that this Stalking Horse Real Estate Purchase Agreement shall be governed by and construed in accordance with the Laws of the State of Florida without regard to conflict of Laws principles.

10.5   <u>Assignment</u>.   No Party may assign this Stalking Horse Real Estate Purchase Agreement without the prior written consent of the other Party, except to an Affiliate of such assigning Party. Notwithstanding the foregoing, Buyer shall have the right, without the prior written consent of Seller, to assign all or a portion of its rights and/or obligations under this Stalking Horse Real Estate Purchase Agreement to any Person or Persons so long as such Person or Persons are controlled, directly or indirectly, by one or both of HCP, Inc. and/or Life Care Companies, LLC.

10.6   <u>Waiver of Breach</u>.  The waiver by any Party of a breach or violation of any provision of this Stalking Horse Real Estate Purchase Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  This Stalking Horse Real Estate Purchase Agreement may only be amended, or rights hereunder waived, by agreement in writing by the Party to be charged.

10.7   <u>Notice</u>.  Any notice, demand, or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when (i) personally delivered, (ii) received by overnight delivery sent via nationally recognized overnight courier, (iii) three (3) Business Days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, or (iv) one (1) Business Day after being sent by electronic mail, addressed as follows:

| | |
|---|---|
| If to Seller: | D.  Bruce Jones, CEO |
| | Life Care St. Johns, Inc. |
| | 1000 Vicar's Landing Way |
| | Ponte Vedra Beach, Florida 32082 |
| | Email: bjones@vicarslanding.com |
| | |
| With copy to: | Richard R.  Thames, Esq. |
| | Charles H. Keller, Esq. |
| | Thames Markey & Heekin, P.A. |
| | 50 North Laura Street, Suite 1600 |
| | Jacksonville, Florida 32202 |
| | Email: rrt@tmhlaw.net, chk@tmhlaw.net |
| | |
| If to Buyer: | Tom Mathisen |
| | Capital Square |
| | 400 Locust Street, Suite 820 |
| | Des Moines, IA 50309 |
| | Email: mathisentom@lcsnet.com |
| | |
| | HCP, Inc. |
| | 1920 Main Street, Suite 1200 |
| | Irvine, CA 92614 |

                        Attention:  Kendall Young
                        Email:  kyoung@HCPI.COM

With copy to:           Faegre Baker Daniels LLP
                        311 S. Wacker Drive, Suite 4300
                        Chicago, IL 60606
                        Attention: George R. Mesires
                        Email: george.mesires@faegrebd.com

and to:                 Skadden, Arps, Slate, Meagher & Flom LLP
                        Four Times Square
                        New York, NY 10036
                        Attention:  Evan R. Levy, Esq.
                        Email: evan.levy@skadden.com

or to such other address, and to the attention of such other person or officer as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party.

        10.8    Severability.  In the event any provision of this Stalking Horse Real Estate Purchase Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice, or disturb the validity of the remainder of this Stalking Horse Real Estate Purchase Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

        10.9    Gender and Number.  Whenever the context of this Stalking Horse Real Estate Purchase Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural.

        10.10   Divisions and Headings.  The divisions of this Stalking Horse Real Estate Purchase Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Stalking Horse Real Estate Purchase Agreement.

        10.11   Survival.  The representations and warranties of the Parties contained herein shall expire upon and shall not survive the Closing for any purpose whatsoever.

        10.12   Accounting Date.  The Transactions contemplated hereby shall be effective for accounting purposes as of 12:01 a.m. on the Closing Date, prevailing Eastern Time, unless otherwise agreed in writing by Seller and Buyer.

        10.13   Third-Party Beneficiaries.  The terms and provisions of this Stalking Horse Real Estate Purchase Agreement are intended solely for the benefit of Buyer and Seller and their respective permitted successors or assigns, and it is not the intention of

                                24

the Parties to confer, and this Stalking Horse Real Estate Purchase Agreement shall not confer, third-party beneficiary rights upon any other Person.

      10.14  <u>Force Majeure</u>.  Whenever a period of time is prescribed herein for action to be taken by a Party, such Party shall not be liable or responsible for, and there shall be excluded from the computation for any period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions, or any other cause of any kind whatsoever which is beyond the reasonable control of such Party.

      10.15  <u>Entire Agreement; Amendment</u>.  This Stalking Horse Real Estate Purchase Agreement supersedes all previous contracts or understandings, including any offers, letters of intent, proposals or letters of understanding, and constitutes the entire agreement of whatsoever kind or nature existing between or among the Parties respecting the within subject matter, and no Party shall be entitled to benefits other than those specified herein.  As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect.  The Parties specifically acknowledge that in entering into and executing this Stalking Horse Real Estate Purchase Agreement, the Parties rely solely upon the representations and agreements contained in this Stalking Horse Real Estate Purchase Agreement and no others.  All prior representations or agreements, whether written or verbal, not expressly incorporated herein are superseded, and no changes in or additions to this Stalking Horse Real Estate Purchase Agreement shall be recognized unless and until made in writing and signed by all Parties hereto.  The schedules and exhibits hereto constitute an integral and material part of this Stalking Horse Real Estate Purchase Agreement, are incorporated herein by reference, and shall be considered part of this Stalking Horse Real Estate Purchase Agreement for all purposes.

      10.16  <u>Risk of Loss</u>.  In the event that all or any part of the Adjacent Parcel are damaged or destroyed by fire, windstorm or any other casualty on or prior to the Closing, Seller shall immediately notify Buyer of such damage or destruction.  In the event that such damage or destruction is in the aggregate more than One Hundred Thousand Dollars ($100,000), Buyer shall have the option to: (x) terminate this Stalking Horse Real Estate Purchase Agreement by written notice delivered to Seller within ten (10) Business Days after Buyer's receipt of notice of such damage or destruction, in which case the Deposit shall be returned to Buyer and the Parties shall have no further obligations hereunder, or (y) proceed with the Transactions without abatement of the Purchase Price, in which case (i) all insurance proceeds relating to such damage or casualty shall be deemed to have been absolutely and irrevocably assigned to and be payable directly to Buyer, (ii) after the Closing, Buyer shall have the right to conduct all settlement proceedings with respect to such insurance claims, and (iii) Seller shall deliver to Buyer through Escrow an unconditional assignment of all such insurance proceeds.  If this Stalking Horse Real Estate Purchase Agreement is not terminated, Seller shall not be obligated to repair any damage or destruction.

      10.17  <u>SUBMISSION TO JURISDICTION</u>.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF

THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION, AND ANY APPELLATE COURT ARISING THEREFROM, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS STALKING HORSE REAL ESTATE PURCHASE AGREEMENT, THE TRANSACTIONS OR ANY OF THE DOCUMENTS ENTERED INTO IN CONNECTION HEREWITH OR FOR THE RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH COURT. EACH OF THE PARTIES AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND BINDING ON SUCH PARTY.

10.18 <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY TO THIS STALKING HORSE REAL ESTATE PURCHASE AGREEMENT HEREBY UNCONDITIONALLY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS STALKING HORSE REAL ESTATE PURCHASE AGREEMENT, ANY OF THE DOCUMENTS RELATED HERETO, ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS STALKING HORSE REAL ESTATE PURCHASE AGREEMENT OR ANY RELATED TRANSACTION.

10.19  <u>Time of Essence</u>.  Time is of the essence under this Stalking Horse Real Estate Purchase Agreement.

10.20  <u>Constituent Liability</u>.  No constituent member or partner in or agent of Buyer, nor any advisor, trustee, director, officer, employee, beneficiary, shareholder, member, partner, participant, representative or agent of any partnership, limited liability company, corporation, trust or other entity that has or acquires a direct or indirect interest in Buyer, shall have any personal liability, directly or indirectly, under or in connection with this Stalking Horse Real Estate Purchase Agreement or any agreement made or entered into under or pursuant to the provisions of this Stalking Horse Real Estate Purchase Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Seller and its successors and assigns and, without limitation, all other persons and entities, shall look solely to Buyer's assets for the payment of any claim or for any performance, and Seller, on behalf of itself and its successors and assigns, hereby waives any and all such personal liability. Notwithstanding anything to the contrary contained in this Stalking Horse Real Estate Purchase Agreement, neither the negative capital account of any constituent member or partner in Buyer (or in any other constituent member or partner of Buyer), nor any obligation of any constituent member or partner in Buyer (or in any other constituent member or partner of Buyer) to restore a negative capital account or to contribute capital to Buyer (or to any other constituent member or partner of Buyer), shall at any time be deemed to be the property or an asset of Buyer or any such other constituent member or partner (and neither Seller nor any of its successors or assigns shall have any right to collect, enforce or proceed against or with respect to any such negative capital account or a member's or partner's obligation to restore or contribute).

10.21  <u>Section 1031 Exchange</u>.  Seller and/or Buyer may, for the purpose of treating all or part of its sale or acquisition of the Properties as a like-kind exchange of property under Section 1031 of the Internal Revenue Code, assign certain rights that it has under this Stalking Horse Real Estate Purchase Agreement, including its right to sell or acquire the Properties pursuant to this Stalking Horse Real Estate Purchase Agreement, to one or more qualified intermediaries, and to provide notice of such assignment to the other party, provided that no such assignment shall release the assigning party from its obligations hereunder and no such assignment shall delay the Closing hereunder.  The non-assigning party shall not incur any costs in connection with such exchange.  The assigning party agrees to save, indemnify, protect and defend the other party (with counsel reasonably satisfactory to such other party) from and against and hold the other party harmless from any and all expenses and/or liabilities arising from such assignment and exchange and the other party shall not be required to take title to any other property.  The provisions of this Section 10.21 shall survive the Closing.

10.22  <u>Designation of Reporting Person</u>.  In order to assure compliance with the requirements of Section 6045 of the Code, and any related reporting requirements of the Code, the parties hereto agree as follows:

(a)  <u>Escrow Agent as Reporting Person</u>.  Escrow Agent agrees to assume all responsibilities for information reporting required under Section 6045(e) of the Code, Seller and Buyer shall designate the Escrow Agent as the person to be responsible for all information reporting under Section 6045(e) of the Code (the "<u>Reporting Person</u>").

(b)  <u>Information to the Reporting Person</u>.  Sellers and Buyer hereby agree:

(i)  to provide the Reporting Person all information and certifications regarding such party, as reasonably requested by the Reporting Person or otherwise required to be provided by a party to the transaction described herein under Section 6045 of the Code; and

(ii)  to provide the Reporting Person such party's taxpayer identification number and a statement (on Internal Revenue Service Form W-9 or an acceptable substitute form, or on any other form the applicable current or future Code sections and regulations might require and/or any form requested by the Reporting Person), signed under penalties of perjury, stating that the taxpayer identification number supplied by such party to the Reporting Person is correct.

10.23  <u>Execution in Counterparts</u>.  For the convenience of the Parties, this Stalking Horse Real Estate Purchase Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.  Signature and acknowledgement pages may be detached from the counterparts and attached to a single copy of this Stalking Horse Real Estate Purchase Agreement to physically form one document.  Facsimile or email transmissions of any executed original and/or retransmission of any executed facsimile or email transmission

27

shall be deemed to be the same as the delivery of an executed original. At the request of any Party hereto, the other Parties hereto shall confirm facsimile or email transmissions by executing duplicate original documents and delivering the same to the requesting Party or Parties.

*[signatures on following page]*

IN WITNESS WHEREOF, the Parties hereto have caused this Stalking Horse Real Estate Purchase Agreement to be executed in multiple originals by their authorized officers, all as of the Execution Date.

**BUYER:**

**LCS GLENMOOR, LLC**

By: _____
Name: _____
Its: _____

**SELLER:**

**LIFE CARE ST. JOHNS, INC.**

By: _____
Name: D. Bruce Jones
Its: Chief Executive Officer

1414.3

IN WITNESS WHEREOF, the Parties hereto have caused this Stalking Horse Real Estate Purchase Agreement to be executed in multiple originals by their authorized officers, all as of the Execution Date.

**BUYER:**                                    **SELLER:**

**LCS GLENMOOR, LLC**                         **LIFE CARE ST. JOHNS, INC.**

By: _____                By: _____
Name: Joel Nelson                            Name: D. Bruce Jones
Its: President & COO                          Its: Chief Executive Officer

## EXHIBIT A-1

### Form of Bidding Procedures Order

[Exhibit begins on next page.]

**EXHIBIT A-1**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | |
| LIFE CARE ST. JOHNS, INC.,<br>a Florida not-for-profit corporation<br>doing business as GLENMOOR,[1] | )<br><br>) | Case No.:<br><br>Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |

## ORDER APPROVING BIDDING PROCEDURES
## IN CONNECTION WITH SALE OF 11 ACRE PARCEL

This Chapter 11 case came before the Court upon the motion filed by debtor, Life

Care St. Johns, Inc., a Florida not-for-profit corporation doing business as Glenmoor

("Glenmoor" or "Debtor"), pursuant to §§ 363, 1129(b)(2) and 365 of title 11 of the United

States Code and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy

Procedure, seeking the entry of an order (a) authorizing the Debtor to sell the 11 Acre Parcel

of unimproved real estate adjacent to its primary campus to LCS Glenmoor, LLC ("LCS" or

the "Stalking Horse Bidder") or such other party (the "Successful Bidder") who submits a

higher and better bid at the Auction (as defined below) free and clear of liens, claims and

interests; (b) approving bidding procedures in connection therewith; and (C) authorizing the

---

[1] The Federal Employer Identification Number for the Debtor is 59-3474627. The
address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

payment of a real estate sales commission to [insert](the "Motion") [Docket No. _____]; the Court having reviewed the Motion, and conducted a hearing on April __, 2016; and having heard statements of counsel and any evidence presented in support of the relief requested in the Motion at the hearing; and it appearing that due and proper notice of the Motion was provided; and it appearing that the relief requested in the Motion is in the best interests of Glenmoor, its estate, and all other parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and after due deliberation thereon, the Court makes the following findings of fact and conclusions of law:

**Findings of Fact and Conclusions of Law:**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. Glenmoor has articulated good and sufficient reasons for the approval of the Bidding Procedures attached hereto as **Exhibit A** and incorporated herein by reference.

3. Notice of the Motion was good and sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures or any other form of relief granted herein is or shall be required.

4. The transaction contemplated by the Stalking Horse Real Estate APA is undertaken by LCS without collusion and in good faith, as that term is defined in § 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the

- 2 -

authorization provided herein to consummate the Sale shall not affect the validity of the transactions, unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.

5.    Neither Glenmoor nor LCS have engaged in any action or inaction that would cause or permit the transactions contemplated by the Stalking Horse Real Estate APA to be avoided or costs or damages to be imposed under § 363(n) of the Bankruptcy Code. The consideration provided by LCS for the 11 Acre Parcel under the Stalking Horse Real Estate APA is fair and reasonable and the sale may not be avoided under § 363(n) of the Bankruptcy Code.

**It Is Ordered:**

1.    The Motion is GRANTED to the extent set forth herein.

2.    That portion of the Motion requesting (a) the scheduling of an Auction, (b) the scheduling of a Sale Hearing, and (c) the approval of the form and manner of notice of the Auction and Sale (the "Sale Notice") is granted. The Auction shall be held before the Honorable Jerry A. Funk, in Courtroom 4D, United States Courthouse, 300 North Hogan Street, Jacksonville, Florida on [_____, 2016] beginning at ___:_____ __.m. The hearing to consider approval of the sale of the 11 Acre Parcel (the "Sale Hearing") shall be held immediately thereafter.

3.    The Bidding Procedures are hereby approved and shall govern the sale process. Bids that do not conform to the Bid Procedures will not be considered for participation in the Auction. Glenmoor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

4.    The deadline to submit a Qualified Bid (as defined in the Bidding Procedures) shall be [insert date] (the "Bid Deadline").

- 3 -

5.    As further described in the Bidding Procedures, Glenmoor shall conduct the Auction if a Qualified Bid, other than the LCS bid under the Stalking Horse Real Estate APA, is received prior to the Bid Deadline.  The Debtor shall serve notice of the time and place for the Auction on all Qualified Bidders, including LCS, in accordance with the Motion.  If no timely, conforming Qualified Bids other than the LCS bid under the Stalking Horse Real Estate APA are submitted by the Bid Deadline, the Auction will not be held, LCS will be the Successful Bidder, and Glenmoor will seek authority to consummate the transactions contemplated by the Stalking Horse Real Estate APA with LCS at the Sale Hearing.

6.    Any obligations of Glenmoor contained in the Stalking Horse Real Estate APA that are intended to be performed prior to entry of an order by this Court approving the sale, are hereby authorized and are fully enforceable as of the date of entry of this Order.

7.    Objections, if any, to the Sale of the 11 Acre Parcel must (a) be in writing, (b) state the basis of such objection with specificity, (c) conform to the Bankruptcy Rules, (d) be filed with the Court electronically by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, so as to be actually received no later than 4:00 p.m. (Eastern Time) seven (7) days before the Sale Hearing (the "Sale Objection Deadline"), provided, however, that objections to the assumption and assignment of the Assumed Contracts and the proposed Cure Amounts should be filed in accordance with the Assumption and Assignment Procedures set forth herein.

8.    The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion of any objection to the Motion and the consummation and performance of the Sale, and shall be deemed to constitute such party's consent to the Sale and the transactions and documents related thereto.

- 4 -

9.      Notwithstanding Rules 6004(h), 6006(d), 7062, or 9041 of the Federal Rules of Bankruptcy Procedure or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution of this Order.

10.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

American Legal Claims Services is directed to serve copies of this Order on interested parties within 3 days of the entry of this Order.

**Exhibit A – Bidding Procedures**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
<u>JACKSONVILLE DIVISION</u>

| | | |
|---|---|---|
| In re | ) | |
| LIFE CARE ST. JOHNS, INC., | ) | Case No.: |
| a Florida not-for-profit corporation | | |
| doing business as GLENMOOR,[2] | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |

<u>**BIDDING PROCEDURES**</u>

These Bidding Procedures (the "Bidding Procedures") set forth the process by which Life Care St. Johns, Inc., a Florida not-for-profit corporation doing business as Glenmoor ("Glenmoor" or "Debtor") is authorized to conduct the sale (the "Sale") by auction (the "Auction") of the 11 Acre Parcel as defined in the Stalking Horse Real Estate APA, dated March ____, 2016 (as may be amended) (the "Stalking Horse Real Estate APA") between Glenmoor, as seller, and LCS Glenmoor, LLC ("LCS"), as buyer, or such other Asset Purchase Agreement submitted at or prior to the Auction and subsequently determined by the Debtor to be the highest and best offer for the 11 Acre Parcel and approved by the Bankruptcy Court. Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Stalking Horse Real Estate APA.

These Bidding Procedures have been approved by an Order dated April __, 2016 (the "Sales Procedures Order"), entered by the United States Bankruptcy Court for the Middle

---

[2] The Federal Employer Identification Number for the Debtor is 59-3474627. The address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

District of Florida, Jacksonville Division (the "Bankruptcy Court"), in which the Chapter 11

bankruptcy case, Case No. **[TBD]** of Glenmoor is pending.

**Assets to be Sold**

1.      These Bidding Procedures set forth the terms by which prospective bidders, if

any, may qualify for and participate in the Auction, thereby competing to make the highest

and best offer for the 11 Acre Parcel, as identified in further detail and defined in the Stalking

Horse Real Estate APA.

**Bid Requirements**

2.      To participate in the Auction, prior to the Bid Deadline, a Potential Bidder

(other than LCS) must deliver to Glenmoor a written irrevocable offer that must:

(a)      be in writing;

(b)      authorize Glenmoor to provide the bid to LCS, the Bond Trustee and the Refund Queue Trustee;

(c)      equal or exceed $475,000, which is the sum of (i) the offer submitted by LCS, and (ii) the minimum bid increment of $25,000 (such aggregate sum, the "Minimum Bid Amount");

(d)      constitute a good faith, bona fide offer to purchase of the 11 Acre Parcel on substantially the same terms as contemplated in the Stalking Horse Real Estate APA, the purchase of the other assets of Glenmoor as a condition precedent to closing excepted;

(e)      be accompanied by a clean and duly executed copy of an Asset Purchase Agreement and the documents set forth as exhibits thereto, along with copies that are marked to reflect the amendments and modifications from the Stalking Horse Real Estate APA executed with LCS, which may not be on terms less favorable in the aggregate to Glenmoor or materially inconsistent with these Bidding Procedures;

(f)      require a closing within fourteen days of the Sale Hearing;

- 2 -

(g)    identify with particularity each and every condition to closing;

(h)    not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder; and

(i)    must remain irrevocable until 48 hours after the Auction.

3.    In addition to the above, each Potential Bidder must:

(a)    provide Glenmoor and the Refund Queue Trustee, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of Glenmoor (in consultation with the Refund Queue Trustee), that such Potential Bidder has the financial wherewithal and ability to consummate the acquisition of the 11 Acre Parcel, including current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the 11 Acre Parcel, current audited financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtor, demonstrating such Potential Bidder's ability to timely close the proposed transaction;

(b)    fully disclose the identity of each entity that will be bidding for or purchasing the 11 Acre Parcel or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;

(c)    on or before the Bid Deadline, submit a cash deposit equal to $50,000 by wire transfer of immediately available funds to an account or accounts established pursuant to an escrow agreement (the "Good Faith Deposit"); and

(d)    not be entitled to any break-up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

4.    Bids fulfilling all of the preceding requirements shall be deemed to be "Qualified Bids," and those parties submitting Qualified Bids shall be deemed to be

"Qualified Bidders." Within twelve hours after receipt of a Qualified Bid, Glenmoor shall provide such Qualified Bid to the Bond Trustee, the Refund Queue Trustee, and LCS. Within [1] [(one)] Business Days after the Bid Deadline, Glenmoor, shall determine, in consultation with the Bond Trustee and the Refund Queue Trustee, which Potential Bidders are Qualified Bidders and will notify the Potential Bidders and LCS whether their bids constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. The Stalking Horse Real Estate APA submitted by LCS shall be deemed a Qualified Bid.

5.     The Refund Queue Trust shall have the right to credit bid its secured claim towards the acquisition of the 11 Acre Parcel without the necessity of submitting a formal written offer. Should the Refund Queue Trust exercise its credit bid rights and be deemed the Successful Bidder (as defined below), the 11 Acre Parcel shall be conveyed to it by general warranty.

6.     If the Refund Queue Trust intends to credit bid, it must provide Glenmoor with written notice of such intention and its initial bid prior to the Bid Deadline. Such bid shall be considered a Qualified Bid for purposes of this Order.

**Bid Deadline**

7.     Binding bids must be actually received by Glenmoor no later than 5:00 p.m. (prevailing Eastern Time) on [, 2016] (the "Bid Deadline").

**Evaluation of Qualified Bids**

8.     Prior to the Auction, Glenmoor, in consultation with the Refund Queue Trustee shall evaluate Qualified Bids and identify the Qualified Bid that is, in Glenmoor's

- 4 -

judgment, the highest and best bid (the "Starting Bid").    Within 24 hours of such determination, Glenmoor shall notify LCS as to which Qualified Bid is the Starting Bid. Glenmoor shall distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**No Qualified Bids**

9.    If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the Stalking Horse Real Estate APA will be deemed the Successful Bid (as defined herein), and Glenmoor will pursue entry of an order by the Bankruptcy Court approving the Stalking Horse Real Estate APA and authorizing the sale of the 11 Acre Parcel to LCS.

**Auction**

10.    If one or more Qualified Bids are received by the Bid Deadline, then Glenmoor shall conduct an auction (the "Auction") with respect to the 11 Acre Parcel.    The Auction shall be conducted before and at the direction of the Honorable Jerry A. Funk, Chief United States Bankruptcy Judge, in the Bryan Simpson United States Courthouse, Room 4D, 300 North Hogan Street, Jacksonville, Florida 32202, if one or more Qualified Bids are received by the Bid Deadline.    The Debtor shall request that the Bankruptcy Court conduct the Auction on or before [__, 2016].

11.    The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

(a)    the Auction will be conducted openly;

(b)    only the Qualified Bidders, including LCS, shall be entitled to bid at the Auction;

- 5 -

(c)    the Qualified Bidders, including LCS, shall appear in person at the Auction, or through duly-authorized representatives;

(d)    only such authorized representatives of each of the Qualified Bidders, LCS, Glenmoor, the Bond Trustee, the Refund Queue Trustee, and their respective advisors shall be permitted to attend the Auction;

(e)    bidding at the Auction shall begin at the Starting Bid;

(f)    subsequent bids at the Auction, including any bids by LCS, shall be made in minimum increments of $25,000;

(g)    each participating bidder will be informed of the terms of the previous bids;

(h)    the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

(i)    each bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale and is not in violation of § 363(n) of the Bankruptcy Code; and

(j)    absent irregularities in the conduct of the Auction, the Bankruptcy Court will not consider bids made after the Auction is closed.

**Acceptance of the Successful Bid**

12.    Upon the conclusion of the Auction (if the Auction is conducted), Glenmoor, in the exercise of its reasonable, good-faith business judgment and after consulting with the Bond Trustee and the Refund Queue Trustee, shall identify the highest and best bid (the "Successful Bid"). In determining which Qualified Bid is the Successful Bid, the Debtor may consider, after consultation with the Refund Queue Trustee (other than any one of the foregoing choosing to bid at the Auction), among other things: (1) the amount of the purchase price; (2) the form of consideration being offered; (3) the likelihood of the

Qualified Bidder's ability to close a transaction and the timing thereof; (4) the net benefit to the Debtor's estate and all of its constituents, and the effect of the Sale Transaction on the residents of the Debtor; (5) the extent of such Qualified Bidder's background and experience operating a CCRC; (6) licensure qualification issues; and (7) any other facts, including but not limited to, all other non- economic factors. Before the conclusion of the Auction, the Debtor shall inform each of the Bidders of the decision regarding designation of the Successful Bid, and the Qualified Bidder who submitted such Successful Bid shall be required to execute a definitive asset purchase agreement at such time. The Debtor shall present the Successful Bid to the Bankruptcy Court for approval at the Sale Hearing.

13.    The Qualified Bidder having submitted a Successful Bid will be deemed the "Successful Bidder." The Successful Bidder and Glenmoor shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

14.    The Bankruptcy Court will conduct a hearing to approve the Sale to the Successful Bidder on [__, 2016]. Glenmoor will request the Bankruptcy Court make certain findings regarding the Auction, including, among other things, that (a) the Auction was conducted and the Successful Bidder was selected in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid as defined in these Bidding Procedures, and (d) consummation of the Sale contemplated by the Successful Bid will provide the highest and best value for the 11 Acre Parcel, and is in the best interests of Glenmoor and its estate.

15.    If an Auction is held, Glenmoor shall be deemed to have accepted a Qualified Bid only when (a) such bid is declared the Successful Bid at the Auction and (b) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the entry of an order approving such Successful Bid.

**Designation of Back-Up Bidder**

16.    If for any reason the Successful Bidder fails to consummate the purchase of the 11 Acre Parcel within the time permitted after the entry of the order approving the Sale to the Successful Bidder, then the Qualified Bidder with the second highest and best bid for the 11 Acre Parcel (the "Back-Up Bidder"), as determined by Glenmoor, after consultation with the Bond Trustee and the Refund Queue Trustee, at the conclusion of the Auction and announced at that time to all the bidders participating therein, will automatically be deemed to have submitted the highest and best bid, and Glenmoor and the Back-Up Bidder will be authorized, but not required, to consummate the Sale with the Back-Up Bidder as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court.

Return of Good Faith Deposit

17.    The Good Faith Deposit of the Successful Bidder shall, upon consummation of the purchase of the 11 Acre Parcel, be credited to the purchase price paid for the 11 Acre Parcel.  If the Successful Bidder fails to consummate the purchase of the 11 Acre Parcel (other than as a result of a material breach of the Stalking Horse Real Estate APA by

Glenmoor), then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, Glenmoor.

18.    The Good Faith Deposit of any unsuccessful Qualified Bidders (except for LCS) will be returned within fifteen (15) days after the Sale Hearing or upon the permanent withdrawal of the proposed Sale of the 11 Acre Parcel.  The Good Faith Deposit of LCS shall be returned in accordance with the terms of the Stalking Horse Real Estate APA.

111.4

## EXHIBIT A-2

**Form of Sale Order**

[Exhibit begins on next page.]

EXHIBIT A-2

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | |
| LIFE CARE ST. JOHNS, INC., | ) | Case No.: |
| a Florida not-for-profit corporation | | |
| doing business as GLENMOOR,[1] | ) | Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |

**ORDER APPROVING SALE OF ADJACENT 11 ACRE**
**PARCEL TO LCS GLENMOOR, LLC AND AUTHORIZING**
**PAYMENT OF REAL ESTATE SALES COMMISSION**

This chapter 11 case came before the Court on April _____, 2016 upon the motion (the "Motion") of the debtor, Life Care St. Johns, Inc., a Florida not-for-profit corporation doing business as Glenmoor ("Glenmoor" or "Debtor"), for the entry of an order, pursuant to §§ 363(b)(1), 1123, 1129 and 1146 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), authorizing the Debtor to (i) sell the 11 Acre Parcel of unimproved real estate adjacent to its primary campus to LCS Glenmoor, LLC ("LCS" or the "Stalking Horse Bidder") or such other party (the "Successful Bidder") who submits a higher and better bid at the Auction (as defined in the motion) free and

---

[1]    The Federal Employer Identification Number for the Debtor is 59-3474627. The address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

clear of liens, claims and interests, and (ii) pay a sales commission to Debtor's broker, [insert], in connection therewith. The Court having conducted a hearing (the "Hearing") to approve the sale to LCS, or its assigns (the "Buyer"); and the Court having heard argument of counsel and any evidence presented in support of the relief requested in the motion at the Hearing; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, and all creditors and other parties in interest; and after due deliberation thereon; the Court hereby makes the following findings of fact and conclusions of law:

**Findings of Fact and Conclusions of Law:**

A.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.       On or about March _____, 2016, the Debtor and LCS entered into a Stalking Horse Real Estate APA, attached to the motion as Exhibit B (the "Stalking Horse Real Estate APA") for the sale and purchase of the approximate 11 acre parcel of real property located adjacent to its Continuing Care Retirement Community (the "Property"), which property is more fully described as follows:

[Comport legal description with revised]
Approximate 11 Acre Parcel:

Parcel A

Northwest Parcel 11A

Part of Section 44, Township 6 South, Range 28 East, St. Joins County, Florida, more particularly described as follows; for a point of reference,

commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1295.90 feet; thence South 75°04'08" East leaving said Westerly line of Section 44, a distance of 1910.39 feet to the Point of Beginning; thence North 32°40'18" West, a distance of 394.90 feet; thence North 03°28'56" East along a line to its intersection with conservation easement no. 29, a distance of 315.67 feet; thence South 68°38'38" East along said conversation easement, a distance of 65.34 feet; thence North 57°00'25" East continuing along said conservation easement, a distance of 56.53 feet; thence North 36°47'19" East along said conservation easement, a distance of 33.66 feet; thence North 56°23'17" West along said conservation easement, a distance of 38.85 feet; thence North 41°26'16" East along said conservation easement, a distance of 50.16 feet; thence North 77°43'45" East along said conservation easement, a distance of 51.00 feet, thence South 65°06'09" East along said conservation easement, a distance of 21.10 feet; thence North 73°35'01" East along said conservation easement, a distance of 24.11 feet; thence South 67°48'15" East continuing along said easement line, a distance of 61.16 feet; thence South 02°10'02" West continuing along said easement line, a distance of 31.16 feet; thence South 46°29'48" East continuing along said easement line, a distance of 47.46 feet; thence South 68°03'16" East continuing along said easement line, a distance of 69.09 feet; thence North 71°08'08" East continuing along said easement line, a distance of 54.32 feet, thence North 82°51'41" East continuing along said easement line, a distance of 63.97 feet; thence South 81°18'54 " East continuing along said easement line a distance of 44.30 feet; thence North 12°19'30" East continuing along said easement line, a distance of 52.59 feet to the point of curve of a curve, concave Southwesterly having a radius of 130.00 feet; thence Southeasterly along the arc of said curve continuing along said easement line, an arc distance of 392.43 feet, said arc being subtended by a chord bearing of South 81°11'47" East and a chord distance of 259.51 feet to the point of tangency of said curve; thence South 05°16'55" West along a Westerly line of said conservation easement, a distance of 325.44 feet; thence South 24°54'33" West continuing along said easement line and its Southerly projection thereof to its intersection with the Northerly right of way line of Parcel 11A access easement, a distance of 345.54 feet to a point lying on a curve, said curve being concave Southeasterly having a radius of 440.00 feet; thence Southwesterly along the arc of said curve and along said Northerly right of way line, an arc distance of 431.03 feet; said arc being subtended by a chord bearing of South 87°25'35" West and a chord distance of 414.00 feet to the point of tangency of said curve; thence South 59°21'36" West continuing along said Northerly right of way line, a distance of 21.64 feet to the Point of Beginning.

Parcel B

Parcel 1, Swap Parcel to Northwest 11

-3-

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence North 03°28'56" East, a distance of 152.07 feet to the Point of Beginning; thence North 22°20'24" West, a distance of 181.75 feet; thence South 86°31'04" East, a distance of 79.17 feet; thence South 03°28'56" West a distance of 163.60 feet to the Point of Beginning.

Parcel C

Parcel 3, Swap Parcel to Northwest 11

A part of section 44, Township 6 South, Range 28 East, St. Johns County, Florida more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said sect ion 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence South 32°40'18" East, a distance of 213.15 feet to the Point of Beginning; thence continue South 32°40'18" East, a distance of 168.93 feet; thence South 70°30'28" West, a distance op 43.61 feet; thence North 17°43'07" West a distance of 164.56 feet to the Point of Beginning.

LESS AND EXCEPT THE FOLLOWING DESCRIBED LANDS:

Parcel 2, Swap Parcel to Northwest 12

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet: thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in Official Records Book 1291, Page 403 for the Point of Beginning; thence North 03°28'56" East, a distance of 152.07 feet; thence South 17°43'07" East, a distance of 347.71 feet; thence North 32°40'18" West, a distance of 213.15 feet to the Point of Beginning.

Parcel 4, Parcel from Northwest 11

A part of Section 44, Township 6 South, Range 28 East, St. Johns County,

-4-

Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1311.88 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1869.64 feet; thence North 70°30'28" East, a distance of 43.61 feet to Point of Beginning; thence continue North 70°30'28" East, a distance of 107.92 feet to a point on a curve, being concave Southeasterly, having a radius of 440.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 84.30 feet, said arc being subtended by a chord bearing of South 64°51'05" West and a chord distance of 84.18 feet to the point of tangency of said curve; thence South 59°21'36" West, a distance of 21.63 feet; thence North 32°40'18" West, a distance of 12.82 feet to the Point of Beginning.

TOGETHER WITH A NON-EXCLUSIVE PERPETUAL EASEMENT OVER THE FOLLOWING DESCRIBED LANDS:

Royal Pines Park Way

A part of the Antonio Huertas Grant, Section 38, together with a part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 7123.49 feet; thence South 53°13'38" East along a line to its intersection with the Northwesterly right of way line of International Golf Parkway (a 100 foot right of way as proposed), a distance of 2224.53 feet; thence North 50°29'50" East along said proposed Northwesterly right of way line, a distance of 2492.30 feet; thence North 44°29'54" East continuing along said proposed Northwesterly right of way line, a distance of 906.96 feet to the Point of Beginning, said point being on a curve, concave Westerly having a radius of 50.00 feet; thence Northwesterly leaving said right of way line and along the arc of said curve, an arc distance of 78.54 feet, said arc being subtended by a chord bearing of North 00°30'06" West and a chord distance of 70.71 feet to the point of tangency of said curve; thence North 45°30'05" West, a distance of 71.99 feet to the point of a curve of a curve concave Northeasterly having a radius of 550.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 261.20 feet, said arc being subtended by a chord bearing of North 31°53'47" West and a chord distance of 258.75 feet to the point of tangency of said curve; thence North 18°17'27" West a distance of 211.97 feet to the point of a curve of a curve, concave Easterly having a radius of 550.00 feet; thence Northerly along the arc of said curve, an arc distance of 266.10 feet, said arc being subtended by a chord bearing of North 04°25'50" West and a chord distance of 263.51 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve, an arc distance of 438.51 feet, said arc being

subtended by a chord bearing of North 08°30'59" West and a chord distance of 431.37 feet to the point of reverse curve of a curve, concave Easterly having a radius of 800.00 feet; thence Northerly along the arc of said curve, an arc distance of 623.81 feet, said arc being subtended by a chord bearing of North 04°07'27" West and a chord distance of 608.12 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve an arc distance of 328.09 feet, said arc being subtended by a chord bearing of North 04°47'13" East and a chord distance of 325.10 feet to the point of reverse curve, concave Easterly having a radius of 600.00 feet; thence Northerly along the arc of said curve, an arc distance of 314.77 feet, said arc being subtended by a chord bearing of North 06°23'19" East and a chord distance of 311.17 feet to the point of tangency of said curve; thence North 21°25'04" East, a distance of 2.70 feet to the point of curve of a curve, concave Westerly having a radius of 1000.00 feet; thence Northerly along the arc of said curve, an arc distance of 832.14 feet, said arc being subtended by a chord bearing of North 02°25'17" West and a chord distance of 808.34 feet to the point of tangency of said curve; thence North 26°15'38" West a distance of 206.92 feet to the point of curve of a curve, concave Northeasterly having a radius of 1050.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 448.34 feet, said arc being subtended by a chord bearing of North 14°01'42" West and a chord distance of 444.94 feet to a point of compound curve of a curve, concave Southeasterly having a radius of 550.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 609.03 feet, said arc being subtended by a chord bearing of North 29°55'35" East and a chord distance of 578.39 feet to a point of reverse curve of a curve, concave Northwesterly having a radius of 185.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 230.24 feet, said arc being subtended by a chord bearing of North 25°59'45" East and a chord distance of 215.67 feet to a point of cusp of a curve, said point lying on the Westerly right of way line of WGV Boulevard, said curve being concave Westerly having a radius of 2500.00 feet; thence Southerly along said Westerly right of way line and along the arc of said curve, an arc distance of 216.78 feet, said arc being subtended by a chord bearing of South 07°10'25" East and a chord distance of 216.71 feet to the point of reverse curve of a curve, concave Northeasterly having a radius of 550.00 feet; thence Southeasterly, continuing along said Westerly right of way line and along the arc of said curve, an arc distance of 599.77 feet, said arc being subtended by a chord bearing of South 35°55'47" East and a chord distance of 570.49 feet to the point of cusp of a curve, concave Northeasterly having a radius of 556.50 feet; thence Northwesterly leaving said Westerly right of way line of WGV Boulevard and along the arc of said curve, an arc distance of 320.51 feet, said arc being subtended by a chord bearing of North 52°45'08" West and a chord distance of 316.10 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 562.00 feet; thence Northwesterly along the arc of said

-6-

curve, an arc distance of 95.37 feet, said arc being subtended by a chord bearing of North 29°18'05" West and a chord distance of 95.25 feet to the point of reverse curve of a curve, concave Southerly having a radius of 135.00 feet; thence Westerly along the arc of said curve, an arc distance of 262.48 feet, said arc being subtended by a chord bearing of North 80°08'23" West and a chord distance of 223.05 feet to the point of compound curve of a curve, concave Southeasterly having a radius of 450.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 360.94 feet, said arc being subtended by a chord bearing of South 21°10'56" West and a chord distance of 351.34 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 950.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 405.64 feet; said arc being subtended by a chord bearing of South 14°01'42" East and a chord distance of 402.56 feet to the point of tangency of said curve, thence South 26°15'38" East, a distance of 405.77 feet to the point of curve of a curve, concave Westerly having a radius of 650.00 feet; thence Southerly along the arc of said curve, an arc distance of 540.89 feet, said arc being subtended by a chord bearing of South 02°25'17" East and a chord distance of 525.42 feet to the point of tangency of said curve; thence South 21°25'04" West, a distance of 201.54 feet to the point of curve of a curve, concave Easterly having a radius of 500.00 feet; thence Southerly along the arc of said curve, an arc distance of 262.31 feet, said arc being subtended by a chord bearing of South 06°23'19" West and a chord distance of 259.31 feet to the point of reverse curve of a curve concave Westerly having a radius of 800.00 feet; thence Southerly along the arc of said curve, an arc distance of 334.19 feet, said arc being subtended by a chord bearing of South 03°19'36" West and a chord distance of 331.76 feet to the point of reverse curve of a curve, concave Easterly having a radius of 700.00 feet; thence Southerly along the arc of said curve, an arc distance of 469.50 feet, said arc being subtended by a chord bearing of South 03°55'14" East and a chord distance of 460.75 feet to the point of reverse curve of a curve, concave Westerly having a radius of 1050.00 feet; thence Southerly along the arc of said curve, an arc distance of 606.08 feet, said arc being subtended by a chord bearing of South 06°35'56" East and a chord distance of 597.70 feet to the point of reverse curve of a curve, concave Easterly having a radius of 450.00 feet; thence Southerly along the arc of said curve, an arc distance of 221.70 feet, said arc being subtended by a cord bearing of South 04°10'37" East and a chord distance of 219.47 feet to the point of tangency of said curve; thence South 18°17'27" East, a distance of 211.97 feet to the point of curve of a curve, concave Northeasterly having a radius of 450.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 213.71 feet, said arc being subtended by a chord bearing of South 31°53'47" East and a chord distance of 211.71 feet to the point of tangency of said curve; thence South 45°30'05" East, a distance of 71.99 feet to the point of curve of a curve, concave Northerly having a radius of 50.00 feet; thence Easterly along the arc of said curve, an arc distance of

78.54 feet, said arc being subtended by a chord bearing of North 89°29'55" East and a chord distance of 70.71 feet to the point of cusp at the aforesaid proposed Northwesterly right of way line of International Golf Parkway; thence South 44°29'54" West along said proposed Northwesterly right of way line, a distance of 200.00 feet to the Point of Beginning

AND TOGETHER WITH A NON-EXCLUSIVE PERPETUAL EASEMENT OVER THE FOLLOWING DESCRIBED LANDS:

North Parcel 11A access easement:

Part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1295.90 feet; thence South 75°04'08" East leaving said Westerly line of Section 44, a distance of 1910.39 feet to the Point of Beginning; thence North 59°21'36" East, a distance of 21.64 feet to the point of curve of a curve, concave Southerly having a radius of 440.00 feet; thence Easterly along the arc of said curve, an arc distance of 457.03 feet said arc being subtended by a chord bearing of North 89°07'10" East and a chord distance of 436.76 feet to the point of tangency of said curve; thence South 61°07'25" East a distance of 38.20 feet to the point of curve of a curve concave, Northwesterly having a radius of 50.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 71.01 feet; said arc being subtended by a chord bearing of North 78°11'23" East and a chord distance of 65.19 feet to the point of cusp of a curve said curve being concave Southeasterly having a radius of 550.00 feet; thence Southwesterly along the arc of said curve and along the Northwesterly right of way line of Royal Pines Parkway (a right of way of varying width), an arc distance of 165.63 feet, said arc being subtended by a chord bearing of South 28°52'34" West and a chord distance of 165.00 feet to a point on said right of way line and the point of cusp of a curve, said curve being concave Southwesterly having a radius of 50.00 feet: thence Northwesterly along the arc of said curve leaving said Northwesterly right of way line of Royal Pines Parkway, an arc distance of 71.01 feet, said arc being subtended by a chord bearing of North 20°26'41" West and a chord distance of 65.19 feet to the point of tangency of said curve; thence North 61°07'25" West, a distance of 35.77 feet to the point of curve of a curve, concave Southerly having a radius of 360.00 feet; thence Westerly along the arc of said curve, an arc distance of 373.94 feet, said arc being subtended by a chord bearing of South 89°07'10" West and a chord distance of 357.35 feet to the point of tangency of said curve; thence South 59°21'36" West, a distance of 18.80 feet; thence North 32°40'18" West, a distance of 80.05 feet to the Point of Beginning.

C.     The Property has been the subject of a full and robust marketing and sale process, and the Debtor's determination, in consultation with its creditor constituencies, that the Stalking Horse Real Estate APA constitutes the highest and best offer for the Property and is a valid and sound exercise of the Debtor's business judgment.  No other person or entity or group of entities has offered to purchase the Property for greater economic value to the Debtor's estate than LCS, and the terms set forth in the Stalking Horse Real Estate APA are fair and reasonable and constitute the highest and best offer for the Property, and will provide a greater recovery for the Debtor's estates in respect of the Property than would be provided by any other available sale alternative.

D.     The Debtor has full corporate power and authority to execute and deliver the Stalking Horse Real Estate APA and all other documents contemplated thereby, and no further consents or approvals are required for the Debtor to consummate the transactions contemplated by the Stalking Horse Real Estate APA.

E.     The Debtor has fully complied with §§ 363 and 1123(a)(5)(D) of the Bankruptcy Code with respect to the sale of the Property.  All persons claiming an interest in the Property to be sold received due and proper notice of the proposed sale and of the opportunity to object to same.  The Debtor may sell the Property free and clear of any, liens, interests or claims.  Upon closing, LCS shall receive the Property free and clear of any liens, claims or interests.

F.     The Buyer is not an "insider" of the Debtor, as that term is defined in § 101(31) of the Bankruptcy Code.

G.     Pursuant to Bankruptcy Code § 363(m), the Stalking Horse Real Estate APA was negotiated at arm's-length and entered into in good faith by the respective parties thereto and their agents and representatives, and LCS is entitled to all of the

benefits and protections of § 363(m) of the Bankruptcy Code, in that: (i) LCS has not violated § 363(n) of the Bankruptcy Code by any action or inaction; (ii) no common identity of directors or controlling stockholders exists between LCS and the Debtor; and (iii) the negotiation and execution of the Stalking Horse Real Estate APA and any other agreements or instruments related thereto was without collusion, at arm's-length and in good faith.

H.     The Debtor (through its agents) served by first class mail a copy of the amended notice of hearing to approve the sale upon the U.S. Trustee, all known creditors and parties in interest, including; all taxing authorities having jurisdiction over any of the Property, including the Internal Revenue Service, all parties that have requested notice pursuant to Bankruptcy Rule 2002, and all persons or entities known or reasonably believed to have asserted a lien in any of the Property.  Such notice complies fully with Bankruptcy Rule 2002, and was reasonably calculated to provide timely and adequate notice of the sale to the Debtor's creditors and other parties in interest.

I.     The Debtor has established the necessary facts to support the entry of an Order for the sale of the Property as provided in the Stalking Horse Real Estate APA to LCS.

**It Is Therefore Ordered:**

1.     This Order is deemed to be a Sale Order as provided in the Stalking Horse Real Estate APA [and issued in conjunction with confirmation of the Debtor's Chapter 11 plan of liquidation].

2.     The Stalking Horse Real Estate APA and all other ancillary documents, and all of the terms and conditions thereof, are hereby authorized and approved.

-10-

3.    The Debtor may sell the Property free and clear of liens, if any, because one or more of the standards set forth in § 363(f)(1)-(5) of the Bankruptcy Code has or have been satisfied.  Notably, all entities claiming a security interest in the Property have consented to the proposed sale to LCS on the condition that the net sale proceeds be paid to them in order of their lien priority to the extent of such proceeds.

4.    Pursuant to § 363(b) of the Bankruptcy Code, the Debtor is authorized, directed and empowered to take any and all actions necessary or appropriate to: (i) consummate the sale of the Property to LCS pursuant to and in accordance with the terms and conditions of the Stalking Horse Real Estate APA; (ii) close the sale as contemplated in the Stalking Horse Real Estate APA and this Order; and (iii) execute and deliver, perform under, consummate, implement and close fully the Stalking Horse Real Estate APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse Real Estate APA and the sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Stalking Horse Real Estate APA and such other ancillary documents.

5.    Pursuant to §§ 105(a), 363 and 1123(a)(5)(D) of the Bankruptcy Code, the Debtor is authorized to transfer the Property to LCS on the Closing Date (as defined in the Stalking Horse Real Estate APA).  The Property shall be transferred to LCS upon and as of the Closing Date, or at such other time as specified pursuant to the terms of the Stalking Horse Real Estate APA, and such transfer shall constitute a legal, valid, binding and effective transfer of such Property, and, upon the Debtor's receipt of the purchase price, shall be free and clear of all liens, claims (as that term is defined in § 101(5) of the Bankruptcy Code), interests, encumbrances, and other interests with all such liens, claims

-11-

(as that term is defined in § 101(5) of the Bankruptcy Code), interests, encumbrances, and other interests, if any, to attach to the sale proceeds with the same validity, priority, force and effect that they now have as against such Property, after deduction of all necessary and customary closing costs.

6.      [The transfer of the Property under the Stalking Horse Real Estate APA is a transfer under a plan of liquidation confirmed under 11 U.S.C. § 1129.  Pursuant to § 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under or in connection with the Plan, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, assignments, mortgages, deeds of trust or similar documents executed in connection with the transfer of the Property to Buyer shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax nor any Uniform Commercial Code filing or recording fee or similar or other governmental assessment.]

7.      The transfer of the Property to LCS will be as of the Closing Date a legal, valid and effective transfer of such assets, and vests or will vest LCS with all right, title and interest of the Debtor to the Property free and clear of all liens, claims (as that term is defined in § 101(5) of the Bankruptcy Code), interests, encumbrances, and other interests accruing, arising or relating to any time prior to the Closing Date.

8.      The terms and provisions of this Order shall be binding in all respects upon LCS and the Debtor, any trustees appointed pursuant to Chapter 11 or Chapter 7 of the Bankruptcy Code, the estate, all creditors and interest holders of the Debtor, all interested parties and their respective successors and assigns, including, but not limited to, any creditor asserting a lien in the Property.

9.      All persons and entities are hereby forever prohibited and enjoined from taking any action that would interfere with the ability of the Debtor to sell and transfer the Property to LCS in accordance with the terms of the Stalking Horse Real Estate APA and this Order.

10.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to evidence conclusively the release or cancellation of the liens and other encumbrances of record with respect to the Property.

11.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Real Estate APA.

12.     The transactions contemplated by the Stalking Horse Real Estate APA are undertaken by LCS without collusion and in good faith, as that term is defined in § 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale.  The Buyer is a good faith purchaser within the meaning of § 363(m) of the

-13-

Bankruptcy Code and, as such, is entitled to the full protections of § 363(m) of the Bankruptcy Code.

13.    The consideration provided by LCS for the Property pursuant to the Stalking Horse Real Estate APA shall be deemed to constitute reasonably equivalent value, fair consideration, and fair market value for the assets under the Bankruptcy Code and under the laws of the United States, any state, territory or possession.

14.    The Debtor is authorized, but not directed, to pay, at or prior to Closing, certain real property and ad valorem tax claims asserted against the Debtor that have given, or may give, rise to liens with respect to the Property.  The Buyer shall not be responsible for any such taxes or claims, and the Property is transferred to LCS free and clear of all such taxes or claims.

15.    At the Closing, the Debtor is authorized to pay [insert] a commission of _____% of the gross selling price of the Property as its commission.

16.    The Stalking Horse Real Estate APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estates.

17.    The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Stalking Horse Real Estate APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which will be assigned by the Debtor to LCS, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale.

18.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

19.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this Order shall govern.  To the extent the terms of this Order are inconsistent with the terms of the Stalking Horse Real Estate APA agreed to by the parties, the terms of the Stalking Horse Real Estate APA shall govern.

20.     Nothing contained in any order entered in these bankruptcy proceedings subsequent to entry of this Order, or in any Chapter 11 plans confirmed in these Chapter 11 Cases, shall conflict with or derogate from the provisions of the Stalking Horse Real Estate APA or the terms of this Order.

21.     Notice of the Motion constitutes good, sufficient and timely notice, and no other or further notice shall be required, other than service of a copy of this Order by first class mail postage prepaid upon creditors and parties in interest.

22.     Notwithstanding Rules 6004(h) or 9014 of the Federal Rules of Bankruptcy Procedure or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution of this Order.

23.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

American Legal Claims Services is directed to serve copies of this Order on interested parties within 3 days of the entry of this Order.
112.4

## EXHIBIT B

### Legal Description of Facilities

The land referred to herein below is situated in the County of St. Johns, State of Florida, and is described as follows:

PARCEL A

Northwest Parcel 12

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the Westerly line of said section, a distance of 794.29 feet; thence South 75°04'08" East leaving said section line, a distance of 1005.91 feet to the Point of Beginning; thence North 67°18'44" East, a distance of 83.75 feet; thence South 48°28'02" East, a distance of 49.55 feet; thence South 47°07'46" East, a distance of 67.82 feet; thence South 86°31'04" East, a distance of 308.18 feet; thence South 22°20'24" East, a distance of 181.75 feet; thence South 17°43'07" East, a distance of 592.76 feet; thence South 48°47'39" East, a distance of 84.28 feet to a point lying on a curve, said curve being concave Easterly having a radius of 100.00 feet; thence Southerly along the arc of said curve, an arc distance of 129.49 feet, said arc being subtended by a chord bearing of South 02°55'59" East and a chord distance of 120.63 feet to the point of reverse curve of a curve, said curve being concave Westerly having a radius of 150.00 feet; thence Southerly along the arc of said curve, an arc distance of 248.58 feet, said arc being subtended by a chord bearing of South 07°26'43" West and a chord distance of 221.09 feet to the point of tangency of said curve; thence South 54°55'11" West, a distance of 122.79 feet to the point of curve of a curve, concave Southeasterly having a radius of 500.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 308.79 feet, said arc being subtended by a chord bearing of South 37°13'39" West and a chord distance of 303.90 feet to the point of tangency of said curve; thence South 19°32'07" West, a distance of 262.67 feet to the point of curve of a curve, said curve being concave Northwesterly having a radius of 293.73 feet; thence Southwesterly along the arc of said curve, an arc distance of 288.27 feet, said arc being subtended by a chord bearing of South 47°39'02" West and a chord distance of 276.84 feet to the point of tangency of said curve; thence South 75°45'56" West, a distance of 125.65 feet to the point of curve of a curve, concave Southeasterly having a radius of 55.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 43.03 feet, said arc being subtended by a chord bearing of South 53°21'17" West and a chord distance of 41.94 feet to the point of tangency of said curve; thence South 30°56'39" West, a distance of 55.03 feet to the point of curve of a curve, concave Northwesterly having a radius of 105.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 91.70 feet; said arc being subtended a chord bearing of South 55°57'52 " West and a chord distance of 88.82 feet to the point of tangency of said curve; thence South 80°59'05" West, a distance of 235.50 feet to the point of curve of a curve, concave Southeasterly having a radius of 125.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 181.31 feet, said arc being subtended by a chord bearing of South 39°25'52" West and a chord distance of 165.83 feet to the point of reverse curve of a curve, being concave Westerly having radius of 260.00 feet; thence Southerly along the arc of said curve, an arc distance of 118.39 feet, said arc being subtended by a chord bearing of South 10°55'44" West and a chord distance of 117.37 feet to the point of reverse curve of a curve, said curve being concave Easterly having a radius of 359.00 feet; thence Southerly along the arc of said curve an arc distance of 113.19 feet, said arc being subtended by a chord bearing of South 14°56'27" West and a chord distance of 112.72 feet to the point of reverse curve of a curve, said curve being concave Northwesterly having a radius of

60.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 83.58 feet, said arc being subtended to a chord bearing of South 45°49'24" West and a chord distance of 76.99 feet to a point on said curve; thence North 04°51'23" East, a distance of 180.93 feet; thence North 09°28'47" West, a distance of 65.62 feet; thence North 00°56'26" East, a distance of 70.94 feet; thence North 02°31'11" West, a distance of 63.96 feet; thence North 05°27'34" West, a distance of 59.07 feet; thence North 04°53'23" West, a distance of 34.17 feet; thence North 43°54'07" East, a distance of 35.85 feet; thence North 30°31'06" East, a distance of 52.71 feet; thence North 08°26'37" East, a distance of 37.22 feet; thence North 28°29'33" West, a distance of 68.00 feet; thence North 34°56'05" East, a distance of 39.87 feet; thence North 03°28'40" East, a distance of 42.85 feet; thence North 26°11'28" West, a distance of 34.85 feet; thence South 78°18'46" West, a distance of 69.88 feet; thence North 17°50'44" East, a distance of 82.04 feet; thence North 01°04'08" West, a distance of 52.62 feet; thence North 26°45'44" West, a distance of 52.72 feet; thence North 08°37'23" West, a distance of 71.21 feet; thence North 49°58'30" East, a distance of 51.20 feet; thence North 37°03'10" East, a distance of 42.51 feet; thence North 23°05'00" East, a distance of 29.24 feet; thence North 52°42'33" East, a distance of 89.81 feet ; thence North 39°49'53" East, distance of 37.88 feet; thence North 40°59'30" East a distance of 54.14 feet; thence North 25°43'49" East, a distance of 36.24 feet; thence North 01°24'14" East, a distance of 51.32 feet; thence North 33°39'36" East, a distance of 62.76 feet; thence South 89°15'21" West, a distance of 58.49 feet; thence North 49°35'49" East, a distance of 73.15 feet; thence North 00°49'34" West, a distance of 61.21 feet; thence North 33°54'26" East, a distance of 51.85 feet; thence North 08°05'20" East, a distance of 56.90 feet; thence North 16°05'44" East, a distance of 17.23 feet; thence North 18°30'02" East, a distance of 67.33 feet; thence North 50°36'17" East, a distance of 42.65 feet; thence North 20°28'46" East, a distance of 50.48 feet; thence North 31°40'46" East, a distance of 50.71 feet; thence North 23°20'10" East, a distance of 108.38 feet; thence North 00°17'13" East, a distance of 42.81 feet; thence North 41°10'10" West, a distance of 48.28 feet; thence North 49°27'01" West, a distance of 56.19 feet; thence North 27°08'28" East, a distance of 33.22 feet; thence North 75°55'47" East, a distance of 55.30 feet; thence North 22°52'19" East, a distance of 44.70 feet; thence North 71°25'48" West, a distance of 46.22 feet; thence North 12°53'54" West, a distance of 67.27 feet; thence South 62°30'14" East, a distance of 50.17 feet; thence North 23°43'48" East, a distance of 54.28 feet; thence North 48°32'34 " West, a distance of 51.43 feet; thence South 81°10'17 " East, a distance of 32.67 feet; thence North 00°07'47" East, a distance of 53.89 feet; thence North 83 °08 '49 " East, a distance of 58.62 feet; thence South 78°51'35" East, a distance of 51.51 feet; thence North 50°41'43" East, a distance of 46.88 feet; thence North 67°29'11" East, a distance of 49.38 feet; thence North 15°16'53" West, a distance of 66.99 feet; thence North 26°11'10" West, a distance of 33.82 feet; thence North 06°38'03" West, a distance of 56.00 feet; thence North 03°21'28" East, a distance of 63.24 feet; thence North 41°14'49" West, a distance of 62.47 feet to the Point of Beginning.

LESS AND EXCEPT THE FOLLOWING THREE PARCELS:

Parcel 1

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the Westerly line of said section, a distance of 794.29 feet; thence South 75°04'08" East leaving said Section line, a distance of 1005.91 feet to the Point of Beginning; thence North 67°18'44" East, a distance of 83.75 feet; thence South 48°28'02" East, a distance of 49.55 feet; thence South 47°07'46" East, a distance of 67.82 feet; thence South 86°31'04 " East, a distance of 308.18 feet; thence South 22°20'24" East, a distance of 181.75 feet; thence South 17°04'07" East, a distance of 592.76 feet; thence South 48°47'39" East, a distance of 84.28 feet to the point of beginning; said point lying on a curve, concave Easterly having a radius of 100.00 feet; thence Southerly along the arc of said curve, an arc

distance of 129.49 feet, said arc being subtended by a chord bearing of South 02°55'59" East and a chord distance of 120.63 feet to the point of reverse curve of a curve, said curve being concave Southwesterly having a radius of 150.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 60.03 feet, said arc being subtended by a chord bearing of South 28°33'51" East and a chord distance of 59.63 feet to a point on said curve; thence North 38°52'55" West, a distance of 53.45 feet to the point of curve of a curve, concave Easterly, having a radius of 100.00 feet; thence Northerly along the arc of said curve, an arc distance of 141.06 feet, said arc being subtended by a chord bearing of North 00°29'44" West, and a chord distance of 131.24 feet to the point of beginning.

Parcel 2

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the Westerly line of said section, a distance of 794.29 feet; thence South 75°04'08" East leaving said section line, a distance of 1005.91 feet; thence North 67°18'44" East, a distance of 83.75 feet; thence South 48°28'02" East, a distance of 49.55 feet; thence South 47°07'46" East, a distance of 67.82 feet; thence South 86°31'04" East, a distance of 308.18 feet; thence South 22°20'24" East, a distance of 181.75 feet; thence South 17°43'07" East, a distance of 592.76 feet; thence South 48°47'39" East, a distance of 84.28 feet to a point on a curve, concave Easterly having a radius of 100.00 feet; thence Southerly along the arc of said curve, an arc distance of 129.49 feet, said arc being subtended by a chord bearing of South 02°55'59" East and a chord distance of 120.63 feet to point of reverse curve of a curve, said curve being concave Westerly having a radius of 150.00 feet; thence Southerly along the arc of said curve, an arc distance of 248.58 feet, said arc being subtended by a chord bearing of South 07°26'43" West and a chord distance of 221.09 feet to the point of tangency of said curve; thence South 54°55'11" West, a distance of 122.79 feet to the point of curve of a curve, concave Southeasterly having a radius of 500.00 feet; thence Southwesterly, along the arc of said curve, an arc distance of 200.22 feet, said arc being subtended by a chord bearing of South 43°26'53 " West, and a chord distance of 198.88 feet to the Point of Beginning; thence continue Southwesterly, along the arc of said curve, an arc distance of 108.57 feet, said arc being subtended by a chord bearing of South 25°45'22" West and a chord distance of 108.36 feet to the point of tangency of said curve; thence South 19°32'07" West, a distance of 229.74 feet; thence North 18°32'11" East, a distance of 74.25 feet to a point on a curve, concave Southwesterly, having a radius of 325.00 feet; thence Northwesterly, along the arc of said curve, an arc distance of 143.96 feet, said arc being subtended by a chord bearing of North 14°55'10" West, and a chord distance of 142.78 feet to a point on said curve; thence North 52°21'05 " East, a distance of 173.11 feet to the Point of Beginning.

Parcel 3

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the Westerly line of said section, a distance of 794.29 feet; thence South 75°04'08" East leaving said section line, a distance of 1005.91 feet; thence North 67°18'44" East, a distance of 83.75 feet; thence South 48°28'02" East, a distance of 49.55 feet; thence South 47°07'46 " East, a distance of 67.82 feet; thence South 86°31'04" East, a distance of 308.18 feet; thence South 22°20'24" East, a distance of 181.75 feet; thence South 17°43'07" East, a distance of 592.76 feet; thence South 48°47'39" East, a distance of 84.28 feet to a point lying on a curve, said curve being concave Easterly having a radius of 100.00 feet; thence Southerly along the arc of said curve, an arc distance of 129.49 feet, said arc being subtended by a chord bearing of South 02°55'59" East and a chord distance of 120.63 feet

to the point of reverse curve of a curve, said curve being concave Westerly having a radius of 150.00 feet; thence Southerly along the arc of said curve, an arc distance of 248.58 feet, said arc being subtended by a chord bearing of South 07°26'43" West and a chord distance of 221.09 feet to the point of tangency of said curve; thence South 54°55'11" West, a distance of 122.79 feet to the point of curve of a curve, concave Southeasterly having a radius of 500.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 308.79 feet, said arc being subtended by a chord bearing of South 37°13'39" West and a chord distance of 303.90 feet to the point of tangency of said curve; thence South 19°32'07" West, a distance of 262.67 feet to the point of curve of a curve, said curve being concave Northwesterly having a radius of 293.73 feet; thence Southwesterly along the arc of said curve, an arc distance of 40.99 feet, said arc being subtended by a chord bearing of South 23°32'00" West and a chord distance of 40.96 feet to the Point of Beginning; thence continue, Southwesterly, along the arc of said curve, an arc distance of 247.28 feet, said arc being subtended by a chord bearing of South 51°38'55" West, and a chord distance of 240.04 feet to the point of tangency of said curve; thence South 75°45'56" West, a distance of 125.65 feet to the point of curve of a curve, concave Southeasterly having a radius of 55.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 43.03 feet, said arc being subtended by a chord bearing of South 53°21'17" West and a chord distance of 41.94 feet to the point of tangency of said curve; thence South 30°56'39" West, a distance of 55.03 feet to the point of curve of a curve, concave Northwesterly having a radius of 105.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 91.70 feet, said arc being subtended by a chord bearing of South 55°57'52" West and a chord distance of 88.82 feet to the point of tangency of said curve; thence South 80°59'05" West, a distance of 197.53 feet; thence North 58°13'29" East, a distance of 161.08 feet; thence North 57°17'24" East, a distance of 187.83 feet; thence South 86°13'46" East, a distance of 127.56 feet to a point on a curve, concave Northwesterly, having a radius of 312.00 feet; thence Northeasterly, along the arc of said curve, an arc distance of 276.69 feet, said arc being subtended by a chord bearing of North 54°40'27" East, and a chord distance of 267.71 feet to the Point of Beginning.

And Further Excepting the following Parcels:

Parcel 1, Swap Parcel to Northwest 11

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence North 03°28'56" East, a distance of 152.07 feet to the Point of Beginning; thence North 22°20'24" West, a distance of 181.75 feet; thence South 86°31'04" East, a distance of 79.17 feet; thence South 03°28'56" West a distance of 163.60 feet to the Point of Beginning.

Parcel 3, Swap Parcel to Northwest 11

A part of section 44, Township 6 South, Range 28 East, St. Johns County, Florida more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence South 32°40'18" East, a distance of 213.15 feet to the Point of Beginning; thence continue South 32°40'18" East, a distance of 168.93 feet; thence South 70°30'28" West, a distance of 43.61 feet; thence North 17°43'07" West a distance of 164.56 feet to the Point of Beginning.

PARCEL B:

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the Westerly line of said section, a distance of 794.29 feet; thence South 75°04'08" East leaving said section line, a distance of 1005.91 feet; thence North 67°18'44" East, a distance of 83.75 feet; thence South 48°28'02" East, a distance of 49.55 feet; thence South 47°07'46" East, a distance of 67.82 feet; thence South 86°31'04" East, a distance of 308.18 feet; thence South 22°20'24" East, a distance of 181.75 feet; thence South 17°43'07" East, a distance of 592.76 feet; thence South 48°47'39" East, a distance of 84.28 feet to a point lying on a curve, concave Easterly having a radius of 100.00 feet; thence Southerly along the arc of said curve, an arc distance of 129.49 feet, said arc being subtended by a chord bearing of South 02°55'59" East and a chord distance of 120.63 feet to the point of reverse curve of a curve, said curve being concave Southwesterly having a radius of 150.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 60.03 feet, said arc being subtended by a chord bearing of South 28°33'51" East and a chord distance of 59.63 feet to the Point of Beginning; thence South 38°52'55" East, a distance of 29.33 feet; thence North 55°00'29" East, a distance of 27.93 feet to the point of curve of a curve, concave Southwesterly, having a radius of 45.29 feet; thence Southeasterly along the arc of said curve, an arc distance of 141.31 feet, said arc being subtended by a chord bearing of South 38°02'19" East, and a chord distance of 90.57 feet to the point of tangency of said curve; thence South 51°20'55" West, a distance of 50.00 feet; thence South 52°19'22" West, a distance of 163.79 feet to a point on a curve, concave Northwesterly, having a radius of 18.00 feet; thence Southwesterly, along the arc of said curve, an arc distance of 36.07 feet, said arc being subtended by a chord bearing of South 52°07'15" West, and a chord distance of 30.33 feet to a point on said curve; thence South 52°17'24" West, a distance of 158.67 feet to a point on a curve, concave Northwesterly, having a radius of 18.00 feet; thence Southwesterly, along the arc of said curve, an arc distance of 36.05 feet, said arc being subtended by a chord bearing of South 52°17'02" West, and a chord distance of 30.32 feet to a point on said curve; thence South 52°21'05" West, a distance of 62.37 feet to a point on a curve, concave Southeasterly, having a radius of 500.00 feet; thence Northeasterly, along the arc of said curve, an arc distance of 200.22 feet, said arc being subtended by a chord bearing of North 43°26'53" East, and a chord distance of 198.88 feet to the point of tangency of said curve; thence North 54°55'11" East, a distance of 122.79 feet to the point of curve of a curve concave Northwesterly, having a radius of 150.00 feet; thence Northeasterly, along the arc of said curve, an arc distance of 188.55 feet, said arc being subtended by a chord bearing of North 18°54'37 " East, and a chord distance of 176.38 feet to the Point of Beginning.

TOGETHER WITH THE FOLLOWING PARCEL:

Parcel 2, Swap Parcel to Northwest 12

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet: thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in Official Records Book 1291, Page 403 for the Point of Beginning; thence North 03°28'56" East, a distance of 152.07 feet; thence South 17°43'07" East, a distance of 347.71 feet; thence North 32°40'18" West, a distance of 213.15 feet to the Point of Beginning.

TOGETHER WITH A NON-EXCLUSIVE PERPETUAL EASEMENT OVER THE FOLLOWING DESCRIBED LANDS:

Royal Pines Park Way

A part of the Antonio Huertas Grant, Section 38, together with a part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 7123.49 feet; thence South 53°13'38" East along a line to its intersection with the Northwesterly right of way line of International Golf Parkway (a 100 foot right of way as proposed), a distance of 2224.53 feet; thence North 50°29'50" East along said proposed Northwesterly right of way line, a distance of 2492.30 feet; thence North 44°29'54" East continuing along said proposed Northwesterly right of way line, a distance of 906.96 feet to the Point of Beginning, said point being on a curve, concave Westerly having a radius of 50.00 feet; thence Northwesterly leaving said right of way line and along the arc of said curve, an arc distance of 78.54 feet, said arc being subtended by a chord bearing of North 00°30'06" West and a chord distance of 70.71 feet to the point of tangency of said curve; thence North 45°30'05" West, a distance of 71.99 feet to the point of a curve of a curve concave Northeasterly having a radius of 550.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 261.20 feet, said arc being subtended by a chord bearing of North 31°53'47" West and a chord distance of 258.75 feet to the point of tangency of said curve; thence North 18°17'27" West a distance of 211.97 feet to the point of a curve of a curve, concave Easterly having a radius of 550.00 feet; thence Northerly along the arc of said curve, an arc distance of 266.10 feet, said arc being subtended by a chord bearing of North 04°25'50" West and a chord distance of 263.51 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve, an arc distance of 438.51 feet, said arc being subtended by a chord bearing of North 08°30'59" West and a chord distance of 431.37 feet to the point of reverse curve of a curve, concave Easterly having a radius of 800.00 feet; thence Northerly along the arc of said curve, an arc distance of 623.81 feet, said arc being subtended by a chord bearing of North 04°07'27" West and a chord distance of 608.12 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve an arc distance of 328.09 feet, said arc being subtended by a chord bearing of North 04°47'13" East and a chord distance of 325.10 feet to the point of reverse curve, concave Easterly having a radius of 600.00 feet; thence Northerly along the arc of said curve, an arc distance of 314.77 feet, said arc being subtended by a chord bearing of North 06°23'19" East and a chord distance of 311.17 feet to the point of tangency of said curve; thence North 21°25'04" East, a distance of 2.70 feet to the point of curve of a curve, concave Westerly having a radius of 1000.00 feet; thence Northerly along the arc of said curve, an arc distance of 832.14 feet, said arc being subtended by a chord bearing of North 02°25'17" West and a chord distance of 808.34 feet to the point of tangency of said curve; thence North 26°15'38" West a distance of 206.92 feet to the point of curve of a curve, concave Northeasterly having a radius of 1050.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 448.34 feet, said arc being subtended by a chord bearing of North 14°01'42" West and a chord distance of 444.94 feet to a point of compound curve of a curve, concave Southeasterly having a radius of 550.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 609.03 feet, said arc being subtended by a chord bearing of North 29°55'35" East and a chord distance of 578.39 feet to a point of reverse curve of a curve, concave Northwesterly having a radius of 185.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 230.24 feet, said arc being subtended by a chord bearing of North 25°59'45" East and a chord distance of 215.67 feet to a point of cusp of a curve, said point lying on the Westerly right of way line of WGV Boulevard, said curve being concave Westerly having a

radius of 2500.00 feet; thence Southerly along said Westerly right of way line and along the arc of said curve, an arc distance of 216.78 feet, said arc being subtended by a chord bearing of South 07°10'25" East and a chord distance of 216.71 feet to the point of reverse curve of a curve, concave Northeasterly having a radius of 550.00 feet; thence Southeasterly, continuing along said Westerly right of way line and along the arc of said curve, an arc distance of 599.77 feet, said arc being subtended by a chord bearing of South 35°55'47" East and a chord distance of 570.49 feet to the point of cusp of a curve, concave Northeasterly having a radius of 556.50 feet; thence Northwesterly leaving said Westerly right of way line of WGV Boulevard and along the arc of said curve, an arc distance of 320.51 feet, said arc being subtended by a chord bearing of North 52°45'08" West and a chord distance of 316.10 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 562.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 95.37 feet, said arc being subtended by a chord bearing of North 29°18'05" West and a chord distance of 95.25 feet to the point of reverse curve of a curve, concave Southerly having a radius of 135.00 feet; thence Westerly along the arc of said curve, an arc distance of 262.48 feet, said arc being subtended by a chord bearing of North 80°08'23" West and a chord distance of 223.05 feet to the point of compound curve of a curve, concave Southeasterly having a radius of 450.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 360.94 feet, said arc being subtended by a chord bearing of South 21°10'56" West and a chord distance of 351.34 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 950.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 405.64 feet; said arc being subtended by a chord bearing of South 14°01'42" East and a chord distance of 402.56 feet to the point of tangency of said curve, thence South 26°15'38" East, a distance of 405.77 feet to the point of curve of a curve, concave Westerly having a radius of 650.00 feet; thence Southerly along the arc of said curve, an arc distance of 540.89 feet, said arc being subtended by a chord bearing of South 02°25'17" East and a chord distance of 525.42 feet to the point of tangency of said curve; thence South 21°25'04" West, a distance of 201.54 feet to the point of curve of a curve, concave Easterly having a radius of 500.00 feet; thence Southerly along the arc of said curve, an arc distance of 262.31 feet, said arc being subtended by a chord bearing of South 06°23'19" West and a chord distance of 259.31 feet to the point of reverse curve of a curve concave Westerly having a radius of 800.00 feet; thence Southerly along the arc of said curve, an arc distance of 334.19 feet, said arc being subtended by a chord bearing of South 03°19'36" West and a chord distance of 331.76 feet to the point of reverse curve of a curve, concave Easterly having a radius of 700.00 feet; thence Southerly along the arc of said curve, an arc distance of 469.50 feet, said arc being subtended by a chord bearing of South 03°55'14" East and a chord distance of 460.75 feet to the point of reverse curve of a curve, concave Westerly having a radius of 1050.00 feet; thence Southerly along the arc of said curve, an arc distance of 606.08 feet, said arc being subtended by a chord bearing of South 06°35'56" East and a chord distance of 597.70 feet to the point of reverse curve of a curve, concave Easterly having a radius of 450.00 feet; thence Southerly along the arc of said curve, an arc distance of 221.70 feet, said arc being subtended by a cord bearing of South 04°10'37" East and a chord distance of 219.47 feet to the point of tangency of said curve; thence South 18°17'27" East, a distance of 211.97 feet to the point of curve of a curve, concave Northeasterly having a radius of 450.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 213.71 feet, said arc being subtended by a chord bearing of South 31°53'47" East and a chord distance of 211.71 feet to the point of tangency of said curve; thence South 45°30'05" East, a distance of 71.99 feet to the point of curve of a curve, concave Northerly having a radius of 50.00 feet; thence Easterly along the arc of said curve, an arc distance of 78.54 feet, said arc being subtended by a chord bearing of North 89°29'55" East and a chord distance of 70.71 feet to the point of cusp at the aforesaid proposed Northwesterly right of way line of International Golf Parkway; thence South 44°29'54" West along said proposed Northwesterly right of way line, a distance of 200.00 feet to the Point of Beginning

AND TOGETHER WITH ACCESS EASEMENT AS SET FORTH IN OFFICIAL RECORDS BOOK 1468,

PAGE 1409, AS RECORDED IN THE PUBLIC RECORDS OF ST. JOHNS COUNTY, FLORIDA, DESCRIBED AS FOLLOWS:

NORTHWEST PARCELS 11A AND 12 ACCESS EASEMENT:

PART OF SECTION 44, TOWNSHIP 6 SOUTH, RANGE 28 EAST, ST. JOHNS COUNTY, FLORIDA, MORE PARTICULARLY DESCRIBED AS FOLLOWS: FOR A POINT OF REFERENCE, COMMENCE AT THE NORTHWEST CORNER OF SAID SECTION 44; THENCE SOUTH 14°55'52" WEST ALONG THE WEST LINE OF SAID SECTION 44, A DISTANCE OF 1312.29 FEET; THENCE SOUTH 75°04'08" EAST LEAVING SAID WESTERLY LINE OF SECTION 44, A DISTANCE OF 1865.19 FEET TO THE POINT OF BEGINNING; THENCE NORTH 70°20'25" EAST, A DISTANCE OF 151.54 FEET TO THE POINT OF CURVE OF A CURVE, CONCAVE SOUTHERLY HAVING A RADIUS OF 440.00 FEET; THENCE EASTERLY ALONG THE ARC OF SAID CURVE, AN ARC DISTANCE OF 346.72 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 87°05'05" EAST AND A CHORD DISTANCE OF 337.82 FEET TO A POINT ON SAID CURVE; THENCE NORTH 24°54'33" EAST, A DISTANCE OF 10.73 FEET TO A POINT ON A CURVE, SAID CURVE BEING CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 440.00 FEET; THENCE SOUTHEASTERLY ALONG THE ARC OF SAID CURVE, AN ARC DISTANCE OF 40.08 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 62°42'38" EAST AND A CHORD DISTANCE OF 40.07 FEET TO THE POINT OF TANGENCY OF SAID CURVE; THENCE SOUTH 60°06'02" EAST, A DISTANCE OF 25.69 FEET TO THE POINT OF CURVE OF A CURVE, CONCAVE NORTHWESTERLY HAVING A RADIUS OF 50.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE, AN ARC DISTANCE OF 71.01 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 79°12'45" EAST AND A CHORD DISTANCE OF 65.19 FEET TO THE POINT OF CUSP OF A CURVE, SAID CURVE BEING CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 550.00 FEET; THENCE SOUTHWESTERLY ALONG THE ARC OF SAID CURVE AND ALONG THE NORTHWESTERLY RIGHT-OF-WAY LINE OF ROYAL PINES PARKWAY (A RIGHT-OF-WAY OF VARYING WIDTH, AS RECORDED IN OFFICIAL RECORDS BOOK 1185, PAGE 740, EXHIBITS A, D AND E, AS AMENDED BY OFFICIAL RECORDS BOOK 1198, PAGE 872, EXHIBITS A, B AND C, BOTH OF THE PUBLIC RECORDS OF SAID COUNTY), AN ARC DISTANCE OF 175.44 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 29°23'16" WEST AND A CHORD DISTANCE OF 174.70 FEET TO A POINT ON SAID RIGHT-OF-WAY LINE AND THE POINT OF CUSP OF A CURVE, SAID CURVE BEING CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 50.00 FEET; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE LEAVING SAID NORTHWESTERLY RIGHT-OF-WAY LINE OF ROYAL PINES PARKWAY, AN ARC DISTANCE OF 71.01 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 20°26' 14" WEST AND A CHORD DISTANCE OF 65.19 FEET TO THE POINT OF TANGENCY OF SAID CURVE; THENCE NORTH 61°07'25" WEST, A DISTANCE OF 38.20 FEET TO THE POINT OF CURVE OF A CURVE, CONCAVE SOUTHERLY HAVING A RADIUS OF 360.00 FEET; THENCE WESTERLY ALONG THE ARC OF SAID CURVE, AN ARC DISTANCE OF 304.96 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 85°23'30" WEST AND A CHORD DISTANCE OF 295.92 FEET TO THE POINT OF TANGENCY OF SAID CURVE; THENCE SOUTH 70°20'25" WEST, A DISTANCE OF 154.25 FEET; THENCE NORTH 17°43'07" WEST, A DISTANCE OF 80.05 FEET TO THE POINT OF BEGINNING.

## EXHIBIT C

### Legal Description of Adjacent Parcel

Approximate 11 acre parcel:

Parcel A

Northwest Parcel 11A

Part of Section 44, Township 6 South, Range 28 East, St. Joins County, Florida, more particularly described as follows; for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1295.90 feet; thence South 75°04'08" East leaving said Westerly line of Section 44, a distance of 1910.39 feet to the Point of Beginning; thence North 32°40'18" West, a distance of 394.90 feet; thence North 03°28'56" East along a line to its intersection with conservation easement no. 29, a distance of 315.67 feet; thence South 68°38'38" East along said conversation easement, a distance of 65.34 feet; thence North 57°00'25" East continuing along said conservation easement, a distance of 56.53 feet; thence North 36°47'19" East along said conservation easement, a distance of 33.66 feet; thence North 56°23'17" West along said conservation easement, a distance of 38.85 feet; thence North 41°26'16" East along said conservation easement, a distance of 50.16 feet; thence North 77°43'45" East along said conservation easement, a distance of 51.00 feet, thence South 65°06'09" East along said conservation easement, a distance of 21.10 feet; thence North 73°35'01" East along said conservation easement, a distance of 24.11 feet; thence South 67°48'15" East continuing along said easement line, a distance of 61.16 feet; thence South 02°10'02" West continuing along said easement line, a distance of 31.16 feet; thence South 46°29'48" East continuing along said easement line, a distance of 47.46 feet; thence South 68°03'16" East continuing along said easement line, a distance of 69.09 feet; thence North 71°08'08" East continuing along said easement line, a distance of 54.32 feet, thence North 82°51'41" East continuing along said easement line, a distance of 63.97 feet; thence South 81°18'54 " East continuing along said easement line a distance of 44.30 feet; thence North 12°19'30" East continuing along said easement line, a distance of 52.59 feet to the point of curve of a curve, concave Southwesterly having a radius of 130.00 feet; thence Southeasterly along the arc of said curve continuing along said easement line, an arc distance of 392.43 feet, said arc being subtended by a chord bearing of South 81°11'47" East and a chord distance of 259.51 feet to the point of tangency of said curve; thence South 05°16'55" West along a Westerly line of said conservation easement, a distance of 325.44 feet; thence South 24°54'33" West continuing along said easement line and its Southerly projection thereof to its intersection with the Northerly right of way line of Parcel 11A access easement, a distance of 345.54 feet to a point lying on a curve, said curve being concave Southeasterly having a radius of 440.00 feet; thence Southwesterly along the arc of said curve and along said Northerly right of way line, an arc distance of

431.03 feet; said arc being subtended by a chord bearing of South 87°25'35" West and a chord distance of 414.00 feet to the point of tangency of said curve; thence South 59°21'36" West continuing along said Northerly right of way line, a distance of 21.64 feet to the Point of Beginning.

Parcel B

Parcel 1, Swap Parcel to Northwest 11

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence North 03°28'56" East, a distance of 152.07 feet to the Point of Beginning; thence North 22°20'24" West, a distance of 181.75 feet; thence South 86°31'04" East, a distance of 79.17 feet; thence South 03°28'56" West a distance of 163.60 feet to the Point of Beginning.

Parcel C

Parcel 3, Swap Parcel to Northwest 11

A part of section 44, Township 6 South, Range 28 East, St. Johns County, Florida more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said sect ion 44, a distance of 1029.64 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in official Records Book 1291, Page 403; thence South 32°40'18" East, a distance of 213.15 feet to the Point of Beginning; thence continue South 32°40'18" East, a distance of 168.93 feet; thence South 70°30'28" West, a distance op 43.61 feet; thence North 17°43'07" West a distance of 164.56 feet to the Point of Beginning.

LESS AND EXCEPT THE FOLLOWING DESCRIBED LANDS:

Parcel 2, Swap Parcel to Northwest 12

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1029.64 feet: thence South 75°04'08" East leaving said West line of Section 44, a distance of 1618.76 feet to the most Westerly corner of the lands described in Official Records Book 1291, Page 403 for the Point of Beginning; thence North 03°28'56" East, a distance of 152.07 feet; thence South 17°43'07" East, a distance of 347.71 feet; thence North 32°40'18" West, a distance of 213.15 feet to the Point of Beginning.

Parcel 4, Parcel from Northwest 11

A part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1311.88 feet; thence South 75°04'08" East leaving said West line of Section 44, a distance of 1869.64 feet; thence North 70°30'28" East, a distance of 43.61 feet to Point of Beginning; thence continue North 70°30'28" East, a distance of 107.92 feet to a point on a curve, being concave Southeasterly, having a radius of 440.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 84.30 feet, said arc being subtended by a chord bearing of South 64°51'05" West and a chord distance of 84.18 feet to the point of tangency of said curve; thence South 59°21'36" West, a distance of 21.63 feet; thence North 32°40'18" West, a distance of 12.82 feet to the Point of Beginning.

TOGETHER WITH A NON-EXCLUSIVE PERPETUAL EASEMENT OVER THE FOLLOWING DESCRIBED LANDS:

Royal Pines Park Way

A part of the Antonio Huertas Grant, Section 38, together with a part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida, more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 7123.49 feet; thence South 53°13'38" East along a line to its intersection with the Northwesterly right of way line of International Golf Parkway (a 100 foot right of way as proposed), a distance of 2224.53 feet; thence North 50°29'50" East along said proposed Northwesterly right of way line, a distance of 2492.30 feet; thence North 44°29'54" East continuing along said proposed Northwesterly right of way line, a distance of 906.96 feet to the Point of Beginning, said point being on a curve, concave Westerly having a radius of 50.00 feet; thence Northwesterly leaving said right of way line and along the arc of said curve, an arc distance of 78.54 feet, said arc being subtended by a chord bearing of North 00°30'06" West and a chord distance of 70.71 feet to the point of tangency of said curve; thence North 45°30'05" West, a distance of 71.99 feet to the point of a curve of a curve concave Northeasterly having a radius of 550.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 261.20 feet, said arc being subtended by a chord bearing of North 31°53'47" West and a chord distance of 258.75 feet to the point of tangency of said curve; thence North 18°17'27" West a distance of 211.97 feet to the point of a curve of a curve, concave Easterly having a radius of 550.00 feet; thence Northerly along the arc of said curve, an arc distance of 266.10 feet, said arc being subtended by a chord bearing of North 04°25'50" West and a chord distance of 263.51 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve, an arc distance of 438.51 feet, said arc being subtended by a chord bearing of North 08°30'59" West and a chord distance of 431.37 feet to the point of reverse curve

of a curve, concave Easterly having a radius of 800.00 feet; thence Northerly along the arc of said curve, an arc distance of 623.81 feet, said arc being subtended by a chord bearing of North 04°07'27" West and a chord distance of 608.12 feet to the point of reverse curve of a curve, concave Westerly having a radius of 700.00 feet; thence Northerly along the arc of said curve an arc distance of 328.09 feet, said arc being subtended by a chord bearing of North 04°47'13" East and a chord distance of 325.10 feet to the point of reverse curve, concave Easterly having a radius of 600.00 feet; thence Northerly along the arc of said curve, an arc distance of 314.77 feet, said arc being subtended by a chord bearing of North 06°23'19" East and a chord distance of 311.17 feet to the point of tangency of said curve; thence North 21°25'04" East, a distance of 2.70 feet to the point of curve of a curve, concave Westerly having a radius of 1000.00 feet; thence Northerly along the arc of said curve, an arc distance of 832.14 feet, said arc being subtended by a chord bearing of North 02°25'17" West and a chord distance of 808.34 feet to the point of tangency of said curve; thence North 26°15'38" West a distance of 206.92 feet to the point of curve of a curve, concave Northeasterly having a radius of 1050.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 448.34 feet, said arc being subtended by a chord bearing of North 14°01'42" West and a chord distance of 444.94 feet to a point of compound curve of a curve, concave Southeasterly having a radius of 550.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 609.03 feet, said arc being subtended by a chord bearing of North 29°55'35" East and a chord distance of 578.39 feet to a point of reverse curve of a curve, concave Northwesterly having a radius of 185.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 230.24 feet, said arc being subtended by a chord bearing of North 25°59'45" East and a chord distance of 215.67 feet to a point of cusp of a curve, said point lying on the Westerly right of way line of WGV Boulevard, said curve being concave Westerly having a radius of 2500.00 feet; thence Southerly along said Westerly right of way line and along the arc of said curve, an arc distance of 216.78 feet, said arc being subtended by a chord bearing of South 07°10'25" East and a chord distance of 216.71 feet to the point of reverse curve of a curve, concave Northeasterly having a radius of 550.00 feet; thence Southeasterly, continuing along said Westerly right of way line and along the arc of said curve, an arc distance of 599.77 feet, said arc being subtended by a chord bearing of South 35°55'47" East and a chord distance of 570.49 feet to the point of cusp of a curve, concave Northeasterly having a radius of 556.50 feet; thence Northwesterly leaving said Westerly right of way line of WGV Boulevard and along the arc of said curve, an arc distance of 320.51 feet, said arc being subtended by a chord bearing of North 52°45'08" West and a chord distance of 316.10 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 562.00 feet; thence Northwesterly along the arc of said curve, an arc distance of 95.37 feet, said arc being subtended by a chord bearing of North 29°18'05" West and a chord distance of 95.25 feet to the point of reverse curve of a curve, concave Southerly having a radius of 135.00 feet; thence Westerly along the arc of said curve, an arc distance of 262.48 feet, said arc being subtended by a chord bearing of North 80°08'23" West and a chord distance of 223.05 feet to the point of compound curve of a curve, concave Southeasterly having a radius of 450.00 feet; thence Southwesterly along the arc of said curve, an arc distance of 360.94 feet, said arc being subtended by a chord bearing of South 21°10'56" West and a

chord distance of 351.34 feet to the point of compound curve of a curve, concave Northeasterly having a radius of 950.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 405.64 feet; said arc being subtended by a chord bearing of South 14°01'42" East and a chord distance of 402.56 feet to the point of tangency of said curve, thence South 26°15'38" East, a distance of 405.77 feet to the point of curve of a curve, concave Westerly having a radius of 650.00 feet; thence Southerly along the arc of said curve, an arc distance of 540.89 feet, said arc being subtended by a chord bearing of South 02°25'17" East and a chord distance of 525.42 feet to the point of tangency of said curve; thence South 21°25'04" West, a distance of 201.54 feet to the point of curve of a curve, concave Easterly having a radius of 500.00 feet; thence Southerly along the arc of said curve, an arc distance of 262.31 feet, said arc being subtended by a chord bearing of South 06°23'19" West and a chord distance of 259.31 feet to the point of reverse curve of a curve concave Westerly having a radius of 800.00 feet; thence Southerly along the arc of said curve, an arc distance of 334.19 feet, said arc being subtended by a chord bearing of South 03°19'36" West and a chord distance of 331.76 feet to the point of reverse curve of a curve, concave Easterly having a radius of 700.00 feet; thence Southerly along the arc of said curve, an arc distance of 469.50 feet, said arc being subtended by a chord bearing of South 03°55'14" East and a chord distance of 460.75 feet to the point of reverse curve of a curve, concave Westerly having a radius of 1050.00 feet; thence Southerly along the arc of said curve, an arc distance of 606.08 feet, said arc being subtended by a chord bearing of South 06°35'56" East and a chord distance of 597.70 feet to the point of reverse curve of a curve, concave Easterly having a radius of 450.00 feet; thence Southerly along the arc of said curve, an arc distance of 221.70 feet, said arc being subtended by a cord bearing of South 04°10'37" East and a chord distance of 219.47 feet to the point of tangency of said curve; thence South 18°17'27" East, a distance of 211.97 feet to the point of curve of a curve, concave Northeasterly having a radius of 450.00 feet; thence Southeasterly along the arc of said curve, an arc distance of 213.71 feet, said arc being subtended by a chord bearing of South 31°53'47" East and a chord distance of 211.71 feet to the point of tangency of said curve; thence South 45°30'05" East, a distance of 71.99 feet to the point of curve of a curve, concave Northerly having a radius of 50.00 feet; thence Easterly along the arc of said curve, an arc distance of 78.54 feet, said arc being subtended by a chord bearing of North 89°29'55" East and a chord distance of 70.71 feet to the point of cusp at the aforesaid proposed Northwesterly right of way line of International Golf Parkway; thence South 44°29'54" West along said proposed Northwesterly right of way line, a distance of 200.00 feet to the Point of Beginning

AND TOGETHER WITH A NON-EXCLUSIVE PERPETUAL EASEMENT OVER THE FOLLOWING DESCRIBED LANDS:

North Parcel 11A access easement:

Part of Section 44, Township 6 South, Range 28 East, St. Johns County, Florida more particularly described as follows: for a point of reference, commence at the Northwest corner of said Section 44; thence South 14°55'52" West along the West line of said Section 44, a distance of 1295.90 feet; thence South 75°04'08" East leaving said

Westerly line of Section 44, a distance of 1910.39 feet to the Point of Beginning; thence North 59°21'36" East, a distance of 21.64 feet to the point of curve of a curve, concave Southerly having a radius of 440.00 feet; thence Easterly along the arc of said curve, an arc distance of 457.03 feet said arc being subtended by a chord bearing of North 89°07'10" East and a chord distance of 436.76 feet to the point of tangency of said curve; thence South 61°07'25" East a distance of 38.20 feet to the point of curve of a curve concave, Northwesterly having a radius of 50.00 feet; thence Northeasterly along the arc of said curve, an arc distance of 71.01 feet; said arc being subtended by a chord bearing of North 78°11'23" East and a chord distance of 65.19 feet to the point of cusp of a curve said curve being concave Southeasterly having a radius of 550.00 feet; thence Southwesterly along the arc of said curve and along the Northwesterly right of way line of Royal Pines Parkway (a right of way of varying width), an arc distance of 165.63 feet, said arc being subtended by a chord bearing of South 28°52'34" West and a chord distance of 165.00 feet to a point on said right of way line and the point of cusp of a curve, said curve being concave Southwesterly having a radius of 50.00 feet: thence Northwesterly along the arc of said curve leaving said Northwesterly right of way line of Royal Pines Parkway, an arc distance of 71.01 feet, said arc being subtended by a chord bearing of North 20°26'41" West and a chord distance of 65.19 feet to the point of tangency of said curve; thence North 61°07'25" West, a distance of 35.77 feet to the point of curve of a curve, concave Southerly having a radius of 360.00 feet; thence Westerly along the arc of said curve, an arc distance of 373.94 feet, said arc being subtended by a chord bearing of South 89°07'10" West and a chord distance of 357.35 feet to the point of tangency of said curve; thence South 59°21'36" West, a distance of 18.80 feet; thence North 32°40'18" West, a distance of 80.05 feet to the Point of Beginning.

## EXHIBIT D

### Form of Escrow Agreement

[Exhibit begins on next page.]

## ESCROW AGREEMENT

This **ESCROW AGREEMENT** (this "Agreement") dated as of March 15, 2016, is by and among **LIFE CARE ST. JOHNS, INC.**, a Florida not-for-profit corporation, d/b/a Seller ("Seller"), **LCS GLENMOOR, LLC**, an Iowa limited liability company ("Buyer"), and **THAMES MARKEY & HEEKIN, P.A.**, as escrow agent ("Escrow Agent"). Buyer, Seller and Escrow Agent are sometimes referred to in this Agreement as a "Party" or collectively as the "Parties".

WITNESSETH:

A.    Buyer and Seller have entered into a Stalking Horse Real Estate Purchase Agreement, dated as of March 21, 2016 (the "Purchase Agreement"). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

B.    Pursuant to the Purchase Agreement, Buyer will acquire an 11 acre parcel from Seller.

C.    The Purchase Agreement provides for the payment of Twenty Five Thousand Dollars ($25,000) (the "Deposit") to Escrow Agent, which shall be held, administered and disbursed by Escrow Agent in accordance with the terms and conditions of this Agreement. In the event of a discrepancy between the Purchase Agreement and this Agreement, this Agreement shall prevail.

D.    Escrow Agent is willing to accept the Deposit and to hold and distribute the same in accordance with the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the premises and the mutual agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    <u>Establishment of Escrow Funds</u>. Pursuant to the terms of the Purchase Agreement, Buyer shall deposit with Escrow Agent, via wire transfer of funds pursuant to Escrow Agent's wiring instructions attached hereto as <u>Exhibit A</u>, the Deposit which represents a portion of the Purchase Price (as such term is defined in the Purchase Agreement) to be paid by Buyer to Seller under the Purchase Agreement (such sum is referred to hereinafter as the "Escrow Funds"). Buyer and Seller hereby designate and appoint the Escrow Agent as the Escrow Agent to receive, hold and disburse the Escrow Funds, and the Escrow Agent hereby accepts such appointment to receive, hold and disburse the Escrow Funds, upon the terms and subject to the conditions set forth in this Agreement. The Escrow Funds shall be held in escrow by Escrow Agent and administered and disbursed by Escrow Agent pursuant to the terms and conditions of this Agreement.

1

2. <u>Investment of Escrow Funds</u>.

(a)    Intentionally omitted.

(b)    Escrow Agent shall hold the Escrow Funds uninvested.

(c)    The Escrow Agent shall have no liability for any failure to invest all or any part of the Escrow Funds.

3. <u>Claims against the Escrow Funds</u>.

(a)    <u>Distributions of the Escrow Funds</u>.  At such time as Escrow Agent receives written notice from both Buyer and Seller, setting forth the identity of the Party to whom the Escrow Funds (or portions thereof) are to be disbursed and further setting forth the specific section of the Purchase Agreement pursuant to which the disbursement of the Escrow Funds (or portions thereof) is being requested, Escrow Agent shall disburse the Escrow Funds pursuant to such notice.

(b)    Seller and Buyer acknowledge that Escrow Agent is merely a stakeholder and has no interest in the Escrow Funds.  Notwithstanding the provisions of Section 3(a) above, in the event of a dispute between Buyer and Seller sufficient in the sole reasonable discretion of Escrow Agent to justify its doing so or in the event that Escrow Agent has not disbursed the Escrow Funds on or before September 1, 2016, Escrow Agent shall be entitled to tender into the registry or custody of any court of competent jurisdiction in Duval County, Florida, the Escrow Funds, together with such legal pleadings as it may deem appropriate, and thereupon be discharged from all further duties and liabilities under this Agreement. Any such legal action may be brought in such court as Escrow Agent shall determine to have jurisdiction thereof.

4. <u>Escrow Agent</u>.

(a)    The Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature, and no other duties shall be implied.  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document to which the Parties are a party, in connection herewith, if any, nor shall the Escrow Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement.  For purposes of this Agreement, in the event of any conflict between the terms and provisions of this Agreement and any other agreement among the Parties, the terms and conditions of this Agreement shall control.  The Escrow Agent may rely upon and shall not be liable for reasonably acting or refraining from acting upon any written notice, document, instruction or request furnished to it hereunder and believed in good faith by it to be genuine and to have been signed or presented by the proper party or parties without

2

inquiry and without requiring substantiating evidence of any kind. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.

(b)     The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that a final adjudication of a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to either Party. In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the Parties which eliminates such ambiguity or uncertainty to the satisfaction of Escrow Agent or by a final and non-appealable order of the Bankruptcy Court. The Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same. In addition, the Escrow Agent may, in its sole discretion, petition (by means of an interpleader action or any other appropriate method) the Bankruptcy Court for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, all Escrow Funds, after deduction and payment to the Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by the Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(c)     The Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited or this Agreement, or to appear in, prosecute or defend any such legal action or proceeding. The Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any Party, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the reasonable opinion or instruction of such counsel.

(d)     Whether or not any action or transaction authorized or contemplated hereby shall be undertaken or consummated, Seller and Buyer hereby agree to indemnify, protect, save and keep harmless the Escrow Agent and its respective successors, assigns, agents and servants, from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs, expenses and disbursements (including legal fees and attorneys' disbursements) of whatsoever kind and nature which may be imposed on, incurred by or asserted against the Escrow Agent at

any time, by reason of or arising out of the execution and delivery of this Agreement, the establishment of the Escrow Account, the acceptance by the Escrow Agent of the funds herein described, the purchase, retention or disposition of investments made hereunder or the proceeds thereof, or any payment, transfer or other application of funds or securities by the Escrow Agent in accordance with the provisions of this Agreement; provided, however, that Seller and Buyer shall not be required to indemnify the Escrow Agent for any expense, loss, costs, disbursements, damages or liability resulting from its own gross negligence or willful misconduct.  The indemnities contained in this section shall survive the termination of this Agreement.

(e)    The Escrow Agent undertakes to perform all duties which are expressly set forth herein for a fee as described in Schedule 1, which shall be promptly paid in equal shares by Seller and Buyer.  The Escrow Agent shall also be entitled to reimbursement by the Company for all reasonable expenses, disbursements and advances actually incurred or made by the Escrow Agent in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ), exclusive of any such expense, disbursement or advance that may arise from its own gross negligence or willful misconduct.

5.    Successor Escrow Agent.    The Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect.  If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following receipt of the notice of resignation, the Escrow Agent may petition the Bankruptcy Court for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the Parties.    The Escrow Agent's sole responsibility after such thirty (30) day notice period expires shall be to hold the Escrow Funds (without any obligation to reinvest the same) and to deliver the same to a designated substitute escrow agent, if any, or in accordance with the directions of the Bankruptcy Court, at which time of delivery Escrow Agent's obligations hereunder shall cease and terminate.  The Escrow Agent shall have the right to make demand on Seller and Buyer for any amount due and owing to the Escrow Agent under this Agreement. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's corporate trust line of business may be transferred, shall be the Escrow Agent under this Agreement without further act.

6.    Disclosures; TIN; Tax Reporting.

(a)    *Patriot Act Disclosure.*    Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new

account with it. Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm Seller and Buyer's identity including without limitation name, address and organizational documents ("identifying information"). Seller and Buyer agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

(b) *Taxpayer Identification Numbers ("TIN")*. Seller and Buyer shall provide the Escrow Agent with their respective fully executed Internal Revenue Service ("IRS") Form W-8, or W-9 and/or other reasonably required documentation. Each of Seller and Buyer represents to the Escrow Agent that its correct TIN assigned by the IRS, or any other taxing authority, is set forth in the forms delivered to Escrow Agent.

(c) *Tax Reporting*. All interest or other income earned under this Agreement shall be allocated to Buyer and reported, as and to the extent required by law, by the Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 10425 (or other appropriate form) as income earned from the Escrow Funds by Buyer whether or not said income has been distributed during such year. Seller and Buyer acknowledge and agree that Escrow Agent shall have no responsibility for the preparation and/or filing of any income, franchise or any other tax return with respect to the Escrow Funds. The Parties further acknowledge and agree that any taxes payable from the income earned on the investment of any sums held in the Escrow Funds shall be paid by Buyer. In the absence of written direction as provided herein, all proceeds of the Escrow Funds shall be retained in the Escrow Funds and reinvested from time to time by the Escrow Agent as provided in this Agreement. Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to the required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

7.    Termination of Agreement. This Agreement (other than Section 3(c)) shall terminate upon the distribution of the Escrow Funds as provided by the terms of this Agreement, unless sooner terminated by written agreement of Seller, Buyer and Escrow Agent. Upon distribution of the Escrow Funds in accordance with this Agreement, Escrow Agent shall be released of all liability and responsibility under this Agreement.

8.    Miscellaneous.

(a) *Waiver*. A waiver of any of the provisions of this Agreement shall not constitute and shall not be deemed a waiver of any other provision of this Agreement, whether or not similar, nor shall such waiver constitute a continuing waiver unless otherwise expressly provided in writing. Except as otherwise provided in this Agreement, any failure of the Parties to comply with any obligation, representation, warranty, covenant, agreement, or condition herein may be waived by the Party entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver.

5

(d)     *Entire Agreement; Amendment.*   This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions of the Parties, whether oral or written.

(e)     *Amendment and Termination.*   This Agreement may be amended only by the express written consent of the Parties, which consent on the part of the Escrow Agent shall not be unreasonably withheld or delayed if the duties or responsibilities of the Escrow Agent are not increased by such amendment.

(d)     *Notices.*    All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered if by hand or overnight courier, (ii) three days after depositing for mailing by first-class registered mail, return receipt requested, postage prepaid, or (iii) when e-mailed, provided that, concurrently therewith, a copy is delivered by one of the methods identified in (i) or (ii) to the Parties at the following addresses (or to such other address as a Party, may have specified by notice given to the other Parties pursuant to this provision):

| | |
|---|---|
| If to Seller: | D. Bruce Jones, CEO<br>Life Care St. Johns, Inc.<br>1000 Vicar's Landing Way<br>Ponte Vedra Beach, Florida 32082<br>Email: bjones@vicarslanding.com |
| With copy to: | Richard R. Thames, Esq.<br>Charles H. Keller, Esq.<br>Thames Markey & Heekin, P.A.<br>50 North Laura Street, Suite 1600<br>Jacksonville, Florida 32202<br>Email: rrt@tmhlaw.net, chk@tmhlaw.net |
| If to Buyer: | Tom Mathisen<br>Capital Square<br>400 Locust Street, Suite 820<br>Des Moines, IA 50309<br>Email: mathisentom@lcsnet.com<br><br>HCP, Inc.<br>1920 Main Street, Suite 1200<br>Irvine, CA 92614<br>Attention: Kendall Young<br>Email: kyoung@HCPI.COM |
| With copy to: | Faegre Baker Daniels LLP<br>311 S. Wacker Drive, Suite 4300<br>Chicago, IL 60606 |

<table>
<tr><td></td><td>Attention: George R. Mesires<br>Email: george.mesires@faegrebd.com</td></tr>
<tr><td>and to:</td><td>Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, NY 10036<br>Attention: Evan R. Levy, Esq.<br>Email: evan.levy@skadden.com</td></tr>
<tr><td>If to Escrow Agent:</td><td>Richard R. Thames, Esq.<br>Charles H. Keller, Esq.<br>Thames Markey & Heekin, P.A.<br>50 North Laura Street, Suite 1600<br>Jacksonville, Florida 32202<br>Email: rrt@tmhlaw.net, chk@tmhlaw.net</td></tr>
</table>

Attorneys for any of the Parties may send notices on behalf of their clients.

(e)    *Headings*.   The headings in this Agreement are for reference purposes and shall not affect the meaning or interpretation of this Agreement.

(f)    *Applicable Law; Consent to Jurisdiction*.   This Agreement shall be governed by and construed in accordance with the laws of the Florida.  The Bankruptcy Court shall have exclusive jurisdiction over the interpretation and enforcement of this Agreement.  The Parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement.

(g)    *Severability*.   If any term or provision of this Agreement or the application thereof to any entity or person or circumstance is or to any extent shall become invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to entities, persons, or circumstances other than those held invalid or unenforceable under the laws now or hereafter in effect in the jurisdiction governing this Agreement, shall not be affected thereby, and each term and provision shall be held valid and enforceable to the greatest possible extent.

(h)    *Counterparts*.   This Agreement may be executed in one or more counterparts.  Each such counterpart, when executed and delivered, shall be an original, but all such counterparts together shall constitute a single document.  Signature and acknowledgement pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.  Executed signature pages may be delivered by facsimile or pdf email and, when so delivered, shall have the same force and effect as an original.

(i)    *Construction*.   The Parties and their respective legal counsel actively participated in the negotiation and drafting of this Agreement, and in the event of any ambiguity or mistake herein, or any dispute among the Parties with respect to the

provisions hereof, no provision of this Agreement shall be construed unfavorably against any of the Parties on the ground that he, it, or his or its counsel was the drafter thereof.

(j)    *Time of Essence*.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

[SIGNATURES BEGIN ON NEXT PAGE]

The Parties hereto have executed this Escrow Agreement effective as of the date first written above.

"SELLER"

**LIFE CARE ST.  JOHNS, INC.**


By: _____
Name: D.  Bruce Jones
Its: Chief Executive Officer


"BUYER"

**LCS GLENMOOR, LLC**


By: _____
Name: _____
Its: _____


"ESCROW AGENT"

**THAMES MARKEY & HEEKIN, P.A.**


By: _____
Name:  Richard R. Thames
Its: President

EXHIBIT "A"

**WIRING INSTRUCTIONS**

SCHEDULE 1

**ESCROW AGENT FEES**

N.A.

## EXHIBIT E

**Conditions to Title**

**Permitted Exceptions**

[Exhibit begins on next page.]

**EXHIBIT E**

**Permitted Exceptions**

1.     Saint Johns DRI Development Order approved under St. Johns County, Florida Resolution No. 91130, as modified by Modification of Saint Johns DRI Development Order under Resolution No. 91183, as noticed under Notification of DRI Development Order recorded in Official Records Book 922, Page 219, as further modified by Modification of Saint Johns DRI Development Order under Resolution No. 94-211, Resolution No. 95-06, Resolution 96-102 and Resolution No. 96-233, as noticed under Notification of DRI/Development Order recorded in Official Records Book 1091, page 1119, and Notification of DRI/Development Order recorded in Official Records Book 1217, page 437, and as further modified by Modification of Saint Johns DRI Development Order under Resolution 98-126, as noticed under Notification of DRI/Development Order recorded in Official Records Book 1338, page 205; modified by Modification of Saint Johns Development of Regional Impact Development Order on September 28, 1998, under Resolution 98-179 as noticed under Notice of DRI/Development Order Modification recorded in Official Records Book 1354, page 1883, and as further modified by Modification of Saint Johns DRI\Development Order Modification under Resolution 99-20, and noticed under Notice of DRI\Development Order Modification recorded in Official Records Book 1388, page 1323, and as further modified by Modification of Saint Johns DRI/Development Order Modification under Resolution 99-173, and noticed under Notice of DRI/Development Order Modification recorded in Official Records Book 1459, page 983, as further modified by Modification of Saint Johns Development of Regional Impact Development Order on March 26, 2002, as noticed under Notice of DRI/Development Order Modification recorded in Official Records Book 1746, page 1893, noticed under Notice of DRI/Development Order Modification recorded in Official Records Book 1989, page 1917, and Notice of DRI/ Development Order Modification recorded July 1, 204 in Official Records Book 2233 page 424, and further notices of modification under Resolution 2006-290 recorded in Book 2803, page 1362, and Resolution No. 2011-335, recorded in Book 3505, page 607.

2.     Water and Wastewater Utility Service Agreement, Between Northwest Utilities I, Inc., SJH Partnership, Ltd. and St. Johns County, Florida dated January 24, 1995, as recorded in Official Records Book 1094, Page 332, together with Partial Assignment and Assumption of Saint Johns Water and Wastewater Utility Service Agreement between IT LAND ASSOCIATES, LLC, a Florida limited liability company and LEVITT AND SONS AT WORLD GOLF VILLAGE, LLC, a Florida limited liability company, as recorded August 10, 2004, in Official Records Book 2259, page 524.

3.     Declaration of Covenants, Conditions, Restrictions and Easements, for Saint Johns - Northwest Master which contains provisions for a private charge or assessments, recorded in Book 1185, page 595, supplemented in Book 1373, page 627 and Book 3091, page 1467, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

4.      Declaration of Covenants, Conditions, Restrictions and Easements, for Saint Johns - Northwest Commercial, which contains provisions for a private charge or assessments, recorded in Book 1185, page 645, Notice of Relocation recorded in Official Records Book 1198, page 866, together with Supplementary Declaration recorded in Official Records Book 1198, page 948, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c). **NOTE:** affects only that portion of the lands described on Schedule A underlying the right of way easements for Royal Pines Park Way and North Parcel 11A access easement.

5.      Declaration of Covenants, Conditions, Restrictions and Easements, for Saint Johns Northwest Residential which contains provisions for a private charge or assessments, recorded in Book 1185, page 740; First Amendment recorded in Official Records Book 1198, page 872, Supplemental Declaration recorded in Official Records Book 1198, page 890; Supplementary Declaration recorded in Official Records Book 1230, page 1358; Supplementary Declaration recorded in Official Records Book 1252, page 1479, Supplementary Declaration recorded in Official Records Book 1279, page 286; and Supplementary Declaration recorded in Official Records Book 1314, page 1544, partial assignment in Official Records Book 1316, page 1274, and further supplemented in Official Records Book 1373, page 630, as corrected by Corrective Supplement recorded in Official Records Book 1460, page 263, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

6.      Conditions and Restrictions as set forth in Special Warranty Deed recorded in Official Records Book 1291, Page 403, together with Assignment of Development Rights recorded in Official Records Book 1291, page 451, together with amended and restated Assignment of Development Rights in Official Records Book 2963, page 104 and amended Use Restrictions in Official Records Book 2963, page 109 .

7.      The Obligations set forth in Access Easement recorded in Official Records Book 1291, Page 435.

8.      Covenants and Agreements set forth in the Purchase Agreement as evidenced by the Memorandum of Agreement recorded in Official Records Book 1291, Page 446.

9.      Terms Conditions and Obligations set forth in Quit Claim Deed and Release of Contract Documents recorded in Official Records Book 1319, Page 1635.

10.     Memorandum Of Declaration Of Voluntary Payment Obligations recorded in Official Records Book 1185, page 1831.

11.     Impact Fee Credit Agreements (Park Impact Fees) recorded in Official Records Book 1278, page 1584.

12.     Impact Fee Credit Agreement (Road Impact Fees) as contained in the instrument, recorded November 24, 1997 in Official Records Book 1278, page 1596; Addendum To Road Impact Fee Credit Agreement recorded in Official Records Book 1391, page 590, Addendum To Road Impact Fee Credit Agreement recorded in Official Records Book 1391, page 1826 and Addendum To Road Impact Fee Credit Agreement recorded in Official Records Book 1563, page 800, AND addendum to Road Impact Fee Credit Agreement recorded in Official Records Book 2107 page 1420, Official Records Book 2709, page 868, Official Records Book 3258, page 444, and Official Records Book 3327, page 865.

13.     Terms Conditions set forth in Access Easement to Life Care St. Johns, Inc. recorded in Book 1468, Page 1409.

14.     Special Warranty to Saint Johns Northwest Residential Property Owners Association, Inc., (Common Property) recorded in Book 2834, Page 1436.

15.     Ordinance Number 2007-3 approving a Major Modification to the St. Johns Interchange Parcels PUD Ordinance Number 91-36, as amended recorded in Book 2854, Page 1887, together with Small Adjustment recorded in Book 3689, page 232.

16.     Easement granted to Florida Power & Light Company by instrument recorded in Book 3008, page 1666.

17.     Concurrent rights of others to use the easement described in Exhibit C hereto.

<u>**SCHEDULE 3.3(e)**</u>

**2015 Ad Valorem Taxes and Non-Ad Valorem Assessments**

[Exhibit begins on next page.]

Dennis W. Hollingsworth Tax Collector

# Dennis W. Hollingsworth Tax Collector

*generated on 11/19/2015 11:09:07 AM EST*

## Tax Record

Last Update: 11/19/2015 11:09:08 AM EST

[ Register for eBill ]

## Ad Valorem Taxes and Non-Ad Valorem Assessments
The information contained herein does not constitute a title search and should not be relied on as such.

| Account or Parcel Number | Tax Type | Tax Year |
|---|---|---|
| 029231-0000 | REAL ESTATE | 2015 |

| | |
|---|---|
| **Mailing Address**<br>LIFE CARE ST JOHNS INC<br>235 TOWERVIEW DR<br>SAINT AUGUSTINE FL 32092-0000 | **Physical Address**<br>ROYAL PINES PKWY |

| Exempt Amount | Taxable Value |
|---|---|
| $0.00 | $305,922.00 |

**Exemption Detail**  **Millage Code**       **Escrow Code**
NO EXEMPTIONS          300
**Legal Description**
44-06-28 11.01 Acres 1-1 PT OF GRANT TO Z KINGSLEY NORTHWEST PARCEL 11 (EX PTS TO
SJH IN OR1319/1635) & 2 SWAP PARCELS FROM SJH OR3868/1935 PARCELS FROM SJH
OR3868/1935

| Ad Valorem Taxes | | | | | |
|---|---|---|---|---|---|
| **Taxing Authority** | **Rate** | **Assessed Value** | **Exemption Amount** | **Taxable Value** | **Taxes Levied** |
| COUNTY | | | | | |
| GENERAL COUNTY | 5.1475 | 305,922 | 0 | $305,922 | $1,574.73 |
| ROAD | 0.7100 | 305,922 | 0 | $305,922 | $217.20 |
| HEALTH | 0.0171 | 305,922 | 0 | $305,922 | $5.23 |
| SCHOOL | | | | | |
| SCHOOL - STATE LAW | 4.9800 | 305,922 | 0 | $305,922 | $1,523.49 |
| SCHOOL - LOCAL BOARD | 2.2480 | 305,922 | 0 | $305,922 | $687.71 |
| SJRWMD | 0.3023 | 305,922 | 0 | $305,922 | $92.48 |
| FIRE | 1.4625 | 305,922 | 0 | $305,922 | $447.41 |
| MOSQUITO | 0.1773 | 305,922 | 0 | $305,922 | $54.24 |
| FL INLAND NAV DISTRICT | 0.0320 | 305,922 | 0 | $305,922 | $9.79 |

| Total Millage | 15.0767 | Total Taxes | $4,612.28 |
|---|---|---|---|

| Non-Ad Valorem Assessments | | | |
|---|---|---|---|
| Code | Levying Authority | | Amount |
| | | | |

| | Total Assessments | $0.00 |
|---|---|---|
| | Taxes & Assessments | $4,612.28 |

| If Paid By | Amount Due |
|------------|------------|
| 11/30/2015 | $4,427.79 |
| 12/31/2015 | $4,473.91 |
| 1/31/2016 | $4,520.03 |
| 2/29/2016 | $4,566.16 |
| 3/31/2016 | $4,612.28 |

| Prior Year Taxes Due |
|----------------------|
| NO DELINQUENT TAXES |

Click Here To Pay Now

Dennis W. Hollingsworth Tax Collector

# Dennis W. Hollingsworth Tax Collector

*generated on 11/19/2015 11:09:20 AM EST*

## Tax Record

Last Update: 11/19/2015 11:09:21 AM EST

[ Register for eBill ]

### Ad Valorem Taxes and Non-Ad Valorem Assessments

The information contained herein does not constitute a title search and should not be relied on as such.

| Account or Parcel Number | Tax Type | Tax Year |
|---|---|---|
| 325606-0000 | PERSONAL PROPERTY | 2015 |

**Mailing Address**
LIFE CARE ST JOHNS INC
235 TOWERVIEW DR
SAINT AUGUSTINE FL 32092-0000

BANKRUPTCY

**Physical Address**
230 TOWERVIEW DR

| Exempt Amount | Taxable Value | |
|---|---|---|
| $223,493.00 | $0.00 | |

**Exemption Detail**
19      223493

**Millage Code**
300

**Escrow Code**

**Legal Description**
623110/ 230 TOWERVIEWDR SAINT AUGUSTINE SAINT AUGUSTINE

| Ad Valorem Taxes | | | | | |
|---|---|---|---|---|---|
| **Taxing Authority** | **Rate** | **Assessed Value** | **Exemption Amount** | **Taxable Value** | **Taxes Levied** |
| COUNTY | | | | | |
| GENERAL COUNTY | 5.1475 | 223,493 | 223,493 | $0 | $0.00 |
| ROAD | 0.7100 | 223,493 | 223,493 | $0 | $0.00 |
| HEALTH | 0.0171 | 223,493 | 223,493 | $0 | $0.00 |
| SCHOOL | | | | | |
| SCHOOL - STATE LAW | 4.9800 | 223,493 | 223,493 | $0 | $0.00 |
| SCHOOL - LOCAL BOARD | 2.2480 | 223,493 | 223,493 | $0 | $0.00 |
| SJRWMD | 0.3023 | 223,493 | 223,493 | $0 | $0.00 |
| FIRE | 1.4625 | 223,493 | 223,493 | $0 | $0.00 |
| MOSQUITO | 0.1773 | 223,493 | 223,493 | $0 | $0.00 |
| FL INLAND NAV DISTRICT | 0.0320 | 223,493 | 223,493 | $0 | $0.00 |
| Penalty | 0.0000 | 0 | 0 | $0 | $0.00 |

| | Total Millage | 15.0767 | Total Taxes | | $0.00 |
|---|---|---|---|---|---|

| Non-Ad Valorem Assessments | | |
|---|---|---|
| **Code** | **Levying Authority** | **Amount** |
| | Total Assessments | $0.00 |
| | Taxes & Assessments | $0.00 |

| If Paid By | Amount Due |
|---|---|
|  | $0.00 |

| Prior Year Taxes Due |
|---|
| NO DELINQUENT TAXES |

**SCHEDULE 5.2(b)**

**Seller's Government Entity Approvals**

1. Florida Agency for Health Care Administration, Division of Health Quality Administration.

2. Florida Office of Insurance Regulation.

3. Florida Department of Health.

4. Florida Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco.

5. Division of Laboratory Services, Center for Medicaid and State Operations.

6. To the extent transferable, approvals required in connection with the Licenses, Permits, etc. set forth on Schedule 2.1.

7. CMS approval.

8. Transfer of Medicare Provider Agreements.

### SCHEDULE 5.2(c)

### Conflicts

The consideration for this Transaction is less than the secured indebtedness owed under (i) the Series 2014A and 2014A Health Care Refunding Revenue Bonds issued by the St. Johns County Industrial Development Authority (Glenmoor Project), and (ii) the promissory notes provided to the Refund Queue Claim Holders' Distribution Trust pursuant to the Plan of Reorganization.  Seller is not in compliance with Contracts related to the Bonds and/or the Indenture.

Seller is not in compliance with the Debtor's Reserve Accounts.

Seller is not in compliance with past-due entrance fee refund payments owed by Seller to former residents of Seller or their estates, also known as the Refund Queue Obligations, as more particularly described in Seller's 2013 Bankruptcy Case, and pursuant to Florida Statutes, Chapter 651.

Seller is not in compliance with the terms and conditions of that certain Forbearance Agreement dated July 6, 2015, between Seller and the Bond Trustee.

Seller is not in compliance with the terms and conditions of that certain Restructuring Agreement dated July 6, 2015, between Seller and U.S. Bank National Association.

All matters reflected in Section B-1 of the Title Commitment, including without limitation, the following:

1.      Mortgage in the original principal amount of (a) Note No. One $41,711,250.00 (b) Note No. Two $15,434,643.75, executed by Life Care St. Johns, Inc., a Florida not-for-profit corporation, doing business as Glenmoor in favor of UMB Bank, N.A., as master Trustee, recorded April 17, 2014 in Book 3869, page 1.

2.      Second Mortgage in the original principal amount of $4,700,378.40, executed by Life Care St. Johns, Inc., a Florida not-for-profit corporation, doing business as Glenmoor in favor of U.S. Bank National Association, as Trustee of the Refund Queue Claim Holder's Distribution Trust dated as of April 6, 2014, the date hereof, for the benefit of the Refund Queue Claim Holders, recorded April 17, 2014 in Book 3869, page 78.

3.      Mortgage in the original principal amount of (a) Note No. One $41,711,250.00 (b) Note No. Two $15,434,643.75, executed by Life Care St. Johns, Inc., a Florida not-for-

profit corporation, doing business as Glenmoor in favor of UMB Bank, N.A., as master Trustee, recorded April 17, 2014 in Book 3869, page 155.

4.      Third Mortgage in the original principal amount of $3,133,585.60, executed by Life Care St. Johns, Inc., a Florida not-for-profit corporation, doing business as Glenmoor in favor of U.S. Bank National Association, as Trustee of the Refund Queue Claim Holder's Distribution Trust dated as of April 6, 2014, the date hereof, for the benefit of the Refund Queue Claim Holders, recorded April 17, 2014 in Book 3869, page 223.

5.      UCC-1 Financing Statement naming St. Johns County Industrial Development Authority as secured party and Life Care St. Johns, Inc. as debtor, filed April 17, 2014, recorded in Book 3869, page 250.

6.      UCC-1 Financing Statement naming St. Johns County Industrial Development Authority as secured party and Life Care St. Johns, Inc. as debtor, filed April 17, 2014, recorded in Book 3869, page 266.

## SCHEDULE 5.4(a)

### Collateral Assignments and Liens

See Schedule 5.2(c), which is incorporated herein by this reference.

### SCHEDULE 5.6

**Compliance with Laws**

Reference is made to the Seller's 2013 Bankruptcy Case and the Bankruptcy Case, including all schedules and pleadings referenced therein.

Seller is not in compliance with the Debtor's Reserve Accounts.

Seller is not in compliance with past-due entrance fee refund payments owed by Seller to former residents of Seller or their estates, also known as the Refund Queue Obligations, as more particularly described in Seller's 2013 Bankruptcy Case, and pursuant to Florida Statutes, Chapter 651.

Seller is not in compliance with the terms and conditions of that certain Forbearance Agreement dated July 6, 2015, between Seller and the Bond Trustee.

Seller is not in compliance with the terms and conditions of that certain Restructuring Agreement dated July 6, 2015, between Seller and U.S. Bank National Association.

Seller is not in compliance with Contracts related to the Bonds and/or the Indenture.

## SCHEDULE 5.7

### Environmental Matters

Matters addressed in Phase I Environmental Site Assessment dated November 11, 2015, prepared by EMG, under Project No. 116523.15R – 001.135, a copy of which was previously provided to Buyer.

## SCHEDULE 5.8

### Pending Litigation or Adversarial Proceedings

Reference is made to the Seller's 2013 Bankruptcy Case and the Bankruptcy Case, including all schedules and pleadings referenced therein.

Seller is not in compliance with the Debtor's Reserve Accounts.

Seller is not in compliance with past-due entrance fee refund payments owed by Seller to former residents of Seller or their estates, also known as the Refund Queue Obligations, as more particularly described in Seller's 2013 Bankruptcy Case, and pursuant to Florida Statutes, Chapter 651.

Seller is not in compliance with the terms and conditions of that certain Forbearance Agreement dated July 6, 2015, between Seller and the Bond Trustee.

Seller is not in compliance with the terms and conditions of that certain Restructuring Agreement dated July 6, 2015, between Seller and U.S. Bank National Association.

Seller is not in compliance with Contracts related to the Bonds and/or the Indenture.

**SCHEDULE 6.2(b)**

**Buyer's Governmental Approvals**

See Schedule 5.2(b), which is incorporated herein by this reference.

# Exhibit "C"

## Bid Procedures Order

106.5

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | |
|---|---|
| In re | ) |
| | ) |
| LIFE CARE ST. JOHNS, INC., | )    Case No.: 3:16-bk-1347-JAF |
| a Florida not-for-profit corporation | ) |
| doing business as GLENMOOR,[1] | )    Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) |
| _____ | ) |

## ORDER APPROVING BIDDING PROCEDURES
## IN CONNECTION WITH SALE OF 11 ACRE PARCEL

This Chapter 11 case came before the Court upon the motion filed by debtor, Life Care St. Johns, Inc., a Florida not-for-profit corporation doing business as Glenmoor ("Glenmoor" or "Debtor"), pursuant to §§ 363, 1129(b)(2) and 365 of title 11 of the United States Code and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure, seeking the entry of an order (a) authorizing the Debtor to sell the 11 Acre Parcel of unimproved real estate adjacent to its primary campus to LCS Glenmoor, LLC ("LCS" or the "Stalking Horse Bidder") or such other party (the "Successful Bidder") who submits a higher and better bid at the Auction (as defined below) free and clear of liens, claims and interests; (b) approving bidding procedures in connection therewith; and (C) authorizing the

---

[1] The Federal Employer Identification Number for the Debtor is 59-3474627. The address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

payment of a real estate sales commission to Walchle Lear Multifamily Advisors (the "Motion") [Docket No. _____]; the Court having reviewed the Motion, and conducted a hearing on April 14, 2016; and having heard statements of counsel and any evidence presented in support of the relief requested in the Motion at the hearing; and it appearing that due and proper notice of the Motion was provided; and it appearing that the relief requested in the Motion is in the best interests of Glenmoor, its estate, and all other parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and after due deliberation thereon, the Court makes the following findings of fact and conclusions of law:

**Findings of Fact and Conclusions of Law:**

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     Glenmoor has articulated good and sufficient reasons for the approval of the Bidding Procedures attached hereto as **Exhibit A** and incorporated herein by reference.

3.     Notice of the Motion was good and sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures or any other form of relief granted herein is or shall be required.

4.     The transaction contemplated by the Stalking Horse Real Estate APA is undertaken by LCS without collusion and in good faith, as that term is defined in § 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the

- 2 -

authorization provided herein to consummate the Sale shall not affect the validity of the transactions, unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.

5.     Neither Glenmoor nor LCS have engaged in any action or inaction that would cause or permit the transactions contemplated by the Stalking Horse Real Estate APA to be avoided or costs or damages to be imposed under § 363(n) of the Bankruptcy Code.  The consideration provided by LCS for the 11 Acre Parcel under the Stalking Horse Real Estate APA is fair and reasonable and the sale may not be avoided under § 363(n) of the Bankruptcy Code.

**It Is Ordered:**

1.     The Motion is GRANTED to the extent set forth herein.

2.     That portion of the Motion requesting (a) the scheduling of an Auction, (b) the scheduling of a Sale Hearing, and (c) the approval of the form and manner of notice of the Auction and Sale (the "Sale Notice") is granted.  The Auction shall be held before the Honorable Jerry A. Funk, in Courtroom 4D, United States Courthouse, 300 North Hogan Street, Jacksonville, Florida on **[June ___, 2016]** beginning at ___:_____ __.m.  The hearing to consider approval of the sale of the 11 Acre Parcel (the "Sale Hearing") shall be held immediately thereafter.

3.     The Bidding Procedures are hereby approved and shall govern the sale process.  Bids that do not conform to the Bid Procedures will not be considered for participation in the Auction.  Glenmoor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

4.     The deadline to submit a Qualified Bid (as defined in the Bidding Procedures) shall be May 30, 2016 (the "Bid Deadline").

5.      As further described in the Bidding Procedures, Glenmoor shall conduct the Auction if a Qualified Bid, other than the LCS bid under the Stalking Horse Real Estate APA, is received prior to the Bid Deadline.  The Debtor shall serve notice of the time and place for the Auction on all Qualified Bidders, including LCS, in accordance with the Motion.  If no timely, conforming Qualified Bids other than the LCS bid under the Stalking Horse Real Estate APA are submitted by the Bid Deadline, the Auction will not be held, LCS will be the Successful Bidder, and Glenmoor will seek authority to consummate the transactions contemplated by the Stalking Horse Real Estate APA with LCS at the Sale Hearing.

6.      Any obligations of Glenmoor contained in the Stalking Horse Real Estate APA that are intended to be performed prior to entry of an order by this Court approving the sale, are hereby authorized and are fully enforceable as of the date of entry of this Order.

7.      Objections, if any, to the Sale of the 11 Acre Parcel must (a) be in writing, (b) state the basis of such objection with specificity, (c) conform to the Bankruptcy Rules, (d) be filed with the Court electronically by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, so as to be actually received no later than 4:00 p.m. (Eastern Time) seven (7) days before the Sale Hearing (the "Sale Objection Deadline"), provided, however, that objections to the assumption and assignment of the Assumed Contracts and the proposed Cure Amounts should be filed in accordance with the Assumption and Assignment Procedures set forth herein.

8.      The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion of any objection to the Motion and the consummation and performance of the Sale, and shall be deemed to constitute such party's consent to the Sale and the transactions and documents related thereto.

- 4 -

9.      Notwithstanding Rules 6004(h), 6006(d), 7062, or 9041 of the Federal Rules of Bankruptcy Procedure or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution of this Order.

10.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

American Legal Claims Services is directed to serve copies of this Order on interested parties within 3 days of the entry of this Order.

**Exhibit A – Bidding Procedures**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
<u>JACKSONVILLE DIVISION</u>

In re                           )

LIFE CARE ST. JOHNS, INC.,    )     Case No.:  3:16-bk-1347-JAF
a Florida not-for-profit corporation
doing business as GLENMOOR,[2]  )     Chapter 11

            Debtor.      )

_____ )

## <u>BIDDING PROCEDURES</u>

These Bidding Procedures (the "Bidding Procedures") set forth the process by which Life Care St. Johns, Inc., a Florida not-for-profit corporation doing business as Glenmoor ("Glenmoor" or "Debtor") is authorized to conduct the sale (the "Sale") by auction (the "Auction") of the 11 Acre Parcel as defined in the Stalking Horse Real Estate APA, dated March 21, 2016 (as may be amended) (the "Stalking Horse Real Estate APA") between Glenmoor, as seller, and LCS Glenmoor, LLC ("LCS"), as buyer, or such other Asset Purchase Agreement submitted at or prior to the Auction and subsequently determined by the Debtor to be the highest and best offer for the 11 Acre Parcel and approved by the Bankruptcy Court.  Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Stalking Horse Real Estate APA.

These Bidding Procedures have been approved by an Order dated April 14, 2016 (the "Sales Procedures Order"), entered by the United States Bankruptcy Court for the Middle

---

[2]  The Federal Employer Identification Number for the Debtor is 59-3474627.  The address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

District of Florida, Jacksonville Division (the "Bankruptcy Court"), in which the Chapter 11 bankruptcy case, Case No. **[TBD]** of Glenmoor is pending.

**Assets to be Sold**

1.       These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in the Auction, thereby competing to make the highest and best offer for the 11 Acre Parcel, as identified in further detail and defined in the Stalking Horse Real Estate APA.

**Bid Requirements**

2.       To participate in the Auction, prior to the Bid Deadline, a Potential Bidder (other than LCS) must deliver to Glenmoor a written irrevocable offer that must:

     (a)     be in writing;

     (b)     authorize Glenmoor to provide the bid to LCS, the Bond Trustee and the Refund Queue Trustee;

     (c)     equal or exceed $475,000, which is the sum of (i) the offer submitted by LCS, and (ii) the minimum bid increment of $25,000 (such aggregate sum, the "Minimum Bid Amount");

     (d)     constitute a good faith, bona fide offer to purchase of the 11 Acre Parcel on substantially the same terms as contemplated in the Stalking Horse Real Estate APA, the purchase of the other assets of Glenmoor as a condition precedent to closing excepted;

     (e)     be accompanied by a clean and duly executed copy of an Asset Purchase Agreement and the documents set forth as exhibits thereto, along with copies that are marked to reflect the amendments and modifications from the Stalking Horse Real Estate APA executed with LCS, which may not be on terms less favorable in the aggregate to Glenmoor or materially inconsistent with these Bidding Procedures;

     (f)     require a closing within fourteen days of the Sale Hearing;

- 2 -

(g)     identify with particularity each and every condition to closing;

(h)     not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder; and

(i)     must remain irrevocable until 48 hours after the Auction.

3.     In addition to the above, each Potential Bidder must:

(a)     provide Glenmoor and the Refund Queue Trustee, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of Glenmoor (in consultation with the Refund Queue Trustee), that such Potential Bidder has the financial wherewithal and ability to consummate the acquisition of the 11 Acre Parcel, including current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the 11 Acre Parcel, current audited financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtor, demonstrating such Potential Bidder's ability to timely close the proposed transaction;

(b)     fully disclose the identity of each entity that will be bidding for or purchasing the 11 Acre Parcel or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;

(c)     on or before the Bid Deadline, submit a cash deposit equal to $25,000 by wire transfer of immediately available funds to an account or accounts established pursuant to an escrow agreement (the "Good Faith Deposit"); and

(d)     not be entitled to any break-up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

4.     Bids fulfilling all of the preceding requirements shall be deemed to be "Qualified Bids," and those parties submitting Qualified Bids shall be deemed to be

"Qualified Bidders." Within twelve hours after receipt of a Qualified Bid, Glenmoor shall provide such Qualified Bid to the Bond Trustee, the Refund Queue Trustee, and LCS. Within one Business Day after the Bid Deadline, Glenmoor, shall determine, in consultation with the Bond Trustee and the Refund Queue Trustee, which Potential Bidders are Qualified Bidders and will notify the Potential Bidders and LCS whether their bids constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. The Stalking Horse Real Estate APA submitted by LCS shall be deemed a Qualified Bid.

5.      The Refund Queue Trust shall have the right to credit bid its secured claim towards the acquisition of the 11 Acre Parcel without the necessity of submitting a formal written offer. Should the Refund Queue Trust exercise its credit bid rights and be deemed the Successful Bidder (as defined below), the 11 Acre Parcel shall be conveyed to it by general warranty deed.

6.      If the Refund Queue Trust intends to credit bid, it must provide Glenmoor with written notice of such intention and its initial bid prior to the Bid Deadline. Such bid shall be considered a Qualified Bid for purposes of this Order.

**Bid Deadline**

7.      Binding bids must be actually received by Glenmoor no later than 5:00 p.m. (prevailing Eastern Time) on May 30, 2016 (the "Bid Deadline").

**Evaluation of Qualified Bids**

8.      Prior to the Auction, Glenmoor, in consultation with the Refund Queue Trustee shall evaluate Qualified Bids and identify the Qualified Bid that is, in Glenmoor's

- 4 -

judgment, the highest and best bid (the "Starting Bid").    Within 24 hours of such determination, Glenmoor shall notify LCS as to which Qualified Bid is the Starting Bid. Glenmoor shall distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**No Qualified Bids**

9.    If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the Stalking Horse Real Estate APA will be deemed the Successful Bid (as defined herein), and Glenmoor will pursue entry of an order by the Bankruptcy Court approving the Stalking Horse Real Estate APA and authorizing the sale of the 11 Acre Parcel to LCS.

**Auction**

10.    If one or more Qualified Bids are received by the Bid Deadline, then Glenmoor shall conduct an auction (the "Auction") with respect to the 11 Acre Parcel.  The Auction shall be conducted before and at the direction of the Honorable Jerry A. Funk, Chief United States Bankruptcy Judge, in the Bryan Simpson United States Courthouse, Room 4D, 300 North Hogan Street, Jacksonville, Florida 32202, if one or more Qualified Bids are received by the Bid Deadline.  The Debtor has requested that the Bankruptcy Court conduct the Auction on or before June 2, 2016.

11.    The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

    (a)    the Auction will be conducted openly;

    (b)    only the Qualified Bidders, including LCS, shall be entitled to bid at the Auction;

(c)    the Qualified Bidders, including LCS, shall appear in person at the Auction, or through duly-authorized representatives;

(d)    only such authorized representatives of each of the Qualified Bidders, LCS, Glenmoor, the Bond Trustee, the Refund Queue Trustee, and their respective advisors shall be permitted to attend the Auction;

(e)    bidding at the Auction shall begin at the Starting Bid;

(f)    subsequent bids at the Auction, including any bids by LCS, shall be made in minimum increments of $25,000;

(g)    each participating bidder will be informed of the terms of the previous bids;

(h)    the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

(i)    each bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale and is not in violation of § 363(n) of the Bankruptcy Code; and

(j)    absent irregularities in the conduct of the Auction, the Bankruptcy Court will not consider bids made after the Auction is closed.

**Acceptance of the Successful Bid**

12.    Upon the conclusion of the Auction (if the Auction is conducted), Glenmoor, in the exercise of its reasonable, good-faith business judgment and after consulting with the Bond Trustee and the Refund Queue Trustee, shall identify the highest and best bid (the "Successful Bid"). In determining which Qualified Bid is the Successful Bid, the Debtor may consider, after consultation with the Refund Queue Trustee (other than any one of the foregoing choosing to bid at the Auction), among other things: (1) the amount of the purchase price; (2) the form of consideration being offered; (3) the likelihood of the

Qualified Bidder's ability to close a transaction and the timing thereof; (4) the net benefit to the Debtor's estate and all of its constituents, and the effect of the Sale Transaction on the residents of the Debtor; (5) the extent of such Qualified Bidder's background and experience operating a CCRC; (6) licensure qualification issues; and (7) any other facts, including but not limited to, all other non- economic factors.  Before the conclusion of the Auction, the Debtor shall inform each of the Bidders of the decision regarding designation of the Successful Bid, and the Qualified Bidder who submitted such Successful Bid shall be required to execute a definitive asset purchase agreement at such time. The Debtor shall present the Successful Bid to the Bankruptcy Court for approval at the Sale Hearing.

13.    The Qualified Bidder having submitted a Successful Bid will be deemed the "Successful Bidder."  The Successful Bidder and Glenmoor shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

14.    The Bankruptcy Court will conduct a hearing to approve the Sale to the Successful Bidder on **[June __ 2016 at __:____ __.m.]**.  Glenmoor will request the Bankruptcy Court make certain findings regarding the Auction, including, among other things, that (a) the Auction was conducted and the Successful Bidder was selected in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid as defined in these Bidding Procedures, and (d) consummation of the Sale contemplated by the Successful Bid will provide the highest and best value for the 11 Acre Parcel, and is in the best interests of Glenmoor and its estate.

15.    If an Auction is held, Glenmoor shall be deemed to have accepted a Qualified Bid only when (a) such bid is declared the Successful Bid at the Auction and (b) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the entry of an order approving such Successful Bid.

**Designation of Back-Up Bidder**

16.    If for any reason the Successful Bidder fails to consummate the purchase of the 11 Acre Parcel within the time permitted after the entry of the order approving the Sale to the Successful Bidder, then the Qualified Bidder with the second highest and best bid for the 11 Acre Parcel (the "Back-Up Bidder"), as determined by Glenmoor, after consultation with the Bond Trustee and the Refund Queue Trustee, at the conclusion of the Auction and announced at that time to all the bidders participating therein, will automatically be deemed to have submitted the highest and best bid, and Glenmoor and the Back-Up Bidder will be authorized, but not required, to consummate the Sale with the Back-Up Bidder as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court.

Return of Good Faith Deposit

17.    The Good Faith Deposit of the Successful Bidder shall, upon consummation of the purchase of the 11 Acre Parcel, be credited to the purchase price paid for the 11 Acre Parcel.  If the Successful Bidder fails to consummate the purchase of the 11 Acre Parcel (other than as a result of a material breach of the Stalking Horse Real Estate APA by

Glenmoor), then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, Glenmoor.

18.     The Good Faith Deposit of any unsuccessful Qualified Bidders (except for LCS) will be returned within fifteen (15) days after the Sale Hearing or upon the permanent withdrawal of the proposed Sale of the 11 Acre Parcel.  The Good Faith Deposit of LCS shall be returned in accordance with the terms of the Stalking Horse Real Estate APA.

111.5